# Exhibit 2

**Edward F. Roesch** 1

```
1                IN THE UNITED STATES DISTRICT COURT
2                FOR THE MIDDLE DISTRICT OF ALABAMA
3                        NORTHERN DIVISION
4
5   SCOTTSDALE INSURANCE     )
    COMPANY, a corporation,  )
6                            )
           Plaintiff,        )
7                            )
          vs.                ) 2:11-CV-668-MEF
8                            )
    ALABAMA MUNICIPAL INSURANCE)
9   CORPORATION, a corporation,)
                             )
10         Defendant.        )
11  _____
12
13       DEPOSITION OF:  EDWARD F. ROESCH
14  _____
15
16            S T I P U L A T I O N
17
18      IT IS STIPULATED AND AGREED by and between the
19  parties through their respective counsel that the
20  deposition of EDWARD F. ROESCH may be taken on
21  March 7, 2013, before Anne E. Miller, Commissioner
22  and Notary Public, at Baker, Donelson, Bearman,
23  Caldwell & Berkowitz, PC, 1600 Wells Fargo Tower,
```

**Edward F. Roesch** 2

```
1   Birmingham, Alabama.
2       IT IS FURTHER STIPULATED AND AGREED that the
3   signature to and the reading of the deposition by
4   the witness is waived, the deposition to have the
5   same force and effect as if full compliance had
6   been had with all laws and rules of court relating
7   to the taking of depositions.
8       IT IS FURTHER STIPULATED AND AGREED that it
9   shall not be necessary for any objections to be
10  made by counsel to any questions except as to form
11  or leading questions, and that counsel for the
12  parties may make objections and assign grounds at
13  the time of trial or at the time said deposition
14  is offered in evidence or prior thereto.
15
16
17
18
19
20
21
22
23
```

**Edward F. Roesch** 3

```
1                     APPEARANCES
2   Appearing For The Plaintiff:
3
4        BAKER, DONELSON, BEARMAN, CADLWELL &
                     BERKOWITZ, PC
5        Mr. David W. McDowell
         420 Twentieth Street North
6        1600 Wells Fargo Tower
         Birmingham, Alabama 35201
7
8   Appearing For The Defendant:
9        WEBSTER, HENRY, LYONS, WHITE, BRADWELL
                  & BLACK, PC
10       Mr. Scott M. Speagle
         105 Tallapoosa Street, Suite 101
11       Montgomery, Alabama 36104
12
13
14
15  Court Reporter:  Anne E. Miller
16  Also Present:  Mr. Tim Sullivan
17               Mr. Steve Wells
18               Mr. David Sikes
19
20
21
22
23
```

**Edward F. Roesch** 4

```
1                       INDEX
2
3   Examination by Mr. Speagle ...............    5
4   Defendant's Exhibit 1 ....................   19
    Defendant's Exhibit 2 ....................   21
5   Defendant's Exhibit 3 ....................   25
    Defendant's Exhibit 4 ....................   25
6   Defendant's Exhibit 5 ....................   37
    Defendant's Exhibit 6 ....................   38
7   Defendant's Exhibit 7 ....................   39
    Defendant's Exhibit 8 ....................   40
8   Defendant's Exhibit 9 ....................   47
    Defendant's Exhibit 10 ...................   52
9   Defendant's Exhibit 11 ...................   53
    Defendant's Exhibit 12 ...................   56
10  Defendant's Exhibit 13 ...................   60
    Defendant's Exhibit 14 ...................   63
11  Defendant's Exhibit 15 ...................   64
    Defendant's Exhibit 16 ...................   66
12  Defendant's Exhibit 17 ...................   67
    Defendant's Exhibit 18 ...................   72
13  Defendant's Exhibit 19 ...................   73
    Defendant's Exhibit 20 ...................   75
14  Defendant's Exhibit 21 ...................   81
    Defendant's Exhibit 22 ...................   85
15  Defendant's Exhibit 23 ...................   87
    Defendant's Exhibit 24 ...................   88
16  Defendant's Exhibit 25 ...................   94
    Defendant's Exhibit 26 ...................   99
17  Defendant's Exhibit 27 ...................  102
    Defendant's Exhibit 28 ...................  110
18  Defendant's Exhibit 29 ...................  111
    Defendant's Exhibit 30 ...................  116
19  Defendant's Exhibit 31 ...................  119
    Defendant's Exhibit 32 ...................  126
20  Defendant's Exhibit 33 ...................  128
    Defendant's Exhibit 34 ...................  129
21  Defendant's Exhibit 35 ...................  131
    Defendant's Exhibit 36 ...................  158
22  Defendant's Exhibit 37 ...................  159
    Defendant's Exhibit 38 ...................  160
23  Defendant's Exhibit 39 ...................  185
```

Edward F. Roesch 5

1     I, Anne E. Miller, a Court Reporter of the State
2 of Alabama, acting as Commissioner, certify that
3 on this date there came before me at the law
4 offices of Baker, Donelson, Bearman, Caldwell &
5 Berkowitz, PC, 1600 Wells Fargo, at Birmingham,
6 Alabama, on March 7, 2013, beginning at or about
7 9:00 a.m., EDWARD F. ROESCH, witness in the above
8 cause, for oral examination, whereupon the
9 following proceedings were had:
10
11         EDWARD F. ROESCH,
12 being first duly sworn, was examined and testified
13 as follows:
14
15 EXAMINATION BY MR. SPEAGLE:
16     Q. Ed, I know we have, of course, met before.
17 I'm Scott Speagle. Let me ask you just to start
18 off in preparation for this deposition, were you
19 able to review AMIC's answers to NAMIC's
20 interrogatories?
21     A. I might have. I did not -- I had seen them.
22 I have not reviewed them.
23     Q. Okay. Were you able to read David Sikes'

Edward F. Roesch 6

1 deposition and Steve Wells' deposition?
2     A. No.
3     Q. Let me get a couple of rules first. Have
4 you taken a deposition before?
5     A. Yes.
6     Q. About how many times?
7     A. Two or three.
8     Q. Okay. So you are familiar with the process?
9 I will ask a question, you will give a verbal
10 response. I will be bad about saying "uh-huh" and
11 "huh-uh," and Anne will smack me. If I ask you a
12 question that elicits a response for
13 attorney/client privilege; that is, something that
14 you have talked to David or another attorney
15 about, I don't mean to do that. It just -- it may
16 happen. Just let me know, and we'll move on.
17 That was one of the questions that I was about to
18 do. In preparation for this deposition, what kind
19 of documents have you looked at, if any?
20     A. I looked at a couple yesterday, glanced at
21 the notes.
22     Q. Okay.
23     A. Took a look at Kate's summary.

Edward F. Roesch 7

1     Q. And Kate's summary, that litigation
2 strategy, does that sound familiar as being the
3 title?
4     A. It was a June 27th document. I don't know
5 what the title was.
6     Q. We'll get to that. I think we are talking
7 about the same thing. Okay. And again other
8 than, let's say, David or another attorney who you
9 may have retained, have you discussed with anybody
10 "I have to go to a deposition, what kind of things
11 do I need to do," anything like that in
12 preparation for your deposition?
13     A. No.
14     Q. Okay. This is not a sweat shop or anything
15 like that. Any time you need to get up and take a
16 break, we'll take a break. As you know, we are
17 going to take lunch. That's pretty much a given
18 with me. The one thing that I will caution you on
19 is if there is a question on the table, if I have
20 asked you a question and you say "I need to take a
21 break," I will ask you -- and I think I'm entitled
22 to know -- if you discussed anything with your
23 attorney while you were on break and what you all

Edward F. Roesch 8

1 said. I think the Federal rules provide that. So
2 I want to give that caution. Now David may say no
3 and he may object and he may not let you answer.
4 But in any event, I will ask that if there is a
5 question pending when we take a break -- other
6 than that, Ed, state your name for the jury,
7 please.
8     A. Jury?
9     Q. Well, we always say that, don't we?
10     A. Edward F. Roesch.
11     Q. And where do you work?
12     A. I work at NAMIC Insurance Company.
13     Q. And where is that located?
14     A. Indianapolis, Indiana.
15     Q. How long have you been at NAMIC?
16     A. About five years.
17     Q. Where were you before NAMIC?
18     A. I was with Chubb Group of insurance
19 companies.
20     Q. Also in Indianapolis or had you moved to
21 Indianapolis?
22     A. I was with them in Indianapolis.
23     Q. When you were with Chubb, what did you do?

Edward F. Roesch                                                    9

1    A. I was a -- started out as a litigation
2    examiner, claim manager in Indianapolis, and then
3    designated as a casualty claims specialist for the
4    company nationwide.
5    Q. What kind of litigation? Did you specialize
6    in construction or slip and fall or anything in
7    particular?
8    A. It varied.  It was all those pieces.  Did
9    some product liability, E&O.
10   Q. When you moved over to NAMIC, what is your
11   title at NAMIC?
12   A. I am the claims manager.
13   Q. Okay.  And as claims manager, tell us what
14   you do.  What do you do as a claims manager?
15   A. I manage the claims for NAMIC.
16   Q. Okay.  And what kind of area of business
17   does NAMIC operate in?
18   A. We have professional liability for insurance
19   companies and directors and officers and agents.
20   Q. Okay.  There is a document -- and we'll get
21   to it -- down yonder in the stack a little bit, a
22   reference to that the Holloway and Meadows claim
23   was or that the AMIC policy was D&O and ICPL or --

Edward F. Roesch                                                    10

1    A. Insurance Company Professional Liability.
2    Q. That's what I was -- that's the acronym I
3    wanted to know.  And what kind of, I guess,
4    coverage does ICPL provide an insurance company?
5    A. It provides coverage for enumerated
6    professional services.
7    Q. Okay.  And the enumerated services would be
8    in the policy then?
9    A. Correct.
10   Q. Okay.  I think a lot of times, folks in the
11   insurance industry would use the term adjuster.
12   Have you operated or acted as an adjuster, as I
13   say it in its general sense?
14   A. Absolutely.
15   Q. Okay.  So for, let's say, the Holloways and
16   Meadows claim, the claim we are here about today,
17   would you have been the adjuster on that claim?
18   A. I would have been -- my title would have
19   been litigation examiner.
20   Q. Would that be different than adjuster?  And
21   I don't know.
22   A. Really the same functions.
23   Q. For the Holloway and Meadows claim or just

Edward F. Roesch                                                    11

1    in general when you are acting as a litigation
2    examiner, what do you do?  What kind of things do
3    you want to accomplish as a litigation examiner
4    when a claim comes in to you?
5    A. Well, you want to, first off, establish if
6    you had coverage for the insured or had a policy
7    in effect.  You want to review the complaint.  You
8    want to get copies of -- complete copies of the
9    claims files and potentially the underwriting
10   files to review.  You want to determine if there
11   is any issues or coverage issues that may arise
12   from the policy.  You want to provide the insured
13   with any type of reservation of rights if it's
14   applicable.  You want to provide a defense counsel
15   to work with the insured to get a defense counsel
16   in place.  You want to review the merits of the
17   case, the underlying case.  You want to review the
18   potentials of trying to come to the best outcome
19   you can for the policyholder and the insured.
20   Q. Okay.  Typically when I think of a claim, I
21   think of a lawsuit.  Now I know claims don't have
22   to necessarily be a lawsuit, but I think of them
23   in terms of lawsuits.  You cover claims over a

Edward F. Roesch                                                    12

1    bunch of states; am I correct?
2    A. Correct.
3    Q. Whether it's Georgia or Alabama or Indiana
4    or whatever state it may be in, do you ask or try
5    to find out what the relevant law is that would be
6    applicable to the claim?
7    A. You would ask defense counsel to look at
8    those issues, yes.
9    Q. Okay.  And you have met David Sikes, sitting
10   over here to my right?
11   A. Yes.
12   Q. What does David Sikes do for a living as you
13   understand it?
14   A. I believe he was the litigation examiner
15   that was assigned by AMIC in the handling of the
16   underlying case.
17   Q. From your standpoint as litigation examiner
18   on the Holloway and Meadows case, would you feel
19   -- just asking -- that David's duties and
20   responsibilities as litigation examiner for AMIC
21   are substantially similar as what you would have
22   for NAMIC?
23        MR. McDOWELL:  Object to the form.

Edward F. Roesch                                     13

1  A. Procedurally maybe.  Yeah, I think he would
2  go through a lot of the same motions.
3  Q. (BY MR. SPEAGLE) Sure.  I mean, you are
4  claims manager at NAMIC?
5  A. Right.
6  Q. David is claims manager at AMIC.  I mean,
7  you all kind of speak the same language, I would
8  think, wouldn't you, professionally speaking?
9  A. I would think so.
10 Q. Let me ask:  Other than the case that we are
11 going to talk about today, which I'm going to
12 refer to it all day as the Holloway Meadows case,
13 if that's okay by you.
14       MR. McDOWELL:  Yeah.  It can get
15 confusing, but I think that's fine.  I think we
16 are on the same page.
17       MR. SPEAGLE:  Sure.  And if we need to
18 define our terms further, we will.  But otherwise
19 I'm just going to say Holloway and Meadows and
20 blunder forward.
21       MR. McDOWELL:  That would suit me just
22 fine because it gets very cumbersome.
23 Q. (BY MR. SPEAGLE) Sure.  Have you had the

---

Edward F. Roesch                                     14

1  chance to adjust or have a claim for AMIC on other
2  suits?
3  A. Yes.
4  Q. And tell me what those are, if you can
5  recall.
6  A. I couldn't probably give you all of them,
7  but there is a City of Vernon case.  There is the
8  McCoy case, I believe was the gentleman's name.
9  There is the one that you are handling, City of --
10 it's another city case that talks about -- it's
11 the property issue.
12 Q. Fairfield, yeah.  At some point -- Fairhope.
13 You are right.
14       MR. McDOWELL:  There is a big difference
15 between Fairhope and Fairfield.
16       MR. SPEAGLE:  I'm going to second that.
17 Q. Do you recall the McCoy case?  We had asked
18 for some discovery regarding the McCoy case file.
19 Do you recall that?
20 A. I recall portions of it.
21 Q. Okay.  Tell me what you recall about that
22 particular, I guess, conflict.
23 A. If I remember correctly, it was a case where

---

Edward F. Roesch                                     15

1  I think McCoy was a police officer, if I'm correct
2  maybe.  And he was injured, and there was a
3  provision in the AMIC policy where there was
4  exclusionary language in the policy that was cited
5  by AMIC to decline coverage for the gentleman's
6  injuries.
7  Q. Okay.  I think we'll find -- I'm going to
8  show you what I have now marked as Defendant's
9  Exhibit 1, which I believe are your claims notes
10 for Jason McCoy versus AMIC.  I'm going to
11 represent to you that I'm going to try for the
12 most part today to use documents that I have
13 received from your attorney, and they should all
14 be Bates labeled SIC and then some number after
15 it.  There may be some that we use and some that
16 aren't involved.  But in any event, that's --
17 (Defendant's Exhibit 1 was marked and is attached
18       to the original transcript.)
19 A. Did you want me to read all this?
20 Q. (BY MR. SPEAGLE) Only if you want to.  We
21 are going to go through some entries, I think, of
22 note.  But otherwise, no.  I think if you reviewed
23 the claim description, you would find that your

---

Edward F. Roesch                                     16

1  recollection mirrors that of the claim
2  description.  Now let's say when you get the McCoy
3  claim in, I guess one of the first things you did,
4  Ed, was assign defense counsel.  And it looks like
5  down here on, I guess, your second claims note,
6  May 27th, that you contacted William Wood, Bill
7  Wood at Norman, Wood, to enter an appearance on
8  behalf of the insured.  I guess that's obviously,
9  like you said, one of the first things you want to
10 do as an adjuster on a claim, correct?
11 A. Correct.
12 Q. And I guess from the standpoint of the
13 insured; that is, AMIC, what is it that you would
14 want to ask for or see from the insured?  What do
15 you want them to send you?
16 A. Usually I would ask them to send me a
17 complete copy of the claim file and most likely a
18 copy of the underwriting file.
19 Q. Okay.  And in fact if you take a look at
20 that very first note, 5-11, you said, "I contacted
21 insured Jennifer Long at Al Municipal Insurance
22 Corporation.  She will be sending me a complete
23 copy of her file."  When you received that file,

Edward F. Roesch                                    17

1   what do you -- I'm trying to, I guess, get a
2   glimpse into the inner workings of professional Ed
3   Roesch.  What is it you do or look for?
4       A. I go through the file materials, all the
5   documents.
6       Q. Okay.  Do you typically discuss any problems
7   that you have with, let's say, defense counsel?
8               MR. McDOWELL:  Object to the form.
9       A. I guess problems is a big word.
10      Q. (BY MR. SPEAGLE) Yeah.  If you go through
11  the claim file and you see -- I don't know --
12  issues or concerns, what do you do about those
13  issues or concerns?
14      A. I may discuss them with counsel.
15      Q. Sure.  Flip to your -- I guess your second
16  page, claim note 5-28-2009, one, two, three, four,
17  five, I suppose five paragraphs down, Bill and I.
18  Yeah.  "Bill and I decided the best outcome based
19  on what has transpired is to contact the insured."
20  We can go into the rest of that a little bit
21  later.  But that's the kind of thing I mean.  You
22  would see some sort of problem or issue, and you
23  may discuss that with your defense counsel.  Is

Edward F. Roesch                                    18

1   that how this typically works?
2       A. Correct.
3       Q. Okay.  And after discussing it, let's say,
4   with defense counsel, you typically then contact
5   the insured and ask for any further information or
6   solutions to a problem.  Is that how you typically
7   operate?
8       A. If an issue would arise or a problem as you
9   term it came up and I needed or I felt like there
10  was additional information or input the insured
11  could offer, I would contact the insured.
12      Q. Okay.  In this particular case, do you
13  recall what the problem was on behalf of AMIC?
14  And I think you may have mentioned it earlier.
15  What was it that was concerning to you about this
16  particular case?
17      A. My problem was that AMIC was issuing a
18  policy with an exclusion that had been deemed
19  inappropriate by the Alabama Supreme Court.
20      Q. Okay.  And that based on that exclusion,
21  they were being sued for bad faith?
22      A. Yes.
23      Q. Were you getting -- I say trying to use the

Edward F. Roesch                                    19

1   term pushed back.  Were you getting any negative
2   feedback from AMIC about the claim at all?
3       A. I would need some more detail, Scott.
4       Q. It is 2009 that we are talking about.  I
5   understand.  I understand.  Well, I suppose again
6   your earlier comment was one of the situations
7   that you do or one of the things that you would
8   like to do is try to come to the best outcome or
9   best resolution for the insured.  From your
10  standpoint, let's say just in the McCoy case, how
11  was it or what is it that you wanted to accomplish
12  that would have given AMIC the best resolution
13  possible?
14      A. I probably would have wanted them to address
15  a potential payment to the claimant based on the
16  fact that the basis for their denying the claim
17  was ruled illegal or however you would term it by
18  the Alabama Supreme Court.
19      Q. Okay.  And do you recall it involved an
20  issue with UM coverage?
21      A. I believe that's correct.
22      Q. And I think there was a worker's comp
23  payment made to the particular police officer, and

Edward F. Roesch                                    20

1   then the police officer also wanted UM payments
2   from the AMIC policy?
3       A. That sounds accurate.
4       Q. And those UM payments in the AMIC policy may
5   have said that they stack up to three times?
6       A. I believe that was the case.
7       Q. And again as we go -- if you will flip with
8   me to page 38 and 39, which is down there at the
9   bottom, from November 20th, 2009, through --
10  really, Ed, through that entire next page and it
11  looks like ending on December 11th, 2009, do you
12  recall sort of authorizing at this point Kyle
13  Turner to enter into a series of negotiations with
14  plaintiff's counsel to settle the claim?
15      A. I think they were basically floating
16  numbers, not really making offers.
17      Q. That the plaintiff's counsel was floating
18  numbers?
19      A. Well, I believe so.  I would want to take a
20  second and go through here, if you don't mind.
21      Q. Sure, sure.  No, please.
22      A. Okay.
23      Q. If we can -- if you will flip with me to the

Edward F. Roesch 21

1  very -- I say the very last note.  It's going to
2  be December 11th, 2009.  As I read this note, it
3  looks like that you have authorized Kyle Turner to
4  settle the case for $165,000.
5     A. I think it talks that Kyle was checking or
6  discussing with PC or plaintiff's counsel.
7     Q. And sure.  And it's actually the next page,
8  Ed.  I'm sorry.  A continuation of that.  Let me
9  read that second line, "I authorize Kyle to accept
10 the demand of 165 and get the case settled."
11    A. Uh-huh (yes).
12    Q. They offered it and you accepted it.  And
13 then if you could read that next paragraph for me.
14    A. Uh-huh (yes).  Yes.
15    Q. It says, "I contacted Danny Ransom, claims
16 manager at the insured, and told him that the case
17 had been settled for 165."  Now you had already
18 settled the case at that point?  I mean, this
19 wasn't a recommendation settlement, was it?
20    A. No.  It was settled at that point.
21    Q. You weren't seeking Danny's permission to
22 settle?
23    A. Oh, I think Danny was already on board with

Freedom Court Reporting, Inc          877-373-3660

Edward F. Roesch 22

1  the settlement.
2     Q. Okay.  When you say you think he was on
3  board with the settlement, what gives you that
4  impression?
5     A. There would have been times we were going
6  through this process when conversations or
7  whatever would have been -- not conversations but
8  maybe a telephone call would have been made to
9  Danny's voice mail or something of that nature.
10 Danny was kind of hard to get a hold of at times,
11 and you would use his cell phone most of the time
12 to try to reach him.
13    Q. Sure.  Do you recall Steve Wells being upset
14 about the McCoy settlement?
15    A. I think on July 8th, I heard Steve's first
16 coloration of the settlement.
17    Q. Maybe I can help you with it.  Do you recall
18 Steve saying that the settlement was chicken shit?
19    A. Something to that effect.
20 (Defendant's Exhibit 2 was marked and is attached
21       to the original transcript.)
22    Q. (BY MR. SPEAGLE) Yeah.  And let me show you
23 what I have as Defendant's Exhibit 2.  This is

Freedom Court Reporting, Inc          877-373-3660

Edward F. Roesch 23

1  again another document from that particular claims
2  file, and I don't necessarily expect you to recall
3  this every detail right off the bat.  But this is
4  somebody's interview with Tom Burgess on May the
5  27th, 2009.  Ed, I don't think it was you.
6  Actually I think it was Bill Wood and that he just
7  transcribed it and sent it to you.  This would
8  have been very shortly after the claim was
9  assigned to him.  It may have been you, but I'm
10 just -- for some reason, I don't think it was.  In
11 any event, if you flip with me to this back page
12 or this second page, I'm interested in the very
13 first paragraph up here.  About midways down,
14 there is a sentence that starts, "I understand
15 that Ransom filed -- that Ransom authorized
16 Burgess 60,000 to settle the claim.  This was
17 perhaps after the suit had been filed, but at any
18 rate it was before Ransom was aware of the suit.
19 I am not aware of when Alabama Mutual determined
20 to offer its limits of coverage available to McCoy
21 over the apparent objection of Steve Wells."  Do
22 you recall Steve, this being a problem with Steve
23 that this claim was being settled and that they

Freedom Court Reporting, Inc          877-373-3660

Edward F. Roesch 24

1  were offering $60,000?
2     A. I was unaware that -- I take that back.  I
3  was -- I knew that this paragraph existed.  I
4  didn't realize that there was the objection by
5  Steve Wells, but I also did not know what Danny's
6  authority was.
7  (Defendant's Exhibit 3 was marked and is attached
8       to the original transcript.)
9     Q. (BY MR. SPEAGLE) Let me show you what I have
10 marked as Defendant's Exhibit 3.  This is another
11 email from you to Tim Sullivan, and it's a -- it
12 printed out strange, and I'm not sure why.  I
13 didn't notice it until last night that it printed
14 out on our system weird.  So we have got blocks in
15 here.  I may have to get us a new one.  But in any
16 event --
17       MR. McDOWELL:  Yeah, and I think that's
18 just a function of -- that's the way it appears on
19 my system as well.  I think it's just migrating
20 from different software programs and to get it
21 down to me.  But, yeah, if we find that there is
22 something that's undecipherable in here, we can
23 deal with that.  But I think we can piece it

Freedom Court Reporting, Inc          877-373-3660

Edward F. Roesch                                    25

1   together.

2       Q.  Sure.  Again I'm interested in, Ed, this

3   first paragraph in your email to Tim.  Ransom

4   advised Burgess that Steve Wells, president of

5   AMIC, had become involved with the claim and that

6   Wells wanted the claim denied based on the

7   exclusion.  Ransom made a comment during one of

8   these phone conversations with Burgess stating

9   something to the effect that his hands were tied.

10  And I ask all this to -- or show you all these

11  documents, Ed, to say this:  Did you ever actually

12  contact Steve during the McCoy claim to find out

13  what was upsetting him or what the problem was?

14      A.  No.  I figured that was an internal issue

15  between Danny Ransom and Steve.

16      Q.  But you were adjusting the claim to get to

17  the best outcome on behalf of the insured?

18      A.  I was dealing with who my contact at AMIC

19  was, and that's Danny Ransom.

20      (Defendant's Exhibit 4 was marked and is attached

21          to the original transcript.)

22      Q.  (BY MR. SPEAGLE) Let me show you Defendant's

23  Exhibit 4, which is -- I will give you a chance

---

Edward F. Roesch                                    26

1   to -- now this is the second type of document that

2   I have seen like this.  There is one that we'll

3   look at for the Holloway and Meadows claim.  Is

4   this particular document something that you

5   typically fill out with -- well, let me ask you

6   this:  What kind of document is this and what do

7   you use it for?  How about that?

8       A.  This is what we call a large loss notice.

9       Q.  Okay.  I read that.  When you say large

10  loss, I mean everything is relative, I suppose.

11  What does large loss mean?

12      A.  We had -- we have a reporting requirement

13  with Scottsdale Insurance Company that cases that

14  have potential to exceed over 200,000 need to be

15  communicated to them.

16      Q.  Okay.  If they don't have that potential,

17  then you don't fill this out?

18      A.  Correct.

19      Q.  All right.  And let me draw your attention

20  to the facts paragraph, and the last -- well, it

21  may not be the last.  It looks like the last

22  sentence, claimant attorney.  Are you with me,

23  about three lines up from the bottom?

---

Edward F. Roesch                                    27

1       A.  Yes.

2       Q.  "Claimant attorney demanded payment by

3   insured of their UM/UIM limits."  Then you have a

4   parenthetical, and this is what I'm interested in.

5   "Alabama law and policy allows stacking of three

6   times the limits of 20,000 for a total limit of

7   exposure of $60,000."  Now it's that particular

8   parenthetical that I'm interested in.  Where, if

9   you recall, did you come up with the idea that

10  Alabama law allowed stacking of three times the

11  limits for a total exposure of $60,000?

12      A.  I think that would have been communicated to

13  me by defense counsel.

14      Q.  Okay.  Is it something that you would have

15  looked up or sought a coverage opinion on

16  independently, I mean, typically in how you work?

17      A.  It would have.  It would have been an issue.

18      Q.  Okay.  The reason I ask that is because

19  right below it, there is coverage questions, if

20  any, and you put none.  Why did you put none, if

21  you recall?

22      A.  That would be more to the coverage of the

23  Scottsdale policy to AMIC.

---

Edward F. Roesch                                    28

1       Q.  Sure.  I'm with you.

2       A.  Okay.

3       Q.  I'm with you there.  I was just wondering

4   why -- okay.  The insured's liability, you put

5   clear liability.  And again, does that speak to

6   the fact that you had been given or informed that

7   the Alabama Supreme Court had ruled that

8   particular endorsement void?

9       A.  Correct.

10      Q.  Okay.  Now let me ask you this:  When you

11  are dealing with claims -- this isn't binding on

12  you.  This is how I think of it.  I'm just trying

13  to see if you think of it the same way.  I tend to

14  think of them in two ways, liability and damages.

15  You may be liable, but you may not be damaged.

16  Are you sort of the same way?

17      A.  I would agree with that concept.

18      Q.  In going back over McCoy and thinking about

19  this, it was NAMIC's -- or when I say NAMIC, your

20  -- recommendations and -- well, we'll just use the

21  word recommendation right now -- that AMIC pay

22  Jason McCoy $60,000 or 20,000 stacked three times.

23  Do you recall that?

---

Edward F. Roesch                                    29

1   A. Yes.

2   Q. And the reason is that that would help

3   alleviate some of their liability possibly for a

4   bad faith claim?  Again, I have read all the --

5   that stack of claim notes.  That's sort of the

6   general idea that I am getting from you in any

7   event.  So that's why I'm picking your brain and

8   asking you if that's your understanding as well?

9   A. Yes.  That would have been the damages that

10  would have been payable under the AMIC policy.

11  Q. Sure.  Now if the damages under the AMIC

12  policy weren't $60,000, let's say they were 20,

13  would that be something that you would have wanted

14  to have known?

15  A. Yeah.

16  Q. Well, you remember Jason McCoy was the

17  police officer with the City of Pleasant Grove,

18  right?  Is that right?

19  A. I believe -- yes.

20  Q. I represent to you Jason McCoy -- do you

21  have any reason to disbelieve?

22  A. No.

23  Q. And while he was in his police car, he was

---

Edward F. Roesch                                    30

1   hit by an uninsured motorist.  Is that your

2   understanding of the claim?

3   A. Correct.

4   Q. He filed for his worker's compensation, and

5   then he sued for his uninsured motorist benefits?

6   A. Correct.

7   Q. AMIC's insurance policy was with the City of

8   Pleasant Grove.  I would think you would have had

9   their insurance policy.  I actually think it's in

10  that big stack of documents, but I didn't bring

11  it.  I represent to you their insurance policy was

12  with the City of Pleasant Grove.

13  A. Okay.

14  Q. Let me read you something.  Tell me what you

15  think about this.  This is from Alabama Automobile

16  Insurance Law.  It's the third edition, Ron

17  Davenport.  He is in the building right next to

18  me.  "If an employee is not listed as a named

19  insured on an employer's liability policy and is

20  only provided coverage because he is driving or is

21  a passenger in an employer's vehicle, he may not

22  stack the coverage of the other vehicles of the

23  employer not involved in the accident."  Now

---

Edward F. Roesch                                    31

1   should Jason McCoy have been able to stack those

2   policies according to Ron Davenport?

3   MR. McDOWELL:  Object to the form to the

4   extent that calls for a legal conclusion.

5   Q. (BY MR. SPEAGLE)  Let me ask you this:  Ed,

6   did you ever look and see whether Jason McCoy was

7   a named insured on that AMIC policy?

8   A. I reviewed the policy.  I can't recall.

9   Q. Sure.  There is another case, Hines versus

10  Home Insurance Company.  And this is a police

11  officer in Creola who was hit by an uninsured

12  motorist.  This is 495 Southern 2nd 692.  And here

13  is what the Court of Civil Appeals said, "He was

14  an employee of the Town of Creola and was allowed

15  to drive one of the insured vehicles when his

16  duties so required.  He was not a named insured on

17  the insurance policy, nor did he pay premiums for

18  the insurance.  Hines was therefore a permissive

19  user of the insured vehicle involved in the

20  collision and, as such, was not entitled to stack

21  the applicable coverages."  Assuming that that law

22  is correct and that Jason McCoy should have only

23  received $20,000, would that have had an impact on

---

Edward F. Roesch                                    32

1   how you valued his bad faith damages claim?

2   MR. McDOWELL:  Object to the form.

3   A. No.

4   Q. (BY MR. SPEAGLE)  No?  Do you recall a memo

5   from Kyle Turner saying that in Alabama, your

6   punitive damages for a bad faith claim are limited

7   to three times the underlying claim?

8   A. I haven't seen that memo in a while.

9   Q. Sure.  Let's assume that that's in the

10  documents in your claims file, that memo.  That

11  changes your mathematics, doesn't it?  If Jason

12  McCoy is only entitled to $20,000 and assuming

13  Alabama law says punitive damages are limited to

14  three times that amount, assume both of those

15  things, what would be the greatest bad faith

16  exposure to AMIC?

17  MR. McDOWELL:  Object to the form.

18  A. I would have to actually read the document,

19  but I would imagine that holding that all things

20  were accurate, the punitive damages would have

21  been capped at three times.

22  Q. $60,000?

23  A. Right.

Edward F. Roesch                                          33

1    Q. And you settled this case for 165,000,
2  correct?
3    A. Correct.
4    Q. Do you think maybe that's why Steve was mad?
5         MR. McDOWELL:  Object to the form.
6    A. I don't know.  I never had Steve call me and
7  communicate that he was mad.
8    Q. (BY MR. SPEAGLE) But you didn't call him and
9  wonder why he was mad either, did you?
10   A. I was in contact with Danny Ransom, my
11 contact.
12   Q. And let me ask you this:  NAMIC has since
13 non renewed AMIC because they have had such a
14 large loss history, right?
15   A. That's something you would have to ask the
16 underwriters.
17   Q. Okay.  That's just fine.  I'm with you
18 there.
19         MR. SPEAGLE:  Did Tim sign the
20 interrogatories?
21         MR. McDOWELL:  Yes.
22         MR. SPEAGLE:  I couldn't remember.  I'm
23 sorry.

Freedom Court Reporting, Inc            877-373-3660

---

Edward F. Roesch                                          34

1    Q. What kind of entity is AMIC?  Do you know?
2  I mean, how is it constituted?
3    A. AMIC?
4    Q. Yes.
5    A. It's an insurance company.
6    Q. Well, sure.  Is it -- and do you understand
7  that AMIC is a nonprofit insurance company?  It's
8  a nonprofit corporation under the state laws of
9  Alabama?
10   A. I'm not familiar with how it's incorporated.
11   Q. That's what I was asking.  Do you know who
12 was on AMIC's board of directors?
13   A. No idea.
14   Q. Do you know how AMIC is funded or anything
15 like that?
16   A. No idea.
17   Q. Okay.  Let's get into this Holloway-Meadows
18 claim.  Let me ask you this:  Why did you get the
19 Holloway-Meadows claim?  And not you, Ed Roesch,
20 as opposed to John Smith or Bob Smith or whoever.
21 You as in NAMIC, why did you all get the Holloway-
22 Meadows claim?
23   A. It was assigned to me.

Freedom Court Reporting, Inc            877-373-3660

---

Edward F. Roesch                                          35

1    Q. Well, let me ask it this way:  Why did AMIC
2  send NAMIC that claim?
3    A. Because they were sued for bad faith.
4    Q. Okay.  And does the insurance policy that
5  NAMIC has with AMIC protect against or provide
6  coverage for bad faith?
7    A. Correct.
8    Q. All right.  Is the bad faith claim against
9  AMIC still active today?
10   A. No.
11   Q. Why?
12   A. The case was settled.
13   Q. For how much?
14   A. Two million dollars.
15   Q. And what is NAMIC's policy limits with AMIC?
16   A. You know, I would have to see the dec sheet.
17   Q. Sure.  If I represent to you that it's two
18 million dollars, would you --
19   A. It says on this large loss notice it's two
20 million.  I mean, to really confirm it, I guess I
21 would need to see the dec page.
22   Q. Sure.  I think we'll probably get to it at
23 some point.  Would you agree with me on the

Freedom Court Reporting, Inc            877-373-3660

---

Edward F. Roesch                                          36

1  Holloway-Meadows claim that there are a lot of
2  moving parts?
3    A. On the underlying case?
4    Q. Well, that's part of the problem that I see.
5  Yes, on the underlying case.  And that's what you
6  were evaluating, is it not, the underlying case?
7    A. Correct.
8    Q. And you were evaluating the underlying case
9  to see what kind of exposure AMIC would have?
10   A. Correct.
11   Q. And again back to our original comments, you
12 wanted to evaluate that to see what was the best
13 possible outcome you could provide to AMIC?
14   A. In cooperation with them, yes.
15   Q. Well, let me ask you this:  Do you
16 understand in Alabama that insurance companies
17 typically with our court system, say, have twin
18 duties, the duty to defend and the duty to
19 indemnify?  Have you ever heard that?
20   A. Yes.
21   Q. Okay.  When you say in cooperation with
22 AMIC -- and I'm just asking.  You may know.  You
23 may not -- do you understand whether Alabama state

Freedom Court Reporting, Inc            877-373-3660

Edward F. Roesch                                      37

1    law says that your duty to defend extends only to
2    the amount of cooperation that the underlying
3    insured provides to you?
4        A. I have not heard it termed in that manner.
5        Q. Okay.  Well, let's do this.  Talk to me
6    about this:  What are all moving parts -- and
7    that's my term, that's not your term -- to the
8    Holloway-Meadows claim?  Do you recall what all
9    the various actions were?
10       A. I mean, if you want to me to talk, Scott, to
11   liability and damages, I mean, I could --
12       Q. Yeah.  Let's first do this.
13   (Defendant's Exhibit 5 was marked and is attached
14              to the original transcript.)
15       Q. (BY MR. SPEAGLE)  I'm going to show you what
16   I have marked as Defendant's Exhibit 5.  This is a
17   series of emails, it looks like one long line of
18   emails, starting from me and ending with Tim
19   Sullivan.  If I recall correctly, the first
20   document you received regarding the Holloway and
21   Meadows claim was the bad faith claim in Troup
22   County, Georgia.  Do you recall that?
23       A. The suit?

Edward F. Roesch                                      38

1        Q. Yes, the suit.
2        A. Yes.
3        Q. And again, I would think the first thing
4    that you wanted to do was assign defense counsel
5    to AMIC?
6        A. Correct.
7        Q. And in Tim's email to you, he has in, I
8    guess, that second paragraph, "Refer this to
9    Turner at Norman, Wood, if you want, or we can
10   discuss another lawyer."  Was there any -- I guess
11   any reason in particular why you didn't refer it
12   to Kyle?
13       A. I can't recall at this point.
14       Q. Okay.
15       A. Why --
16       Q. Okay.  At some point, you assigned -- well,
17   at some point.  I actually have it right here.
18   This is Defendant's Exhibit 6.
19   (Defendant's Exhibit 6 was marked and is attached
20              to the original transcript.)
21       Q. (BY MR. SPEAGLE)  You assigned the case to
22   Kate Whitlock at Drew, Eckl in Atlanta, Georgia.
23   And this would have been on Monday, January 31st

Edward F. Roesch                                      39

1    of 2011.  Do you recall talking to Kate beforehand
2    about this suit or would you have just sent her
3    the email and then talked later?
4        A. It appears the way that this is worded, I
5    would not have talked to her yet.
6        Q. Okay.  I have a follow-up email, which I
7    will mark as Defendant's Exhibit 7, which is about
8    maybe 15 minutes later to Danny Ransom.
9    (Defendant's Exhibit 7 was marked and is attached
10              to the original transcript.)
11       Q. (BY MR. SPEAGLE)  In this particular email,
12   you asked Danny for a complete copy of the claims
13   file.  And that's something that you would have,
14   of course, wanted to look at and see as you say
15   ASAP, correct?
16       A. Correct.
17       Q. And you put in here also "need to discuss
18   defense counsel with you."  Well, let me ask you
19   this:  You had assigned the claim to Kate.  What
20   is it you wanted to discuss with Danny about
21   defense counsel?  Do you recall?
22              MR. McDOWELL:  Object to the form.
23       A. I wanted to see if he had any objections to

Edward F. Roesch                                      40

1    using Kate.
2        Q. (BY MR. SPEAGLE) Okay.  Do you recall if
3    Danny ever called you back?
4        A. In the claim note, we did discuss this.
5        Q. Okay.  And did he have objections?
6        A. Not at all.
7        Q. Okay.
8        A. In fact he told me on his own he had heard
9    the name of Drew, Eckl and had no issues at all.
10       Q. Okay.  And let me ask you this:  Assigning
11   defense counsel is a right that NAMIC has under
12   its policy?
13       A. I believe so, yes.
14       Q. And I have got -- might as well go ahead and
15   put it in now.  Defendant's Exhibit 8.  You can
16   flip.
17   (Defendant's Exhibit 8 was marked and is attached
18              to the original transcript.)
19       Q. (BY MR. SPEAGLE)  That, again I will
20   represent, is the policy between AMIC and NAMIC.
21   I did not include all of the various and sundry
22   front stuff.
23       A. No problem.

Edward F. Roesch                                      41

1    Q. Under the section Roman numeral number one,
2    subpart C, it says, "The insurer shall have the
3    right to choose counsel to defend an insurer,"
4    correct?
5    A. Correct.
6    Q. While we are on the topic of the policy,
7    Defendant's Exhibit 8 would be the document you
8    would have used to determine whether or not
9    coverage existed for the Holloway-Meadows claim,
10   correct?
11   A. Correct.  The dec page refers to the policy
12   form.  So I would want to see the dec page to
13   corroborate the policy.
14   Q. Make sure you had the correct policy?
15   A. Yeah.
16   Q. Not missing any -- sure.  Now after
17   assigning the claim to Kate and you have now put
18   in your request to get the claims file back from
19   AMIC.  I say back.  Get the claims file from AMIC,
20   what is it that you would have wanted to do, Ed
21   Roesch, litigation examiner?  What kind of things
22   would you have wanted to have looked at at that
23   point?

Edward F. Roesch                                      42

1    A. You mean, prior to getting the file?
2    Q. No.  I'm assuming you would have gotten it
3    ASAP, and I think you did.  I think they FedExed
4    it pretty quick.
5    A. I looked -- I think the first electronic
6    document was February 9th, or going into the file,
7    which would have been the hard copy --
8    Q. Okay.
9    A. -- that was sent to me, but I believe there
10   is about two banker's boxes of materials coming.
11   Q. Of stuff?
12   A. Yeah.  And I think it didn't all come at
13   once.  I think there were two deliveries.
14   Q. Okay.  And when you got -- let's say you
15   have got all the information from AMIC.  You would
16   have, I think at that point, wanted to delve in to
17   the file and attempt to understand the facts?
18   A. Absolutely.
19   Q. And again you would have wanted to at least
20   identify legal issues that you needed to have
21   clarified?
22   A. True.
23   Q. And based off of that investigation, you

Edward F. Roesch                                      43

1    would have wanted to come up with a plan to
2    resolve again to the best outcome of the insured?
3    A. Correct.
4    Q. Well, let's just go ahead and get this out
5    of the way.  From the time you received the claim
6    on January the 27th, 2011, until the five of us --
7    less you two -- all sat down in AMIC's offices on
8    July the 8th of 2011, did you ever speak to Steve
9    Wells?
10   A. Not that I recall.
11   Q. Did you ever speak to David Sikes?
12   A. Not that I recall.
13   Q. And you know that David was the litigation
14   examiner for the underlying claim?
15   A. Correct.
16   Q. Okay.  When you discussed the claim with --
17   let me ask this:  What about Danny Ransom?  Did
18   you have any substantive conversations about the
19   claim with Danny?
20   A. We had a number of conversations.
21   Q. Again -- and this is not -- I asked David
22   earlier who had signed the interrogatory answers.
23   This is not necessarily binding on you, but I'm

Edward F. Roesch                                      44

1    going to ask.  In the interrogatory answers that I
2    received from you all, it said -- I had asked
3    about conversations that you had had with Danny
4    Ransom.  And the response that I received was that
5    pursuant to Federal rule 33 D?
6        MR. MCDOWELL:  C or D.
7    Q. Let's just say pursuant to Federal rule 33,
8    you all were going to provide me with documents
9    that answered that.  There are a series of emails
10   in your claims file between typically you and
11   Danny and Kate and me.  Other than those emails,
12   do you recall any kind of face-to-face or phone
13   conversations that you would have had with him?
14   Again, apart from the one we just talked about
15   about Kate Whitlock, assigning Kate Whitlock.
16   A. There would have been -- there potentially
17   would have been other conversations, and that
18   would show up in the claim notes.
19   Q. Okay.  If there were, they would be in the
20   claims notes?
21   A. Most likely, yes.
22   Q. Okay.  It is probably not -- if it is, let
23   me know.  And if you want Tim to leave, you can

Edward F. Roesch                                                  45

1   tell me.  It's probably not your practice that you
2   would have a conversation with the insured and it
3   not show up in the claims notes?
4       A.  Say for the most part, that is accurate.
5       Q.  Okay.  Now again from 1-27 of '11 to 7-8 of
6   '11, you never spoke to David Sikes about the
7   underlying claim?
8       A.  No.
9       Q.  And David is a fellow litigation examiner,
10  fellow adjuster; is that correct?
11      A.  Correct.
12      Q.  He speaks your language professionally,
13  doesn't he?
14      A.  I would hope so.
15      Q.  Why didn't you talk to him?
16      A.  I was talking to his boss, his supervisor.
17      Q.  Did you know whether his boss or supervisor
18  knew anything about the claim?
19      A.  I would anticipate that his title being
20  litigation manager, that he would know quite a bit
21  about the claim.
22      Q.  Okay.  I'm not asking you to test your
23  memory, but assume with me, if you will, that the

---

Edward F. Roesch                                                  46

1   claims notes do not mention any phone calls or
2   conversations with Danny Ransom other than the
3   phone call you had with him about Kate Whitlock.
4   I'm not trying to test your memory.  I'm just
5   saying assume that to be the case, and it is by
6   the way.  Why wouldn't you have spoken to David
7   Sikes about it?
8       A.  I don't know if there would have been any
9   information that David could have provided.  You
10  know, technically David was a witness.
11      Q.  Okay.
12              MR. SPEAGLE:  Can we take a break just a
13  second?
14              MR. McDOWELL:  Yeah, absolutely.
15              (Recess taken.)
16      Q.  (BY MR. SPEAGLE) When we went to break, we
17  were talking about the Holloway and Meadows case.
18  When you got the claims or when you got the files
19  from AMIC, tell me about the case.  Do you recall
20  what the case was about, what happened, what
21  occurred?
22      A.  It was a van accident, a single car
23  accident, where the driver ran off the road

---

Edward F. Roesch                                                  47

1   because he missed a curve and severely injured one
2   of the passengers, moderately hurt another
3   passenger.  I think there was a third passenger,
4   but was not necessarily major damages case.  I do
5   know one of the passengers was a quadriplegic
6   resulting from the accident, and I believe the
7   other one -- and I don't want to say of
8   significance, but you never know what the broken
9   leg.  I think that was the injury.  I would have
10  to review more documents.
11      Q.  Okay.  Well, let me show you what I have as
12  Defendant's Exhibit 9.
13      (Defendant's Exhibit 9 was marked and is attached
14              to the original transcript.)
15      Q.  (BY MR. SPEAGLE) I have put in both Connie
16  Meadows and Jeanette Holloway's complaints into
17  the same exhibit.  It's a composite exhibit, I
18  suspect.  And this is the two complaints in the
19  underlying case, correct?  And you would have
20  reviewed these?
21      A.  Correct.
22      Q.  Okay.  And we say the Holloway and Meadows
23  claims.  That's because there were two plaintiffs,

---

Edward F. Roesch                                                  48

1   one who had the broken leg and one who was a
2   quadriplegic and subsequently died.  And let me
3   ask you this:  Who were the defendants in the
4   lawsuit?
5       A.  As it's captioned here, the Town of
6   Woodland, Alabama, and Billie Vernon Edmondson.
7       Q.  And the -- it was your understanding, of
8   course, that AMIC was the insurer for the Town of
9   Woodland and Billie Vernon Edmondson?
10      A.  Correct.
11      Q.  And how did these lawsuits end up?  What
12  happened I guess in terms of how did these -- how
13  did you get the case from this lawsuit?
14      A.  If I remember correctly, these cases went to
15  trial in November, December of 2010, and were
16  tried to a verdict.
17      Q.  Okay.  And when we talk about an excess
18  verdict, did you understand they were tried to an
19  excess verdict?
20      A.  I believe that was 3.9 million.
21      Q.  Okay.  And what was as you understood it
22  AMIC's policy limits with the Town of Woodland?
23      A.  I believe it was two million dollars.

---

Edward F. Roesch 49

1    Q. Okay.  If you will flip with me to -- and
2  you can just use -- I will represent the Meadows
3  and the Holloway complaints are exactly the same.
4  Just that first Meadows complaint to paragraph 10
5  and 11 or to paragraph 11, now specifically focus
6  your attention on paragraph 11.  "Upon information
7  and belief, Billie Vernon Edmondson was operating
8  the van in his line and scope of his agency with
9  the defendant Town of Woodland at the time of the
10 accident.  And as principal under the doctrine
11 respond superiority, Town of Woodland is legally
12 responsible for any negligence or wantonness of
13 its agent or employee, Billie Vernon Edmondson."
14 Have you run into this situation before about
15 someone operating in the line and scope of their
16 employment?
17          MR. McDOWELL:  Object to the form.
18   A. I have run into course and scope.
19   Q. (BY MR. SPEAGLE) Course and scope?  Okay.
20 Was this a new -- when you read these complaints,
21 did it peak your curiosity or was it something
22 that you wanted to investigate about Billie Vernon
23 Edmondson and any capacity for suit in the line

---

Edward F. Roesch 50

1  and scope of his employment?
2          MR. McDOWELL:  Let me just object to the
3  form to the extent you are referencing paragraph
4  11.  Obviously the document speaks for itself, but
5  I believe the phrasing that's used by plaintiff's
6  counsel in that document is in his line and scope
7  of his agency.
8          MR. SPEAGLE:  Of his agency, yeah.  I
9  guess I kept saying employment.
10   Q. Was that something that you keyed in on or
11 thought about reviewing or looking at?  It may not
12 have been.
13   A. I didn't get any red flags from it.
14   Q. Okay.  Do you recall that at some point AMIC
15 hired Tom Harper to draft appeals on behalf of the
16 Town and Billie Vernon Edmondson?
17   A. I was aware of that.
18   Q. Did you ever review those appeal briefs?  Do
19 you recall?
20   A. I may have.  I would have probably reviewed
21 them.
22   Q. Okay.  Do you recall an argument in there by
23 any chance that under Georgia law, if Billie

---

Edward F. Roesch 51

1  Vernon Edmondson was in the line and scope of his
2  agency, then he couldn't be sued individually?  Do
3  you recall that line of argument?
4    A. I may have -- I would have to review the
5  brief, but I may have recalled that line of
6  argument.
7    Q. If it rings a bell, it does.  If it doesn't,
8  it doesn't.  We won't talk about it if it doesn't.
9  That's fine.  Let me ask this:  Were you curious
10 in your investigation about the venue and the
11 judge?
12   A. As one of the variables as you previously
13 mentioned?
14   Q. Sure, sure.  We are going to go through, I
15 guess, a series of variables.  I can't do them all
16 at the same time.  I have to do them one at a
17 time.  Do you recall hearing any stories about the
18 judge in the underlying case and the judge in the
19 bad faith case were one and the same?
20   A. I knew that.
21   Q. The Honorable William F. Lee.
22   A. Wasn't it John Lee?
23   Q. He may have gone by John.

---

Edward F. Roesch 52

1    A. I know Lee, Judge Lee.
2    Q. It was Judge Lee.  What do you recall
3  hearing about Judge Lee?
4    A. I believe through the defense of the
5  underlying case that he didn't decide one thing in
6  AMIC's favor.
7    Q. That's right.  Let me show you what I have
8  marked as Defendant's Exhibit 10.  This is a
9  newspaper article in your claims file.
10 (Defendant's Exhibit 10 was marked and is attached
11           to the original transcript.)
12   A. Am I supposed to read this?
13   Q. (BY MR. SPEAGLE) Only if you want.  I
14 thought you were.  I'm sorry.  My first question
15 is:  Do you know how this made it into your claims
16 file?  Is this something that you went and found
17 or is this something someone sent you?
18   A. I would not know how this ended up, if this
19 was one of the pieces of materials that was in
20 AMIC's claim files or file materials that they
21 sent to me.
22   Q. Okay.  Whether it was -- that's fine.
23   A. It's not dated.

Edward F. Roesch 53

```
1       Q. Right, right.  That's what I was getting at.
2    That was my first question.  Well, the third, it's
3    the third paragraph I'm interested in.  And let me
4    read this.  "Among them, Cowetta Circuit Chief
5    Judge William F. Lee, Jr., should not have heard
6    the case because he had ex parte contact with
7    lawyer," and then it describes who the lawyer was.
8    Do you recall hearing that one of the problems
9    with Judge Lee was that he was having ex parte
10   contacts with the lawyers?
11      A. No.
12   (Defendant's Exhibit 11 was marked and is attached
13          to the original transcript.)
14      Q. (BY MR. SPEAGLE) Okay.  Well, let me show
15   you another Defendant's Exhibit 11.  This is a
16   document actually that I found off of the AJC in
17   April of 2012.
18      A. This says January 8th of 2013.
19      Q. That's when I -- article date is actually
20   here.  That's when I printed it off my computer.
21      A. Okay.
22      Q. I'm sorry.  The article date is Thursday --
23      A. I see that.
```

Edward F. Roesch 54

```
1       Q. This is my computer's when I print it out.
2           MR. McDOWELL:  For clarity, the article
3    date is Thursday, April 26th, 2012; is that right?
4           MR. SPEAGLE:  Correct, correct.
5       Q. And the title of the article is "Cowetta
6    Chief Judge to Leave Bench Amid Probe," and it's
7    the second paragraph.  "A disposition signed by
8    Lee -- and skipping some places -- was filed
9    Thursday with the Georgia Supreme Court and said
10   Lee was being investigated for engaging in
11   improper communications with lawyers and entering
12   orders in cases without notifying all parties and
13   attorneys in cases.  He was also being
14   investigated for assigning cases to himself when
15   he was otherwise disqualified."  Once again, do
16   you recall from your claims notes or from any
17   communications with any of the parties that these
18   are exactly the problems that AMIC, Town of
19   Woodland, Billie Vernon Edmondson were having with
20   Judge Lee, ex parte communications, entering
21   orders without notifying and that he assigned and
22   specifically the bad faith case to himself?
23      A. Well, I knew he assigned the bad faith case
```

Edward F. Roesch 55

```
1    to himself.  The ex parte conversations, I do not
2    know.  And the other, I would anticipate would
3    have been the concern of defense counsel.
4       Q. Okay.  Let me ask this:  Do you recall
5    discussing with anybody that it would be better
6    for the underlying litigation and for the bad
7    faith litigation if Judge Lee was not the judge?
8    Or to put it another way, that we wanted to try
9    every avenue to get out of Judge Lee's courtroom?
10      A. It would make sense.
11      Q. Yeah.  Just kind of doing the timing here,
12   if the appeal was in -- see if you recall this
13   with me.  The appeal before the Court of Appeals
14   was in July of 2011.  Does that sound about right?
15      A. I believe the hearing was set for July 14th.
16      Q. Sure.  With how Courts of Appeals typically
17   do, I would not have anticipated a decision for
18   several months.  And -- I'm asking -- if the bad
19   faith case had stayed in Judge Lee's courtroom --
20   well, by April the 12th, we would have at least
21   had another judge.  Does that sound about right?
22          MR. McDOWELL:  Object to the form.
23      A. That's a crystal ball I didn't have.
```

Edward F. Roesch 56

```
1       Q. (BY MR. SPEAGLE) Okay.  But the concerns
2    were there at the time, right, the concerns about
3    Judge Lee?
4       A. That he wasn't granting AMIC's motions and
5    appeared to be not pro AMIC, that would have been
6    a concern.
7       Q. Right.
8    (Defendant's Exhibit 12 was marked and is attached
9          to the original transcript.)
10      Q. (BY MR. SPEAGLE) Here is Defendant's Exhibit
11   12.  This is the actual bad faith complaint.
12      A. I'm sorry, Scott.  Hold on.
13      Q. No worries.  Now is this the complaint that
14   triggered NAMIC's duty to defend AMIC?
15      A. Yes.
16      Q. Okay.  And NAMIC hired Kate Whitlock again
17   to fulfill that duty in terms of defense counsel?
18      A. After securing AMIC's consent, yes.
19      Q. Well, we looked at the policy.  You didn't
20   need AMIC's consent to do that, to hire Kate
21   Whitlock, did you?
22      A. It was a large enough case that that's kind
23   of a courtesy, I think, more than anything else.
```

Edward F. Roesch                                             57

1    Q. Okay.  Okay.  Tell me about the bad faith
2  complaint.  Who were the plaintiffs and what were
3  they saying AMIC did wrong as you recall?
4    A. Well, their caption is bad faith failure to
5  settle within policy limits.
6    Q. And again, who were the plaintiffs in this
7  particular case?
8    A. Barbara Jean Murphy, an individual, Barbara
9  Jean Murphy and Jimmy T. Murphy, personal
10  representatives of Jeanette Holloway, deceased,
11  and Connie Meadows.
12    Q. Would you agree with me that those are the
13  same plaintiffs that were the plaintiffs in the
14  two underlying actions against the Town of
15  Woodland and Billie Vernon Edmondson as
16  substituted?
17    A. I saw the -- what was it?  Meadows?
18    Q. Right.
19    A. And I saw the Jeanette Holloway.
20    Q. At some point Jeanette Holloway dies.  Her
21  estate substituted in --
22    A. Murphy.
23    Q. Sure.

Edward F. Roesch                                             58

1    A. Okay.
2    Q. I'm fairly certain that's right.  As a
3  matter of fact, it is.  But in any event, if I'm
4  correct, these would be the same plaintiffs that
5  faced the Town of Woodland and Billie Vernon
6  Edmondson?
7    A. Okay.
8    Q. So they were suing AMIC for failure to
9  settle within policy limits?
10    A. Correct.
11    Q. Had you come up -- in your experience in
12  dealing with bad faith claims, had you had
13  experience with a tort, with a judgment creditor
14  suing the insurance company of the judgment debtor
15  for bad faith?  Had you ever seen that line up of
16  parties before?
17    A. You mean a third party?
18    Q. Correct.
19    A. Coming against the carrier for the
20  defendant?
21    Q. Correct.
22    A. I have seen that before.
23    Q. You have?  Typically would you agree that it

Edward F. Roesch                                             59

1  is the insured or the judgment debtor who is suing
2  judgment debtor's carrier for bad faith?  Isn't
3  that typically how we see these bad faith claims?
4    A. You mean the first party?
5    Q. Right, right.
6    A. Yes.
7    Q. They are typically first party claims.  Tell
8  me, how have you dealt with third party claims as
9  we are going to call them?  I will use your
10  terminology, first and third party.
11    A. It depends on the jurisdiction.
12    Q. Okay.  And the jurisdiction, when you said
13  it depends on the jurisdiction, we are talking
14  about what the law in that jurisdiction allows a
15  third party to do?
16    A. Correct.
17    Q. Okay.  So in this particular instance, it
18  was important for you to know -- again I'm asking
19  -- what Georgia law allowed a third party to sue
20  an insurance carrier for?
21    A. Correct.
22    Q. Okay.  Did you know that AMIC had filed a
23  declaratory judgment -- well, as a matter of fact,

Edward F. Roesch                                             60

1  AMIC, the Town of Woodland and the estate of
2  Billie Vernon Edmondson in Randolph County,
3  Alabama?
4    A. I understood a dec action was commenced.
5    Q. And I'm going to --
6    A. I believe you filed it.
7  (Defendant's Exhibit 13 was marked and is attached
8           to the original transcript.)
9    Q. (BY MR. SPEAGLE) Right.  It's Defendant's
10  Exhibit 13, and if you will notice that beautiful
11  styling, if you compare that with Defendant's
12  Exhibit 12, they poached it.  So I'm a little
13  upset that they have poached my style.  But in any
14  event --
15    A. If this was first and this was second --
16    Q. That was first and that was second.
17    A. Okay.  I wanted to give credit to the proper
18  party.
19    Q. In any event, do you recall having this in
20  your claim file as well?
21    A. At one point, it probably made it into the
22  claim file.
23    Q. Sure.  Let me ask you this:  Was it

**Edward F. Roesch** 61

1  important for you to know that there was a

2  declaratory judgment action pending?

3      A. Yes.

4      Q. It had or could have a fairly significant

5  impact on the claim that you were assigned to

6  defend, couldn't it?

7      A. It could.

8      Q. Sure.  And that's why you would want to know

9  about it, I would assume?

10      A. Absolutely.

11      Q. Let me ask you this:  Do you know what AMIC

12  was asking for or requesting -- well, AMIC, the

13  Town of Woodland and the estate of Billie Vernon

14  Edmondson, what they were seeking to have done?

15      A. I would have to review the whole complaint.

16          MR. McDOWELL:  I'm content to have you

17  ask questions about these documents with the

18  understanding the documents speak for themselves.

19  I don't want to impede your examination.

20          MR. SPEAGLE:  That's right.  That's

21  typically how -- understood.

22      Q. Ed, did you understand that one of the

23  things that AMIC and the Town of Woodland and the

**Edward F. Roesch** 62

1  estate of Billie Vernon Edmondson were seeking to

2  have the Circuit Court of Randolph County,

3  Alabama, do was limit any judgment against them to

4  what are called the tort cap limits?

5      A. Yes.

6      Q. Okay.  What did you understand?  Did you

7  have an understanding of what the amount of that

8  tort cap limit was?

9      A. I believe it was 100,000 per claim.

10      Q. That's right.  That's right.  Up to a

11  $300,000 aggregate.  Assume with me that the tort

12  caps were applicable.  That would mean that

13  Jeanette Holloway or her estate would have

14  received $100,000, and Connie Meadows would have

15  received $100,000.

16          MR. McDOWELL:  Object to the form.

17      A. Correct.

18      Q. (BY MR. SPEAGLE) And again the dates?

19      A. This one --

20      Q. It's actually better here on the back.  I

21  will represent to you that the declaratory

22  judgment action was filed on January the 7th,

23  2011.  Way down here.

**Edward F. Roesch** 63

1      A. I saw that.

2      Q. Okay.  And that this was a couple of weeks

3  prior to the bad faith action being filed.  So

4  this was an action already at issue when you

5  received the bad faith claim.  Does that timing

6  sound right as looking at the documents?

7      A. It would appear so.

8  (Defendant's Exhibit 14 was marked and is attached

9          to the original transcript.)

10      Q. (BY MR. SPEAGLE) Okay.  Let me show you

11  Defendant's Exhibit 14, which was an order from

12  the court in that case.  This is not a document

13  that you have had previously, but you may have

14  seen it.  I'm just going to ask.  In the

15  declaratory judgment action, Judge Martin had set

16  all pending motions for September 6th, 2011.  Were

17  you --

18          MR. McDOWELL:  September 8th, I believe.

19  Not that that's terribly significant.

20      Q. I'm reading it backwards.

21      A. Let me help you.

22      Q. I'm not sure why I am reading it backwards

23  because I have my own copy sitting right here.

**Edward F. Roesch** 64

1  But in any event, were you aware that there were

2  pending actions set in the declaratory judgment

3  action?

4      A. It would depend on if this document made it

5  to me.

6      Q. Let me ask this:  Did you know about a

7  garnishment action in Troup County, Georgia, that

8  involved AMIC and the Town of Woodland and Billie

9  Vernon Edmondson?

10      A. I was made aware of it.

11  (Defendant's Exhibit 15 was marked and is attached

12          to the original transcript.)

13      Q. (BY MR. SPEAGLE) Okay.  Let me show you

14  Defendant's Exhibit 15.  Again, this is another

15  document that you all provided to me, once again

16  probably came from AMIC, and it's a summons of

17  garnishments.  And there is actually -- I

18  combined.  There are two summons of garnishments

19  attached to this action against Regions Bank and

20  against Alabama Municipal Insurance Corporation.

21  Did you hear or do you recall hearing any problems

22  involving AMIC and this summons of garnishment?

23          MR. McDOWELL:  Object to the form.

## Page 65

Edward F. Roesch 65

1    A. Peripherally, if you would.

2    Q. Okay.  When you say peripherally, just --

3    A. I understood that I believe AMIC was taking

4    exception to these documents.

5    Q. Okay.  I'm sorry.  I didn't mean to speak

6    over you.  Go ahead.

7    A. No.

8    Q. This is not an action that you were

9    defending or that you were reviewing or

10   investigating.  Am I correct about that?

11   A. No, because this would have been prior to

12   the bad faith case being filed, I believe.

13   Q. Correct.  It was -- it was -- yeah.  It was

14   done on the 18th, and the bad faith case would

15   have been filed on the 24th.  Well, do you

16   remember that a bond -- that AMIC received or

17   issued a garnishment bond in this garnishment

18   case?  Do you recall that at all?

19   A. I believe I understood that AMIC procured a

20   bond.

21   Q. Let me show you that.  This is Defendant's

22   Exhibit 16.

23   A. I don't know if bond is the proper term.

## Page 66

Edward F. Roesch 66

1    (Defendant's Exhibit 16 was marked and is attached

2           to the original transcript.)

3    Q. (BY MR. SPEAGLE)  This is not a document

4    that was in your submissions so I'm not sure if

5    you had ever seen whether AMIC had filed a bond or

6    not.  But in any event, do you ever recall seeing

7    this particular bond?

8    A. No.

9    Q. Okay.  Well, let me ask this more generally.

10   Did you have an understanding when you got this

11   claim or did you develop one through the life of

12   the claim as to how Jeanette Holloway or her

13   estate or Connie Meadows was going to collect on

14   their judgment?

15          MR. McDOWELL:  Object to the form.

16   A. I mean, I wasn't their attorney so I don't

17   know.  When you say collect, I mean, are you

18   saying how a check would have been issued?

19   Q. Well, yeah.  You would agree with me that

20   getting a judgment against someone and collecting

21   on that judgment are two different issues?

22   A. Correct.

23   Q. All right.  They had a judgment -- they, the

## Page 67

Edward F. Roesch 67

1    underlying plaintiffs, had a judgment in the

2    Holloway and Meadows case, but they hadn't yet

3    collected on the judgment.  Did you have any

4    understanding or appreciation of how they were

5    actually going to collect on their judgment?

6    A. No.

7    Q. Okay.  Well, then let me show you a document

8    that was in your claims file, and this is going to

9    be Defendant's Exhibit 17.

10   (Defendant's Exhibit 17 was marked and is attached

11          to the original transcript.)

12   Q. (BY MR. SPEAGLE)  And again I have

13   stapled -- this is both for Holloway and Meadows,

14   and I have just stapled them together.  This is a

15   notice of claim by Holloway and Meadows to the

16   Probate Court of Randolph County, Alabama.  Did

17   you know that Connie Meadows and the estate of

18   Jeanette Holloway actually began collection

19   efforts in the state of Alabama?  Did you have

20   that understanding?

21   A. It appears that they were starting the

22   process to collect.

23   Q. Sure.  Do you remember that one of AMIC's

## Page 68

Edward F. Roesch 68

1    concerns -- I say concerns -- in the litigation

2    was that it wanted to bring the case back to

3    Alabama for collection?  Do you remember hearing

4    AMIC or me or anybody else talking about that?

5    A. Very vaguely.

6    Q. Okay.  Do you recall that it was AMIC's

7    position that when the case came back to Alabama

8    for collection, that Alabama's tort caps would

9    come in and apply and apply to that collection?

10          MR. McDOWELL:  Object to the form.

11   A. I believe that was AMIC's belief.

12   Q. (BY MR. SPEAGLE)  Let me ask this:  Did you

13   ever ask -- was that an important variable in the

14   litany of variables that you would have looked at,

15   was that one of the variables that was important

16   to you in determining the best possible outcome

17   for AMIC in the bad faith lawsuit?

18          MR. McDOWELL:  Object to the form.

19   A. It was one of them.

20   Q. (BY MR. SPEAGLE)  Sure, sure.  I understand

21   that.

22   A. I mean, might not have had much weight.

23   Q. Okay.  And tell me why or why it wouldn't

Edward F. Roesch                                     69

1  have had much weight.
2      A. Well, I think there was questions as to
3  whether that would occur.
4      Q. Okay.
5      A. I think there were questions by defense
6  counsel on the underlying case if they would even
7  be able to get them to apply in Georgia, which
8  they were not, prior to judgment.
9      Q. Sure.
10     A. And I think there was even questions by Kate
11 that they would be applied.
12     Q. Okay.  Now let me ask this:  The
13 questions -- see if you agree with me.  Whether
14 the caps would have applied to reduce the judgment
15 in Georgia and whether the caps would have applied
16 on the collection in Alabama, I see as two
17 different issues.  Would you agree with me on
18 that?
19          MR. McDOWELL:  Object to the form.
20     A. I don't have an opinion.
21     Q. (BY MR. SPEAGLE)  Okay.  We had talked about
22 earlier third party and first party cases.  And as
23 I recall, you mentioned that whether a third party

Edward F. Roesch                                     70

1  bad faith case against an insurer could go through
2  depended on the jurisdiction you were in.
3      A. Correct.
4      Q. And we were in the state of Georgia.  What
5  investigation, if any, did you undertake to
6  determine whether Georgia allowed third party bad
7  faith claims?
8      A. I believe that was a question posed to
9  counsel.
10     Q. And I didn't mean to interrupt you, but when
11 you say counsel, who?
12     A. I believe it was a question posed to Kate.
13     Q. Okay.  And was that the -- I say the only
14 investigation is that you would have asked Kate
15 that question?
16     A. One more time on the question.
17     Q. Sure.  In attempting to determine whether
18 Georgia allowed third party bad faith cases
19 against an insurer, would the only investigation
20 -- you can use another term if you like.  Would
21 the only investigation that you would have done
22 been to ask Kate whether they did or didn't?
23     A. It would have been one of the questions

Edward F. Roesch                                     71

1  asked to Kate, yes.
2      Q. Would you have wanted any case law for you
3  to review?
4      A. I would take counsel at their word.
5      Q. Let me ask this:  Do you typically -- and
6  I'm asking.  Do you typically review case law or
7  ask for case law?
8      A. If the issue is gray.
9      Q. You would want to then review the case to
10 see what you thought about it?
11     A. Probably want to see how it was viewed both
12 ways.
13     Q. What about, for example, hiring maybe
14 independent counsel or coverage counsel to review
15 a question?
16     A. That would be an option.
17     Q. That's not an option you took here though,
18 correct?  You didn't have coverage counsel review
19 this claim?
20          MR. McDOWELL:  Object to the form.
21     A. It was -- we had one very general question,
22 and I believe it was whether the estate --
23     Q. Okay.  I didn't want you to say something

Edward F. Roesch                                     72

1  you shouldn't have said.  But, yeah, let me see if
2  I can refresh your memory.  We are on Defendant's
3  Exhibit 18.
4  (Defendant's Exhibit 18 was marked and is attached
5            to the original transcript.)
6      Q. (BY MR. SPEAGLE)  And this is an email from
7  you to Kyle Turner.  Is that what you are
8  referring to?
9      A. I believe so.
10     Q. Okay.  And again I think you could
11 probably -- as David says, the document speaks for
12 itself, but you were really more asking about
13 Alabama estate law to Kyle in this particular
14 instance; is that right?
15     A. That appears to be what the subject is.
16     Q. Okay.  Let me ask this:  This is late in the
17 game.  I shouldn't have said that.  This is in
18 late June of 2011.  The case settles in early July
19 2011.  What was it in late June that made you ask
20 this particular question of Kyle?
21     A. It would have just been one of the variables
22 that we wanted to get an opinion on.
23     Q. Sure.  Would this have been the variable

Edward F. Roesch                                                              73

1    about whether or how the plaintiffs would be able
2    to collect on a judgment in the state of Alabama?
3        A. It could be.
4        Q. Okay. Again, I know you are kind of looking
5    at me strange, but the only reason I'm asking is
6    it just sort of -- this email just kind of pops
7    up. And I didn't -- I was trying just to get what
8    it was in late June that you were wondering about
9    Alabama estate law in this particular claim for,
10   if you recall.
11       A. No.
12       Q. And you may not.
13       A. I don't know what triggered this.
14       Q. Sure. Amazingly enough, this is almost two
15   years ago. Can you believe that?
16       A. It's getting there.
17       Q. Let me show you Defendant's Exhibit 19.
18   (Defendant's Exhibit 19 was marked and is attached
19              to the original transcript.)
20       Q. (BY MR. SPEAGLE) Here is an email I
21   forwarded you soon after you received the case in
22   February of '11. And again I don't necessarily
23   expect that you recall the details of this, but

Edward F. Roesch                                                              74

1    the email that I forwarded on to you was from Matt
2    Maguire. Do you recall who Matt Maguire was?
3        A. I believe he was a defense counsel on the
4    underlying case.
5        Q. Okay. And he was with Balch and Bingham in
6    Atlanta, as I recall. Is that what you recall as
7    well?
8        A. I see balch.com so I would anticipate that's
9    the firm.
10       Q. Let me direct your attention. He says a
11   couple of observations about the bad faith
12   complaint. Number one, no allegation of an
13   assignment from the policyholders to the
14   plaintiffs should be dismissed on that basis.
15   Here as I read it, Matt is telling us that because
16   the Town of Woodland and Billie Vernon Edmondson
17   didn't assign the bad faith claim to the
18   plaintiffs, it was due to be dismissed. Did you
19   ever have that understanding of Georgia bad faith
20   law?
21       A. I think that was one of the potential
22   options.
23       Q. Okay. And read number two. "The second

Edward F. Roesch                                                              75

1    observation, why is Connie Meadows in this case?
2    There was no excess verdict rendered in her case.
3    Her case should be dismissed." Connie Meadows, as
4    you recall, was the one that had the broken leg.
5    Do you remember what her judgment was for?
6        A. I would have to look, but I thought it was
7    -- it was over 300.
8        Q. Hers was around $340,000.
9        A. Okay.
10       Q. Assuming that's the case, that wouldn't be
11   an excess verdict on a two million dollar policy?
12   I think we can all agree to that, can't we?
13       A. I would agree to that, but I think there
14   were people talking about municipal caps applying.
15       Q. Well, yes. Yes. That is -- and we'll get
16   into that too. Let me show you another letter
17   four days later, and this is Defendant's Exhibit
18   20.
19   (Defendant's Exhibit 20 was marked and is attached
20              to the original transcript.)
21       Q. (BY MR. SPEAGLE) And this is a letter from
22   Kate to you. And in this, she said, "You and Tim
23   raised a few questions to which I have preliminary

Edward F. Roesch                                                              76

1    responses. And specifically I want to focus in on
2    number two." And I think, Ed, this gets into our
3    previous conversation. Does Georgia have a third
4    party bad faith against an insurer? Would you
5    mind reading her full response, please?
6        A. "No. The cause of action for bad faith
7    against an insurer for failure to settle within
8    policy limits resides in the insured, not in the
9    third party. Typically the claim is assigned to a
10   third party after an excess judgment. As an
11   interesting aside in this case, there is o excess
12   verdict for the Meadows' claim because her verdict
13   was for 340,000, well within the one million
14   dollar limits."
15       Q. Ed, she said this was a preliminary
16   response. Did you ever ask for any follow-up to
17   this response or any case law to support this as
18   you recall or any other further explanation from
19   Kate?
20       A. I would not know if she embellished on this
21   answer.
22       Q. Okay. And let me ask this: Any time during
23   the course of this claim, do you ever recall the

Edward F. Roesch                                                77

1   estate of Billie Vernon Edmondson or the Town of
2   Woodland, Alabama, assigning the lawsuit to the
3   Holloway and Meadows or assigning their bad faith
4   allegations?
5       A. No.
6       Q. Never happened, did it?
7       A. Not at this point in time or --
8       Q. At any point in time during the claim as you
9   recall, did it?
10      A. No.
11      Q. Did you ever contact the estate of Billie
12  Vernon Edmondson or the Town of Woodland or the
13  Town of Woodland's city attorney, John Tinney, to
14  discuss, "hey, guys, what's your plans?  What are
15  you all doing?  Are you all going to file a bad
16  faith claim," talk to them as witnesses, anything
17  like that?
18      A. The communication would have been through
19  defense counsel.
20      Q. Okay.  Let me ask this:  And again, I'm
21  asking.  As a litigation examiner, adjuster,
22  however, claims manager, I think all the terms we
23  have used, do you ever contact third parties or

Edward F. Roesch                                                78

1   vendors or witnesses to find out their version of
2   an accident or an event?
3       A. Usually not witnesses or people.  Yeah,
4   witnesses.
5       Q. Okay.  And so in this particular case, you
6   would have followed your usual practice and you
7   wouldn't have contacted the estate or the town?
8       A. No.
9       Q. Is it something that you ever asked Kate to
10  do?  "Hey, Kate, you know what?  We may want to
11  find out what these folks think about it"?
12      A. If I remember, Kate had the defense of the
13  case.  I believe another attorney had the defense
14  of the estate.
15      Q. Yes.  Tom Harper, and we'll get to that.
16  We'll get to him in a second.
17      A. Okay.
18      Q. Sure.  Okay.  Let's kind of recap where we
19  are.  The bad faith claim lawsuit against AMIC is
20  by third party -- what we would call third
21  parties; Jeanette Holloway, her estate, and Connie
22  Meadows, correct?
23      A. Correct.

Edward F. Roesch                                                79

1       Q. And a weekend -- and we know that Connie
2   Meadows has a $340,000 judgment against AMIC?
3       A. Correct.
4       Q. And that AMIC's policy is a two million
5   dollar policy?
6       A. Correct.
7       Q. And a week into it, we have two Georgia
8   attorneys who both say the same thing about
9   Georgia bad faith law.  Connie Meadows doesn't
10  have an excess verdict; is that correct?
11      A. Correct.
12      Q. And Georgia doesn't allow third party bad
13  faith unless it's assigned?
14      A. Correct.
15      Q. And an assignment never occurred?
16      A. Correct.
17      Q. So a week into it, did you have an
18  assessment or an appreciation about the merits or
19  the likelihood of success as to this bad faith
20  lawsuit ultimately --
21      A. I knew there could be other outcomes.
22      Q. There could be other outcomes?
23      A. Correct.

Edward F. Roesch                                                80

1       Q. But neither on the email from Matt Maguire
2   or on this particular letter from Kate, other
3   outcomes aren't listed?
4       A. Hadn't come into play yet.
5       Q. Let me ask this:  Do you have a recollection
6   on whether any of those other outcomes could have
7   occurred absent an assignment of the bad faith
8   claim from the judgment debtors?
9           MR. McDOWELL:  Object to the form.
10      A. I have no opinion.
11      Q. (BY MR. SPEAGLE) Okay.  Earlier we discussed
12  how I view a claim and that that wasn't binding on
13  you.  I looked at it as the liability and as the
14  damages.  Did you want to similarly know about
15  what sort of damages AMIC could be exposed to as
16  part of the bad faith claim?
17      A. I would want to eventually know that, yes.
18      Q. Okay.  Well, let me ask this:  Did you
19  undertake to find out about any damages
20  assessments against AMIC?
21          MR. McDOWELL:  Object to the form.
22      A. At what point?
23      Q. (BY MR. SPEAGLE) Well, at any point during

Edward F. Roesch                                      81

1   the claim.  I mean, did you look to see what they
2   could be exposed to or couldn't be exposed to?
3       A. I don't think we put it into dollar ranges.
4       Q. Okay.  Did the topic of punitive damages
5   ever come up?
6       A. It may have been one of the variables
7   discussed.
8       Q. Okay.  You just don't recall as we sit here?
9       A. I really don't.
10  (Defendant's Exhibit 21 was marked and is attached
11          to the original transcript.)
12      Q. (BY MR. SPEAGLE) Let me show you, and
13  Defendant's Exhibit 21, this is a litigation plan.
14  And I think this is one of the documents that you
15  had talked about earlier, early on, that you may
16  have looked at before your deposition.  Do you
17  recall this particular document?
18      A. Yes, I do.
19      Q. As I recall, it was attached maybe to an
20  email or to a letter late June of 2011?
21      A. I believe we first got this document on June
22  27th.
23      Q. June 27, 2011, okay.

Edward F. Roesch                                      82

1       A. I'm not confident of that, but I think that
2   is close.
3       Q. For some reason, I didn't bring the email
4   with me.  If you will flip with me to page six.
5   I'm going to focus on preliminary evaluation of
6   damages, including punitive damages.  And it's
7   that second paragraph that I'm interested in.  "It
8   is not believed that plaintiffs would recover
9   punitive damages, which in any event would be
10  limited to $250,000."  Now my question is:  Did
11  you ever ask her was this one of those gray areas,
12  Ed, "hey, Kate, what do you mean believe?  Can you
13  send me a case?  What are you talking about"?
14      A. I don't believe I asked her that, no.
15      Q. Okay.  If it is an accurate assessment of
16  Georgia law -- and I'm just saying if -- that
17  someone who is assigned -- a third party who is
18  assigned a bad faith claim cannot get punitive
19  damages, you would want to know that, right?
20      A. Give it to me one more time, Scott.  I'm
21  sorry.
22      Q. Let me just -- this is 593 Southeastern 2nd
23  41.  It's Canal Indemnity Company versus Green.

Edward F. Roesch                                      83

1   This is a Georgia Court of Appeals case, and the
2   Georgia Court of Appeals says this:  Canal, the
3   insurance company, is correct that under Georgia
4   law, a right to punitive damages cannot be
5   assigned."  Now assume with me that that's a
6   correct and accurate statement of Georgia law.
7   Holloway and Meadows would not have a punitive
8   damages claim against AMIC, would they?
9               MR. McDOWELL:  Object to the form, and
10  object to the extent that calls for a legal
11  conclusion.
12      A. I'm unfamiliar with the case so --
13      Q. (BY MR. SPEAGLE) Okay.  But when Kate wrote
14  down here that she didn't think the plaintiffs
15  would recover punitive damages against AMIC, that
16  would probably be fairly important, I would think,
17  in your analysis of AMIC's exposure?
18              MR. McDOWELL:  Object to the form.
19      A. It would have been one of the variables.
20      Q. (BY MR. SPEAGLE) Okay.  Did you have any
21  reason or did you have conflicting case law or
22  opinions or memos that gave you an indication that
23  AMIC could be exposed to punitive damages?

Edward F. Roesch                                      84

1       A. No opinion.
2       Q. Okay.  As you recall the life of this claim
3   and any documents -- again, I understand it's 2011
4   we are talking about.  I understand we have 4,000
5   pages of documents.  I also understand that the
6   documents all speak for themselves.  But all that
7   being said, am I correct that the only analysis
8   that NAMIC has as to whether punitive damages are
9   available in Georgia against AMIC is, as Kate
10  says, that they aren't?
11      A. At this point --
12              MR. McDOWELL:  Object to the form.
13      A. At this point, we had Kate's comments.
14      Q. (BY MR. SPEAGLE) Okay.  And if I asked you
15  this already, I apologize.  Were you ever going to
16  seek any further determination as to whether in
17  fact punitive damages could be assessed against
18  AMIC?
19              MR. McDOWELL:  Object to the form.  Are
20  you asking whether as of the time he received
21  this?
22              MR. SPEAGLE:  Yeah.
23      Q. After this, did you have any other thought

Edward F. Roesch                                              85

1    that you needed to go and seek further
2    clarification on the punitive damages issue?
3        A. It was not a variable that I was going to
4    explore beyond this at this point in time.
5        Q. Sure.  And we say at this point in time.  Is
6    there another point in time you may have?
7        A. Yes.
8        Q. Okay.  Did that point in time ever arrive?
9        A. No.
10       Q. Okay.  Let me ask you about this particular
11   document, 22.
12   (Defendant's Exhibit 22 was marked and is attached
13               to the original transcript.)
14       Q. (BY MR. SPEAGLE)  This is an early email
15   from David Sikes to David Stubbs and Matt Maguire.
16       A. This was from David Stubbs to Matt Maguire.
17       Q. There you go, and David Sikes.  I got my
18   David S's mixed up.
19       A. Okay.
20       Q. Thank you very much.  And in particular, I
21   want to -- you may have reviewed this.  I'm sure
22   you did.  But I want to focus your attention on
23   the second page of this document, in particular

Edward F. Roesch                                              86

1    the --
2        A. This second paragraph here?
3        Q. No, the second page.  I'm sorry.  The second
4    page.  The bold type where it says, "Also in
5    Alabama punitive damages cannot be assessed
6    against municipalities."  Was it ever a concern to
7    you or was it ever one of the variables about
8    whether or not punitive damages could be assessed
9    in Alabama?  Was that something that you ever
10   looked into?
11       A. Not at that -- not at the time.
12       Q. Okay.
13       A. I mean, I don't know when this was written.
14   April 12th?
15       Q. Oh, goodness.  This was well before you ever
16   got the claim.  In terms of your legal
17   investigation, whether this was something you ever
18   followed up with.
19       A. There wouldn't have been any need to.
20       Q. Okay.
21       A. At the pivotal time of probably between June
22   27th.
23       Q. And July the 8th?

Edward F. Roesch                                              87

1        A. Well, maybe even up to July 13th.
2        Q. Okay.  Whenever it settled.
3        A. Yeah.
4        Q. That's right.
5    (Defendant's Exhibit 23 was marked and is attached
6               to the original transcript.)
7        Q. (BY MR. SPEAGLE)  Document 23, this is
8    another email that again comes from your packet.
9    It is an email string with David Sikes.  I'm
10   assuming that this was probably in your claims
11   file that you received from AMIC.
12       A. I would -- you know, the date is pretty
13   close to when the thing was filed.  I don't know
14   if this was in there.  I believe it was.  I don't
15   know.
16       Q. Okay.  And this is what I'm going to ask
17   about, specifically the forwarded email down below
18   from Righton Johnson.  She is an attorney at
19   Balch.  "Matt asked me to do some research on
20   AMIC's ability to seek fees for the bad faith
21   action."  You may not have, you may have.  I'm
22   just asking.  Is this an email that you ever asked
23   Kate to follow up on these statutes as to whether

Edward F. Roesch                                              88

1    AMIC could offensively go after Holloway and
2    Meadows for any fees?  If you didn't see it, I bet
3    you didn't, but I don't know unless I ask.
4        A. I don't know if that would have been a
5    question I would have directed to Kate.
6        Q. Okay.  And as you sit here, do you recall
7    this being one of your variable of factors that
8    you were even interested in?
9        A. Probably not one of the variables I would
10   have been spotlighting.
11       Q. Okay.
12   (Defendant's Exhibit 24 was marked and is attached
13               to the original transcript.)
14       Q. (BY MR. SPEAGLE)  I will show you
15   Defendant's Exhibit 24.  One of the areas I think
16   you did spotlight early on and get a resolution to
17   is the idea of -- or a constitutional issue
18   regarding state sovereignty.  And this particular
19   document, 24, is an email string between you and
20   Tim Sullivan and Kate about an issue Tim had
21   regarding constitutional law.  Do you recall why
22   this was important in the early analysis of the
23   claim?

Edward F. Roesch                                                                89

1    A. This was a question better -- this was a
2    question posed by Tim to Kate.
3    Q. Okay.
4    A. I pretty much just read it, the response.
5    Q. Gave a thumbs up or a thumbs down, right?
6    A. Well --
7    Q. Sure, sure.  In any particular case, the
8    idea was whether or not an Alabama entity could be
9    sued in Georgia, and Kate provides the answer that
10   that is probably true that they could.  Did you
11   all ever have any discussions about what in U. S.
12   Constitutional law we call the full faith and
13   credit clause of the constitution?
14   A. I don't have that.
15   Q. Does that ring a bell?
16   A. I may have seen it written in an email.  I
17   don't have anything beyond that.
18   Q. Okay.  Let me ask this:  Let's get back to
19   what I have been calling the Alabama tort caps.
20   And if you want to use a different term or we need
21   to talk about it a different way, I'm fine with
22   that.  Did you undertake any kind of evaluation of
23   whether Alabama tort caps were going to apply in

Edward F. Roesch                                                                90

1    this case, either in Georgia or in Alabama?
2              MR. McDOWELL:  Object to the form.
3    A. I think we posed that as a question to
4    counsel.
5    Q. (BY MR. SPEAGLE)  I always want to know --
6    never mind.  I'm sorry.  And who did you pose that
7    to?
8    A. I think we posed it to Kate.  I can't really
9    think of anybody else.  I think I read where
10   underlying defense counsel on the underlying case
11   may have made comments to AMIC about whether they
12   would apply or not.
13   Q. And underlying defense counsel meaning Matt
14   Maguire?
15   A. Yes.
16   Q. Let me see if I can't -- well, before I get
17   to this particular exhibit, do you recall ever
18   hiring anybody independently, anybody in Alabama,
19   to look at the issue other than Kate?
20   A. No.
21   Q. Okay.  Do you recall whether or not AMIC
22   viewed the tort caps as being a significant issue?
23   A. It was gospel to them.

Edward F. Roesch                                                                91

1    Q. Tort caps were pretty important to AMIC
2    then, weren't they?
3    A. Yes.
4    Q. Okay.  And when you say it was gospel to
5    them, what was AMIC's view as you understand it as
6    to what the tort caps were going to do or not do
7    in the Holloway and Meadows case?
8              MR. McDOWELL:  Object to the form.
9    A. They believed -- AMIC believed that they
10   should apply.
11   Q. (BY MR. SPEAGLE) Okay.  And when we say that
12   they should apply, we are not -- you and I
13   understand we are not talking about that those
14   tort caps should apply to the bad faith action,
15   correct?
16   A. Correct.
17   Q. We are talking about that these tort caps
18   should have applied to the underlying action?
19   A. That was AMIC's wish.
20   Q. Yeah.  Right, right.  That the idea that
21   AMIC wasn't saying to you, 'Ed, these tort caps
22   should apply to limit damages in the bad faith
23   action,' that's not what the argument was.  The

Edward F. Roesch                                                                92

1    argument by AMIC was these tort caps should apply
2    to the judgments entered against the Town of
3    Woodland and Billie Vernon Edmondson?
4    A. AMIC never provided that comment to me.
5    Q. Okay.  Well, let me ask you this then:  When
6    you say it was gospel with AMIC that the tort cap
7    should apply, we use that phrase a lot, that it's
8    gospel this, it's gospel that.  It means we are
9    going to stick to it.  Where do you get that
10   understanding?  Where does that come from?
11   A. That was their whole approach to the defense
12   of the underlying case.
13   Q. Okay.  Was that the tort caps were going to
14   apply?
15   A. Correct.
16   Q. And that was -- again I'm asking.  Did you
17   understand that was going to be their approach to
18   appeal in any other collateral lawsuits?
19   A. I don't know for certain.
20   Q. Okay.  Was it important the issue of the
21   Alabama tort caps and their applicability or lack
22   of applicability an important variable for you?
23   A. It was one of the variables that had a

---

Edward F. Roesch                                    93

```
 1   little bit more import.
 2        Q.  Okay.  Let me ask you this:  Did you ever,
 3   for instance, ask me for a memo on the tort caps?
 4        A.  I don't think so.
 5        Q.  Okay.  Or ask for any cases, Alabama cases,
 6   on the tort caps?
 7        A.  I seem to recall in our July 8th meeting.
 8        Q.  Roy versus Suttles?
 9        A.  That one.  But there was also, I think,
10   mention from David about a bus case.
11        Q.  Okay.  The BJCTA case?  Does that strike a--
12        A.  You've got a lot of acronyms in there.
13            MR. McDOWELL:  And for clarity, I
14   believe the witness was referring to David Sikes
15   as opposed to David McDowell.
16            THE WITNESS:  Right.
17            MR. SPEAGLE:  We have a lot of Davids in
18   the case.  And David McDowell, sitting next to
19   you, not David McDowell, city attorney for the
20   City of Prattville?
21            MR. McDOWELL:  Correct.
22            MR. SPEAGLE:  Or the scurly David
23   McDowell up in north Alabama?
```

Freedom Court Reporting, Inc                877-373-3660

---

Edward F. Roesch                                    94

```
 1            MR. McDOWELL:  That's right.  That's why
 2   I use my middle initial on all my correspondence.
 3        Q.  (BY MR. SPEAGLE)  I have only got one copy of
 4   this what I have marked as Defendant's Exhibit 25.
 5   (Defendant's Exhibit 25 was marked and is attached
 6                to the original transcript.)
 7        Q.  (BY MR. SPEAGLE)  And I'm not sure why.  But
 8   in any event, this is a letter from you -- I'm
 9   sorry.  From Kate to you.  Do you recall receiving
10   this letter?
11        A.  I would imagine I did.  It doesn't appear to
12   be a complete copy.  There is no signature.
13        Q.  That may be why I don't have my other copy.
14            MR. McDOWELL:  If we need a copy of
15   that --
16            MR. SPEAGLE:  Yeah.  Let's do this.
17            THE WITNESS:  Could I get a bathroom
18   break?
19            MR. SPEAGLE:  Let's also -- it's dead
20   slap noon.  What about 1:15?
21            (Recess taken.)
22        Q.  (BY MR. SPEAGLE)  Ed, when we left off, we
23   were discussing, if you recall, the Alabama tort
```

Freedom Court Reporting, Inc                877-373-3660

---

Edward F. Roesch                                    95

```
 1   caps.  And one of the questions that I had was
 2   about who you had look at it, had examine it, and
 3   I believe your response was something to the
 4   effect we asked a question, and there was a memo
 5   out there that discussed what the lawyer in the
 6   underlying case thought.  Off of that answer,
 7   assuming that I have succinctly stated your
 8   testimony, off of that answer, I think this may be
 9   what you were referring to.  And I have marked
10   that as Defendant's Exhibit 25.
11            MR. McDOWELL:  Object to the form.
12        A.  This wasn't the defense counsel for the
13   underlying action.  This was Kate.
14        Q.  (BY MR. SPEAGLE)  Correct.  Let me take a
15   look first at number two, and she says, "Matt
16   Maguire, lead trial lawyer for the defendants,
17   opined that the trial judge, William Lee, would
18   most likely not apply Alabama cap to the car wreck
19   issue.  And Mr. Maguire -- No. 3, Mr. Maguire
20   concluded that whether the cap would be applied,
21   that the judgment had to be domesticated in
22   Alabama was not certain because Alabama law on
23   this issue was conflicting."  Having read that, is
```

Freedom Court Reporting, Inc                877-373-3660

---

Edward F. Roesch                                    96

```
 1   this the document that you were thinking about in
 2   terms of what Alabama law on the tort caps may
 3   have been?
 4            MR. McDOWELL:  Object to the form.
 5        A.  This might have been part of it.  I think
 6   her references to Matt Maguire may have meant
 7   there may have been a document in the underlying
 8   case that he may have had.  I don't know.
 9        Q.  Okay.
10        A.  Or presented.
11        Q.  Okay.  And just to kind of reflect back on
12   the morning session, you would agree with me that
13   the Alabama caps and how they would or would not
14   have applied was an important element in this
15   lawsuit?
16        A.  Correct.
17        Q.  Okay.  And I think you said it was gospel
18   that AMIC believed it would apply?
19        A.  Correct.
20        Q.  Now let me ask this:  From NAMIC's
21   standpoint of the adjustment of this case, what
22   was your view on the Alabama caps as you recall?
23        A.  I knew there was a big question on whether
```

Freedom Court Reporting, Inc                877-373-3660

Edward F. Roesch                                      97

1   or not they would apply.

2     Q. I'm sorry. I think that's how you phrased

3   it earlier. And I think my follow-up question was

4   what is it in the file that led you to believe

5   there was a question as to whether they would have

6   applied or not?

7           MR. McDOWELL: Object to the form.

8     A. This might have been -- this July 5th letter

9   might have been part of it, but I believe there

10  may have been other documents that defense counsel

11  had in the underlying case because it seemed to me

12  that there was a concern from them expressed to

13  AMIC about the ability of the caps to apply.

14    Q. Okay. I think I know what you are talking

15  about. I think there was a mediation letter

16  written by Matt Maguire to a mediator before trial

17  in that case where he mentions that. Do you

18  recall reading that letter? Of the 4,000

19  documents, you mentioned the one I didn't bring.

20    A. I don't -- I mean, I would have seen it.

21  But retained memory of it, no.

22    Q. Sure, sure. Okay. Other than that letter

23  and what we are looking at here in front of us as

Edward F. Roesch                                      98

1   Defendant's Exhibit 25, is there anything else you

2   can recall that you would have looked at, talked

3   to, used to come up with the conclusion that there

4   were big questions as to whether the cap would

5   have applied?

6     A. I believe in addition to my previous

7   comments would have been our meeting on July 8th.

8     Q. Okay. Our meeting on July 8th, and we'll

9   get that. We are kind of steadily progressing

10  toward that. But on the July 8th meeting, what is

11  it during that meeting that would have led you to

12  believe that the caps would not have applied? Or

13  I'm sorry. You didn't say that. That there were

14  big questions as to whether they would have?

15    A. I believe AMIC expressed a case that was

16  going.

17    Q. Okay.

18    A. That had not -- I don't think came down

19  favorably at that point.

20    Q. Roy Suttles? Does that remind --

21    A. That seems to be one, and then I think there

22  was discussion about the bus driver case. And

23  just kind of a general discussion.

Edward F. Roesch                                      99

1     Q. Okay. There is in your stack of exhibits a

2   Defendant's Exhibit 21, which is Kate Whitlock's

3   litigation plan. And you can review this. I can

4   shortcut it, if you would like, but do you recall

5   anywhere in that litigation plan where Kate

6   analyzes Alabama tort caps and their applicability

7   to this lawsuit?

8     A. I know that she mentions them in here. How

9   far she goes in that discussion, I don't know. I

10  didn't review the document.

11    Q. Would it surprise you that she doesn't cite

12  any of the statutes or the cases in that memo?

13    A. I know she cites cases in the memo and

14  statutes. I don't know if they are on point to

15  the applicability of the municipal caps.

16    Q. Okay. Let me show you what I'm going to

17  mark Defendant's Exhibit 26.

18  (Defendant's Exhibit 26 was marked and is attached

19          to the original transcript.)

20    Q. (BY MR. SPEAGLE) This is an email from me

21  to you and Tom Harper and Tim Sullivan and David

22  and Steve, David Sikes and Steve Wells. Do you

23  recall this email?

Edward F. Roesch                                     100

1     A. Not offhand.

2     Q. Okay. Well, you mentioned that at that July

3   8th meeting that we discussed some cases. In this

4   particular memo, I cite -- well, several cases on

5   several different issues, some of which regard the

6   tort cap issue. Specifically if you will go to

7   that second page, that last paragraph. Finally

8   where I say, "Finally the tort cap is a

9   collections cap," and then I run through a series

10  of cases. Did you ask anyone else other than me

11  or try yourself to chase any of those cases down

12  to see whether in fact -- well, anyway, to review

13  the tort caps to see whether there was a big

14  question as to whether they would have applied?

15    A. No.

16    Q. Okay. Is it fair for me to say that pretty

17  much by July 11th, NAMIC's mind was made up that

18  the tort caps were not going to apply?

19          MR. McDOWELL: Object to the form.

20    A. I think we had serious doubts.

21    Q. Okay. There is a particular case that I

22  cite in here that is the Nolan versus Druid City

23  Hospital case. And I cite the first case, and

Edward F. Roesch                                               101

```
 1    then I cite the second case, which is St. Paul and
 2    Marine Insurance Company versus Nolan.  Our
 3    Supreme Court calls them Nolan one and Nolan two.
 4        A. I'm not picking up.  I see the first mention
 5    here.
 6        Q. Yeah.  And then if you flip the page, there
 7    is the second one about midway down, St. Paul Fire
 8    and Marine.
 9        A. Okay.
10        Q. Were you familiar with the facts of Nolan by
11    any chance?
12        A. No, no.
13        Q. In Nolan, the claimant, the third party
14    claimant as we would call them, got a judgment
15    against the insured for $500,000.  Nolan one is
16    where the insured appealed the judgment, and the
17    judgment was upheld.  In Nolan two, the insurance
18    company tendered $100,000 to the insured under a
19    garnishment, and the insured -- or I'm sorry, to
20    the judgment creditor.  I apologize.  And the
21    judgment creditor, i. e., the claimant, then sued
22    the insurance company and asked for the rest of
23    their money.  In that case, Ed, the court held
```

Freedom Court Reporting, Inc                    877-373-3660

---

Edward F. Roesch                                               102

```
 1    that while the judgment remained, the insured
 2    through the insurance company only had to pay the
 3    tort cap.  Is that case at all relevant or
 4    analogous to what AMIC was facing in the Holloway-
 5    Meadows case?
 6            MR. McDOWELL:  Object to the form.
 7        A. I really don't have an opinion.
 8        Q. Okay.  Let me show you Defendant's Exhibit
 9    27.
10    (Defendant's Exhibit 27 was marked and is attached
11            to the original transcript.)
12        Q. (BY MR. SPEAGLE)  This is a similar document
13    to what we looked at earlier, just on this case as
14    opposed to the McCoy case.  And if you will follow
15    with me under the facts section, it says this
16    policy provides ICPL and D&O coverage for AMIC.
17    This claim is under the ICPL portion, and again
18    just for clarification, ICPL means?
19        A. Insurance Company Professional Liability.
20        Q. Okay.  That's right.  And in that particular
21    case, we talked about that would be for bad faith
22    and failure to or bad faith failure to settle type
23    claims?
```

Freedom Court Reporting, Inc                    877-373-3660

---

Edward F. Roesch                                               103

```
 1        A. It would be for any claim arising from the
 2    professional services that are enumerated under
 3    the policy.
 4        Q. Okay.  That's right.  Thank you.  The next
 5    sentence says the claim file contains numerous
 6    notes from the insured examiner indicating that
 7    the AL municipal cap -- and in parenthesis
 8    (100K) -- would be applied by the Court.  The
 9    insured examiner in that sentence is who?
10        A. I'm sorry.  I lost where you were.
11        Q. I'm sorry.  I'm on the very second sentence
12    of the facts section.
13        A. I got you now.  That would be actually
14    referring to David Sikes.
15        Q. Okay.  And this is, I guess, what you were
16    talking about about when you said the caps were
17    gospel with AMIC?
18        A. Yes.
19        Q. Are you getting that from the fact that you
20    found numerous notes?
21        A. I think not only the notes but just even
22    with the actions.
23        Q. Okay.  Five lines up from the bottom, there
```

Freedom Court Reporting, Inc                    877-373-3660

---

Edward F. Roesch                                               104

```
 1    is a sentence that starts at the very end,
 2    "insured has filed an appeal."  Do you see that
 3    one?
 4        A. Yes.
 5        Q. "Of the underlying action in Georgia, along
 6    with the filing of a declaratory action in
 7    Randolph County, Alabama, to attempt to get the
 8    case back to Alabama and have the Alabama court
 9    rule that the Alabama municipal cap is applicable
10    to this auto accident."  In other words, by April
11    the 8th, you understood in the underlying action
12    that that's what AMIC's goal was to do, to get it
13    back in Alabama and have an Alabama court rule on
14    Alabama law?
15        A. That appeared to be the way it was headed.
16        Q. Okay.  Was that a scenario, a plan that you
17    disagreed with?
18        A. No.
19        Q. Okay.  If we can flip to the recommendations
20    and remarks on the next page, "Insured is
21    spearheading appeal of the underlying action,
22    along with prosecuting the new declaratory
23    judgment action filed by the insured in AL to get
```

Freedom Court Reporting, Inc                    877-373-3660

## Page 105

1  the case back to AL and subject to AL jurisdiction
2  as well as municipal cap." Now it's that first
3  part, "insured is spearheading the appeal of the
4  underlying action," who was doing -- when you say
5  insured is spearheading, who were you referring
6  to?
7    A. Actually that probably would have been AMIC
8  along with the defense counsel.
9    Q. Okay. Defense counsel meaning?
10    A. If it was on the appeal would have been
11  Kate.
12    Q. Okay. Kate Whitlock?
13    A. Right.
14    Q. And what I don't see -- and this may not be
15  your practice. I don't see anything in this
16  recommendations or remarks that say, for example,
17  we think the cap argument is questionable or we
18  had big questions of whether the cap was going to
19  apply. And so my question to you then is on April
20  the 8th of 2011, did you have questions about
21  whether Alabama tort caps would apply in this
22  case?
23    A. Oh, yes.  Yes.

## Page 106

1    Q. Okay. And again was that from your review
2  of the underlying claims file?
3    A. Probably from the underlying claims file. I
4  don't know if we had the initial thought from Kate
5  or not.
6    Q. Okay. Is that something you normally would
7  have put into your large loss notice, whether you
8  have questions or whether you think a particular
9  strategy is wise or not?
10    A. Yeah. I mean, no. I think you see all
11  sides or try to fight it as best you can from all
12  sides.
13    Q. Okay. Let me come down here on your first
14  page again where it says "coverage questions, if
15  any." That's on your first page, I'm sorry. You
16  put "resolved coverage being provided under an
17  ROR." Does NAMIC as a practice ever assign a
18  separate adjuster or litigation examiner to a
19  coverage file?
20    A. If there is a coverage issue that is being
21  researched or explored.
22    Q. Okay. Was there a coverage issue being
23  researched or explored in this case?

## Page 107

1    A. I do not think so. I don't believe so.
2    Q. That second line -- I'm sorry. The next
3  line after that, "insured's liability," you put
4  questionable. In the previous large loss notice,
5  you had -- I think the entry said clear liability.
6  The document says what it will say, but if my
7  memory serves me correctly, it says clear
8  liability.
9    A. On the first one?
10    Q. On the first one. In this one, you put
11  questionable.
12        MR. McDOWELL: When you say the first
13  one, you are talking about McCoy?
14        MR. SPEAGLE: The first one we looked at
15  today.
16    A. McCoy?
17    Q. Right.
18    A. Yeah.
19    Q. Here you put questionable. What was it --
20  when I see the word questionable, it means they
21  could be liable or they couldn't be. Is that
22  correct? Is that how you use the term?
23    A. Yes.

## Page 108

1    Q. Well, tell me in terms of liability why you
2  thought they wouldn't be liable as you looked at
3  it, or if you recall. Ed, again, this is almost
4  two years ago. I understand.
5    A. And I think the thought process was if the
6  case had -- I mean, the case was originally --
7  underlying case was originally filed in Randolph
8  County, if I remember correctly.
9    A. Yes.
10    Q. And was then removed to Georgia. And the
11  reason for the removal was kind of strange to me,
12  if I remember correctly.
13    Q. Very.
14    A. And so I saw that as, you know, kind of what
15  happened, who was watching, what was going on.
16    Q. Okay. Now in terms of that AMIC could be
17  liable, what is it that you, if you recall,
18  thought about factually where you thought AMIC
19  could be liable in this particular instance?
20        MR. McDOWELL: Just so that we are
21  understanding each other, are you asking what the
22  thought process was on whether it was questionable
23  on AMIC's liability for bad faith or for the

Edward F. Roesch                                          109

1  underlying case or --
2            MR. SPEAGLE:  David, that's a good
3  point.
4       Q.  I had asked you earlier when you put
5  questionable for insured's liability whether it
6  was fair for me to say they could be liable or
7  they couldn't be liable.  I didn't really define
8  as to what and you didn't -- we didn't really
9  discuss that.  So my question goes back to this
10 particular entry where you put questionable next
11 to insured's liability.  And I'm trying to see if
12 you today almost two years later recall what it is
13 you were thinking about why AMIC couldn't be
14 liable, and I think you just told me because there
15 was some fishy things going on with the first part
16 of the case.  And now I'm trying to shift to the
17 other side of that spectrum as to why they might
18 be liable.  I know you are not telling me that
19 they are or aren't.  I understand that.  But that
20 could apply here to anything.  I'm not sure what
21 you were thinking when you put questionable down.
22 So that's what I'm seeking to discover.
23      A.  I think it was just basically the

Edward F. Roesch                                          110

1  uncertainty surrounding the applicability of the
2  caps because at that point how that would unfold
3  if -- I mean, if the caps apply, AMIC would have
4  been exonerated.  If the caps didn't apply, then I
5  could see where they could develop a case for bad
6  faith.
7       Q.  Okay.  And at the time -- I say you knew.
8  At the time in your file, was a copy of a
9  declaratory judgment complaint that AMIC had filed
10 to determine that in Randolph County as well as
11 proof of claims that the underlying tort claimants
12 had made in the probate court of Randolph County?
13 Do you remember looking at those earlier?
14      A.  I'm not following that question real well.
15      Q.  Sure.  We'll go on to something else.
16      A.  Okay.
17      Q.  When you first took over the case in
18 January, late January or early February, I guess
19 it was late January 2011, did you issue a
20 reservation of rights?
21      A.  Yes.
22      Q.  You did?
23 (Defendant's Exhibit 28 was marked and is attached

Edward F. Roesch                                          111

1            to the original transcript.)
2       Q.  (BY MR. SPEAGLE)  Let me show you what I
3  have marked as Defendant's Exhibit 28.  Is that
4  the reservation of rights you are referring to?
5       A.  Yes.
6       Q.  Okay.  And tell me, what's the date on that
7  reservation of rights?
8       A.  April 8th of 2011.
9       Q.  Okay.  So two, two and a half months after
10 you got the claim?
11      A.  Somewhere in there.  The file documents
12 weren't sent immediately with the complaint so I
13 don't know if it's fair to say they got there
14 January 27th.
15      Q.  Yeah.  That's when the complaint would have
16 gotten there.
17      A.  Yeah.  The complaint beat the file by some
18 time.
19      Q.  Let me ask, I'm going to show you another
20 document, Defendant's Exhibit 29.
21 (Defendant's Exhibit 29 was marked and is attached
22            to the original transcript.)
23      Q.  (BY MR. SPEAGLE)  Let me ask about this.

Edward F. Roesch                                          112

1  This is to Danny Ransom from Lenora L. Adams.  And
2  I would think you would know Ms. Adams?
3       A.  Yes.
4       Q.  Okay.  And who is she?
5       A.  She is the senior executive assistant.
6       Q.  And is this her acknowledgment that -- well,
7  tell me what this letter is.
8       A.  This is a letter that we send to our
9  insureds upon receipt of a claim or a suit.
10      Q.  Okay.
11      A.  Depending on if it's a claim or if it's a
12 suit or it's an agent E&O case or D&O case, that
13 type of thing.  But basically it's just sent to
14 acknowledge receipt of the suit.  And then as
15 customary, we do put a reservation of rights,
16 general reservation of rights.
17      Q.  Okay.  And that was my question.  Have you
18 run into a situation at NAMIC where you all
19 haven't sent this letter out after receipt of a
20 claim?
21            MR. McDOWELL:  Object to the form.
22      A.  I can't recall any, no.
23      Q.  This is a customary letter on your part?

Edward F. Roesch                    113

1   A. Yes.

2   Q. Okay.  Did you intend for this letter to be

3   a reservation of rights under which this case

4   would be governed or the claim would be governed,

5   I'm sorry, not the case?

6           MR. McDOWELL:  Object to the form.

7   A. It's a reservation of rights letter that we

8   issue on the case.

9   Q. Okay.  What is then the letter of April the

10  8th?

11  A. It's a further clarification of the

12  reservation of rights.

13  Q. Okay.  Let's go back, if I can, to the April

14  the 8th reservation.  If you will flip with me to

15  your page eight, I guess the Bates label is 140.

16  A. Yes.

17  Q. Let's see here.  It is the third paragraph

18  up from the bottom.

19  A. Okay.

20  Q. It starts off, "AMIC has retained the law

21  firm of" -- and in parenthesis it puts firm -- "to

22  provide a defense in this matter.  Scottsdale

23  consents to the firm representing AMIC so long as

Edward F. Roesch                    114

1   there is no conflict of interest between

2   Scottsdale and AMIC which renders this

3   representation inappropriate."  Now, Ed, I think

4   we have looked at some emails.  It was actually --

5   wasn't it the other way around?  Didn't NAMIC hire

6   Kate Whitlock, and then after hiring Kate

7   Whitlock, call Danny Ransom and say "do you have

8   any problems"?

9   A. No.

10  Q. That's not how it worked?

11  A. No.

12  Q. AMIC hired Kate Whitlock?

13  A. The email you are referring to was having

14  Kate run a conflict check.

15  Q. Okay.  It is Defendant's Exhibit 6.  That's

16  the one I'm referring to.

17  A. Right.

18  Q. Okay.  So is it your position -- I say

19  yours.  Well, yeah.  Is it your position that it

20  was AMIC who hired Kate Whitlock and Scottsdale is

21  the one who consented to that hiring?

22  A. I think my claim notes are pretty extensive

23  on this.  But basically, as I mentioned, we had --

Edward F. Roesch                    115

1   this just was having Kate do a conflict check.

2   There was a conversation I had with Danny Ransom

3   where he advised me that he also was given the

4   name of the Drew, Eckl firm as potential handler

5   of this and that he would have no problem with

6   them.

7   Q. Okay.

8   A. Then there was additional notes almost a

9   month where you and I were almost conversing on a

10  semi daily basis or whatever, trying to ensure

11  that Steve Wells and you and Danny and ultimately

12  David Sikes was in agreement with that retention

13  because, if I remember, you and Steve were on

14  board and then took it to David Sikes.  And David

15  Sikes had push back on it.

16  Q. Let me see if I can't -- and we'll get to

17  this, but just see if this helps you clarify.  Do

18  you recall any conversations that we needed to

19  replace Matt Maguire at Balch, Bingham with an

20  attorney that Kate Whitlock was, I guess,

21  advertising by the name of Tom Harper?

22  A. We knew that underlying counsel needed to be

23  substituted out.

Edward F. Roesch                    116

1   Q. There you go.  I represent to you that's, I

2   think, going to be what we find are the series of

3   notes and conversations that we had.  I'm really

4   referring to in your large loss notice letter you

5   have that the defense counsel is Kate Whitlock.

6   I'm talking about the assignment of Kate Whitlock

7   to defend the bad faith claim.  Is it your

8   position that AMIC hired her and that you all

9   consented as you stated here in this reservation

10  of rights letter?

11  A. I think we came to them with a

12  recommendation and got AMIC to agree to the

13  recommendation.

14  Q. Okay.

15  (Defendant's Exhibit 30 was marked and is attached

16          to the original transcript.)

17  Q. (BY MR. SPEAGLE)  We looked at the policy a

18  little bit earlier.  Do you recall what the policy

19  said about who had the responsibility or who could

20  choose defense counsel?

21  A. Yes.

22  Q. Okay.  And what did you recall the policy

23  saying?

**Edward F. Roesch** 117

1   A. I believe it said that NAMICO could assign
2   defense counsel.
3   Q. Okay. So if the policy states that NAMICO
4   gets the right to choose the defense counsel, this
5   particular sentence is actually in conflict with
6   the policy?
7        MR. McDOWELL: Object to the form.
8   Q. (BY MR. SPEAGLE) I said this particular
9   sentence and nobody on God's green earth is going
10  to know what I'm talking about. When I said this
11  particular sentence, Ed, I'm talking about
12  Defendant's Exhibit 28, page eight, the first
13  sentence of the third paragraph from the bottom
14  that we have just been talking about.
15       MR. McDOWELL: Object to the form.
16  A. What's the question?
17  Q. Sure. That conflicts with the policy?
18       MR. McDOWELL: Object to the form.
19  A. I don't know if it conflicts.
20  Q. Okay. That's all I was asking. So it's
21  AMIC's or NAMIC's position that -- well, that AMIC
22  retained Drew, Eckl or let me say Kate Whitlock
23  because I don't want to confuse our terms -- and

**Edward F. Roesch** 118

1   that Scottsdale consented?
2        MR. McDOWELL: Object to the form.
3   Asked and answered.
4   A. I think NAMICO made a recommendation that
5   was received well by their litigation manager,
6   Danny Ransom, and further was asked to make sure
7   that Stephen Wells and David Sikes and Scott
8   Speagle were on board with counsel that was going
9   to be retained to defend AMIC.
10  Q. Okay. When Kate was brought on -- I was
11  going to say retained by you, but we'll just move
12  on from there. When Kate was brought on as
13  defense counsel, what lawsuit was she defending?
14  A. She was defending the bad faith case.
15  Q. Okay. Now you picked up on one thing. Two
16  things early on in going through your claim notes
17  came up. One is the removal of Matt Maguire as
18  the Town of Woodland and Billie Vernon Edmondson's
19  attorney and replacing him with Tom Harper. Do
20  you recall that being an important issue early on?
21  A. It was an issue that needed to be addressed.
22  Q. Okay. And from NAMIC's standpoint, how did
23  you all want that to be addressed?

**Edward F. Roesch** 119

1   A. We wanted to substitute counsel.
2   Q. And that's a change you all were directing?
3   That's what you all wanted to have happen?
4   A. That would have been our recommendation,
5   yes.
6   Q. Okay.
7   (Defendant's Exhibit 31 was marked and is attached
8        to the original transcript.)
9   Q. (BY MR. SPEAGLE) Let me show you
10  Defendant's Exhibit 31, which again is a series of
11  emails, I think, about this very topic. And the
12  first is, if you will go down to your email of
13  Tuesday, March the 1st, to Kate and to me. You
14  say this: "Hey, do we have the B&B and local
15  attorneys off of the appeal yet? We need to get
16  this finished." And my response to you is above,
17  "I have gotten David to come around. He wants the
18  opportunity to talk about the B&B lawyer from
19  Montgomery about what we are about to do." Does
20  this document help you recall that all of those
21  discussions between you and I and Kate and Steve
22  and Danny and David had to do with the Balch,
23  Bingham attorney and getting Harper put on the

**Edward F. Roesch** 120

1   case?
2        MR. McDOWELL: Object to the form.
3   A. Getting Kate put on the case.
4   Q. (BY MR. SPEAGLE) Kate was already on the
5   case, wasn't she?
6   A. Not at this point. I don't think she had
7   entered an appearance.
8   Q. Well, I tell you what, we can find out. Let
9   me show you what I have marked as 30. Have you
10  seen this before?
11  A. Appears to be a bill.
12  Q. From Drew, Eckl and Farnham, and it's to
13  you. And what is the first entry for
14  professional services? What's the date?
15  A. January 31st.
16  Q. Okay. Now when you say that Kate hadn't
17  noticed an appearance yet, did you mean in the --
18  what action did you mean? What action were you
19  referring to?
20  A. I'm sorry. Once again, please?
21  Q. What action were you referring -- you
22  mentioned earlier, "I didn't think Kate had
23  entered an appearance yet. She hadn't been

---

Edward F. Roesch                                    121

1    hired."  What action were you referring to?
2        A. I don't think we had completed a
3    substitution of counsel.
4        Q. Okay.  Who was the substitution of counsel
5    supposed to be between?
6        A. Kate for Mr. Maguire.
7        Q. If I represent it was actually Tom Harper
8    for Mr. Maguire, would that cause you heartburn?
9        MR. McDOWELL:  Object to the form.
10       Q. And it may, but --
11       A. I don't -- I don't know why.
12       Q. Okay.  Look on page 2654.  And if you would
13   for me, look at entry 2-20-11.  She has an entry
14   there for 1.4 hours of drafting an answer to a
15   complaint, and then down below it, draft a motion
16   to dismiss.  And that's two full weeks before this
17   email that is Defendant's Exhibit 31.  Do you see
18   that?
19       A. Okay.
20       Q. Does that help you recall that Kate was
21   already in the case defending the bad faith action
22   and that what we were trying to do was replace Tom
23   Harper who Kate recommended with -- replace Matt

---

Edward F. Roesch                                    122

1    Maguire with Tom Harper who Kate was recommending?
2        A. One more time on the question.
3        Q. Okay.  I'm just trying to nail down
4    factually whether we are on the same page, and we
5    may not be.  The substitution of counsel was going
6    to be with Tom Harper and Matt Maguire.  You don't
7    have to agree with that.  I'm sort of dogmatically
8    stating it, but I think the documents are going to
9    bear that out.  I'm just seeing if that's the same
10   recollection you have.  And the reason I'm asking
11   that is because by the time I'm sending this email
12   to you on March the 3rd, 2011, Kate Whitlock was
13   already in the case defending the bad faith
14   action.  Is that your understanding?
15       A. Not from looking at this record.
16       Q. Okay.  The fact that on February the 20th of
17   2011 she was drafting an answer to the complaint,
18   that doesn't help you at all?
19       A. Drafting and filing are two different
20   things.
21       Q. Well, okay.  Let me -- did Kate Harper do
22   anything else for AMIC other than defend the bad
23   faith action?

---

Edward F. Roesch                                    123

1        MR. McDOWELL:  Object to the form.
2        A. Who is Kate Harper?
3        Q. (BY MR. SPEAGLE) Kate Whitlock.  How many
4    times did I say that in a row?  Did she do
5    anything else for AMIC?
6        A. Can you give me the whole question?
7        Q. Well, what was Kate Whitlock's scope of
8    work?
9        A. She is probably reviewing file materials.
10       Q. Okay.  And what did you all hire Kate
11   Whitlock to do?
12       A. Defend AMIC.
13       Q. In what?
14       A. The bad faith case.
15       Q. Okay.  That's what I'm getting at.  It was
16   also NAMIC's position that Kate should defend AMIC
17   in the appeal of the underlying declaratory
18   judgment action?
19       A. Correct.
20       Q. Okay.  Good.  Now let's go back to
21   Defendant's Exhibit 30.  And if you will flip with
22   me to page 2655, there is an entry on 2-23-11
23   where she says -- it's about four down, finalized

---

Edward F. Roesch                                    124

1    request for oral arguments.  Oral arguments would
2    have been the appeal, correct?
3        A. I believe so.
4        Q. Okay.  Two down from that -- well, no, it's
5    not.  I just lied to you.  Six down from that on
6    2-24, there is a point three entry, telephone
7    conference with E. Roesch -- that's you.  I
8    represent that's you -- regarding defensive
9    insureds in appeal and retrial strategy and
10   arguments to be made.  Does that help us that Kate
11   was simultaneously defending AMIC in the bad faith
12   case and defending AMIC in the appeal?
13       A. It says telephone conference with E. Roesch
14   regarding defense of insureds in appeal and
15   retrial strategy and arguments to be made.
16       Q. Okay.  And do you recall having
17   conversations with Kate about the appeal, AMIC's
18   appeal strategy, and appeal arguments?
19       A. I don't have any specific.
20       Q. Just generally, did you all remember talking
21   about it?
22       A. Most likely we did.
23       Q. Okay.  Getting back to this Tom Harper, do

Edward F. Roesch                                                125

1    you have any recollection or understanding of who
2    Tom Harper is?
3        A. Tom Harper was the attorney suggested by
4    Kate to represent the town and the estate.
5        Q. Okay.  Great.  Did Tom Harper bill NAMIC for
6    his services?
7        A. I can't -- I don't know.
8        Q. Okay.  He didn't.  If I represent to you he
9    didn't, you don't have any recollection that he
10   would have billed you all?
11       A. I wouldn't have thought he would.
12       Q. Right.  And the reason you wouldn't have
13   thought he would is because that was AMIC's
14   insureds, correct?
15       A. Correct.
16       Q. So that Tom Harper would have billed AMIC
17   for his services?
18       A. Seems logical.
19       Q. Yeah.  Kate, however, billed NAMIC for her
20   services; is that correct?  And we'll get to the
21   deductible in just a second.
22       A. Yeah.  I mean, she sent us a copy of the
23   bill.

---

Edward F. Roesch                                                126

1        Q. Well, take a look at this bill.  She didn't
2    send you a copy of the bill.  She sent you the
3    bill.
4        A. Well, yeah.
5        Q. Right?
6        A. Yeah.
7        Q. And it was regarding the bad faith claim,
8    Murphy Barbara Jean versus Alabama Municipal
9    Insurance Corporation, correct?
10       A. Correct.
11       Q. And we can go back through it.  But as part
12   of her time that she billed NAMIC for, part of her
13   time, a good bit of her time, was in defending
14   AMIC in the underlying appeal litigation; is that
15   correct?
16       A. I haven't reviewed the bill enough to tell
17   one way or the other.
18       Q. Now AMIC's policy, do you recall whether it
19   had a $50,000 deductible?
20       A. I believe that was the deductible.
21   (Defendant's Exhibit 32 was marked and is attached
22           to the original transcript.)
23       Q. (BY MR. SPEAGLE) And Defendant's Exhibit 32,

---

Edward F. Roesch                                                127

1    I think that is in your file.  And right after you
2    received that, you actually closed it.  But in any
3    event, you recall that AMIC paid Kate that
4    deductible?
5        A. Yes.
6        Q. Okay.
7        A. On October 28th of 2011.
8        Q. And after payment of the deductible, there
9    was still legal expenses outstanding.  Do you
10   recall that?
11       A. I couldn't recall.
12       Q. Okay.  So if I'm correct that Kate billed
13   AMIC for its time on the appeal, that went against
14   the deductible that AMIC had to pay.  Does that
15   make sense?
16       A. Kate billed AMIC for -- I really am not
17   following the question.
18       Q. Okay.  You recall after you received this
19   bill, do you know what you did with it?
20       A. It probably went into the file.
21       Q. Okay.
22       A. I don't know if this would have been her
23   first bill generated.  It looks like it was.

---

Edward F. Roesch                                                128

1        Q. Yeah.  I think this is her first bill.
2        A. And we got it on June 6 of 2011.
3        Q. Sure.  Do you recall that you forwarded on
4    -- do you recall any emails that you forwarded on
5    to AMIC that we have received these bills, these
6    are subject to a $50,000 deductible?  Do you
7    recall anything like that?
8        A. There may have been an email to that effect.
9        Q. In any event, early on in the case, within a
10   month, NAMIC wants Kate to defend the bad faith
11   suit and defend the appeal in the underlying
12   litigation?
13       A. Correct.
14       Q. Okay.  And do you recall that the appeal --
15   that was a pretty big deal, wasn't it?
16           MR. McDOWELL:  Object to the form.
17       A. Yes.  What do you mean a big deal?
18       Q. (BY MR. SPEAGLE) Well, the appeal was a big
19   part of this case, wasn't it?
20       A. It was part of the case.
21       Q. Yeah.
22   (Defendant's Exhibit 33 was marked and is attached
23           to the original transcript.)

Edward F. Roesch                                     129

1    Q. (BY MR. SPEAGLE)  Defendant's Exhibit 33,
2  which is a letter -- I apparently do not have one
3  for you.  Defendant's Exhibit 33, "Dear Ed, We
4  were recently notified by the Court of Appeals
5  granted the request for oral argument in the Town
6  of Woodland/Edmondson versus Murphy and Meadows
7  case.  Since granting oral argument is
8  discretionary with the Court and is not often
9  granted, we were quite pleased with the order."
10 Is it fair for me to say that Kate kept you
11 abreast on all of the appeal activities going on?
12   A. Oh, yes.
13   Q. Is it fair for me to say that you stayed
14 involved as a litigation examiner in all of the
15 appeal activities?
16   A. Yes.
17   Q. Okay.  And in fact you were --
18 (Defendant's Exhibit 34 was marked and is attached
19           to the original transcript.)
20   Q. (BY MR. SPEAGLE)  Defendant's Exhibit 34,
21 you were pleased with the news that we had oral
22 arguments?
23   A. Must have been.

Freedom Court Reporting, Inc            877-373-3660

Edward F. Roesch                                     130

1    Q. Defendant's Exhibit 34 simply says, "Great
2  news.  Thanks for the update."  Would you have
3  been surprised if Kate did not keep you up to date
4  on the appeal activities?
5    A. I believe we had sent Kate -- and I'm not
6  sure on this, Scott -- but a letter that basically
7  outlines that we wanted to be kept abreast of --
8    Q. Defense attorney guidelines?
9    A. Yeah.
10   Q. Okay.  As you recall, all of the issues and
11 all of the elements and all of the variables going
12 on, do you recall how you characterized the
13 appeal?
14        MR. McDOWELL:  Object to the form.
15   Q. (BY MR. SPEAGLE) Well, let me say this:  Do
16 you recall saying this about the appeal:  "The
17 critical junction on this case will come with the
18 appellate hearing scheduled for 7-14-2011.  This
19 is when oral arguments will be heard on the
20 current pending motions on the underlying appeal"?
21 Do you recall that?
22   A. You are reading something to me that I'm not
23 looking at so --

Freedom Court Reporting, Inc            877-373-3660

Edward F. Roesch                                     131

1    Q. Okay.  And I guess my point, Ed, is that
2  everybody agreed that the appellate stage of this
3  litigation was critical in how this whole claim
4  was going to play out.  Would you agree with that?
5    A. Yes.
6    Q. Okay.  And you recall, I think you told me
7  earlier, that oral arguments on this were set for
8  Thursday, July 14th, 2011?
9    A. I believe that was the date.
10   Q. Okay.  Well, that takes us to a new section.
11        MR. SPEAGLE:  Can I take a brief break?
12        (Recess taken.)
13 (Defendant's Exhibit 35 was marked and is attached
14           to the original transcript.)
15   Q. (BY MR. SPEAGLE)  I'm going to hand you what
16 I have marked as Defendant's Exhibit 35.  Now this
17 is a series of your claim notes in this action,
18 and you can look through them.  I have ended this
19 particular batch on, I think it is, the 12th of
20 July, 2011.  Anyway, I have broken them up into
21 two batches, and we'll talk about that in a
22 minute.  But nevertheless, that's the first half
23 of them starting with the beginning.  And that's

Freedom Court Reporting, Inc            877-373-3660

Edward F. Roesch                                     132

1  where I would like for you and I to start, if we
2  could.
3    A. Okay.
4    Q. The first claim note on 1-27-2011, "I
5  received this suit and claim from the insured
6  today.  It appears that NAMICO may wish to retain
7  coverage counsel in light of the suit details."
8  Now talk to me, I guess, about that.  We talked
9  earlier that there was no coverage counsel
10 retained, but it looks like initially you thought
11 that you may need to.  What changed?  Why did you
12 think you needed to and why did you ultimately not
13 do so, if you recall?
14   A. If I remember correctly, AMIC was named as a
15 defendant in July or June of 2011.  Not named
16 but --
17   Q. Yeah.  In the underlying case?
18   A. Correct.
19   Q. I see.  For, I guess, declaratory judgment
20 purposes.  So the issue there would have gone to
21 notice?
22   A. Correct.
23   Q. I see.  And so I'm assuming eventually you

Freedom Court Reporting, Inc            877-373-3660

Edward F. Roesch                                    133

1   answered all your questions regarding notice and
2   opted not to retain coverage counsel?
3       A. Oh, yes. Very quickly, in fact.
4       Q. Okay. The next one, the next note I want to
5   direct your attention to starts on February the
6   3rd, 2011. It's just the date on the first page.
7   If we go to the second page, it looks like your
8   offices were closed for the winter ice storm. I
9   didn't think that you all closed offices in
10  Indianapolis. Don't you all brave ice and snow?
11      A. This was a big one. I mean, it was a really
12  bad one. You couldn't walk anywhere without
13  slipping and falling down. It was a mess. It was
14  a mess.
15      Q. Well, that being an aside, it's that second
16  full paragraph. "I did confirm with Danny that
17  AMIC had no issues with the retention of Kate
18  Whitlock at Drew, Eckl and Farnham, LLP, to defend
19  AMIC. Danny advised that this was one of the
20  firms that had been recommended to him, and he was
21  okay with their representation of AMIC." Again, I
22  guess, is this the note that keeps popping up that
23  reminds you of the phone call that you had with

Edward F. Roesch                                    134

1   him?
2       A. Correct.
3       Q. Okay. And that very next paragraph then, "I
4   called Kate Whitlock to let her know that we had
5   received her assignment letter of 2-1-2011."
6   Again, does this refresh your recollection that
7   Kate Whitlock was hired early on and that later
8   the substitution of counsel came with Tom Harper?
9   It may not. We may have to get to those notes.
10      A. I was just basically stating that the
11  recommendation of Kate Whitlock to defend AMIC had
12  been received well by Danny.
13      Q. Okay. Then let's, if we could, go to --
14  it's going to be Bates labeled page SIC 624. And
15  right above the line continued to monitor, that
16  last full paragraph, "We are still awaiting
17  confirmation from AMIC" -- are you with me?
18      A. I'm not.
19      Q. I'm sorry.
20      A. Oh, down here at the bottom?
21      Q. There you go. "We are still awaiting
22  confirmation from AMIC that they agree with Kate
23  and NAMIC's proposal that new counsel be brought

Edward F. Roesch                                    135

1   in as substitute counsel to take over the handling
2   of the underlying case and appeal." Again, does
3   that help solve the -- I guess it's not really a
4   dilemma, but the question about who the substitute
5   counsel was going to take over for?
6           MR. McDOWELL: Object to the form.
7       A. Yes.
8       Q. (BY MR. SPEAGLE) Okay. And according to
9   this note, it was Kate and NAMIC who wanted
10  substitute counsel in for the underlying
11  litigation and the appeal?
12      A. Yes.
13      Q. And the follow-up question to that is Tom
14  Harper eventually became that substitute counsel
15  as you recall?
16          MR. McDOWELL: Object to the form.
17      A. For the two defendants I had previously told
18  you.
19      Q. (BY MR. SPEAGLE) There you go. Okay. Now
20  let me ask you this: Did you ever call or talk or
21  have any conversations with Tom Harper?
22      A. There may have been or maybe even a type of
23  a conference call with Tom and Kate. But I'm

Edward F. Roesch                                    136

1   really -- that's -- I can't really clearly say yes
2   or no.
3       Q. If you did, would you anticipate that your
4   claims notes would reflect that?
5       A. Possibly.
6       Q. Okay. Let's move, if we could, it's going
7   to be your Bates label 637. And particularly I'm
8   interested in the very first note under April the
9   8th, 2011. It says, "I have drafted and sent
10  NAMICO ROR and DAG letters to the insured and DC."
11  Tell me, if you could, what is an ROR letter?
12      A. Reservation of rights.
13      Q. And what is a DAG letter?
14      A. Defense attorney guidelines.
15      Q. Okay. "And I also drafted and sent to TFS a
16  copy of my LLR for SIC." Let's see if we can't
17  navigate our way through that. TFS is Tim
18  Sullivan?
19      A. Correct.
20      Q. The LLR, am I correct that that's that large
21  loss notice document?
22      A. Report, yes.
23      Q. There you go, large loss report, and for

Edward F. Roesch                                      137

1    CIC, Scottsdale Insurance Company?

2        A. SIC.

3        Q. That too.  Thank you.

4        A. No problem.

5        Q. If we flip back between January 31st, 2011,

6    and February 3rd, 2011, there is not a reference

7    to that Lenora Adams letter that we looked at

8    earlier.

9        A. Did you say January 31st or January 3rd?

10       Q. Let's go with 31st.

11       A. Okay.

12       Q. The first three claim notes.

13       A. Okay.  There is no reference -- do you

14   remember the Lenora Adams letter that we looked at

15   a little earlier?

16       A. Yes.

17       Q. There is no reference to that in your claim

18   notes.  Would you have seen that letter or would

19   you have dictated that letter or is that something

20   that when she gets the claims, she processes and

21   sends out herself?

22       A. I would have asked her to send the letter in

23   an email.

---

Edward F. Roesch                                      138

1        Q. Okay.  The next place in our claims notes

2    that I want to go to is 6-27-2011.  And that, I

3    find, beginning at 649.  Now it looks to me, this

4    is a fairly long note, and it looks to me like the

5    reason it's a fairly long note is you took the

6    litigation plan that we reviewed earlier and

7    that's one of the things that you put in your

8    claim file.  Would I be correct about that?

9        A. Correct.

10       Q. Okay.  Now talk to me about what you see.

11   You say DC's litigation plan is below, right

12   before you begin that litigation plan.  Tell me

13   about the litigation plan.  What is it, what were

14   you looking for, is it a requirement for your

15   defense attorneys under the defense attorney

16   guidelines, that sort of thing?

17       A. It is a request that is made within the

18   defense attorney guidelines and also a document

19   that we -- I don't want to say expect but want

20   from defense counsel when they are able to comment

21   on liability and damages or a case evaluation.

22       Q. Okay.  Had you had a case evaluation or a

23   liability or damages evaluation prior to this

---

Edward F. Roesch                                      139

1    particular litigation plan?

2        A. Not that I'm aware of.

3        Q. Okay.  Now if I recall correctly -- and we

4    can probably go back through these notes and

5    actually find out -- but the appeal briefs had

6    already been drafted and submitted and filed.  Do

7    you recall that?

8        A. I believe -- yes, prior to the June 27th

9    date.

10       Q. In fact I was able to put my hand on it.  On

11   Bates label 640, there is a note that says, "On

12   4-25-2011, I received the following update today

13   from DC, which contains numerous documents and

14   briefs that have been filed on behalf of the

15   insured."  Do you see where I was talking about?

16       A. Yes.

17       Q. Okay.  So by the end of April, all of the

18   appeal briefs had been filed?

19       A. I believe so.

20       Q. Okay.  Do you recall whether or not you

21   received the appellee's briefs or, let me say

22   this, the estate of Jeanette Holloway and Connie

23   Meadows' briefs?

---

Edward F. Roesch                                      140

1        A. I do not recall if I had those at the time

2    of this.

3        Q. And tell me what you are pointing to.

4        A. The April 25th, 2011, note.

5        Q. Sure.  I think you would have received

6    those.  Let's see if this helps.  If you can go to

7    643 under 5-20-2011, it says, "I received the

8    following letter from DC."  If we flip it, brief

9    of appellees, Barbara Jean Murphy and Connie

10   Meadows in the AMIC case.  So maybe a little about

11   towards the end of May, you would have gotten

12   their briefs?

13       A. It appears to be so.

14       Q. Do you recall reviewing those?

15       A. I would have reviewed them.

16       Q. Okay.  And then following that on page 645,

17   on June 6, 2011, you received AMIC's reply brief.

18   And do you recall reviewing it?

19       A. I'm sorry, Scott.  What date?

20       Q. I'm sorry.  June 6, 2011.

21       A. And the question?

22       Q. Kate says that she has sent you the reply

23   brief.  Do you recall reviewing it or, if you had

Edward F. Roesch                                    141

1    received it, would you have reviewed it?
2        A. That's what the note says.
3        Q. Okay.  Now at some point after these briefs
4    have come in, as I understand it, Kate went to
5    Indianapolis to meet with Tim and yourself.  Do
6    you recall that?
7        A. Yes.
8        Q. Okay.  Do you know when that would have
9    been?
10       A. Seems to me it was June 26th, 27th.  It may
11   even be referenced in the note.
12       Q. It is.  Look at 649 again.  And right above
13   June 27th, 2011, "DC is in Indy on Monday,
14   6-27-2011.  We will discuss our litigation plan at
15   that time."  The claims notes help, don't they?
16       A. That's why we keep them.
17       Q. Do you recall that meeting?  Apart from
18   anything that you would look in your claims notes,
19   do you recall what you all discussed, how you
20   discussed it, what you talked about?
21       A. We probably would have reviewed the
22   litigation plan that she had because it was
23   obviously a document.

Edward F. Roesch                                    142

1        Q. Right.
2        A. And discussed it.
3        Q. Did you recall -- let me ask this:  How long
4    did the meeting last?
5        A. Boy, a couple of hours and maybe a lunch in
6    there.
7        Q. Sure, sure.  Did you all look at any case
8    law?  Do you recall?
9        A. I don't know if Kate brought additional
10   documents besides the litigation plan.
11       Q. You are getting to my questions, did Kate
12   bring any additional documents besides the
13   litigation plan?  Do you recall whether you -- you
14   mentioned earlier you may have had a telephone
15   conversation when Tom Harper was there.  Do you
16   think this was it or maybe that was later?
17           MR. McDOWELL:  Object to the form.
18       Q. Or could be earlier?
19       A. It may have been earlier, Scott, or, I mean,
20   in that time frame, there was a lot of things
21   going on.
22       Q. Okay.  When you say in that time frame a lot
23   of things going on, how do you mean?

Edward F. Roesch                                    143

1        A. Just the meeting with Kate and then knowing
2    that we were planning to meet with AMIC.
3        Q. Okay.  And let me get to that point.  When
4    did you determine you wanted to come meet with
5    AMIC?
6        A. I will take a minute.
7        Q. If it's in there, tell me.
8            MR. McDOWELL:  While he is looking, I
9    neglected to put on the record we want the usual
10   stipulations, except this is going to be a read
11   and sign before I forget.
12       A. It looks like June 30th of 2011, starting on
13   page 659 at the bottom with the date, discussed up
14   in the very first paragraph of 660 and maybe three
15   lines up from the bottom of that paragraph.
16       Q. (BY MR. SPEAGLE) Okay.  TFS and EFR heading
17   to Montgomery, Alabama, on 7-8.  Okay.  What was
18   it that occurred as best you recall -- let me back
19   up.  You had not previously come down to
20   Montgomery to meet with AMIC during the life of
21   this claim?
22       A. No.
23       Q. Okay.  What was it that occurred that --

Edward F. Roesch                                    144

1    what was it that occurred that made you all want
2    to come down to Montgomery?
3        A. The hearing scheduled for July 14th.
4        Q. Okay.  And what hearing was that?
5        A. Where they were going to -- I think it was
6    oral arguments on the briefs, wasn't it?
7        Q. Yeah.
8        A. You were there.
9        Q. Oral arguments in the appeal wasn't on the
10   bad faith case, was it?
11       A. No.
12       Q. No.  Let me ask this:  At any time between
13   as you recall the issuance of the reservation of
14   rights in April and the meeting of July the 8th,
15   2011, did you update AMIC or give them any kind of
16   a status on where they stood with you on coverage?
17       A. No.
18       Q. Okay.  Go back to the -- instead of fishing
19   through that for the litigation plan, the
20   litigation plan starts in your claims notes on
21   page 649.  And I am interested in page 658,
22   probability of a defense verdict.  Now Kate in
23   here says, "We estimate there is a 35 to 40

Edward F. Roesch                                                      145

```
1   percent chance of obtaining a defense verdict in
2   the bad faith case." Did you all discuss that
3   probability with her as you recall at the meeting
4   in Indianapolis?
5       A. It would have come up as part of the
6   discussion of the litigation plan.
7       Q. Did Kate as you recall inform you or tell
8   you that the Town of Woodland and/or the estate of
9   Edmondson had assigned their bad faith claims to
10  the Holloway and Meadows?
11      A. No.
12      Q. Because they hadn't yet, had they?
13      A. Correct.
14      Q. They never did? I think we have gone over
15  that. The life of this claim, they never assigned
16  that claim?
17      A. Correct.
18      Q. If they never assigned the claim as you
19  understand Georgia law, could a third party bring
20  a bad faith action?
21      A. No.
22      Q. So as of this date, it was not a 35 to 40
23  percent chance. It was 100 percent chance because
```

Edward F. Roesch                                                      146

```
1   they couldn't even bring the claim, could they?
2                MR. McDOWELL: Object to the form.
3       A. I don't have the ability to foresee what
4   they would have done in the future.
5       Q. (BY MR. SPEAGLE) Okay. It says, "We
6   estimate that there is a 30 percent chance that
7   the town and Mr. Edmondson will be granted a new
8   trial." Did you all discuss at all Tom Harper's
9   brief that because Mr. Edmondson was acting in the
10  line and scope of his employment, he couldn't be
11  sued individually? Do you ever recall that
12  discussion coming up?
13      A. I think that was a question.
14      Q. Okay. You remember it, you just don't
15  remember it? You remember it as being a question
16  as to whether he could or couldn't?
17      A. I think he was named as a defendant in the
18  suit individually.
19      Q. Correct. But they also said -- you are
20  right. He was absolutely named in the suit. I'm
21  talking about Tom had made an argument in this
22  brief that because he was sued in the line and
23  scope of his agency, that he couldn't be sued
```

Edward F. Roesch                                                      147

```
1   individually even though they named him as an
2   individual. And I don't know if -- that may not
3   have come up and it may. I'm just asking.
4       A. I don't recall.
5       Q. Certainly. I'm just talking about in terms
6   of this 30 percent chance, what is it you would
7   have -- you all would have talked about back then
8   that you can recall gave these percentages? And
9   you may not be able to. Why did Kate think it was
10  a 30 percent chance?
11      A. You should ask her.
12      Q. Well, you have it in your claims notes.
13  That's why I'm asking you.
14      A. It was a cut and paste from her report.
15      Q. That's fair. That's fair. Okay. After you
16  end her report, it says "end" there in parenthesis
17  so I'm assuming -- if I'm wrong, tell me. The
18  very next paragraph, I think, is you; that is,
19  your notes or your thoughts. Would that be
20  correct?
21      A. Correct.
22      Q. Okay. And here is what it says, "Following
23  review of DC's litigation plan, we have lots of
```

Edward F. Roesch                                                      148

```
1   hurdles to overcome. In order to get the case in
2   any position to have some leverage to be able to
3   possibly compromise the claim with PC" -- PC
4   meaning plaintiff's counsel?
5       A. Correct.
6       Q. "The best chance would be that the appellate
7   court hold the municipal cap applies be it AL or
8   Georgia, which effectively eliminates the
9   potential for a bad faith finding." And on 6-28
10  of 2011, that was your thought, wasn't it, that
11  the appellate court was the best chance?
12      A. It appears to have been my thought.
13      Q. Now come up to the probability of defense
14  verdict, what did Kate estimate, if you don't mind
15  telling me, what the likelihood that the judgments
16  would be capped under Alabama or Georgia law?
17      A. I believe that's the third sentence that she
18  has in the report under probability of defense
19  verdict.
20      Q. Yes. And what does that say? What was that
21  estimate?
22      A. Her comment is "we estimate there is a 75 to
23  80 percent chance that the judgments will be
```

Edward F. Roesch                                      149

1   capped under either Alabama or Georgia law."

2       Q. From your standpoint, is a 75 or 80 percent

3   chance good, bad or indifferent?

4       A. It's good.

5       Q. It's good?  Okay.  Now the next -- I guess

6   that was 6-27.  The next day, on 6-28-2011, which

7   is 659, here is what I read to you earlier and we

8   just hadn't gotten to it yet.  Your comment --

9   these are your comments as best I can tell.  This

10  does not look like a letter.  "The critical

11  juncture of the case will come with the appellate

12  hearing scheduled for 7-14-2011."  Did I read that

13  correctly?

14      A. Correct.

15      Q. And again that was NAMIC's understanding,

16  that the appeal is the critical juncture in the

17  case, isn't it?

18      A. That's Ed Roesch's opinion.

19      Q. Well, and Ed Roesch is the one adjusting the

20  claim on behalf of Scottsdale for AMIC, right?

21      A. Correct.

22      Q. All right.  Now if you come down to the very

23  last paragraph, there is a sentence that says --

---

Edward F. Roesch                                      150

1   well, I say the last paragraph.  In the claim note

2   6-28-2011, I have got one, two, three, four

3   paragraphs before continue to monitor.  It starts

4   with "finally."  Are you with me?

5       A. Correct.

6       Q. All right.  It's the second sentence that

7   I'm most interested in.  "DC relayed that the

8   insured" -- and you have in parenthesis David

9   Sikes -- "is still of the opinion that the most

10  AMIC will be required to pay is $100,000, and

11  there is nothing within the current state of any

12  of these cases which suggests this is a realistic

13  outcome."  Okay.  Ed, where in either of your

14  claims notes or any of the documents that we have

15  looked at today do you base this particular

16  opinion on?

17      A. I think I would have to go back to Kate's

18  statement where she says that she represents the

19  75 to 80 percent, and I think if you would suggest

20  that if it would have been two sentences there

21  that had two different percentages in there that

22  she may have had different percentages if she said

23  the percentage of winning the municipal cap under

---

Edward F. Roesch                                      151

1   AL is X, and then the percentage applicable or

2   possible under the Georgia cap would be X.  But

3   you would have to ask her on that.

4       Q. Okay.  And as you think about that, is that

5   something that you all would have discussed at

6   that meeting?  "While you may have put this in

7   here, Kate, what is the likelihood that it will be

8   capped in Georgia and what's the likelihood it

9   will be capped in Alabama"?

10      A. I think her comment -- and I think you will

11  have to talk to her, but it was pretty low that

12  the Alabama caps would apply.

13      Q. Okay.  Do you know whether Kate is licensed

14  in Alabama?

15      A. Good question.

16      Q. Okay.  Would it surprise you that she is

17  not?

18      A. Not necessarily.

19      Q. Okay.  Do you know whether Kate had any

20  experience previous to this case with Alabama tort

21  caps?

22      A. You would have to ask her.

23      Q. Okay.  Did you seek the opinion of another

---

Edward F. Roesch                                      152

1   attorney licensed in Alabama as to whether the

2   tort caps would have been a realistic outcome in

3   this particular case?

4       A. I do not believe so, no.

5       Q. Okay.  If we go back from this date, 6-28-

6   2011, and go through all these claims notes to

7   1-27-2011, do you reference or do you recall

8   putting in cases or statutes from Alabama as to

9   the Alabama tort caps?

10      A. I can't recall.

11      Q. Okay.  Do you recall whether Kate's

12  litigation plan references any statutes or cases

13  from Alabama?

14      A. I don't know.  I would suggest that might be

15  a good question for her.

16      Q. Let me ask you this:  We can actually

17  probably go through it and see, right?

18      A. Sure.

19      Q. The litigation plan begins on page 649 or we

20  can use the exhibit.  That's better.  We'll use

21  the exhibit.  It is Defendant's Exhibit 21.  Now

22  on that first page, Ed, do you see any references

23  to any Alabama statutes or Alabama cases?

Edward F. Roesch                                    153

1      A. Not being an attorney, I don't see any.

2      Q. Well, are you familiar with statutory and

3   case sites?

4      A. Somewhat.

5      Q. I mean, if you saw a case site in a statute,

6   you would know that's what it was?

7      A. Probably.

8      Q. Let's flip to the second page and let's take

9   a look.

10     A. Looks like we have an Alabama statute.

11     Q. There you go, and what Alabama statute,

12  which one is it?

13     A. 11-93-2.

14     Q. Okay.  And that is the statute she begins

15  here, correct?

16     A. Correct.

17     Q. And could you tell me what that statute

18  says, please, if you don't mind?

19     A. What Kate has written here says, "The

20  recovery of damages under any judgment against a

21  governmental entity shall be limited to $100,000

22  for bodily injury or death for one person in any

23  single occurrence...  No governmental entity shall

---

Edward F. Roesch                                    154

1   settle or comprise any claim for bodily injury,

2   death, or property damage in excess of the amounts

3   hereinabove set forth."

4      Q. Okay.  Now did you ever ask AMIC whether

5   they had settled any claim above that tort cap?

6      A. I don't know if we specifically asked AMIC.

7      Q. Did you ever ask them for, let's say, a list

8   of claims that either settled or went to judgment

9   above the tort cap?

10     A. I don't think we asked for a listing of

11  claims.

12     Q. Did you ever ask AMIC for any claims that

13  may have started outside the state of Alabama that

14  the tort cap was either used or used to settle a

15  case?

16     A. No.

17     Q. Okay.  Now did Kate give you any explanation

18  as you recall as to why that cap would not have

19  applied in this case?

20        MR. McDOWELL:  Object to the form.

21     A. I believe those were motions that had been

22  made by underlying defense counsel in the case and

23  had been rejected.

---

Edward F. Roesch                                    155

1      Q. Sure.  That was on appeal, correct?

2      A. Correct.

3      Q. And that's what you put in your case note as

4   being the critical juncture in the case; am I

5   right?

6        MR. McDOWELL:  Object to the form.

7      A. Possibly.

8      Q. (BY MR. SPEAGLE) Well, let's flip through

9   that second page and see if we find any Alabama

10  cases that can help us distinguish what that

11  particular statute tells us.  Do you see any cases

12  cited on that second page or any statutes other

13  than the one you just looked at?

14     A. I see a reference to appearance to be a

15  Georgia statute.

16     Q. A Georgia statute, sure.  On the next page,

17  there is a preliminary -- probably on your next

18  page too, under preliminary evaluation of

19  liability, that's where most of these case

20  citations and statutes come from.  Are there any

21  from Alabama that you can tell?

22     A. It looks to me that page three only has

23  Georgia.

---

Edward F. Roesch                                    156

1      Q. Georgia cases.  Now you can look to your

2   heart's desire, but I will submit to you, Ed, that

3   as we go through the rest of this, you are not

4   going to find any Alabama cases or any further

5   Alabama statutes on the issue of the tort caps.

6   Would that surprise you?

7      A. No, because the case was in Georgia.

8      Q. Was the declaratory action in Georgia?

9      A. No.

10     Q. Was the notice of claims on the estate of

11  Billie Vernon Edmondson in Georgia?

12     A. Are you referring to a previous document?  I

13  would have to look at it again to see what it was

14  captioned or where it was.

15     Q. If I represent to you it was in the probate

16  court of Randolph County?

17     A. Okay.

18     Q. And it was AMIC's -- and again I get back to

19  this question of how was Jeanette Holloway and

20  Connie Meadows going to collect on their judgment?

21        MR. McDOWELL:  Object to form.

22     A. I don't know.  I mean, I don't know

23  procedurally how they would collect on their

Edward F. Roesch                                          157

1    judgment.  I knew they did have a judgment sitting
2    in Georgia, and they had a two million dollar bond
3    that had been posted.  So I imagine the judge
4    could have handed them that.
5        Q. (BY MR. SPEAGLE) Well, you bring up an
6    interesting point.  The two million dollar bond,
7    did you notice the case number that the two
8    million dollar bond referred to?
9        A. It wasn't pointed out to me.
10       Q. Sure.  Let's take a look at that because I
11   submit to you that that was Randy Haynes' first
12   fatal mistake in this entire litigation.  That's
13   gratuitous and probably should be stricken, but in
14   any event.  Now let's take, if I could, this bond.
15   Take a look for me and see what case number this
16   references, if you could read that for me, please.
17       A. CV-2011-CV-0035.
18       Q. Okay.  And the underlying cases are CV what?
19       A. 01423.
20       Q. And?
21       A. CV-10424.
22       Q. Defendant's Exhibit 16, which is the bond,
23   is a different case number than the two underlying

Edward F. Roesch                                          158

1    cases according to these documents, correct?
2        A. This is the first time I have seen that
3    document.
4        Q. Sure.  And did you understand that in
5    Georgia, collection or a garnishment action is a
6    separate action from the underlying action?  It's
7    a completely separate lawsuit?
8        A. No idea.
9        Q. Did you understand that you actually have to
10   have another essentially mini trial on the
11   garnishment if a defendant or a garnishee objects
12   to the garnishment?
13       A. I have no knowledge.
14       Q. Okay.  Do you know one way or the other
15   whether AMIC objected -- actually it's a strange
16   word called submitted a traverse in the
17   garnishment action?
18       A. I don't recall seeing one or being provided
19   one.
20   (Defendant's Exhibit 36 was marked and is attached
21            to the original transcript.)
22       Q. (BY MR. SPEAGLE)  Let me show you
23   Defendant's Exhibit 36, and you may not have ever

Edward F. Roesch                                          159

1    seen this.  It does not have an SIC Bates label
2    number, but this is traverse of defendants Alabama
3    Insurance Municipal Corporation in CV-2011-35.
4    Now again is this a document that you have ever
5    seen?
6        A. It doesn't refresh or -- I don't have any
7    knowledge of this document.
8        Q. Okay.  Where we left off in our -- in our
9    claims notes at June the 28th.  And I guess the
10   next claims note that I want to come to, if I can
11   find it, is the claim note of 7-12-2011, which is
12   on the very last page of that document.
13       A. Appears to be more to it.
14       Q. There is, and that's on the -- I just
15   realized that we did not add --
16   (Defendant's Exhibit 37 was marked and is attached
17            to the original transcript.)
18       Q. (BY MR. SPEAGLE)  Defendant's Exhibit 37,
19   here is the next page of that.  In our zeal to
20   make this efficient, we did not put that page,
21   attach that page with the other one.  Okay.  This
22   particular claim note, I think, is going to
23   describe the meeting that we had on July the 8th

Edward F. Roesch                                          160

1    of 2011.  As a matter of fact, it starts off "TFS
2    and I met with DC, insured GC and insured in
3    Montgomery, Alabama, on 7-8-2011."  Now we talked
4    a little earlier, Ed, about why you all came to
5    Montgomery.  And if I recall, the answer was to
6    talk about the appeal.  Is that why you all came
7    to Montgomery?
8            MR. McDOWELL:  Object to the form.
9        A. Yes.
10   (Defendant's Exhibit 38 was marked and is attached
11            to the original transcript.)
12       Q. (BY MR. SPEAGLE)  Now I'm going to also --
13   so you have it handy -- hand you Defendant's
14   Exhibit 38, which is -- I believe, are these your
15   notes that you would have had on the -- is that your
16   handwriting?
17       A. Yes.
18       Q. Okay.  It doesn't have to be.  It can be
19   somebody else's.  But I believe these are your
20   notes.  Okay.  Let's talk first about Defendant's
21   Exhibit 38, which is your handwritten notes.
22       A. Okay.
23       Q. You have a little heading, "Domesticate

Edward F. Roesch                                    161

1    judgment in Alabama," and you have Scott Speagle.
2    You have number one, driver not proper party.
3    Dismissed out of Georgia action.  Two, AMIC
4    dismissed totally."
5        A. In totality.
6        Q. In totality, thank you.  I'm sorry.  I'm
7    curious as to why those two things were important
8    to put down.  Talk to me about how you took notes
9    that day.  What were you trying to keep up with?
10   What did you want to hear from us, those sorts of
11   things?
12       A. It looks like the first four may have been
13   Kate's summary of four possible outcomes.
14       Q. Okay.
15       A. And then evidently I think this refers that
16   Scott Speagle is basically two potential options
17   or outcomes that you brought up.  And that's about
18   it.
19       Q. Okay.  Tell me, did NAMIC have a plan of
20   what it wanted to accomplish when it came to meet
21   with AMIC on July the 8th of 2011?
22       A. I think we wanted to discuss the case with
23   AMIC and work out a strategy.

Edward F. Roesch                                    162

1        Q. A strategy to do what?
2        A. Somehow potentially try to resolve the case
3    or if there was any interest in resolving the
4    case.
5        Q. Did AMIC as you recall have any interest in
6    -- well, let me ask you this:  In resolving what
7    case?
8        A. I think if I remember correctly, this would
9    have been after the receipt of a letter from Randy
10   Haynes suggesting a global settlement of
11   everything.
12       Q. Including the bad faith case?
13       A. I believe the whole kit and caboodle.  I
14   would have to look at his letter.
15       Q. Well, I would agree with you.  I think your
16   recollection is correct, and that letter is, I
17   think, in their depositions.  And how much was he
18   going to settle it for?
19       A. I believe -- and I would have to look at the
20   letter, Scott.  But I seem to recall I thought it
21   was two million plus interest.
22       Q. I think your recollection is correct.  Now
23   let me ask you this:  Have you -- and I think I asked

Edward F. Roesch                                    163

1    you this earlier, and if I did, please forgive me.
2    Have you read AMIC's responses to NAMIC's
3    interrogatory answers?
4        A. I think I have already answered the
5    question, but I --
6        Q. I can't remember whether you have or
7    haven't.
8        A. I think I did.
9        Q. And you said you did not read David or
10   Steve's depositions?
11       A. Correct.
12       Q. All right.  And who spoke on behalf of NAMIC
13   that day?
14       A. I would -- it was probably Tim, Tim
15   Sullivan.
16       Q. Okay.  And let me ask this:  This is what we
17   are kind of all here about today and what we all
18   want to hear.  Do you recall that Tim looked at
19   Steve and David and I and proposed the -- or gave
20   the hammer clause or the hammer letter in the
21   policy?
22       A. There was reference to the consent to settle
23   clause.

Edward F. Roesch                                    164

1        Q. Okay.  And tell me -- I guess tell us what
2    the consent to settle clause, what you mean by
3    that.
4        A. Let's get it.
5        Q. Sure.  It's in Exhibit 8, right?
6        A. I'm hoping I'm picking it up in its
7    entirety here, but I believe it starts in Roman
8    numeral one, letter C.
9        Q. Sure.
10       A. And it says, "If an insured shall refuse to
11   consent to any settlement or compromise
12   recommended by the insurer and acceptable to the
13   claimant and shall elect to further contest the
14   claim, then the insurer's liability shall not
15   exceed the amount for which the insurer would have
16   been liable for loss and claim expense at the time
17   the claim could have been settled or compromised.
18   Should the insured refuse consent for such
19   recommended settlement, the insurer may withdraw
20   from the defense of the claim.  If an insured
21   shall refuse such a consent and continue to
22   contest the claim and either prevail in litigation
23   or pay loss in an amount less than the loss amount

Edward F. Roesch                                  165

```
 1   which the insurer recommended, the insurer shall,
 2   subject to the deductible and any applicable
 3   policy provision, reimburse the insured for loss
 4   and/or claim expenses incurred by the insured
 5   subsequent to the proposed settlement, even if the
 6   claim expense to be reimbursed to the insured
 7   exceeds the claim expense at the time of the
 8   proposed settlement, but in no event shall the
 9   insured be obligated to reimburse the insured for
10   more than the total amount of claim expense and
11   loss at the time of the proposed settlement
12   recommended by the insurer." And then it goes on,
13   "The insurer has the right, but not duty, to
14   appeal any judgment." And then it goes on to say,
15   "except at the insured's own cost and for the
16   insured's own account, without an insured's prior
17   written consent," and then it enumerates six
18   pieces.
19       Q. What the insured can't do?
20       A. Right.
21       Q. Okay. Now I have seen that in some of the
22   documents, and I have referred to that as a hammer
23   clause. If I say the phrase "hammer clause," is
```

Edward F. Roesch                                  166

```
 1   that -- when I said that, is that where you go?
 2   Is that the clause that would refer to a hammer --
 3   is what you just read a clause that would refer to
 4   a hammer clause?
 5       A. I have heard it called that.
 6       Q. You said consent to settle clause?
 7       A. Correct.
 8       Q. Do you recall Tim saying that it was a
 9   hammer clause?
10       A. I don't remember the exact verbiage used.
11       Q. Okay. Do you remember that Tim Sullivan
12   told David and Steve and I that the reason that
13   NAMIC was invoking the hammer clause was because
14   NAMIC had twice the exposure of AMIC in this
15   litigation?
16       A. I think that would be a question that should
17   be posed to Tim.
18       Q. Well, you were there, weren't you?
19       A. I was there. I just -- I would have to look
20   at some notes or something.
21       Q. That's not in -- there are your notes right
22   there. That's Exhibit 35.
23       A. Okay. Does it say anything about it in
```

Edward F. Roesch                                  167

```
 1   there?
 2       Q. Well, I'm sorry, your notes from the actual
 3   Exhibit 35.
 4       A. I don't see any mention of that here.
 5       Q. No, I don't either. So I'm asking, absent
 6   notes, do you remember Tim Sullivan saying that in
 7   that meeting?
 8       A. I remember he had suggested some exposure to
 9   NAMIC.
10       Q. Do you remember that the exposure was twice
11   the amount of the exposure that AMIC had? I think
12   it was actually over twice the amount.
13       A. Once again, I would be giving you a guess.
14       Q. Okay. Let me ask this: If David and Steve
15   testify under oath that that's what Tim said to
16   us, would you have any reason to disagree with
17   them?
18       A. I would say that that's David and Steve's or
19   David Sikes and Stephen Wells' recollection of the
20   day.
21       Q. Okay. You just don't recall that one way or
22   the other?
23       A. I don't have to a point where I could be
```

Edward F. Roesch                                  168

```
 1   accurate, I think. I believe.
 2       Q. Do you recall that one of the reasons that
 3   Tim said AMIC had twice the exposure --
 4       A. AMIC or NAMIC?
 5       Q. I'm sorry, NAMIC, was because AMIC could
 6   have punitive damages instituted against it in the
 7   bad faith action?
 8       A. That's a better question for Tim Sullivan
 9   than me.
10       Q. Again, you were at the meeting.
11       A. Absolutely.
12       Q. Do you recall whether he said that or not?
13       A. I don't recall the specific verbiage, Scott,
14   so I can't tell you if he would have said
15   punitives or bad faith damages or whatever.
16       Q. Do you recall that Tim said to David and
17   Steve and I that AMIC had a five million dollar
18   policy limit with NAMIC; whereas, AMIC's policy
19   limit with its insureds was only two million
20   dollars?
21       A. I seem to recall a comment on the limit.
22       Q. Okay. Do my numbers sound correct, five
23   million with NAMIC policy and two million with
```

Edward F. Roesch                                        169

```
1    AMIC's policy?
2        A. I would have to see the dec page to
3    accurately --
4        Q. No, no, no.  The dec pages say what the dec
5    pages say.  I'm with you there.  I'm talking about
6    do you have a recollection of what Tim said to
7    David, Steve and I?
8        A. He may have suggested what you said.
9        Q. Do you recall then Tim concluding on those
10   three bases that AMIC was going to settle the
11   underlying claim for two million dollars or NAMIC
12   was going to pull the defense in the lawsuit?
13       A. I believe there was a reference to the
14   consent to settle clause.
15       Q. Well, and the actual -- we can call it what
16   we will.  But the threat was you all were going to
17   pull the defense, right?
18           MR. McDOWELL:  Object to the form.
19   Characterization.
20       A. It's policy language.  It's not a threat.
21       Q. (BY MR. SPEAGLE) Okay.  And this was six
22   days prior to in your notes the critical juncture
23   of the lawsuit, the oral arguments on the
```

Edward F. Roesch                                        170

```
1    underlying appeal?
2        A. Yes.
3        Q. And the oral arguments on the underlying
4    appeal was not on the bad faith case, was it?
5        A. No.
6        Q. And Kate Whitlock was assigned by you on the
7    bad faith case, correct?
8        A. Correct.
9        Q. And she was also AMIC's counsel or
10   representing AMIC as appeal counsel in the
11   underlying appeal, right?
12       A. Correct.
13       Q. Do you have on your notes, it says "Kate" --
14   I'm sorry.  This last little section here, "Kate,
15   Scott Speagle after lunch."  Do you remember any
16   discussion between your side of the table and our
17   side of the table at the time about whether we had
18   seen the policy and we needed to review the policy
19   and look at the hammer clause?
20       A. I think that might have been something that
21   was discussed prior to lunch.
22       Q. Right.  And that we actually kind of used
23   lunch to review that policy, that hammer clause?
```

Edward F. Roesch                                        171

```
1        A. I don't know what you did, but --
2        Q. Okay.  That's fair.  That's fair.  And the
3    reason I -- I knew I got hammer clause from
4    somewhere, "Kate, Scott Speagle after lunch.
5    Hammer clause."  When you say hammer clause on
6    your notes, you are referring to that big long
7    section you just read in the policy?
8        A. Correct.
9        Q. Okay.  When we came back from lunch, do you
10   recall AMIC making a proposal regarding the
11   settlement?
12       A. I believe so.
13       Q. Okay.  And do you recall what that was?
14       A. Well, I have on my note here that AMIC was
15   suggesting they would be doing 200K up front, not
16   subject to any payment by NAMIC, and that it
17   appears that it was 50/50 with AMIC and NAMICO.
18       Q. Okay.  Do you recall why AMIC said it would
19   pay $200,000 up front?
20       A. I believe that's what they felt they would
21   have had to pay based on the Alabama municipal
22   caps.
23       Q. And that that was essentially AMIC's
```

Edward F. Roesch                                        172

```
1    contract obligation --
2            MR. McDOWELL:  Object to the form.
3        Q. -- was 200,000?
4            MR. McDOWELL:  Object to the form.
5        A. If the Court said Alabama municipal caps
6    apply, yes.
7        Q. (BY MR. SPEAGLE) And it was, I think you
8    said, 50/50 split after that.  Did NAMIC provide
9    any guidance or suggestion or recommendation or
10   thought as to what the amount of the settlement
11   could be?
12       A. I don't have anything specific here on my
13   note.
14       Q. Do you recall at all?  To give you an
15   example, do you recall whether you all thought it
16   could settle for a million dollars or $500,000
17   or --
18       A. I think I knew that since Mr. Haynes had a
19   5.9 judgment, that if we can get the case resolved
20   for two million or 1.8, but those were pretty
21   general discussions.  I think the comment made by
22   everybody there was that there had been little
23   chance for a lot of negotiation.
```

Edward F. Roesch 173

1    Q. Okay. Did NAMIC agree to pay anything at

2  that July 8th meeting as you recall or enter into

3  any kind of settlement agreement or negotiation?

4    A. We at that point would be discussing that

5  with Scottsdale.

6    Q. Okay. Up to that point, you hadn't

7  discussed a settlement with Scottsdale?

8    A. There was no -- there was no plan at that

9  point. We just had a two million dollar plus

10  interest demand.

11    Q. Okay. And I think if my recollection

12  recalls, that was on July 5th when that came, that

13  demand letter came. Does that sound right?

14    A. It sounds approximately right.

15    Q. Okay.

16    A. I mean, if that was the date on the letter,

17  I can't tell you that that's the date that we

18  received it.

19    Q. When we came back from lunch, do you recall

20  whether AMIC -- me in particular -- had any

21  questions about whether or not the hammer clause

22  could be used in the manner you all were

23  attempting to use it?

---

Edward F. Roesch 174

1    A. I don't recall that discussion, Scott.

2    Q. Okay. Do you remember Tim saying, "Yes, it

3  did. I wrote the policy"?

4    A. I really --

5    Q. You just don't recall?

6    A. I mean, that's a pretty specific phrase you

7  are asking so --

8    Q. Sure. After you all went back to

9  Indianapolis, what did you all do?

10    A. I believe we -- rather Tim put together or

11  discussed it with Scottsdale to see if they were

12  in agreement with the proposal.

13    Q. This was -- let me see if we can set our

14  dates. July the 8th was a Friday.

15    A. Correct.

16    Q. Saturday the 9th, Sunday the 10th, Monday

17  the 11th, Tuesday the 12th, Wednesday the 13th.

18  Thursday, July 14th, was oral arguments. So there

19  were three working days after this meeting before

20  the oral arguments, correct? Do you think that --

21  let me ask this: When is the next time you talked

22  to anyone with AMIC about the possibility of an

23  agreed settlement?

---

Edward F. Roesch 175

1    A. It seems I could maybe look at my notes, but

2  I believe we got a call from you and David.

3    Q. Okay. Do you remember Steve being on that

4  phone call as well?

5    A. He wouldn't have been identified.

6    Q. Turn to -- well, I can't find any notes on

7  it either. Let me ask this: Before we get there,

8  before we get there, you have another note on

9  Defendant's Exhibit 37. At the very bottom of

10  that first page, July 12th, 2011, "And as part of

11  our discussion on July the 8th, 2011, DC contacted

12  an associate at her firm to see if they had

13  research on ministerial versus discretionary acts

14  and how the Georgia courts would apply these to

15  the driver of the van. This is the lynch pin of

16  the case, and should the acts of the driver be

17  determined discretionary, no municipal caps would

18  apply in either state." Do you see that?

19    A. Uh-huh (yes).

20    Q. Where did you get that idea? Do you recall?

21    A. You know, I really don't. And I would have

22  definitely thought there would have been some

23  document or something that I would have --

---

Edward F. Roesch 176

1    Q. Now after that, you have a discretionary

2  versus ministerial immunity, and it looks like you

3  have pulled it from a letter. And again, if you

4  will, take a look at 664 and 665. Do you see any

5  -- your note says no municipal caps would apply in

6  either state. Looking at 664 and 665, do you see

7  any Alabama cases at all that would lead you to

8  the conclusion that the municipal cap wouldn't

9  apply in Alabama?

10    A. No. I see two Georgia cases. I mean, hold

11  on.

12    Q. I see four Georgia cases.

13    A. Okay. Wait a minute, yeah, because you have

14  more on the back.

15    Q. We have talked -- goodness, we have been

16  doing this since, I guess, ten o'clock, Ed, with a

17  couple of breaks here and there. As we have gone

18  through the life of this claim, we are now to July

19  12th of 2011, two days before, as you say, the

20  critical juncture in the life of this lawsuit, the

21  appeals. Have we ever discussed or seen any

22  document, note, case that talked about a phone

23  call, anything, that talked about ministerial

Edward F. Roesch                                         177

```
1    versus discretionary acts?
2              MR. McDOWELL:  Object to the form.
3       A. Based on my notes, I don't see them right
4    here.  I'm not going to say that, you know, I
5    mean, there is probably over 200 pages of claim
6    notes.  I don't know how many there are.
7       Q. Sure, sure.
8       A. I mean, I just can't tell you offhand that
9    it had not come up before then.
10      Q. Okay.  If I represent to you this is the
11   first time that we have seen that ministerial
12   versus discretionary acts are the lynch pin of the
13   case, would that surprise you or would you say,
14   "No, Scott.  I think we have talked about this
15   before"?
16             MR. McDOWELL:  Object to the form.
17      A. I think this came up in our discussions on
18   July 8th, didn't it?
19      Q. (BY MR. SPEAGLE) Well, take a look at -- I
20   will use David's line.  Sometimes I may answer a
21   question, but most of the time, I can't.  I have
22   to ask you the questions.
23      A. I do know that we have the case site here,
```

Edward F. Roesch                                         178

```
1    Roy versus Suttles.
2       Q. Okay.  Sure.  Roy versus Suttles is an
3    Alabama case, and that came out in May of 2010.
4    Do you recall anything about Roy versus Suttles or
5    how it applies?
6              MR. McDOWELL:  Object to the form.
7       Q. And you may not.
8              MR. McDOWELL:  Object to the form
9    because I think in May of 2011, it may have still
10   been on rehearing.  And object to the form to the
11   extent it calls for a legal conclusion as to how
12   it would apply.
13             MR. SPEAGLE:  I got that.  I forgot
14   about the rehearing.  You very well may have been
15   right.  It was probably still on rehearing, which
16   maybe is why we discussed it.  I will strike that
17   and take that question off the table.  Okay.
18      Q. Let's go to the next time you talked to AMIC
19   after the face-to-face meeting.  Do you recall
20   when that was or who that was with?
21      A. There was a -- there was a call where I
22   believe either -- I believe you folks initiated
23   the call, I believe.  I'm going on total memory
```

Edward F. Roesch                                         179

```
1    now.
2       Q. Sure.  I haven't been able to find.  It may
3    be in here just in all of the --
4       A. Tim and I were in his office on a speaker
5    phone, and you and David Sikes were on the other
6    end of the speaker phone.  And we were talking
7    about the case and a recent letter, I believe,
8    that Tim had sent down to AMIC.
9       Q. Okay.  Do you recall whether this is before
10   or after the case settled with Kate Whitlock?
11      A. This would have been before because, if I
12   recall, this was the conversation that you
13   initiated and were recording.
14      Q. Okay.  Now if I represent to you that was
15   after I got back from Atlanta when we settled the
16   case on July 13th, would you have any dispute with
17   that?
18      A. My memory may be failing me.  It's been a
19   couple of years.
20      Q. Okay.  Do you recall Steve, David and I
21   talking to you on Monday, the 11th, about what the
22   proposal to settle the case would be?
23      A. No.  I don't see that.
```

Edward F. Roesch                                         180

```
1       Q. Ed, do you recall a letter or an email from
2    me -- it was very short and sweet -- that was "Ed,
3    we will" -- goodness.  "Ed, we will pay the first
4    200,000, split the rest, and litigate afterwards"?
5       A. I recall an email to that effect, yes, sir.
6       Q. Okay.  Whatever the date of that email was,
7    do you recall that that email was sent while --
8    and Tim may have been on the phone.  I don't
9    recall -- while the four of us were on the phone
10   together?
11      A. Scott, I don't -- we may have been
12   discussing the outline of how we were going to
13   approach it.
14      Q. Of the settlement?
15      A. Right.
16      Q. Before the settlement offer was made?
17      A. Oh, absolutely.
18      Q. You recall that we had a phone call to that
19   effect?
20      A. Right, because I think I had asked for
21   confirmation.
22      Q. Exactly.  What do you recall about that?
23      A. I recall you sent me confirmation.
```

Edward F. Roesch                                          181

1      Q. And you wanted confirmation of what?

2      A. That AMIC would be paying the first 200,000.

3      Q. Right.

4      A. We would split the remaining 1.8 equally on

5  a 50/50 basis.

6      Q. Okay.  Do you recall that AMIC or that NAMIC

7  was demanding as part of the settlement that we

8  would agree to litigate the case afterwards?

9      A. I believe -- yes, yes.

10     Q. Okay.  Do you recall as part of that

11 conversation -- you may not -- that Steve said

12 that the settlement was to go up to 1.8 million?

13     A. I don't have a recollection of that.

14     Q. Okay.  Whatever day that was, that email

15 will reflect it.  But in any event, let's fast

16 forward to two days later, Wednesday, July 13th of

17 2011.  Do you recall talking to Kate Whitlock and

18 Tom Harper on Wednesday, July 11th, July 13th,

19 2011?

20     A. I believe so.

21     Q. Okay.  Do you recall talking to both of them

22 about settling the case?

23     A. Yes, because in my notes here, I have got a

---

Edward F. Roesch                                          182

1  date of July 13th, 2011, the agreement that we had

2  gotten to.

3      Q. Okay.  Look at page 667.

4      A. I'm there.

5      Q. All right.  And said authority was

6  communicated to DC, DC being Kate Whitlock?

7      A. Yes.

8      Q. Okay.  "After DC's initial discussion with

9  PC, she contacted NAMICO and advises the only

10 discount that PC would be willing to make is to

11 waive the interest demanded on the judgment

12 subsequent to the filing of the bond by the

13 insured.  DC computed this at approximately

14 $40,000.  Scott Speagle was present with DC, and

15 it is their belief that we will need the entire

16 900,000 to settle, which is the NAMICO/SIC portion

17 needed to meet the demand of two million dollars."

18 Do you see that?

19     A. Yes.

20     Q. Did you ever talk to me that day?

21     A. I believe so.

22     Q. Okay.  I'm just curious --

23     A. I believe so.

---

Edward F. Roesch                                          183

1      Q. -- whether you have an independent

2  recollection or not.

3      A. I believe so.

4      Q. All right.  On that day, the case settles,

5  correct?

6      A. Yes.

7          MR. McDOWELL:  Object to the form.  Go

8  ahead.

9      Q. (BY MR. SPEAGLE)  On that day being --

10         MR. McDOWELL:  I will just tell you, I

11 think there was -- a settlement understanding was

12 reached.  I don't think there had been releases

13 exchanged.  Settlement hadn't been funded, but I

14 think there was what I would call a handshake

15 agreement.

16         MR. SPEAGLE:  This is off the record.

17         (Discussion off the record.)

18     Q. (BY MR. SPEAGLE) Eventually the case as

19 Mr. McDowell points out, all of the settlement

20 checks were issued, all the releases were issued,

21 everything was signed, sealed, packaged up and the

22 case was settled, correct?

23     A. Correct.

---

Edward F. Roesch                                          184

1      Q. Oral arguments never occurred on Thursday,

2  July 14th?

3      A. Correct.

4      Q. That hearing that was going to be in the

5  declaratory judgment as best you understand, that

6  never occurred either, did it?

7      A. The hearing?

8      Q. Correct.

9      A. Correct.

10     Q. Because everything settled?

11     A. Correct.

12     Q. Including the bad faith case?

13     A. Correct.

14     Q. For two million dollars?

15     A. There was a global settlement of all

16 litigation, including the bad faith complaint, the

17 underlying complaint, everything.

18     Q. Declaratory judgment complaint?

19     A. The judgment that was awarded to the

20 plaintiffs for 5.9, all of that settled.

21     Q. Correct.  And the garnishment bond was

22 released as best you understand?

23     A. I would think, you know, if you were going

Edward F. Roesch 185

```
1   to write a check, you would want your garnishment
2   bond back.
3       Q. Right, right, right.
4   (Defendant's Exhibit 39 was marked and is attached
5              to the original transcript.)
6       Q. (BY MR. SPEAGLE)  Let me show you
7   Defendant's Exhibit 39.  I'm not sure if that's a
8   document.  It's probably part of your packet, but
9   that would be the dismissal of the garnishment
10  bond.  That may not be something that you have
11  seen before.  Okay.
12      A. I would have to check.
13      Q. Now after all of -- it may not have been
14  after everything was settled, but I think it was.
15  At some point Scottsdale Insurance Company filed
16  suit against AMIC?
17      A. Correct.
18      Q. And that's the suit that we are taking the
19  deposition about today?
20      A. Correct.
21      Q. Now what is Scottsdale suing for?
22      A. For the amounts that we paid toward the
23  settlement of the case.
```

Freedom Court Reporting, Inc                     877-373-3660

Edward F. Roesch 186

```
1       Q. And how much was that?
2       A. $900,000.
3       Q. Okay.  Just to make sure, for whatever
4   reason, let's say that the split was different.
5   And you all had paid $800,000 towards the
6   settlement.  You would have still brought suit,
7   correct?  That was an important component of the
8   settlement on NAMIC's behalf?
9           MR. McDOWELL:  Object to the form.
10      A. It appears to be stated in point four of the
11  letter that -- which was the settlement agreement
12  and conditions.
13      Q. Okay.  And so NAMIC is suing to get back its
14  $900,000 of a settlement towards two million
15  dollars.  In any of the cases that we have talked
16  about, had there ever been a final determination
17  by any court that AMIC was responsible to its
18  insureds for two million dollars?
19          MR. McDOWELL:  Object to the form.
20      A. Give it to me one more time.
21      Q. (BY MR. SPEAGLE)  Sure.  Had any court made a
22  final determination that AMIC owed on behalf of or
23  to the Town of Woodland and/or the estate of
```

Freedom Court Reporting, Inc                     877-373-3660

Edward F. Roesch 187

```
1   Billie Vernon Edmondson two million dollars?
2           MR. McDOWELL:  Object to the form.
3       A. No.
4       Q. (BY MR. SPEAGLE) No.  To sum up your suit,
5   is it fair for me to say that the only facts that
6   you have that you are entitled to your $900,000 is
7   that AMIC had a policy limit of two million
8   dollars and the lawsuit settled for two million
9   dollars?
10          MR. McDOWELL:  Object to the form.
11      A. No.
12      Q. Okay.  What other facts do you have that
13  shows or supports your assertion that you should
14  have $900,000 back from the settlement?
15          MR. McDOWELL:  Object to the form.
16      A. It would have been the part of the
17  reservation of rights letter back in April that
18  states that exclusion I.
19      Q. (BY MR. SPEAGLE) Sure.  Ed, let me say this.
20  I understand that the policy vehicle that you are
21  using is exclusion I, which states you are not
22  responsible for any of AMIC's contract
23  obligations.  Did I summarize exclusion I fairly?
```

Freedom Court Reporting, Inc                     877-373-3660

Edward F. Roesch 188

```
1       A. Yeah, generally.
2       Q. Close enough for what we are doing?  Okay.
3   The only evidence that you have that the $900,000
4   that you paid out went towards AMIC's contract
5   obligation and not the bad faith claim is that
6   AMIC had a two million dollar policy and that the
7   case settled for two million dollars?
8           MR. McDOWELL:  Object to the form.
9       A. No.
10      Q. (BY MR. SPEAGLE) What other facts do you
11  have that that $900,000 was part of AMIC's
12  contract obligation?
13      A. That was the only judgment against anybody
14  at that point, the 5.9 was the judgment rendered
15  by the Georgia jury against AMIC's insured.
16      Q. And that left AMIC exposed in a bad faith
17  suit for over 1.9 million dollars?
18          MR. McDOWELL:  Object to the form.
19      A. At that point discovery had yet to go
20  forward on the bad faith case.
21      Q. (BY MR. SPEAGLE) Correct.  And we come back
22  to our critical juncture being the appeal?
23      A. True.
```

Freedom Court Reporting, Inc                     877-373-3660

Edward F. Roesch                                              189

1    Q. True.  The 5.9 million dollar judgment was
2    being appealed.  That's not a secret or a problem?
3    A. True.
4    Q. Okay.  Now let's go back to the policy
5    language.  Early on, you told me that it's the
6    policy you used to determine whether there was
7    coverage, and only the language of the policy.
8    A. Well, you look at the policy and you look at
9    the complaint.  I mean --
10   Q. Right.  But the policy is going to define
11   what is covered in or out of the complaint?
12   A. Correct.
13   Q. All right.  Do you have anywhere in that
14   policy, does it state or exclude a loss resulting
15   from a claim where the loss is an equal amount to
16   the insured's policy limit?
17        MR. McDOWELL:  Object to the form.
18   A. I really don't understand that question.
19   Q. Okay.  Go ahead.
20   A. No.  I'm just waiting for you.
21        MR. SPEAGLE:  Let me take five minutes.
22            (Recess taken.)
23   Q. (BY MR. SPEAGLE)  Just a couple last things

Edward F. Roesch                                              190

1    to follow up.  If I'm correct, it is Scottsdale's
2    position that AMIC owes it $900,000 because NAMIC
3    paid $900,000 towards AMIC's contractual
4    obligation of its insureds?
5    A. Yes.
6    Q. Do you recall as we sit here what AMIC's
7    contractual obligations to its insureds are?
8    A. Well, they had an auto policy for the Town
9    of Woodland for two million dollar limits.  They
10   had an auto accident where it was clear liability
11   against their insureds for the damages.
12   Q. Okay.
13   A. They had a quadriplegic who died from her
14   injuries.  They had a lady with a broken leg.
15   They heard continually that the policy or the
16   demand from the plaintiff attorney was two million
17   dollars in the underlying suit.  There was a point
18   in August of 2010 when they filed an offer of
19   judgment and actually would have taken a million
20   dollars to settle the case, and basically AMIC
21   rolled forward.  They had no coverage issues with
22   the policy applying and paying for the contract
23   damages and took it to a jury, and the jury

Edward F. Roesch                                              191

1    awarded 3.9 million dollars to the plaintiffs.
2    Q. You mentioned AMIC's Town of Woodland
3    policy.  Do you know what the insuring agreement,
4    do you recall what it said?
5    A. I don't have it in front of me, no.
6    Q. Do you recall that it says AMIC will pay as
7    damages what its insured becomes legally liable to
8    pay?
9         MR. McDOWELL:  Object to the form.
10   A. Based on your representation.
11   Q. Sure.  Had there been a final determination
12   on what the Town of Woodland and Billie Vernon
13   Edmondson were legally liable to pay?
14   A. There had been a judgment rendered against
15   them.
16   Q. Sure.
17   A. And that was up for appeal.
18   Q. And there was also a declaratory judgment in
19   Randolph County, Alabama, to determine what the
20   Town of Woodland and Billie Vernon Edmondson were
21   legally liable to pay too, correct?
22   A. Possibly, yeah.
23        MR. SPEAGLE:  Okay.  I think I'm done.

Edward F. Roesch                                              192

1         MR. McDOWELL:  Very good.
2
3
4         (Deposition concluded at 3:58 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

C E R T I F I C A T E

STATE OF ALABAMA )

JEFFERSON COUNTY )

I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the questions and answers therein were produced in transcript form by computer aid under my supervision, and that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings occurring on said date at said time.

I further certify that I am neither of counsel nor of kin to the parties to the action; nor am I in anywise interested in the result of said case.

/s/Anne E. Miller

ACCR #486

Expires 9/30/13

WORD INDEX

< $ >
$100,000 62:14 101:18 150:10 153:21
$100,000. 62:15
$165,000. 21:4
$20,000 31:23 32:12
$200,000 171:19
$250,000 82:10
$300,000 62:11
$340,000 79:2
$340,000. 75:8
$40,000 182:14
$50,000 126:19 128:6
$500,000 101:15 172:16
$60,000 24:1 27:7, 11 28:22 29:12 32:22
$800,000 186:5
$900,000 186:14 187:6, 14 188:3, 11 190:2, 3
$900,000. 186:2

< . >
. 21:11 175:19

< 0 >
01423. 157:19

< 1 >
1 4:4 15:9, 17
1.4 121:14
1.8 172:20 181:4, 12
1.9 188:17
1:15 94:20
10 4:8 49:4 52:8, 10
100 145:23
100,000 62:9
100K 103:8
101 3:10
102 4:17
105 3:10
10th 174:16
11 4:9 45:5 49:5, 5, 6 50:4 53:12, 15 73:22

< ' >
'11 45:6

< 1 >
110 4:17
111 4:18
116 4:18
119 4:19
11-93-2. 153:13
11th 20:11 21:2 100:17 174:17 179:21 181:18
12 4:9 56:8, 11 60:12
126 4:19
1-27 45:5
1-27-2011 132:4 152:7
128 4:20
129 4:20
12th 55:20 86:14 131:19 174:17 175:10 176:19
13 4:10 60:7, 10 193:21
131 4:21
13th 179:16 181:16 182:1
13th, 181:18
13th. 87:1 174:17
14 4:10 63:8, 11
140. 113:15
14th 131:8 174:18 184:2
14th. 55:15 144:3
15 4:11 39:8 64:11, 14
158 4:21
159 4:22
16 4:11 66:1
157:22
16. 65:22
160 4:22
1600 1:23 3:6 5:5
165 21:10, 17
165,000, 33:1
17 4:12 67:10
17. 67:9
18 4:12 72:4
18. 72:3
185 4:23
18th 65:14
19 4:4, 13 73:18
19. 73:17
1st 119:13

< 2 >
2 4:4 22:20, 23
2:11-CV-668-MEF 1:7
20 4:13 75:19
20, 29:12
20,000 27:6 28:22
20. 75:18
200 177:5
200,000 26:14 172:3 180:4
200,000. 181:2
2009 19:4 20:9, 11 21:2 23:5
200K 171:15
2010 48:15 190:18
2010. 178:3
2011 39:1 43:6, 8 55:14 62:23 63:16 72:18, 19 81:20, 23 84:3 105:20 110:19 122:12, 17 131:8, 20 132:15 133:6 136:9 137:6 140:4, 17 141:13 143:12 144:15 148:10 152:6 160:1 161:21 175:10, 11
176:19 178:9 181:17, 19 182:1
2011, 137:5
2011. 111:8 127:7 128:2 140:20
2012 54:3
2012. 53:17
2013 1:21 5:6
2013. 53:18
20th 20:9 122:16
21 4:4, 14 81:10, 13 99:2 152:21
2-1-2011 134:5
22 4:14 85:12
22. 85:11
2-20-11 121:13
2-23-11 123:22
2-24 124:6
23 4:15 87:5, 7
24 4:15 88:12, 15, 19
24th 65:15
25 4:5, 5, 16 94:5 98:1
25. 94:4 95:10
25th 140:4
26 4:16 99:18
26. 99:17
2654 121:12
2655 123:22
26th 54:3 141:10
27 4:17 81:23 102:10
27. 102:9
27th 7:4 16:6 23:5 43:6 139:8 141:10, 13
27th. 81:22 86:22 111:14
28 4:17 110:23 111:3 117:12
28th 127:7 159:9
29 4:18 111:21
29. 111:20
2nd 31:12 82:22

< 3 >
3 4:5 24:7, 10

95:19
3.9 48:20 191:1
3:58 192:4
30 4:18 116:15 120:9 123:21 146:6 147:6, 10 193:21
300. 75:7
30th 143:12
31 4:19 119:7, 10 121:17
31st 38:23 137:5, 9
31st. 120:15 137:10
32 4:19 126:21
32, 126:23
33 4:20 44:5 128:22 129:3
33, 44:7 129:1
34 4:20 129:18 130:1
34, 129:20
340,000 76:13
35 4:21 131:13, 16 144:23 145:22
35. 166:22 167:3
35201 3:6
36 4:21 158:20, 23
36104 3:11
37 4:6, 22 159:16 175:9
37, 159:18
38 4:6, 22 20:8 160:10, 14, 21
39 4:7, 23 20:8 185:4, 7
3rd 122:12 133:6 137:6, 9

< 4 >
4 4:5 25:20, 23
4,000 84:4 97:18
40 4:7 144:23 145:22
41 82:23
420 3:5
4-25-2011 139:12
47 4:8
486 193:20
495 31:12

< 5 >
5 4:3, 6 37:13, 16
5.9 172:19 184:20 188:14 189:1
50 171:17, 17 172:8, 8 181:5, 5
5-11 16:20
52 4:8
5-20-2011 140:7
5-28-2009 17:16
53 4:9
56 4:9
593 82:22
5th 97:8 173:12

< 6 >
6 4:6 38:19 114:15 128:2 140:17, 20
6. 38:18
60 4:10
60,000 23:16
624 134:14
6-27 149:6
6-27-2011 138:2 141:14
6-28 148:9
6-28- 152:5
6-28-2011 149:6 150:2
63 4:10
637 136:7
64 4:11
640 139:11
643 140:7
645, 140:16
649 138:3 141:12 144:21 152:19
658, 144:21
659 143:13 149:7
66 4:11
660 143:14
664 176:4, 6
665 176:4, 6
667. 182:3
67 4:12
692 31:12
6th 63:16

< 7 >
7 1:21 4:7 5:6 39:7, 9
7-12-2011 159:11
7-14-2011 130:18 149:12
72 4:12
73 4:13
75 4:13 148:22 149:2 150:19
7-8 45:5 143:17
7-8-2011 160:3
7th, 62:22

< 8 >
8 4:7 40:15, 17 41:7 164:5
80 148:23 149:2 150:19
81 4:14
85 4:14
87 4:15
88 4:15
8th 22:15 43:8 53:18 63:18 86:23 93:7 98:8, 10 100:3 104:11 105:20 111:8 113:10, 14 136:9 159:23 161:21 173:2 174:14 175:11 177:18
8th, 144:14
8th. 98:7

< 9 >
9 4:8 47:13 193:21
9. 47:12
9:00 5:7
900,000 182:16
94 4:16
99 4:16
9th 42:6 174:16

< A >
a 6:11 7:15, 20 8:4 9:21 11:23 15:2 16:16, 17 17:1 18:17 19:15 20:19 27:3 29:3 30:21 31:7 33:13 34:8 37:16 46:12 48:1 51:16 52:8 53:15 56:6 58:2 59:14, 22 61:1 62:10 64:6 65:19 67:14 71:15 74:10 76:9 83:5 88:4 89:1 92:23 95:14 99:1 100:8 101:18 106:17, 18 110:8, 19 112:11, 19 113:3 115:8, 9 116:11, 17 121:2, 14 128:9 131:21 132:14 133:14 135:3, 23 136:15 137:15 138:22 144:16 145:20 147:10 152:15 153:9, 20 154:14 155:14 158:5, 7 160:4 166:4, 8 172:18 176:16 177:20 179:18 181:5, 23 185:7 186:21
a.m 5:7
ability 87:20 97:13 146:3 193:11
able 5:19, 23 31:1 69:7 73:1 138:20 139:10 147:9 148:2 179:2
about 5:6 6:15 7:7 22:14 26:23 28:18 37:6 39:2,

7, 20 44:3, 14, 15 45:21 49:14 56:2 59:14 61:9 69:21 72:12 73:1, 8 79:8 80:14 86:7 87:17 95:2 97:15 105:20 117:11 124:21 138:13 140:10 161:17 169:5 178:14 179:7 181:22 186:16
about. 117:14
above 5:7 141:12 154:9
above, 119:16
abreast 129:11 130:7
absent 80:7 167:5
absolutely 146:20
Absolutely. 10:14 42:18 46:14 61:10 168:11 180:17
accept 21:9
acceptable 164:12
accepted 21:12
accident 30:23 46:22, 23 47:6 49:10 78:2 104:10 190:10
accomplish 11:3 19:11 161:20
account 165:16
ACCR 193:20
accurate 32:20 82:15 83:6 168:1
accurate. 20:3 45:4
accurately 169:3
acknowledge 112:14
acknowledgment 112:6
acronym 10:2
acronyms 93:12
acted 10:12
acting 5:2 11:1 146:9
action 60:4 61:2 62:22 63:3, 4, 15 64:3, 7, 19 65:8 76:6 87:21 91:18 95:13 104:5, 6, 11, 23 120:18, 18, 21 121:1, 21 122:14, 23 123:18 145:20 156:8 158:5, 6, 6, 17 161:3 168:7 193:15
action, 91:14, 23 104:21 105:4 131:17
actions 37:9 57:14 64:2
actions. 103:22
active 35:9
activities 129:11, 15 130:4
acts 175:13, 16 177:1, 12
actual 56:11 167:2 169:15
Actually 23:6 25:11 53:19 67:5 103:13 139:5 152:16
Adams 112:1, 2 137:7, 14
add 159:15
addition 98:6
additional 18:10 115:8 142:9, 12
address 19:14
addressed 118:23
addressed. 118:21
adjust 14:1
adjuster 10:12, 17, 20 16:10 45:10 106:18
adjuster, 77:21
adjuster. 10:11
adjusting 25:16
149:19
adjustment 96:21
advertising 115:21
advised 25:4 115:3 133:19
advises 182:9
after 15:14 41:16 111:9 178:19 179:15 185:14
again 19:5 23:1 44:14 56:16 64:15 102:17 134:6
against 35:8 64:20 70:19 76:7 84:17 86:6 101:15 127:13 190:11 191:14
agency 49:8 50:8 51:2 146:23
agency. 50:7
agent 49:13 112:12
agents. 9:19
aggregate 62:11
ago 73:15 108:4
agree 28:17 35:23 57:12 58:23 66:19 69:13, 17 75:12, 13 96:12 116:12 122:7 131:4 134:22 162:15 173:1 181:8
AGREED 1:18 2:2, 8 131:2 174:23
agreement 115:12 173:3 174:12 182:1 186:11
agreement, 191:3
agreement. 183:15
ahead 40:14 43:4
ahead. 65:6
183:8 189:19
aid 193:9
AJC 53:16
Al 16:21 103:7 104:23 105:1, 1 148:7 151:1
ALABAMA 1:2, 8 3:6, 11 5:2, 6 12:3 18:19 19:18 23:19 27:5, 10 28:7 30:15 32:5, 13 34:9 36:16, 23 48:6 60:3 62:3 64:20 67:16, 19 68:3, 7 69:16 72:13 73:2, 9 77:2 86:5, 9 89:8, 19, 23 90:1 92:21 93:5, 23 94:23 95:18, 22, 22 96:2, 13, 22 99:6 104:7, 8, 8, 9, 13, 13, 14 105:21 126:8 143:17 148:16 149:1 151:9, 12, 14, 20 152:1, 8, 9, 13, 23, 23 153:10, 11 154:13 155:9, 21 156:4, 5 159:2 160:3 171:21 172:5 176:7, 9 178:3 191:19 193:3
Alabama, 90:18 161:1
Alabama. 2:1
Alabama's 68:8
all 7:23 15:13 37:8 51:15 63:16 89:11 106:10, 11 112:18 116:8 130:11 163:17 184:15
all. 40:6, 9
allegation 74:12
allegations 77:4