# Exhibit 5

**Timothy F. Sullivan** 1

```
1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE MIDDLE DISTRICT OF ALABAMA
3               NORTHERN DIVISION
4   SCOTTSDALE INSURANCE COMPANY,
5   a corporation,
6          Plaintiff,
7   Vs.              CASE NO:  2:11-CV-668-MEF
8   ALABAMA MUNICIPAL INSURANCE
9   CORPORATION, a corporation,
10         Defendant.
11
12     DEPOSITION OF TIMOTHY F. SULLIVAN
13             MARCH 8, 2013
14
15             STIPULATION
16       IT IS STIPULATED AND AGREED, by and
17   between the parties through their respective
18   counsel, that the deposition of TIMOTHY F.
19   SULLIVAN, taken before Susan Masters Goldman,
20   Alabama Certified Court Reporter, License
21   Number 83, and Notary Public, at Baker,
22   Donelson, Bearman, Caldwell & Berkowitz, PC,
23   420 20th Street North, Suite 1400,
```

**Timothy F. Sullivan** 2

```
1   Birmingham, Alabama 35203 on the 8th day of
2   March, 2013 commencing at 8:30 a.m.
3        IT IS FURTHER STIPULATED AND AGREED
4   that the signature to and the reading of the
5   deposition by the witness is NOT waived, the
6   deposition to have the same force and effect
7   as if full compliance had been had with all
8   laws and rules of Court relating to the
9   taking of deposition.
10       IT IS FURTHER STIPULATED AND AGREED
11   that it shall not be necessary for any
12   objections to be made by counsel as to any
13   questions, except as to form or leading
14   questions, and that counsel for the parties
15   may make objections and assign grounds at the
16   time of the trial, or at the time said
17   deposition is offered in evidence, or prior
18   thereto.
19       IT IS FURTHER STIPULATED AND AGREED
20   that notice of the filing of the deposition
21   by the Commissioner is waived.
22
23
```

**Timothy F. Sullivan** 3

```
1
2                  INDEX
3   EXAMINATION BY              PAGE NO.
4   Mr. Speagle                   6
5
6                EXHIBITS
7   DEFENDANT'S EXHIBIT NO:
8   40  Memo                     27
9   41  Letter                   42
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

**Timothy F. Sullivan** 4

```
1               APPEARANCES
2   BEFORE:
3      Susan Masters Goldman, Alabama Certified
4      Court Reporter, License Number 83, and
5      Notary Public.
6   APPEARING ON BEHALF OF THE PLAINTIFF:
7      David W. McDowell, Esq.
8      Baker, Donelson, Bearman,
9        Caldwell & Berkowitz, PC
10      420 20th Street North, Suite 1400
11      Birmingham, Alabama 35202
12   APPEARING OF BEHALF OF THE DEFENDANT:
13      Scott M. Speagle, Esq.
14      Webster, Henry, Lyons, White,
15        Bradwell & Black, PC
16      105 Tallapoosa Street, Suite 101
17      Montgomery, Alabama 36101
18
19   ALSO PRESENT: David Sikes
20             Steve Wells
21
22
23
```

Timothy F. Sullivan                                    5

```
 1        I, Susan Masters Goldman, Alabama
 2   Certified Court Reporter, License Number
 3   83, acting as Notary Public, certify that
 4   on this date as provided by the Federal
 5   Rules of Civil Procedure and the foregoing
 6   stipulations of counsel, there came before me
 7   at the law offices of Baker, Donelson,
 8   Bearman, Caldwell & Berkowitz, PC, 420 20th
 9   Street North, Suite 1400, Birmingham, Alabama
10   35202, on the 8th day of March, 2013, at or
11   about 8:30 a.m., TIMOTHY F. SULLIVAN, witness
12   in the above cause, for oral examination,
13   whereupon, the following proceedings were
14   had:
15
16             TIMOTHY F. SULLIVAN,
17   after having been first duly sworn, testified
18   as follows:
19
20        THE REPORTER:  Usual stipulations?
21        MR. MCDOWELL:  We would like for this
22   to be a read and sign.
23
```

Timothy F. Sullivan                                    6

```
 1   EXAMINATION BY MR. SPEAGLE:
 2        Q.  Tim, you were you here yesterday.
 3   Again, I'll introduce myself.  I'm Scott
 4   Speagle.  And we, I think, met twice before,
 5   yesterday and then on July 8th of 2011.
 6        A.  Correct.
 7        Q.  Have you taken a deposition before?
 8        A.  Yes.
 9        Q.  Okay.  How many times?
10        A.  A couple, three or four maybe.
11        Q.  So you're familiar with the process
12   then?
13        A.  I am.
14        Q.  You sat through the one all day
15   yesterday.
16        First, if you could tell us your name,
17   where you live, where you work, what you do,
18   that kind of thing?
19        A.  Certainly.  My name is Timothy F.
20   Sullivan.  I live in Indianapolis, Indiana.
21   I'm employed by NAMIC Insurance Company,
22   N-A-M-I-C, commonly referred to as NAMICO.  My
23   current title is president and CEO.  Prior to
```

Timothy F. Sullivan                                    7

```
 1   that I was a senior vice-president; prior to
 2   that I was a vice-president; prior to that I
 3   was a claims manager.
 4        Q.  Okay.  How long have you been with
 5   NAMICO?
 6        A.  Since February, 1995, so about
 7   18 years.
 8        Q.  Okay.  And NAMICO is in Indianapolis?
 9        A.  Correct.
10        Q.  Let me ask you this:  How are you
11   involved in the case that we're here today?
12        A.  At the time of this case -- the entire
13   pendency of this case, I was the
14   vice-president of claims.
15        Q.  Okay.  That's what I was --
16        A.  The pendency of the case from NAMICO's
17   involvement.
18        Q.  Correct.  And as vice-president of
19   claims, what do you do?
20        A.  I was responsible for the claim
21   department of NAMIC Insurance Company.
22        Q.  Okay.  About how many claims in a year?
23        A.  It varies.  We get probably an average
```

Timothy F. Sullivan                                    8

```
 1   of 175 claims a year, somewhere around there.
 2        Q.  Okay?  As VP of claims, who was -- how
 3   was your corporate structure set up?  You're
 4   VP of claims.  Who was above you?
 5        A.  In 2011, the president of the company
 6   was a gentleman named George Crumpley.
 7        Q.  Did you have anybody out to the sided
 8   of you or was it just president, VP of
 9   claims, and then --
10        A.  I don't know what you mean out to the
11   sides of me.
12        Q.  Well --
13        A.  There were other vice-presidents.
14        Q.  Yes.
15        A.  Okay.  Yes.
16        Q.  What other vice-president titles are
17   there in NAMICO?
18        A.  At that time, there were three other
19   vice -- well, there were two other
20   vice-presidents.  There was a vice-president
21   of underwriting and a vice-president of
22   information technology and there was a
23   secretary-treasurer.
```

## Page 9

1    Q.  Okay.  And underneath you, how would
2  the structure look?
3    A.  There were two litigation examiners --
4    Q.  Okay.
5    A.  -- and Lanora Adams, senior executive
6  assistant, who was a shared person between
7  the executive, the claims department, and the
8  finance department.
9    Q.  Okay.  Ed is one of the litigation
10 examiners?
11   A.  At this time, Ed was a litigation
12 examiner.
13   Q.  Okay.  And Ed is the claims manager
14 now?
15   A.  Correct.
16   Q.  Okay.  So you moved up and he moved to
17 your spot?
18   A.  He moved to the claims manager, not to
19 the vice-president of claims, but he is now
20 responsible for the claim department.
21   Q.  Okay.  And who was the other litigation
22 examiner?
23   A.  A gentleman named Patrick Wruble,

## Page 10

1  W-R-U-B-L-E.
2    Q.  Okay.  And we'll get into NAMICO and
3  Scottsdale's relationship in a little bit.
4  But just, I guess, for clarification up
5  front, you're not an employee of Scottsdale
6  -- well, I shouldn't say it that way.  Are
7  you an employee of Scottsdale?
8    A.  I am not.
9    Q.  Okay.  How does NAMIC Insurance Company
10 relate to Scottsdale?
11   A.  In 1994, Scottsdale Insurance Company
12 became NAMICO's business partner to provide
13 us with essentially a paper policy; the
14 ability to write policies in states in which
15 NAMICO was not authorized to do business.
16   Q.  Okay.  And we'll go into that in a
17 little bit in a second.
18       All right.  Let's go ahead and get this
19 first thing out of the way and off the table.
20 July 13th of 2011, let's call it a
21 Wednesday --
22   A.  That's correct.
23   Q.  -- you and Ed and myself and David

## Page 11

1  Sikes had a phone call --
2    A.  Correct.
3    Q.  -- do you recall that?
4        And that was the phone call -- that's
5  the recorded phone call?
6    A.  Yes.
7    Q.  Right.  We called y'all, the phone call
8  was recorded, you asked if it was recorded,
9  and then we ended the recording and the phone
10 call after that; do you recall that?
11   A.  Roughly like that, yes.  That's a good
12 approximation.
13   Q.  Again, I know it's year and a half ago.
14 We'll all do our best.
15       Do you recall in the timeline of this
16 claim that that phone call happened after
17 Kate and the plaintiff's attorneys negotiated
18 the $2 million settlement?
19   A.  That would be after.
20   Q.  The phone call was after?
21   A.  Correct.
22   Q.  Let me ask you this:  Do you recall
23 what the phone call was about?

## Page 12

1    A.  Yes, I do.
2    Q.  Okay.  Just sum that up for us.
3    A.  You called, I believe, in response --
4  as I recall, the overall history in part
5  based on yesterday's listening to the
6  deposition, we had -- I had authored a letter
7  that was sent down to Alabama Municipal
8  indicating, it's our understanding the case
9  has settled, here is our understanding of the
10 arrangements.
11       David -- Mr. Sikes had called Ed Roesch
12 and said we didn't agree to this or some
13 such; that led to you two calling us to
14 discuss this.
15   Q.  Okay.
16   A.  I believe at that point in the game you
17 took the position on behalf of Alabama
18 Municipal that Alabama Municipal had not
19 agreed to a $2 million settlement -- or had
20 not agreed to the division of $900 and $900,
21 $200,000.00 that you guys had already
22 indicated would be paid anyway.
23   Q.  Let me kind of see if you'll agree with

---

**Timothy F. Sullivan**  13

1  this brief summation:  It was AMIC's position
2  that the agreed-upon settlement was up to
3  $1.8 million, and anything after, NAMIC was
4  responsible for.  And it was NAMIC's position
5  that it was $200 and then the parties would
6  split up to $1.8 million.
7    A.  Well, I think it was NAMICO's position
8  that it was $200,000.00 from Alabama
9  Municipal --
10    Q.  Right.
11    A.  -- and then the parties would split,
12  and I believe that was your e-mail of Tuesday
13  the 12th.
14    Q.  Correct.  Correct.  And do you recall
15  that the fussing was about basically who was
16  going to pay the other $100,000.00?
17    A.  The other $200,000.00, correct.
18    Q.  Yeah, the other $200,000.00.  Whether
19  that was going to be split or whether that
20  was -- NAMICO was going to pay it?
21    A.  Correct.
22    Q.  AMIC was saying, NAMIC, you should pay
23  it; NAMIC was saying we should split it?

---

**Timothy F. Sullivan**  14

1    A.  Their summation.
2    Q.  And there was a lot of uh-huhs and
3  huh-uhs and you said and he said.
4      Let me ask this:  In your lawsuit --
5  your lawsuit.  Scottsdale's lawsuit.  If I
6  say that, I think we can agree it's the
7  lawsuit we're talking about here?
8    A.  Absolutely.
9    Q.  Scottsdale is seeking repayment of the
10  $900,000.00 that it paid out under
11  Defendant's Exhibit 8 -- I'm looking at
12  Defendant's Exhibit 8 under policy Clause P,
13  reimbursement of the insurer; am I correct?
14    A.  Yes, that is correct.  Among other
15  things, we were seek reimbursement of that
16  $900,000.00.
17    Q.  Sure.  And the premise is under that
18  clause, if you paid out a claim that was
19  subsequently deemed to be excluded, you're
20  due to be reimbursed?
21    A.  Yes.
22    Q.  And the idea is that it's excluded
23  because of Exclusion I?

---

**Timothy F. Sullivan**  15

1    A.  I would have to go back and look, but I
2  think it's Exclusion I.
3    Q.  Yeah.  And we will look at it, but --
4    A.  Right here (indicating), yes.
5    Q.  It's Exclusion I.
6      Okay.  Now, in contrast, you're not
7  claiming that AMIC owes you $900,000.00
8  because AMIC made a recording?
9    A.  No, that's not correct.
10    Q.  I didn't think so.  And in fact, let's
11  just say the phone call never took place.
12  All right?  Just assume with me that fact,
13  there was never a phone call.  We would
14  actually be here today in this lawsuit;
15  right?
16      MR. MCDOWELL:  Object to the form.
17    A.  I assume we would be here in this
18  lawsuit, yes.  Whether we would be physically
19  sitting in Birmingham, Alabama today --
20    Q.  (BY MR. SPEAGLE)  Right.
21    A.  -- I don't know.
22    Q.  Right.
23    A.  There would have been litigation

---

**Timothy F. Sullivan**  16

1  instituted by Scottsdale or Alabama Municipal
2  pursuant to our agreement with regard to this
3  transaction.
4    Q.  Had there been no phone call,
5  Scottsdale would have still sought
6  reimbursement of the $900,000.00 under Clause
7  P and Exclusion I?
8    A.  Let's say the policy provisions.
9    Q.  Y'all's provisions, there you go.  I
10  like your phrase better.
11      Now, AMIC has made counterclaims in
12  this action --
13    A.  Correct.
14    Q.  -- and you're familiar with those
15  counterclaims; the breach counterclaim and
16  the bad faith counterclaim, and a breach of
17  enhanced duty of good faith counterclaim?
18    A.  Right, something like that.
19    Q.  Something like that.
20      And, again, I know you're not -- well,
21  are you a lawyer?
22    A.  I am not.
23    Q.  Okay.  I was going to say, I know you

**Timothy F. Sullivan**                                          17

1  are not a lawyer, but you would agree with me
2  that AMIC's countersuit is not to recoup
3  $900,000.00 because of that recording?
4      A.  I believe that to be correct.
5      Q.  You don't have any reason to believe
6  that we're saying, hey, we made a recording
7  of you and thus you owe us $900,000.00?
8      A.  I have no reason to believe that.
9      Q.  And you would agree with me that on
10 that phone call, we actually never talked
11 about the policy or the policy language?
12     A.  I don't recall.  I would need to see
13 the -- or hear the phone call.
14     Q.  Yeah.  As you sit here now, do you
15 recall that being the case?
16         Let me say it a different way -- let me
17 ask it, Tim, this way:  On that recording,
18 you never said, no, Exclusion I doesn't
19 apply, we're just messing with you guys;
20 nothing like that?
21     A.  No, we did not say that -- or, I
22 suppose, more correctly, yes, we did not say
23 that as your question was formatted.

Freedom Court Reporting, Inc                 877-373-3660

---

**Timothy F. Sullivan**                                          18

1      Q.  Sure.  Let's back up and change the
2  facts.  Let's say for whatever reason if the
3  agreement to settle was that it was going to
4  be up to 1.8 million and then NAMIC would
5  take the rest -- let's assume that that was
6  the agreement.  So what we would have is AMIC
7  funding $200,000.00; AMIC and NAMIC split the
8  remaining $8 million -- or splitting the
9  remaining $1.6 million; so that AMIC would
10 pay out a total of $1 million, and then AMIC
11 -- I'm sorry, she's going to kill us.
12         MR. MCDOWELL:  You can refer to it as
13 Scottsdale.
14         MR. SPEAGLE:  There you go.
15     Q.  (BY MR. SPEAGLE)  -- and Scottsdale
16 would take $800,000.00 and the remaining
17 $200,000.00.  Let's change the facts to that,
18 so that each party paid $1 million.
19         If those are the facts under the --
20 assuming the rest of the agreement,
21 Scottsdale would be suing for how much money?
22         MR. MCDOWELL:  Object to the form.
23     A.  I'm sorry, you need to -- if you would

Freedom Court Reporting, Inc                 877-373-3660

---

**Timothy F. Sullivan**                                          19

1  -- I believe what you stated -- let me try it
2  this way --
3      Q.  (BY MR. SPEAGLE)  Please.
4      A.  -- you have recast our agreement that
5  you would pay -- AMIC, Alabama Municipal,
6  would pay $200,000.00, an undisputed amount.
7      Q.  Yes.
8      A.  The two entities, Scottsdale and
9  Alabama Municipal would then split the
10 balance of $1.6, so $800,000.00 apiece, and
11 then that the agreement was anything above
12 $1.8 Scottsdale would pay; is that your
13 question?
14     Q.  That is my question.  It's a much
15 better question than I asked.
16     A.  Okay.  Then, yes, Scottsdale would
17 still have sued for its $800,000.00.
18     Q.  And your theory of recovery would have
19 been the same?
20     A.  Correct.
21     Q.  Okay.  Thank you.
22         MR. MCDOWELL:  And just so we're clear
23 for the record since he helped you formulate

Freedom Court Reporting, Inc                 877-373-3660

---

**Timothy F. Sullivan**                                          20

1  that question, that is a hypothetical.
2          MR. SPEAGLE:  Yes, that is a
3  hypothetical.
4          THE WITNESS:  Yes.
5          MR. MCDOWELL:  It's a little sound byte
6  from that.
7      Q.  (BY MR. SPEAGLE) As we sit here today
8  though, AMIC paid -- AMIC and Scottsdale
9  split the other $200,000.00 so that both
10 sides -- AMIC paid $1.1 million and
11 Scottsdale paid $900,000.00?
12     A.  Yes.
13     Q.  And in this lawsuit, you understand
14 that AMIC is only seeking reimbursement of
15 the $900,000.00?
16     A.  Yes, I understand that.
17     Q.  Okay.
18     A.  In addition to tort damages.
19     Q.  Correct.  All right.  We talked a
20 little bit -- we briefly got into the
21 relationship between Scottsdale and NAMIC,
22 and I think you had said that in 1994 the two
23 parties entered into a business relationship.

Freedom Court Reporting, Inc                 877-373-3660

Timothy F. Sullivan                                    21

1    Was NAMIC licensed at that time in
2  Alabama?
3    A.  No.
4    Q.  Okay.  Is AMIC during the pendency of
5  this claim licensed in Alabama?
6    A.  Is AMIC licensed?  I believe so.
7    Q.  I'm sorry.  NAMIC.
8    A.  Well, I'm going to ask a favor here
9  just to try to keep everything easier.
10    Q.  Sure.
11    A.  Let's refer to the company which
12  employs me as NAMICO.
13    Q.  Okay.  NAMICO.
14    A.  The reason being, there is another
15  legal entity called NAMIC, which is the
16  National Association of Mutual Insurance
17  Companies, which is the parent organization
18  of which we are an affiliate.  That's why
19  we're called NAMIC Insurance Company, it's
20  for the NAMIC trade association.
21    Q.  I see.  NAMIC Insurance Company's, I
22  guess, acronym or nickname is NAMICO?
23    A.  Correct.

Freedom Court Reporting, Inc                877-373-3660

---

Timothy F. Sullivan                                    22

1    Q.  There is another entity named NAMIC?
2    A.  Correct.
3    Q.  Got you.
4    A.  They happen to be our Class A
5  shareholder and control the company.  That's
6  why I like to keep the legal --
7    Q.  It makes all the sense in the world.
8    A.  I don't want the chairman of my Board,
9  who is the president of that trade
10  association, receiving a notice that NAMIC --
11    Q.  Has been sued --
12    A.  -- has now been sued, correct.
13    Q.  -- or are in a lawsuit.  Okay.
14  Understood.
15    A.  Back to our question.  I'm sorry.
16    Q.  No, I appreciate that.
17    NAMICO, during the pendency of this
18  claim, was it licensed in Alabama?
19    A.  No.
20    Q.  Okay.  So the policy was written on
21  Scottsdale paper and through Scottsdale,
22  NAMICO is acting?
23    A.  Correct.

Freedom Court Reporting, Inc                877-373-3660

---

Timothy F. Sullivan                                    23

1    Q.  Scottsdale, I think you would agree, is
2  licensed in Alabama?
3    A.  Yes.
4    Q.  Okay.  During the pendency of this
5  claim, did you have full authority to act on
6  behalf of Scottsdale?  And when I say full
7  authority, what I mean is to enter into any
8  kind of a settlement agreement regardless of
9  the amount to do anything that was needed?
10    A.  No.
11    Q.  Okay.  What was the limit of your
12  authority?
13    A.  $100,000.00 is the limit to NAMICO.
14    Q.  Okay.  Is that $100,000.00 extended to
15  Ed as the litigation examiner -- or the
16  claims manager, I guess, in this case?
17    A.  At the time of this, the litigation
18  examiner.
19    Q.  Okay.  Was that $100,000.00 extended to
20  Ed in authority?
21    A.  I would have to go back and look at
22  what his authority was at that time for
23  Scottsdale claims.  I believe it was, but I

Freedom Court Reporting, Inc                877-373-3660

---

Timothy F. Sullivan                                    24

1  would have to go back and look.
2    Q.  After $100,000.00, where -- I would say
3  up the chain, where did you have to go for
4  authority to settle on behalf of Scottsdale?
5    A.  We would go to the Scottsdale claims
6  department.
7    Q.  Okay.
8    A.  And then they had various tiers of
9  authority.  I think a lady named Kim Severson
10  had $200,000.00; her boss, Bonnie Windsor, I
11  believe at the time, had half a million, and
12  beyond half a million, they went to --
13  Terry's title at the time was director of
14  claims and I think he had either policy
15  limits or a million, I don't remember which.
16    Q.  Okay.  Who had the primary contact with
17  Scottsdale, was it you or was it with Ed?
18    A.  It would be both.
19    Q.  Okay.  And then let me ask this:  Prior
20  to July 8th, 2011, had either you or Ed, to
21  your knowledge, been in contact with
22  Scottsdale in how to formulate any strategies
23  or settlement options for this lawsuit --

Freedom Court Reporting, Inc                877-373-3660

Timothy F. Sullivan                                    25

1    this lawsuit is a terrible question -- for
2    the Holloway and Meadows claim?
3        A.   Can we narrow that down a little,
4    because I think what we want to talk about is
5    the bad faith claim by Holloway and Meadows
6    against Alabama Municipal?
7        Q.   Well, I don't know, Tim.
8        A.   Okay.
9        Q.   It was NAMIC's position that it wanted
10   to hire and defend and strategize the appeal
11   as well; was it not?
12       A.   I don't know off the top of my head
13   whether that was NAMICO's position or whether
14   that was the recommendation of the team
15   defense counsel.
16       Q.   Well, let me just say this -- let me
17   ask my question this way:  When I say the
18   Holloway and Meadows claim, I mean all of
19   those moving parts that we discussed with Ed
20   yesterday that made up that claim.
21       A.   Okay.
22       Q.   Can we agree on that?
23       A.   That would be fine.

Timothy F. Sullivan                                    26

1        Q.   And if you think that your answer would
2    differ if I further distinguish it out by
3    saying bad faith, I'm more than happy to
4    entertain that.
5        A.   Okay.
6        Q.   When I use that term, I'm using all
7    those various moving parts.
8        A.   Okay.
9        Q.   I forgot my question.  It sounded good
10   at the time, but I just don't know if it was.
11   Let me see if I can recast it.
12            Prior to July 8th, 2011, did either you
13   or Ed, to your knowledge, contact or have any
14   communications with Scottsdale's claim
15   department regarding any legal strategies or
16   settlement options for the Holloway and
17   Meadows claim?
18       A.   I did not.
19       Q.   Okay.
20       A.   I am uncertain, I don't know as to Ed.
21   I do believe there were large loss reports
22   filed with regard to this matter.
23       Q.   And we went over one of those

Timothy F. Sullivan                                    27

1    yesterday.  I think it's in the --
2        A.   At least one, I believe, yes.
3            (Defendant's Exhibit 40 was marked and
4    attached.)
5        Q.   (BY MR. SPEAGLE)  We are on Defendant's
6    Exhibit 40.  Take a look at this document and
7    see if you recognize it first.  And if you
8    do, then we'll -- take as much time as you
9    need.
10       A.   (Witness complies.)
11       Q.   Tim, do you recognize that document?
12       A.   Yes, I do.
13       Q.   Is that a document you authored and
14   sent on behalf of NAMICO?
15       A.   It is.
16       Q.   And who did you send it to?
17       A.   Kim Severson.
18       Q.   And the date of this document is
19   Tuesday, July 12th, 2011.  If I recall in our
20   timeline, this would be the day before a
21   settlement was negotiated between the
22   Holloway and Meadows parties and the
23   NAMICO/AMIC parties.

Timothy F. Sullivan                                    28

1        A.   Correct.
2        Q.   That would actually have been the 13th
3    was when that was negotiated?
4        A.   Yes.
5        Q.   Okay.  The attachment is entitled
6    1342512, AMIC Murphy memo to Kim
7    Severson.docx.  The memo is attached on the
8    back.
9            Is this your memo?  Is this something
10   that you authored?
11       A.   Yes.
12       Q.   Okay.  And attached to that memo is --
13   in the back, another section that starts with
14   AMIC general counsel case analysis.
15       A.   Yes.
16       Q.   As I recall, we introduced an exhibit
17   yesterday, an e-mail from me to various and
18   sundry parties.  Does that AMIC general
19   counsel case analysis come from that e-mail,
20   as best you recall?
21       A.   I don't remember the e-mail from
22   yesterday, but I'm sure we have it here.
23       Q.   Yeah, we do.  Let me ask you this just

## Page 29

Timothy F. Sullivan                                           29

1   off your memory:  Where would you have --
2   where would you have gotten that; do you
3   recall?
4       A.  Yes, I do.
5       Q.  Okay.  Tell me.
6       A.  When we were meeting on Friday, July
7   the 8th, we went over many of these issues.
8   During the course of that meeting, you
9   indicated to me either the afternoon of the
10  8th or -- I believe you and I talked on
11  Monday, the 11th.  Somewhere in that
12  timeframe, you indicated you had a memorandum
13  and that you would share that with me and you
14  forwarded it to me as an e-mail either -- I
15  believe on the 11th.
16      Q.  Okay.  And then let's go into a couple
17  of these issues.  The first page of the
18  memorandum, in the second paragraph, it is
19  the second sentence that I'm interested in.
20  "While newly retained defense counsel for the
21  underlying appeal and for AMIC have both done
22  a very good job with the appellate briefs,
23  both counsel indicate that the most likely

## Page 30

Timothy F. Sullivan                                           30

1   result from the Court of Appeals will be an
2   order pursuant to Georgia law capping the
3   town's liability at the available limits of
4   insurance."
5       Did I read that correctly?
6       A.  Yes.
7       Q.  And, in fact, Tim, that was sort of the
8   prevailing wisdom at the time; that was the
9   most likely result, is that $3.99 million
10  judgment was going to get reduced down to
11  $2 million?
12      A.  Correct.
13      Q.  What would that have done to a bad
14  faith case, do you know?
15      A.  It probably would have caused it to
16  evaporate.
17      Q.  Okay.  Let me ask this -- and I
18  broached this subject yesterday with Ed:  Is
19  there an exclusion in the policy that says --
20  or that excludes a loss resulting from a
21  claim if that loss equals or is less than the
22  insured's contractual policy limits?
23      A.  No.

## Page 31

Timothy F. Sullivan                                           31

1       Q.  Okay.  Let's stay in that paragraph,
2   and it's going to be, I think, the -- about
3   three quarters of the way down.  "While
4   AMIC's general counsel believes," do you see
5   that particular sentence?
6       A.  Yes, I do.
7       Q.  Okay.  "While AMIC's general counsel
8   believes that an insurance bad faith claim is
9   not an estate asset that can be assigned and
10  can cite to Alabama law on that point, it
11  seems probable the underlying plaintiffs
12  would petition the Probate Court to have the
13  estate assign its bad faith failure to settle
14  within limits claim against AMIC to the
15  plaintiffs."
16      Do you recall where the Probate Court
17  action was going to take place?
18      A.  I believe it was taking place in
19  Randolph County, Alabama.
20      Q.  Okay.  And that was, of course,
21  consistent with what AMIC was telling NAMICO
22  at the time, that collection of this matter
23  would always have to come back to Alabama;

## Page 32

Timothy F. Sullivan                                           32

1   correct?
2       A.  That's what Alabama Municipal was
3   saying to NAMICO, correct.
4       Q.  Correct.  That's right.
5       Okay.  In the very next small paragraph
6   down, the second sentence "Neither Georgia or
7   Alabama law permits such a third-party bad
8   faith action by an underlying plaintiff
9   against defendant's insurer, but the Georgia
10  trial court did not grant the motion to
11  dismiss."
12      Was it your understanding, like it was
13  Ed's yesterday, that in order for a bad faith
14  case to be viable in Georgia, a third-party
15  would have to have the assignment of the bad
16  faith allegations?
17      A.  Yes.
18      Q.  Okay.  And as of the date you authored
19  this memo, there had been no assignment of
20  that bad faith litigation?
21      A.  To my knowledge, no.
22      Q.  To your knowledge.  Had you ever
23  discussed the matter with the Town of

Timothy F. Sullivan                    33

```
 1   Woodland or with the Estate of Billy Burn and
 2   Edmondson?
 3      A.  I did not.
 4      Q.  Had you ever discussed the matter with
 5   the attorneys representing the Estate of
 6   Holloway and Connie Meadows?
 7      A.  I had not.
 8      Q.  Let's go to -- let's see if I have it.
 9   It's on the following page.  Mine, for some
10   reason, aren't Bates labeled.
11          I'm interested in, again, the first two
12   paragraphs.  "In the course of our meeting,
13   AMIC's general counsel, Scott Speagle,
14   explained AMIC's position regarding the
15   further litigation of the case.  His analysis
16   follows this memo.  Other counsel who have
17   seen this analysis commended for its
18   thoroughness but generally dismiss it as not
19   reflecting an awareness of the reality of the
20   situation. AMIC asked Scottsdale NAMICO's
21   position."
22          I indicated that NAMICO on behalf of
23   Scottsdale believed this case involved bad
```

Timothy F. Sullivan                    34

```
 1   facts and that as Justice Holmes observed,
 2   bad facts make bad law.  This case is in
 3   Georgia, the trial court is hostile to AMIC,
 4   and that I viewed AMIC approach as a
 5   collateral attack on a foreign judgment.
 6          Now, a couple of things that I want to
 7   ask you about this.  The reality of the
 8   situation is that NAMICO did absolutely no
 9   investigation on the Alabama tort caps or how
10   the courts -- Alabama courts rule the Alabama
11   tort caps; isn't that correct?
12          MR. MCDOWELL:  Object to the form.
13      A.  No.
14      Q.  (BY MR. SPEAGLE)  That's not correct?
15      A.  That is not correct.
16      Q.  Okay.  What investigations did NAMICO
17   do on the Alabama tort caps and any case law
18   investigating those?
19      A.  On Friday, July 8th, meeting at the
20   Alabama Municipal office, the five of us in
21   that meeting -- six of us with Ms. Whitlock
22   engaged in a rather lengthy discussion about
23   Alabama tort caps to the extent of, I
```

Timothy F. Sullivan                    35

```
 1   believe, reviewing Roy versus -- Roy Suttle
 2   -- I'm going to call it the Suttles case.
 3      Q.  I'm with you.  I'm with you.
 4      A.  And then there was also a discussion
 5   surrounding Alabama Municipal's recent
 6   experience in Jefferson County with a bus
 7   case in which the trial court did not apply
 8   the tort caps.
 9          I believe there was a discussion led by
10   you as counsel regarding the differences
11   between a -- what I'm going to refer to as a
12   generic tort cap statute, one that applied to
13   county employees and one that applied to
14   municipal employees during the course of that
15   meeting because we were discussing -- I
16   believe that came up in the context
17   particularly of the Suttles case.
18      Q.  Okay.  Let me ask you this:  When y'all
19   came to Montgomery on July the 8th, 2011,
20   were you prepared to give the Hammer Clause
21   and the recommendation that AMIC was to
22   settle?
23      A.  No.
```

Timothy F. Sullivan                    36

```
 1      Q.  You were not?
 2      A.  I did not come -- let me -- I am going
 3   to go with no as my answer.
 4      Q.  Okay.  What did you come to do then?
 5      A.  We came to -- the initial meeting was
 6   set up following a meeting we had with
 7   defense counsel, Ms. Whitlock in Indianapolis
 8   on June 27th.  And then on July 5th, the
 9   plaintiff's lawyer, Mr. Haynes --
10      Q.  Correct.
11      A.  -- sent a settlement demand.
12      Q.  Correct.
13      A.  That changed somewhat the nature of
14   what we were doing, but the primary purpose
15   of the meeting had been set up to discuss
16   with you some of these very issues; how did
17   you perceive the case is why we had these
18   discussions.
19      Q.  Six days before the critical juncture
20   in the lawsuit, the oral arguments before the
21   appellate court?
22      A.  As it turns out, yes.
23      Q.  Okay.  And if I'm correct with my memo
```

Timothy F. Sullivan                                          37

1    date, it wasn't until -- that was Friday the
2    8th.  It wasn't until either the next Monday
3    or the next Tuesday that you actually
4    received a memo from me outlining some of the
5    case law and statutes regarding the cap.
6        A.  Correct.
7        Q.  Okay.  Did you ever ask in that
8    meeting, or at any time that you recall, what
9    AMIC's actual experience with the tort caps
10   in the state were?
11       A.  I believe we did at the July 8th
12   meeting, yes.  That's what led to the
13   discussion of Suttles and the bus driver case
14   -- what I'm going to refer to as the bus
15   driver case.
16       Q.  When the say the BJCTA case, let me ask
17   you --
18       A.  How about I just call it the bus driver
19   case.
20       Q.  There you go.  In that case, we had a
21   bus driver for a governmental entity who
22   Judge Vowell found a million dollars against
23   BJCTA, his employer, and a million dollars

Timothy F. Sullivan                                          38

1    against the bus driver in his individual
2    capacity; correct?
3        A.  I --
4            MR. MCDOWELL:  Object to the form.
5        A.  -- believe those to be the facts
6    related to us, yes.
7        Q.  (BY MR. SPEAGLE)  And then we're on the
8    same one.
9            Do you recall what happened or what the
10   resolution of that case turned out to be?
11       A.  I did not have a resolution at that
12   time.  I was advised that it had gone on
13   appeal to the Alabama Supreme Court.
14       Q.  Okay.  Do you know how many litigation
15   files AMIC handles in a year?
16       A.  No, I do not.
17       Q.  Okay.  Do you know how many times
18   during the course of a year or during its
19   lifetime AMIC has paid more money than the
20   tort caps?
21       A.  I do not know.
22       Q.  Did you review AMIC's answers to your
23   counsel's second set of interrogatories --

Timothy F. Sullivan                                          39

1            MR. SPEAGLE:  Second set of
2    interrogatories?
3            MR. MCDOWELL:  I'm not sure.
4        Q.  -- by any chance?
5        A.  I'm sorry.  He was saying not sure.
6            MR. MCDOWELL:  I wasn't sure which set
7    of -- well, of course, where you're headed
8    with the question, so I don't know.
9        Q.  (BY MR. SPEAGLE) Let me ask you this:
10   Have you reviewed any of AMIC's answers to
11   Scottsdale's interrogatories?
12       A.  As the responses were received, I
13   believe I either reviewed the responses or
14   counsel's summation of the responses.
15       Q.  And obviously, I don't want to know
16   anything --
17       A.  We're not going into anything beyond
18   that.
19       Q.  Okay.  Did you happen to review or do
20   you recall as we sit here today that in
21   AMIC's responses or answers to the second set
22   of interrogatories that they paid a total of
23   four claims above the tort caps?

Timothy F. Sullivan                                          40

1        A.  I don't recall that.
2        Q.  Wouldn't that have been something you
3    would have wanted to know at that July 8th
4    meeting, that they had paid four claims over
5    thousands upon thousands of claims over its
6    lifetime above the tort cap?
7        A.  I would have expected in the course of
8    the discussion, if that were the case, that
9    Alabama Municipal would have related that
10   information to us.
11       Q.  Well, you're the insurer; correct?
12       A.  We are indeed the insurer.
13       Q.  And you have the duty to defend?
14       A.  Correct.
15       Q.  And you have the duty to investigate?
16       A.  Correct.
17       Q.  Who has more experience with the tort
18   caps, NAMICO or AMIC?
19       A.  Alabama Municipal.
20       Q.  Who has more experience with the
21   operation of the tort caps under Alabama law;
22   AMIC or NAMICO?
23       A.  Alabama Municipal.

Timothy F. Sullivan                                    41

```
 1       Q.  Was Kate Whitlock a licensed Alabama
 2  attorney?
 3       A.  I don't know, but -- I don't know.
 4       Q.  Did the fact that they were pending
 5  cases in Alabama that could have affected the
 6  Georgia bad faith case, do you think maybe
 7  you should have found out or hired an
 8  attorney licensed in the state of Alabama?
 9          MR. MCDOWELL:  Object to the form.
10       A.  No.
11       Q.  (BY MR. SPEAGLE)  Okay.  Let's get back
12  to your memo, if we could.
13          Down at the very bottom of that page,
14  the last paragraph is what I'm interested in.
15  Tell me if read this correctly.  "NAMICO is
16  prepared to send a letter formally raising
17  the Hammer Clause and Exclusion I issues and
18  demanding that AMIC settle the claim prior to
19  the expiration of the offer on Thursday,
20  July 14th, at 9:00 a.m."
21          Hadn't you already formally done that
22  at the July 8th meeting?
23       A.  I had not formally sent a letter.
```

Timothy F. Sullivan                                    42

```
 1       Q.  You hadn't formally sent the letter,
 2  but you had activated the Hammer Clause at
 3  the July 8th meeting and demanded that AMIC
 4  settle the claim for $2 million; correct?
 5       A.  Yes, I had verbally done so.
 6       Q.  And you had done so by saying that AMIC
 7  was going to be responsible for all of it and
 8  NAMIC was going to pay zero?
 9       A.  I don't know whether those were my
10  precise words.
11       Q.  Sure.  NAMICO, I'm sorry.  I used NAMIC
12  again.
13          A summation:  Is that a correct
14  understanding from your --
15       A.  That's a fair statement of my point.
16       Q.  In this paragraph that I just read,
17  "NAMICO was prepared to send a letter
18  formally."  Let me show you what I have as
19  Defendant's Exhibit 41.
20          (Defendant's Exhibit 41 was marked and
21  attached.)
22       Q.  (BY MR. SPEAGLE) Is Defendant's
23  Exhibit 41, I guess, the formal letter that
```

Timothy F. Sullivan                                    43

```
 1  you were referring to in this memo?
 2       A.  In a fashion, yes.
 3       Q.  Tell me how it's in a fashion, no.
 4       A.  This letter -- the one contemplated in
 5  the memo I sent to Ms. Severson on the 12th
 6  would have been -- there was no settlement
 7  yet.  This letter encompasses the fact that
 8  as I was typing this letter on the morning of
 9  the 13th, Mr. Roesch was telling me things
10  have changed, we're working on a settlement,
11  things have changed, plaintiff's counsel will
12  only waive the interest, he will not go below
13  $2 million, things have changed, we have a
14  settlement.
15       Q.  You have anticipated my next question.
16  My next question was:  That letter,
17  Defendant's Exhibit 41, came after a
18  negotiated settlement was in place?
19       A.  Yes.
20       Q.  And between this memo to Kim --
21       A.  Severson.
22       Q.  -- Severson, and Defendant's Exhibit
23  41, you did not send any other letters --
```

Timothy F. Sullivan                                    44

```
 1  formal letters we'll call them, to AMIC?
 2       A.  Correct.
 3       Q.  Okay.  Did you send, as you recall,
 4  prior to Defendant's Exhibit 41, AMIC any
 5  letters or memos or phone calls, for that
 6  matter, I guess, advising AMIC of the
 7  possibility that Exclusion I could apply?
 8       A.  Did I --
 9          MR. MCDOWELL:  Object to the form.
10       A.  -- send such a letter?
11          MR. MCDOWELL:  When you use the term
12  you, are you referring to you being Tim
13  Sullivan?
14          MR. SPEAGLE:  I am, I am because the
15  deposition is of Tim Sullivan, yeah.
16          MR. MCDOWELL:  Okay.
17       A.  I just want to make sure in what
18  capacity I'm answering that.
19       Q.  (BY MR. SPEAGLE)  Correct.
20       A.  I, Tim Sullivan, did not send any
21  letters.
22       Q.  Okay.  Did you have any communications
23  with AMIC, David, Steve, me, Danny as you
```

Timothy F. Sullivan 45

1  recall prior to July 8th of 2011?

2     A.  No.

3     Q.  Okay.  Let's go back to your memo which

4  is Defendant's Exhibit 40.

5     A.  (Witness complies.)

6     Q.  The third page of your memo, the first

7  paragraph, as we discussed, do you see that

8  particular paragraph?

9     A.  I do.

10    Q.  All right.  This is what I'm interested

11 in:  "As we discussed, NAMICO is concerned

12 that AMIC will not settle the claims and will

13 await the ruling of the Georgia Court of

14 Appeals and the DJ action in Randolph County

15 referenced in Speagle's analysis.  If the

16 Court of Appeals does not cap the driver's

17 obligation according to either Georgia or

18 Alabama law, and the Randolph County judge

19 does not cap the driver's exposure under

20 Alabama law, then the remaining liabilities

21 would be in the millions of dollars excess of

22 the AMIC policy."

23          Tim, you recognized, it seems to me at

Freedom Court Reporting, Inc                    877-373-3660

---

Timothy F. Sullivan 46

1  this point, that the Alabama courts would

2  have something to say about this particular

3  claim, would that be a fair assessment?

4          MR. MCDOWELL:  Object to the form.

5     A.  No.

6     Q.  (BY MR. SPEAGLE)  Okay.  You didn't

7  think that the Alabama courts would have

8  something to say about the caps --

9     A.  No.

10    Q.  -- in this claim?

11    A.  I was uncertain whether the Alabama

12 courts would have something to say about the

13 caps in this case.

14    Q.  Okay.  But you recognized that there

15 were actions in Alabama in place requesting

16 the Alabama courts to do so?

17    A.  Yes.

18    Q.  Okay.  At this point, do you recall

19 whether or not you had any cases or legal

20 authority from an Alabama court that a

21 particular statute, 1147190, would not apply?

22          MR. MCDOWELL:  Object to the form.

23    A.  No, I did not.

Freedom Court Reporting, Inc                    877-373-3660

---

Timothy F. Sullivan 47

1     Q.  (BY MR. SPEAGLE)  Okay.  The -- well,

2  not the next paragraph, the paragraph after

3  in addition.  I guess it's the third

4  paragraph.  "In order to resolve these many

5  issues and to box this claim to avoid

6  multi-million dollar exposure, NAMICO

7  suggests the following approach," and then

8  you provide the approach.

9          Multi-million dollars exposure meaning

10 exposure to NAMICO?

11          MR. MCDOWELL:  Object to the form.

12    A.  In part.

13    Q.  (BY MR. SPEAGLE)  In part.  But it

14 would be exposure to NAMICO?

15    A.  There would be multi-million dollar

16 exposure to NAMICO.

17    Q.  Okay.  Now, you then provide the

18 approach.  And let me ask this:  The approach

19 is, as best I can tell, what AMIC offered

20 verbally at the meeting of July the 8th to

21 pay the first $200,000.00 and then to split

22 up to 1.8 million.

23          That's a terrible way to say it because

Freedom Court Reporting, Inc                    877-373-3660

---

Timothy F. Sullivan 48

1  that's what got us in trouble the first time;

2  right?

3          MR. MCDOWELL:  Object to the form.

4     Q.  (BY MR. SPEAGLE) To split the remaining

5  $1.6 million?

6     A.  Correct.

7     Q.  Okay.  What was your understanding of

8  why AMIC was going to pay the first

9  $200,000.00?

10    A.  It was my understanding that AMIC

11 considered that to be in my words an

12 undisputed amount --

13    Q.  Okay.

14    A.  -- that $200,000.00 would be pursuant

15 to the Alabama tort caps and they did not

16 dispute that.

17    Q.  That is, AMIC always thought that

18 $200,000.00 was owed by them under their

19 contract of insurance to their insureds -- or

20 on behalf of their insureds?

21    A.  I'm not sure I -- my answer to that

22 would have to be, no, because of the way the

23 question was framed.

Freedom Court Reporting, Inc                    877-373-3660

Timothy F. Sullivan                                    49

1      Q.  Okay.  Well, let's just -- let's just
2   stick with how you said it earlier.  The
3   first time that we met you was on July 8,
4   2011; is that right?
5      A.  In person, yes.
6      Q.  Okay.  Do you have a recollection of
7   what happened at that meeting?
8      A.  All sorts of fun things happened at
9   that meeting.
10     Q.  Okay.
11     A.  As indicated, Ms. Whitlock had set up a
12  meeting with what I'm going to refer to as
13  the three of you, but for the reporter, Mr.
14  Speagle, Mr. Wells, and Mr. Sikes, Mr.
15  Roesch, myself, and Ms. Whitlock.
16     Q.  Okay.
17     A.  I had sort of been getting up to speed
18  during that intervening week as best as I
19  could.  And our purpose for coming down was
20  to talk with folks about this claim and where
21  did we think it was going to and to
22  specifically, in my mind, discuss with the
23  folks from Alabama Municipal the Alabama tort

Timothy F. Sullivan                                    50

1   cap issues and those sort of issues that
2   clearly they were knowledgeable of --
3      Q.  Okay.
4      A.  -- and to find out how that claim was
5   perceived at Alabama Municipal.
6      Q.  Okay.  If you could, flip back with me
7   in your memo to page -- the second page of
8   your memo.
9      A.  (Witness complies.)
10     Q.  And it will be the third paragraph
11  which starts, AMIC inquired as to the amount
12  NAMICO -- do you see that one?
13     A.  I do.
14     Q.  Let me go through that with you.
15     A.  Okay.
16     Q.  "AMIC inquired as to the amount NAMICO
17  was willing to contribute.  I advised them
18  there would be no contribution from the
19  Scottsdale policy.  I advised them of
20  Exclusion I, the contractual benefit
21  exclusion, and of the Hammer Clause.  In
22  brief, AMIC was advised that NAMICO viewed
23  the settlement demand as a demand for the

Timothy F. Sullivan                                    51

1   contract benefits of AMIC's policy insuring
2   the town and driver, and, therefore, not a
3   liability for the Scottsdale policy.
4   The Hammer Clause in particular was news to
5   AMIC and it caused the meeting to recess for
6   about two hours for 'lunch'" and you have
7   lunch in quotations.  We went to Bandanas and
8   had catfish, by the way.
9          I read that correctly; didn't I?
10     A.  I believe so, yes.
11     Q.  Did you read Steve Wells' deposition?
12     A.  No, I did not.
13     Q.  Okay.  Did you read David Sikes'
14  deposition?
15     A.  No, I did not.
16     Q.  Do you recall AMIC's answers and
17  responses to Scottsdale's interrogatories and
18  requests for production of documents?
19     A.  As I previously indicated, I read them
20  when they came in.  I did not specifically
21  read them in preparation for this deposition.
22     Q.  Okay.  Well, I asked Ed this yesterday,
23  and I'm going to ask you today:  Do you

Timothy F. Sullivan                                    52

1   recall that at that meeting before we broke
2   for lunch that I asked you in sum what y'all
3   were here to do?
4      A.  I don't specifically recall that, but I
5   wouldn't be surprised if you did.
6      Q.  Okay.  Would you be surprised, or do
7   you recall that your answer was that you were
8   invoking the Hammer Clause and that -- I'm
9   going to use your words so as to not get
10  mixed up, that you were recommending that we
11  settle for $2 million?
12     A.  I'm certain at some point in that
13  discussion, that meeting that morning I said
14  that or words to that effect.
15     Q.  Do you recall saying that the reason
16  that you were going to, and I'll use again
17  your words, not ours, recommending the
18  settlement was because NAMICO had twice the
19  exposure of AMIC in the suit?
20     A.  I did say that, and I was immediately
21  corrected.
22     Q.  And you were immediately corrected by
23  whom?

Timothy F. Sullivan                                    53

```
 1        A.  I believe Mr. Roesch corrected me
 2   because I looked -- when there was a question
 3   about that from Mr. Wells, I looked at Mr.
 4   Roesch and I said something to that effect
 5   of, Ed, what are the limits here, I thought
 6   we had a $5 million policy.  And he said, no,
 7   we only had $2 million here.
 8        Q.  Okay.
 9        A.  I had been looking at a different
10   insured's policy.
11        Q.  Sure.  And my next question was:  Do
12   you recall saying the reason you had twice
13   the exposure was because you had a $5 million
14   policy and not a $2 million policy?
15        A.  Correct.
16        Q.  You also recall that the reason that --
17   your $5 million policy would have been in
18   play was because AMIC was subject to punitive
19   damages in Georgia?
20        A.  I did say that, and Ms. Whitlock
21   corrected me on that.
22        Q.  Okay.  And you think that both of those
23   corrections happened in that meeting?
```

Timothy F. Sullivan                                    54

```
 1        A.  They both happened right there.  Kate
 2   was sitting to my left and Mr. Roesch was
 3   sitting across the table from me.
 4        Q.  I recall that.  I recall that.
 5            Let's go back to Exhibit 8, which is
 6   the policy.
 7            MR. SPEAGLE:  We've been going an hour,
 8   let's take a brief break if we could.
 9            (Short recess was had.)
10        Q.  (BY MR. SPEAGLE)  Tim, we were leaving
11   off with what I have as Defendant's Exhibit
12   8, which not every piece of paper attached
13   with that policy is Defendant's Exhibit 8,
14   but I think we can all agree that that is the
15   terms and conditions governing Scottsdale and
16   AMIC's insurance contract.
17            Am I correct, did you write that
18   policy?
19        A.  I was part of the committee that wrote
20   this policy, yes.
21        Q.  Okay.  Well, let me ask you to play out
22   another hypothetical; that is, a series of
23   facts different than what we have before us.
```

Timothy F. Sullivan                                    55

```
 1            Assume with the Hammer Clause and
 2   everything else that AMIC continued with the
 3   suit either in Alabama and Georgia, and that
 4   either Alabama or Georgia courts held that
 5   the tort cap in Alabama, in fact, applied to
 6   those judgments; so assume a fact different
 7   than what we have, and that that legal
 8   determination is in place so that Holloway --
 9   the Estate of Holloway is owed $100,000.00
10   and Connie Meadows is owed $100,000.00.
11            With that factual scenario in place
12   under the Hammer Clause, what would
13   Scottsdale's duties or obligations to AMIC
14   have been, if any?
15            MR. MCDOWELL:  Object to the form.
16        A.  Provided that this is not a legal
17   opinion because I'm not a lawyer?
18        Q.  (BY MR. SPEAGLE) Yes.
19        A.  As a claims person responding to
20   that --
21        Q.  Correct.
22        A.  -- it would depend on what Alabama
23   Municipal then did.
```

Timothy F. Sullivan                                    56

```
 1            As this policy is written, Alabama
 2   Municipal would then have the right to apply
 3   to Scottsdale Insurance Company to be
 4   reimbursed for the defense expenses incurred
 5   by them from the date that Scottsdale
 6   withdrew from the defense through the final
 7   date of obtaining a determination outlined in
 8   your hypothetical and presenting Scottsdale
 9   with the bills for that defense.
10        Q.  Okay.  What about the $200,000.00 in
11   indemnity, would that have been?
12        A.  No, that would have still fallen under
13   Exclusion I.
14        Q.  Okay.  Well, let me ask this then:  If
15   under that same hypo, as opposed to the
16   Alabama cap applying, let's say the Georgia
17   cap would have applied, which is the limits
18   of the insurance policy in place for
19   $2 million.  As a claims person, would we be
20   talking about the same result under this
21   Hammer Clause?
22        A.  The same result as what?
23            MR. MCDOWELL:  Object to the form.
```

Timothy F. Sullivan                                    57

1     Q.  (BY MR. SPEAGLE)  I'm sorry.  The same
2  result as the one you just provided under the
3  Alabama tort cap.
4         MR. MCDOWELL:  Object to the form.
5     A.  So that I understand it, the same
6  result under the first hypothetical that you
7  gave me?
8     Q.  Yes.
9     A.  Thank you.  Under the second
10  hypothetical, yes, the result would be the
11  same, that would be the policy benefit
12  exclusion, Exclusion I would apply, and then
13  Alabama Municipal would be under the contract
14  able to apply to Scottsdale Insurance for
15  reimbursement of its defense expenses and we
16  would have evaluated whether any defense
17  expenses were owed.
18     Q.  So under this policy as a claims person
19  reviewing it, Scottsdale has the ability to
20  invoke what we're calling the Hammer Clause?
21  And I got that again from -- that's a term
22  that I pulled from you.  I think that I'm
23  using it the same way you are.  If you feel

---

Timothy F. Sullivan                                    58

1  like I'm not, please let me know.
2         In any event, Scottsdale is able to
3  invoke the Hammer Clause, pull out of the
4  defense, and after it pulls out of the
5  defense, it is still able to invoke an
6  exclusion under the policy, is that your
7  understanding of the how the policy reads?
8     A.  Yes.
9     Q.  Okay.  You may have answered this
10  already, but if not, I know Ed did, but I
11  want to ask you as well.  NAMICO's position
12  in the lawsuit is that it's due to be
13  reimbursed $900,000.00 because Exclusion I is
14  applicable to the $2 million settlement?
15     A.  Among other damages, yes, or among
16  other amounts, let me state it that way.
17     Q.  NAMICO is also seeking attorneys' fees
18  in this lawsuit under Clause --
19     A.  Whatever it is, yes, a subsequent
20  condition under the policy.  I believe we're
21  also seeking interest.
22     Q.  Correct.  Correct.  I'm talking about
23  the main reason for the suit -- I shouldn't

---

Timothy F. Sullivan                                    59

1  say it that way, that's a terrible question.
2         Other than the interest and the
3  attorneys' fees, the $900,000.00 in NAMICO's
4  view is due to be reimbursed because it was
5  paid out under -- or Exclusion I entitles it
6  to be reimbursed?
7     A.  Well, the subject condition entitles it
8  to be reimbursed.  Exclusion I would be the
9  reason Scottsdale and NAMICO did not owe the
10  $900,000.00 to begin with.
11     Q.  Okay.  And, again, another
12  hypothetical.  Let's assume that in Exhibit 8
13  Exclusion I does not exist.  All right?  We
14  have that document, there is no Exclusion I.
15         Under the facts of this case, you would
16  agree with me that the insuring agreement
17  provides that the $2 million is a loss
18  resulting from a claim?
19         MR. MCDOWELL:  Object to the form.
20     A.  You will have to give me a minute to
21  contemplate that because I would have to go
22  through and do a very quick off-the-cuff
23  coverage analysis.

---

Timothy F. Sullivan                                    60

1     Q.  Well --
2     A.  You're asking me whether under an
3  insuring agreement at 1-A --
4     Q.  Yes.
5     A.  -- Insurance Company Professional
6  Liability, if we don't have Exclusion I --
7     Q.  Maybe I shouldn't have done this as a
8  hypothetical.  There's a better way.
9         MR. MCDOWELL:  I don't know.  I object
10  to the form.  I think that calls for a legal
11  conclusion and speculation.
12     A.  I'd have to do some thinking about how
13  this all falls under the definition of loss.
14         MR. MCDOWELL:  Let me just say without
15  -- you know, as a further objection to
16  that -- I mean, I think it would probably --
17  you and I both know as lawyers it probably
18  would be possible for us to gin up any number
19  of arguments back and forth about what this
20  policy may or may not do, but the landscape
21  that we've got here is Exclusion I and
22  Condition P, and that's what this case is
23  about.

Timothy F. Sullivan                                  61

1        MR. SPEAGLE:  Thank you, David.
2    Q.  (BY MR. SPEAGLE) So let me get that on
3  the record from you.  I don't want to show up
4  at trial and have you say, no, no, no, wait,
5  even if Exclusion I doesn't apply, the policy
6  still excludes -- or we're still entitled to
7  reimbursement because of something else.
8        Am I correct to say that in this suit
9  the only reason that Scottsdale is asserting
10  reimbursement under Clause P is that it was
11  never due in the first place under Exclusion
12  I?
13    A.  I would want to before answering that
14  question --
15        MR. MCDOWELL:  Object to form.
16        THE WITNESS:  I'm sorry, go ahead.  I
17  apologize.
18    A.  I would want to see the reservation of
19  rights letter from, I believe, April of 2011
20  written by Mr. Roesch before I would answer
21  that question.  I don't remember whether Mr.
22  Roesch raised any other issues in that
23  reservation of rights letter.

Timothy F. Sullivan                                  62

1        MR. MCDOWELL:  And I would just say,
2  you know, object to the form to the extent it
3  calls for a legal conclusion.
4        We have filed a formal complaint in
5  this case seeking a declaratory judgment
6  testimony action; our theories are outlined
7  in that.  We have even submitted some
8  briefing in this case.  As I sit here today,
9  I can't recall everything we've said.
10        I would be willing to say, however,
11  that the Exclusion I and reimbursement
12  Provision P are certainly the most important
13  aspects of this case in addition to the fact
14  that this is what everyone agreed to, and we
15  had an agreement that after the settlement,
16  we would litigate the issue of who owes whom.
17    Q.  (BY MR. SPEAGLE) Tim, let me ask this:
18  As you sit here right now, can you think of
19  another exclusion that you are asserting or
20  that you think applies in this lawsuit?
21    A.  Sitting here right now, I cannot.
22    Q.  Okay.  Are you familiar with Alabama
23  Bad Faith law?

Timothy F. Sullivan                                  63

1    A.  To some extent, yes.
2    Q.  Okay.  We talked a good bit about it
3  yesterday regarding the McCoy case.  Do you
4  remember that --
5    A.  I remember the discussion.
6    Q.  -- back and forth?
7    A.  I remember the discussion, yes.
8    Q.  Is it your understanding that in
9  Alabama, punitive damages are allowed against
10  an insurer who has committing bad faith?
11    A.  Correct.
12    Q.  Okay.  Is it --
13    A.  Yes would be my answer.  I'm sorry.
14    Q.  Is it your understanding -- again, this
15  isn't bearing on David or I or anybody else,
16  but is it your understanding that in Alabama,
17  punitive damages are typically capped at what
18  we call three times compensatory?
19        MR. MCDOWELL:  Object to the form.
20    A.  I do have that understanding, yes.
21    Q.  (BY MR. SPEAGLE) for example, that was
22  one of the bases, I think, that NAMICO used
23  in their analysis to offer and make a

Timothy F. Sullivan                                  64

1  settlement in the McCoy case?
2    A.  I believe that to be correct.  I was
3  not involved in the McCoy case.
4    Q.  Okay.  Well, for example, to use actual
5  numbers with what this ratio is, assuming
6  that we're both correct in that the law
7  allows a compensatory -- a ratio of punitive
8  damages of three to a compensatory ratio of
9  one.  If your compensatory damages are, let's
10  say for example, $900,000.00, your punitive
11  damages in that particular case would be
12  $2.7 million.  Would my math be about right?
13        MR. MCDOWELL:  Object to the form.
14    A.  Yes.
15    Q.  (BY MR. SPEAGLE)  Tim, I have got
16  another hypothetical for you.  Let's assume
17  that we are here on -- what is it, March
18  the 8th of 2013.  At some point down the
19  tunnel of time, we're going to be at the end
20  of this case.  At the end of this case,
21  whether judge or jury, whomever, has made a
22  determination, either by fact or by law, that
23  Exclusion I doesn't apply and that there was

Timothy F. Sullivan                                     65

```
 1   no arguable or debatable reason why it should
 2   have ever applied in this case and punitive
 3   damages are assessed against Scottsdale --
 4   make that assumption -- who is going to be
 5   responsible to tell Scottsdale they owe $2.7
 6   million?
 7        A.   Tim Sullivan.
 8        MR. MCDOWELL:  Object to the form.
 9        A.   Tim Sullivan would be.
10        MR. SPEAGLE:  I don't have any further
11   questions.
12
13        FURTHER DEPONENT SAITH NOT
14
15
16
17
18
19
20
21
22
23
```

Timothy F. Sullivan                                     66

```
 1        C E R T I F I C A T E
 2
 3        I, SUSAN MASTERS GOLDMAN, Alabama
 4   Certified Court Reporter, License Number 83,
 5   and Notary Public, hereby certify that the
 6   above and foregoing deposition was taken down
 7   by me on Computerized Stenotype, and the
 8   questions and answers thereto were
 9   transcribed by me, and that the foregoing
10   represents a true and correct transcript of
11   the deposition given by said witness upon
12   said hearing.
13        I further certify for, that I am neither
14   attorney or counsel for, nor related to or
15   employed by any of the parties to the action
16   in which this deposition is taken.
17
18
19             /s/Susan Masters Goldman
20             ACCR License No. 83
21
22
23
```

Timothy F. Sullivan                                     67

WORD INDEX

< $ >
$1 18:10, 18
$1.1 20:10
$1.6 18:9 19:10
48:5
$1.8 13:3, 6
19:12
$100,000.00
13:16 23:13, 14,
19 24:2 55:9
$100,000.00.
55:10
$2 11:18 12:19
30:11 42:4
43:13 52:11
53:7, 14 56:19
58:14 59:17
$2.7 64:12 65:5
$200 13:5
$200,000.00
12:21 13:8, 17,
18 18:7, 17 19:6
20:9 24:10
47:21 48:9, 14,
18 56:10
$3.99 30:9
$5 53:6, 13, 17
$8 18:8
$800,000.00
18:16 19:10
$800,000.00.
19:17
$900 12:20
$900, 12:20
$900,000.00
18:10 15:7 16:6
17:3, 7 20:11, 15
58:13 59:3, 10
64:10
$900,000.00.
14:16

< 1 >
1.8 18:4 47:22
101 4:16
105 4:16
1147190 46:21

11th 29:11
11th. 29:11
12th 27:19 43:5
12th. 13:13
1342522 26:6
13th 10:20 28:2
43:9
1400 4:10 5:9
1400, 1:23
14th 41:20
175 8:1
18 7:7
1994 10:11 20:22
1995 7:6
1-A 60:3

< 2 >
2011 8:5 10:20
24:20 26:12
27:19 45:1 49:4
61:19
2011, 35:19
2011, 6:5
2013 1:13 2:12
5:10 64:18
20th 1:23 4:10
5:8
27 3:3
27th 36:8

< 3 >
35202 4:11 5:10
35203 2:1
36101 4:17

< 4 >
40 3:3 27:3, 6
40. 45:4
41 3:9 42:20, 23
43:17, 23 44:4
41. 42:19
42 3:9
420 1:23 4:10
5:8

< 5 >
5th 36:8

< 6 >
6 3:4

< 8 >
8 1:13 14:11, 12
54:5, 12 59:12
8, 49:3 54:13
8:30 2:2 5:11
83 1:21 4:4 5:3
66:20
83, 66:4
8th 2:1 5:10
6:5 24:20 26:12
35:19 37:2, 11
40:3 41:22 42:3
45:1 47:20 64:18

< 9 >
9:00 41:20

< A >
a 1:5 8:22
10:16, 20 20:2,
19 22:4 27:20
29:22 30:20
32:9 37:22 38:1
63:9
a.m. 11:13
agree 12:12, 23
14:6 17:1, 9
23:1 25:22
54:14 59:16
AGREED 1:16
2:3, 10, 19 12:16
20 62:14
agreed-upon 13:2
agreement 16:2
18:3, 6 19:4, 11
23:9 59:16 60:3
62:15
agreement, 18:20
ahead 10:18
61:16
ALABAMA 1:2, 8,
20 2:1 4:3, 11,
17 5:1, 9 12:7,
17, 18 13:8
15:19 16:1 19:5,
9 21:2, 5 22:16
23:2 25:6 31:10,
23 32:2, 7 34:9,
12

act 23:5
acting 5:3 22:22
action 16:12
31:17 32:8
45:14 62:6 66:15
actions 46:15
activated 42:2
actual 37:9 64:4
actually 15:14
37:3
Adams 9:5
addition 20:18
47:3 62:13
advised 38:12
50:17, 19, 22
advising 44:6
affiliate 21:18
after 5:17 11:16
47:2
after. 11:19
afternoon 29:9
ago 8:3 52:16
again. 42:12
against 25:6
ago. 11:13

Timothy F. Sullivan                                     68

10, 10, 17, 20, 23
35:5 38:13 40:9,
19, 21, 23 41:1, 5,
8 45:18, 20 46:1,
7, 11, 15, 16, 20
48:15 49:23, 23
50:5 55:3, 4, 6,
22 56:1, 16 57:3,
13 62:22 63:9
66:3
Alabama, 63:16
Alabama. 31:19
all 2:7 15:12
26:6
allegations 32:16
allowed 63:9
allows 64:7
already 12:21
am. 6:13
AMIC 13:22 15:7,
8 16:11 18:6, 7,
9, 10 19:5 20:6,
8, 10, 14 31:4, 8
27:23 28:6, 14,
18 29:21 34:18
31 33:20 34:1
35:21 38:15, 19
40:18, 22 41:18
42:3, 6 44:1, 4, 6,
23 45:12, 22
47:19 48:8, 10,
17 50:11, 16, 22
51:5 52:19
53:18 55:2, 13
AMIC, 34:3
AMIC's 13:1
17:2 31:4, 7
33:13, 14 37:9
38:22 39:10, 21
51:1, 16 54:16
among 58:15
amount 23:9
48:12 50:11, 16
amount. 19:6
amounts 58:16
an 30:1 41:7
48:11 58:5 60:2
63:10

analysis 28:19
33:15, 17 45:15
63:23
analysis. 28:14
59:23
and 1:16 4:4
10:2 11:9 12:12
13:12 14:2
16:15 19:6, 10
20:10, 22 24:11
26:16 27:3, 6, 13
26:17 29:13
31:2, 9 33:1
34:4 35:21
41:17 42:7, 20
51:7, 16, 17, 23
54:15 55:1, 10
57:21 60:21 66:5
another 21:14
54:22 59:11
62:19 64:16
answer 26:1
48:21 52:7
61:20 63:13
answer. 36:3
answered 58:9
answering 44:18
61:13
answers 38:22
39:10, 21 51:16
40:18 43:8
42:18 43:8
49:12 62:18
ask 17:17 25:17
34:7 37:16
asked 11:9
33:20 51:22 52:2
asked. 19:15
asking 60:2
aspects 62:13
asserting 61:9
62:19
assessed 65:3
assessment 46:3
asset 31:9
assign 2:15
31:13
assigned 31:9
assignment
32:15, 19
assistant 9:6

appellate 29:22
35:21
applicable 58:14
applied 35:12, 13
55:5 56:17 65:2
applies 62:20
apply 17:19
35:7 44:7 46:21
56:2 57:12, 14
61:5 64:23
applying 56:16
appreciate 22:16
approach 34:4
47:18, 18
approach, 47:7
approach. 47:8
approximation.
11:12
April 61:19
are 8:16 10:6
16:21 17:1
arguable 65:1
arguments 38:20
60:19
arrangements.
12:10
as 2:7 5:18
12:4 18:12
25:11 28:20
42:18 43:8
49:12 62:18

Association
21:16 22:10
association.
21:20
assume 15:12,
17 18:5 55:1, 6
59:12 64:16
assuming 18:20
64:5
assumption 65:4
at 5:7 14:11
23:21 26:10
31:22 41:22
42:2 45:23 49:8
61:4
attached 28:7, 12
54:12
attached. 27:4
42:21
attachment 28:5
attack 34:5
attorney 41:2, 8
66:14
attorneys 11:17
33:5 58:17 59:3
authored 12:6
27:13 28:10
32:18
authority 23:5, 7,
12, 20, 22 24:4, 9
24:11
authorized 10:15
available 30:3
average 7:23
avoid 47:5
await 45:13
awareness 33:19

< B >
back 15:1 16:1
22:15 33:21
24:1 28:13
31:23 41:11
45:3 50:6 54:5
60:19 63:6
back. 28:8
26:3 30:13 31:8,
13 32:7, 13, 15,

# Exhibit 6

**Danny Ransom** 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4

 5   SCOTTSDALE INSURANCE      )
     COMPANY, a corporation,   )
 6                             )
          Plaintiff,           )
 7                             )
          vs.                  ) 2:11-CV-668-MEF
 8                             )
     ALABAMA MUNICIPAL INSURANCE)
 9   CORPORATION, a corporation,)
                               )
10        Defendant.           )

11   _____

12

13          DEPOSITION OF:  DANNY RANSOM

14   _____

15

16             S T I P U L A T I O N

17

18       IT IS STIPULATED AND AGREED by and between the

19   parties through their respective counsel that the

20   deposition of DANNY RANSOM may be taken on March

21   14, 2013, before Anne E. Miller, Commissioner and

22   Notary Public, at Baker, Donelson, Bearman,

23   Caldwell & Berkowitz, PC, 1600 Wells Fargo Tower,
```

---

**Danny Ransom** 2

```
 1   Birmingham, Alabama.

 2       IT IS FURTHER STIPULATED AND AGREED that the

 3   signature to and the reading of the deposition by

 4   the witness is waived, the deposition to have the

 5   same force and effect as if full compliance had

 6   been had with all laws and rules of court relating

 7   to the taking of depositions.

 8       IT IS FURTHER STIPULATED AND AGREED that it

 9   shall not be necessary for any objections to be

10   made by counsel to any questions except as to form

11   or leading questions, and that counsel for the

12   parties may make objections and assign grounds at

13   the time of trial or at the time said deposition

14   is offered in evidence or prior thereto.

15

16

17

18

19

20

21

22

23
```

---

**Danny Ransom** 3

```
 1                    APPEARANCES

 2   Appearing For The Plaintiff:

 3

 4        BAKER, DONELSON, BEARMAN, CADLWELL &
             BERKOWITZ, PC
 5        Mr. David W. McDowell
          420 Twentieth Street North
 6        1600 Wells Fargo Tower
          Birmingham, Alabama 35201
 7

 8   Appearing For The Defendant:

 9        WEBSTER, HENRY, LYONS, WHITE, BRADWELL
             & BLACK, PC
10        Mr. Scott M. Speagle
          105 Tallapoosa Street, Suite 101
11        Montgomery, Alabama 36104

12

13

14

15   Court Reporter:  Anne E. Miller

16

17

18

19

20

21

22

23
```

---

**Danny Ransom** 4

```
 1                      INDEX

 2

 3   Examination by Mr. McDowell ...............   5

 4

 5

 6   Defendant's Exhibit 32 ....................  26

 7   Defendant's Exhibit 33 ....................  28

 8   Defendant's Exhibit 34 ....................  36

 9   Defendant's Exhibit 35 ....................  45

10   Defendant's Exhibit 36 ....................  46

11   Defendant's Exhibit 37 ....................  48

12   Defendant's Exhibit 38 ....................  53

13   Defendant's Exhibit 39 ....................  58

14

15

16

17

18

19

20

21

22

23
```

1       I, Anne E. Miller, a Court Reporter of the State

2   of Alabama, acting as Commissioner, certify that

3   on this date there came before me at the law

4   offices of Baker, Donelson, Bearman, Caldwell &

5   Berkowitz, PC, 1600 Wells Fargo, at Birmingham,

6   Alabama, on March 14, 2013, beginning at or about

7   1:00 p.m., DANNY RANSOM, witness in the above

8   cause, for oral examination, whereupon the

9   following proceedings were had:

10

11                 DANNY RANSOM,

12   being first duly sworn, was examined and testified

13   as follows:

14

15   EXAMINATION BY MR. McDOWELL:

16       Q. Would you tell us your name for the record?

17       A. Danny Ransom, Danny R. Ransom.

18       Q. Middle initial R?

19       A. Uh-huh (yes), yes.

20       Q. And what does that stand for?

21       A. Ray.

22       Q. I'm sorry?

23       A. Ray.

1       Q. Ray, okay.  Mr. Ransom, are you represented

2   by counsel here today?

3       A. No.

4       Q. All right.  And we are here on a case, I

5   think, I will tell you the style, Scottsdale

6   Insurance Company versus AMIC Municipal Insurance

7   Corporation.  Do you know anything about this

8   case, what the dispute is about?

9       A. Not what this particular lawsuit is about,

10   but I know something about the case.

11       Q. About the underlying cases; the Meadows,

12   Holloway and Murphy claims?

13       A. I can't remember the plaintiffs, but I

14   remember some of the circumstances.  But it's been

15   some years with regards to my familiarity with

16   this case.

17       Q. Okay.  Well, we'll have an opportunity to

18   look at some documents that may help refresh your

19   memory a little bit.  Let's see.  And I take it as

20   it relates to the Scottsdale versus AMIC case, you

21   haven't reviewed any of the pleadings that have

22   been filed in it, any of the briefs or the

23   exhibits or the other depositions, anything like

1   that?

2       A. I have not.

3       Q. All right.  Have you ever given a deposition

4   before?

5       A. Yes.

6       Q. Do you have a judgment about how many times?

7       A. Three, four.

8       Q. And what kind of cases were those three or

9   four occasions?

10       A. Liability cases, primarily dealing with

11   municipalities.

12       Q. Have you done anything to prepare for your

13   deposition today?

14       A. No.

15       Q. Now I know you have testified before so I

16   think you are familiar with the basic ground

17   rules.  I would just remind you, if I ask you a

18   question today that you don't understand or is

19   confusing for any reason at all, let me know, and

20   I will do my best to try and work with you to make

21   sure we are understanding each other.

22       A. I will.

23       Q. If you need to take a break at any time,

1   speak up and let us know.

2       A. Okay.

3       Q. You are doing a good job of answering with

4   yes's and no's.  But if I start to hear and I

5   notice it -- and I don't always notice it.  But if

6   I hear "uh-huh" and "huh-uh," I may try to remind

7   you to answer with a verbal response to help us

8   get a good transcript.  So don't think I'm being

9   rude by doing that.  It's just to make sure that

10   two or three weeks from now, we will know exactly

11   what you said.

12       A. I understand.

13       Q. All right.  What's your current address?

14       A. I live at 128 Kentwood Lane, Alabaster,

15   Alabama, 35007.

16       Q. And for approximately how long have you

17   lived there?

18       A. Since 2000, the year of 2000.  So we are

19   talking about 13.

20       Q. Okay.  Who is your current employer?

21       A. Millenium Risk Managers.

22       Q. And where are they located?

23       A. They are located in -- they are in

**Danny Ransom**                                          9

1   Birmingham, but in the Hoover section of

2   Birmingham.

3       Q. Thank you.  And your business card which you

4   have just handed me has a title claims adjuster?

5       A. Yes.

6       Q. And Millenium then, it's not an insurance

7   company?

8       A. No.

9       Q. Okay.  Can you just tell us what the

10  business of Millenium is in a nutshell?

11      A. Third party administrator, primarily

12  worker's compensation claims.

13      Q. And are those the type of claims you are

14  handling now, worker's compensation claims?

15      A. Yes, sir.

16      Q. Mr. Ransom, what's your educational

17  background?

18      A. I attended Miles College.  Finished there in

19  1973 with a BS degree in business.

20      Q. And then you are currently with Millenium

21  Risk Managers.  Before that, were you employed by

22  AMIC?

23      A. Yes.

---

**Danny Ransom**                                         10

1       Q. All right.  And for how many years did you

2   work at AMIC?

3       A. Actually for AMIC, what?  Eleven, 12.  But

4   actually handling AMIC claims, over 20, I guess.

5       Q. Okay.  So you were at AMIC for 11 or 12

6   years.  I guess before that, you were with

7   Meadowbrook?

8       A. With Meadowbrook.  And before that, with Gay

9   and Taylor, but all handling AMIC claims.

10      Q. And then before Gay and Taylor, where did

11  you work?

12      A. At USF&G.

13      Q. And then before USF&G?

14      A. Briefly with Sears, but some three months

15  maybe.

16      Q. Right.  Was Sears your first job out of

17  college?

18      A. Yes.

19      Q. So ever since that brief stint at Sears, you

20  have worked in the business of handling claims of

21  one kind or another; is that fair to say?

22      A. Well, I mean technically, the work lineage

23  goes further back than that.  I worked briefly at

---

**Danny Ransom**                                         11

1   Ingle Iron Works.  That's a steel fabricating

2   plant.  I worked at Ford Motor Company after I

3   finished high school, and before that, I was a

4   newspaper boy.

5       Q. Right, right.  But in terms of your

6   experience with handling claims for insurance

7   carriers and, I guess, maybe some self insured

8   entities, you have been doing that work primarily

9   since late '73, early 1974?

10      A. Since August 1973.

11      Q. Let's see.  Are you married?

12      A. No.

13      Q. Do you have any adult children?

14      A. No.

15      Q. Do you have any adult relatives in the state

16  of Alabama?

17      A. Yes.

18      Q. Do you know offhand what counties your adult

19  relatives live in?

20      A. Jefferson.

21      Q. Okay.  Any other counties?

22      A. Shelby, Hale, Madison.  I have relatives

23  that I know are relatives, but I don't know them.

---

**Danny Ransom**                                         12

1   But there are some in Wilcox and Mobile.

2       Q. Okay.  And you indicated you have relatives

3   -- some, it sounds like, closer than others -- but

4   in Jefferson, Shelby, Hale, Madison, Wilcox and

5   Mobile counties?

6       A. Yes.

7       Q. Have we covered them all to your knowledge?

8       A. Tuscaloosa.

9       Q. Okay.

10      A. I forgot that.

11      Q. Okay.  Any others?

12      A. That's all I can think of right now.

13      Q. Thank you.  That's fine.  If something else

14  occurs to you, let me know.  While you were with

15  AMIC, what was your position there?

16      A. Litigation manager.  Claims manager first, I

17  guess.  Supervisor and then claims manager,

18  litigation manager.  The titles kind of changed

19  over the years.

20      Q. You worked there until January -- excuse me,

21  until June of 2011, correct?

22      A. Yes.

23      Q. At that time, what was your title?

Danny Ransom                                                    13

1       A. Litigation manager.

2       Q. Okay.  And you had held that title for

3  approximately how long?

4       A. Oh, gosh.  That's a good question.  To be

5  honest, I can't remember the number of years.

6       Q. Several years from the sound of it?

7       A. Oh, yes, several years.  But I was trying to

8  think the crossover from Meadowbrook to AMIC.

9       Q. And can you just briefly what your

10 job duties were as litigation manager?

11      A. Well, they were somewhat bilateral from the

12 standpoint of managing and assigning and

13 monitoring lawsuits, and also managing claims

14 department.  And supervising the then supervisors,

15 but that kind of changed over the years.  But

16 managing the claim department in general.

17      Q. Okay.  So you had your own files that you

18 had primary responsibility for claims in addition

19 to supervising other claims people at AMIC?

20      A. Yes.

21      Q. Do I have that right?  Was there any type of

22 criteria that determined which files would be

23 assigned to you as the litigation manager as

Danny Ransom                                                    14

1  opposed to going to someone else?

2       A. I guess you might say it was discretionary,

3  because when -- for instance, I primarily handle

4  in specific reference to this claim lawsuits.

5       Q. Right.

6       A. And --

7       Q. Lawsuits meaning if AMIC was sued?

8       A. No.

9       Q. Directly?

10      A. If the insured was sued.

11      Q. Okay.

12      A. You asked the question if AMIC was sued.

13 No, not necessarily.  Most of the claims were

14 assigned to the adjusters, but I did have some

15 that I would handle.

16      Q. Okay.  I have got to bring up an unpleasant

17 topic.  And I'm sorry to do this, but I need to

18 cover it while you are here.  Why was your

19 employment with AMIC terminated?

20      A. That's an excellent question.  I was told

21 that it was circumventing LSS, and what is LSS?

22      Q. That was going to be my next question.

23      A. Legal Solution Suites.

Danny Ransom                                                    15

1       Q. Okay.  Now my next question is what is Legal

2  Solutions Suites?

3       A. It's a task based billing management system,

4  computer based.

5       Q. Is it a system that your outside vendors

6  such as law firms are supposed to use in

7  submitting bills to you?

8       A. Yes.

9       Q. Was it something that you would have used in

10 keeping track of your own activity or was it

11 something exclusively that related to the bills

12 that would be submitted to you by outside

13 entities?

14      A. It was related to the bills that were

15 submitted.

16      Q. Okay.  Who told you that the reason for your

17 termination was circumventing Legal Solutions

18 Suites?

19      A. Steve Wells.

20      Q. Mr. Wells has testified in this case and he

21 testified to me that your employment was

22 terminated because your quote "skill set did not

23 meet the needs of AMIC in its current time" end

Danny Ransom                                                    16

1  quote, his words.  Do you know what he was

2  referring to?

3       A. I didn't -- that's the first time I have

4  heard that.

5       Q. Did anyone at AMIC suggest to you that your

6  termination was connected in any way with your

7  handling of the Barbara Murphy versus AMIC case?

8       A. No.

9       Q. Did anyone at AMIC suggest it had anything

10 to do with the related Holloway and Meadows cases?

11      A. No.

12      Q. All right.  During your tenure at AMIC,

13 there was an older case that's been brought up a

14 couple of times in this litigation, the Jason

15 McCoy against AMIC case.  Do you remember that

16 case?

17      A. I believe that's -- that's an auto case, I

18 think.

19      Q. It was a police officer who had -- a police

20 officer from the City of Pleasant Grove who had an

21 uninsured motorist claim.

22      A. Yeah, okay.

23      Q. I think I know the answer to this, but let

Danny Ransom                                                    17

1    me ask it anyway.  Has anyone from AMIC ever
2    suggested that your termination had anything to do
3    with the McCoy case?
4        A.  No.
5        Q.  I'm going to show you what was marked to
6    Mr. Sikes' deposition as Plaintiff's Exhibit 19.
7    Do you recognize that?
8        A.  I recognize -- recall the names of the
9    plaintiffs.
10       Q.  Okay.
11       A.  In this style here.
12       Q.  All right.  And as you can see, the file
13   stamp on the first page of that document,
14   Plaintiff's Exhibit 19, is January 24th, 2011.
15   And I realize and, of course, Mr. Speagle does, we
16   have been sympathetic to witnesses in this case
17   about the fact that this has been a couple of
18   years.  But thinking back on this suit that was
19   filed against AMIC in January of 2011, do you
20   recall when you first became aware of it?
21       A.  I can't remember the exact date or time, but
22   that would have been when notice of the complaint
23   was placed on my desk.

Danny Ransom                                                    18

1        Q.  All right.  Do you recall, were you the
2    person who put Scottsdale Insurance Company, which
3    was AMIC's E&O carrier at the time, were you the
4    person who put Scottsdale on notice of this claim?
5        A.  I suspect I was or it would have been --
6    Scottsdale, okay, NAMIC.
7        Q.  Yeah, NAMICO.
8        A.  Right.
9            MR. SPEAGLE:  What are we supposed to
10   call it?
11           MR. McDOWELL:  NAMICO.
12           MR. SPEAGLE:  NAMICO?
13           MR. McDOWELL:  Right.
14       Q.  NAMICO in this case managed a professional
15   liability program where the paper was written by
16   Scottsdale or held by Scottsdale.  But were you
17   more accustomed to referring to them as NAMICO or
18   Scottsdale because we can do whichever makes it
19   easier for you?
20       A.  I just call it NAMIC, not even NAMICO.
21       Q.  Okay.  Well, I may say NAMICO.  If you want
22   to say NAMIC, that's fine.  And if we get to a
23   point where it's confusing, we will let it go.

Danny Ransom                                                    19

1    But to your recollection, you likely would have
2    been the person who put NAMICO on notice of this
3    filing?
4        A.  Yes, with either an email or an accompanying
5    letter.
6        Q.  All right.  Now let me show you, this was
7    marked as Plaintiff's Exhibit 4 to Mr. Sikes'
8    deposition.  And I'm going to show you Plaintiff's
9    Exhibit 6 to Mr. Sikes' deposition.
10           MR. SPEAGLE:  What would have been 5?
11           MR. McDOWELL:  Five, I will go ahead and
12   tell you.  Five, I think, was the amended
13   complaint, the declaratory judgment in one of
14   them.
15           MR. SPEAGLE:  I got it.
16           MR. McDOWELL:  And I could trot all
17   those out.
18           MR. SPEAGLE:  No, no, no.
19       Q.  (BY MR. McDOWELL) We have got the Murphy
20   case, of course, that's Exhibit 19.  And then 4
21   and 6, the Meadows and Holloway claims.  Again I
22   know it's been a couple of years, but do you
23   recall understanding that the Murphy case was

Danny Ransom                                                    20

1    related to the Meadows and Holloway cases?
2        A.  Vaguely.  I remember the Town of Woodland.
3        Q.  Right.  The Town of Woodland would have been
4    AMIC's insured?
5        A.  Right.
6        Q.  Okay.
7        A.  But as far as Murphy, the names, like I
8    said, do resonate vaguely.  I remember the --
9    Connie Meadows comes back, but --
10       Q.  Before the Murphy complaint was filed in
11   January 2011, were you at all familiar with the
12   litigation involving the Town of Woodland over in
13   Georgia?
14       A.  Yes.
15       Q.  Okay.  How were you familiar with the Town
16   of Woodland litigation?
17       A.  Because of the fact that one accident took
18   place in another state.  I know David, I think,
19   was handling this.
20       Q.  You are referring to David Sikes?
21       A.  David Sikes.  And the issue was with respect
22   to policy limits.
23       Q.  And what were the issues with respect to

Danny Ransom                                        21

1   policy limits in the Town of Woodland litigation?

2       A. Well, if memory serves me right, this was an

3   accident involving an auto policy.

4       Q. That's right.

5       A. And the limits of the policy, AMIC's

6   position was they were what they were, I mean,

7   versus what the plaintiffs were demanding in

8   Georgia.  And eventually the -- and I think I'm

9   remembering this, that the demand was well in

10  excess of our policy limits.  And AMIC was

11  defending the suit and under the impression that I

12  think it was like a 100/300 limit or something

13  like that.  And there were -- aggregate limit.

14  And the judgment was well in excess of the policy

15  limits, something to that effect.

16      Q. Okay.

17      A. I think.  Those were some of the problems we

18  had.

19      Q. Right.  During the time that Mr. Sikes was

20  involved with the Meadows and Holloway cases

21  against the Town of Woodland, I take he would have

22  been the adjuster primarily responsible for those

23  claims?

Danny Ransom                                        22

1       A. Yes.

2       Q. While he was the adjuster primarily handling

3   those claims, did you have any involvement or

4   input on those claims?

5       A. Not really.

6       Q. All right.  Well, when you say not really,

7   what do you mean?

8       A. Well, David was more or less -- how can I

9   put it?  He handled them.  I mean, they were

10  totally within his -- I don't want to say purview,

11  but he handled them in toto.  I mean, I knew about

12  them.  He would report on them.

13      Q. Right.

14      A. Claims committee, and they were discussed

15  openly in claims committee meeting.  But as far as

16  input or decision making goes, I didn't have any

17  of that.

18      Q. Okay.  I will represent to you in November

19  of 2010, a verdict was entered in the Holloway and

20  Meadows cases against the Town of Woodland that

21  between the two of them totaled approximately 3.9

22  million.  Do you remember hearing about that

23  verdict?

Danny Ransom                                        23

1       A. Yes.

2       Q. At that point once the large verdicts were

3   entered, did you wind up having -- I'm talking

4   about after the verdict but before the Barbara

5   Murphy suit was filed, do you remember whether you

6   had any direct involvement in dealing with the

7   Meadows and Holloway cases against the Town of

8   Woodland?

9       A. I didn't.

10      Q. All right.  Once the bad faith claim was

11  filed -- and that again is the Murphy case that's

12  marked as Exhibit 19 -- were you the person within

13  AMIC who was primarily responsible for handling

14  the bad faith claim at that point?

15      A. No.

16      Q. Who would that have been?

17      A. We had coverage issues so we have -- I don't

18  know how many adjusters would have been involved

19  in this, and I can't remember who they may have

20  been.  But I know David handled the underlying

21  claim.  There probably was a coverage file.  And I

22  don't know whether memory serves me well, but I'm

23  going to say that Martha may have had that, Martha

Danny Ransom                                        24

1   Matthews.  I'm not sure, but I think she had

2   something to do with this too.

3       Q. Is Martha Matthews an AMIC employee?

4       A. Yes, but hers -- here again, I think it --

5   whether it was dealing with the bad faith or not,

6   I can't recall.  I think it would have been just a

7   coverage file.  But whether that involves the suit

8   against AMIC or not, I don't know.  But I think --

9   I'm pretty sure she had a file on it.  Now there

10  may have been another one, but I can't recall.

11      Q. Okay.  In just a moment, I will get you to

12  look at some correspondence and things with me in

13  this.  But let me just ask you, first of all, once

14  this bad faith claim was filed, Exhibit 19, do you

15  know whether the underlying Meadows and Holloway

16  claims, did the handling of those claims

17  transition from David Sikes to you or did they

18  remain with David Sikes?

19      A. They remained with David.

20      Q. All right.  Do you remember who served as

21  AMIC's corporate counsel at the time Exhibit 19

22  was filed?

23      A. This would have been in 2011?

**Danny Ransom** 25

```
 1     Q. Yes, sir.
 2     A. I'm trying to remember when Scott became
 3  corporate counsel, but I don't know.  I don't know
 4  -- and I'm trying to see who preceded him.  I'm
 5  trying to remember.
 6     Q. Well, and I will represent to you that --
 7  and we'll see shortly.  There are some emails
 8  where Mr. Speagle is copied on things and appears
 9  to be involved in it.  Do you remember --
10     A. Yes, but I don't know whether he held that
11  title.
12     Q. Okay.
13     A. Specifically.
14     Q. All right.
15     A. As corporate counsel because I know prior to
16  Scott, Randy Springer was corporate counsel.
17  Bobby Black was corporate counsel.
18     Q. I don't know that we -- I may have gotten us
19  off on what may be just a side issue.  Do you
20  recall in the time frame we are looking at,
21  January of 2011, February, March 2011, did
22  Mr. Speagle have a role as outside counsel serving
23  AMIC and representing AMIC?
```

**Danny Ransom** 26

```
 1     A. Yes.  He was counsel.  I don't know if he
 2  was corporate counsel.
 3     Q. All right.  Do you recall whether
 4  Mr. Speagle was communicating with NAMICO about
 5  the Murphy, Meadow and Holloway claims during this
 6  time period?
 7     A. Specifically?  I don't recall.
 8     Q. Don't recall.  We had some previous exhibits
 9  so I'm going to start us off on 32.
10  (Plaintiff's Exhibit 32 was marked and is attached
11           to the original transcript.)
12     Q. (BY MR. McDOWELL)  Mr. Ransom, I will show
13  you what I have marked as Plaintiff's Exhibit 32.
14  And if you could take just a second to review
15  that.  Are you able to identify this letter or
16  maybe a better question would be do you recognize
17  it?
18     A. Well, obviously I recognize my name.  But
19  Lenora Adams, I can't remember that.  But there is
20  so many pieces of correspondence, but obviously
21  this was -- would be something in response to
22  notification to NAMICO.  But specifically
23  remembering the letter, I don't specifically
```

**Danny Ransom** 27

```
 1  remember the letter, but I recognize this as a
 2  response to notification.
 3     Q. Okay.  As you look at this letter -- and I
 4  know again this has been a while.  But did you
 5  understand that this letter contained a
 6  reservation of rights?
 7        MR. SPEAGLE:  Form.
 8     Q. (BY MR. McDOWELL) You may answer.  He is
 9  making an objection for the record.
10     A. I understood that it mentions reservation of
11  rights in its contents or references that.
12     Q. Do you remember who Kate Whitlock was?
13     A. No.
14     Q. When the Barbara Murphy bad faith case
15  that's Plaintiff's Exhibit 19, when that was filed
16  and when you first learned of it, did you get any
17  recommendations for counsel to represent AMIC?
18     A. Yes.
19     Q. Okay.  From whom?
20     A. I can't recall from whom, but I know we got
21  some.  And I think it was a firm they recommended
22  in Atlanta, seems like.
23     Q. Okay.  Does the name Drew, Eckl, Farnham
```

**Danny Ransom** 28

```
 1  sound familiar to you?
 2     A. I can't remember the exact names, but the
 3  firm was in Atlanta.
 4     Q. Do you remember whether AMIC ever suggested
 5  to NAMICO any specific counsel to represent AMIC
 6  in the Meadows, Holloway or Murphy suits at any
 7  point after the filing of that Murphy complaint
 8  that's Exhibit 19?
 9     A. Seems to me like that was discussed, but I
10  believe -- and I may be -- this is my memory,
11  which is shaky.  That they may have -- it was
12  discussed, yes.  Yes, I remember it was discussed.
13     Q. What can you recall about those discussions?
14     A. Seemingly like I recall AMIC acquiescing to
15  NAMIC's request for the counsel that they had
16  suggested in Atlanta.
17     Q. Okay.
18     A. Initially I think AMIC wanted their own
19  counsel or somebody else, but I think they
20  acquiesced to NAMIC's suggestion.
21     Q. Okay.
22  (Plaintiff's Exhibit 33 was marked and is attached
23           to the original transcript.)
```

Danny Ransom                                      29

1      Q. (BY MR. McDOWELL) I'm going to show you what
2    I have marked as Plaintiff's Exhibit 33, and this
3    is actually a composite exhibit.  It's two closely
4    related emails.  And let me just tell you, if you
5    look on the second page, you will see a signature
6    and I guess sort of a V-card that has Katherine S.
7    Whitlock on it.
8      A. Uh-huh (yes).
9      Q. Seeing that name, does that ring any bells
10   to you?
11     A. No.
12     Q. Okay.  This email is from Ms. Whitlock.
13   It's addressed to Scott Speagle and Ed Roesch.  Do
14   you remember ever seeing this email?  It's not
15   addressed to you, but do you recall whether you
16   ever saw this?
17     A. I don't recall this, no, sir.
18     Q. Okay.  I will represent to you that Ms.
19   Whitlock represented AMIC over in Georgia in the
20   Barbara Murphy litigation as well as in the appeal
21   of certain issues that came up in the Meadows and
22   Holloway cases.  If you look at Exhibit 33, in the
23   second full paragraph on the first page, you will

Danny Ransom                                      30

1    see that Ms. Whitlock -- I will just read a
2    portion of it just to be clear.  "My idea is for
3    you" -- and this is addressed to Scott Speagle --
4    "is for you and me to represent AMIC on appeal."
5    And then she discusses certain advantages she sees
6    with that possible arrangement.  Given where AMIC
7    was at this point in time, February of 2011, and
8    from what you can recall, is there anything that
9    would surprise you to discover that Ms. Whitlock
10   was having a discussion of legal strategy with
11   Mr. Speagle at this point in time?
12     A. No.
13     Q. Would this have bothered you in any way?
14     A. You said within what time frame?  February?
15     Q. This is dated February 24th of 2011.
16     A. No.
17     Q. Okay.  Ms. Whitlock mentions in the email as
18   I pointed out the prospect of both her and
19   Mr. Speagle representing AMIC in the appeal of the
20   Meadows and Holloway trial.  Were you aware that
21   that did in fact occur?
22     A. No, I wasn't.
23     Q. Do you know whether that arrangement was

Danny Ransom                                      31

1    acceptable to AMIC?
2      A. No.
3      Q. And your answer is no, you don't know?
4      A. No, I don't know.
5      Q. Do you recall, was there any dissension
6    within AMIC over the idea of Balch and Bingham
7    withdrawing from its representation of AMIC and
8    having Ms. Whitlock assume that role?
9      A. I do recall there was some angst over that
10   when Balch resigned.  Now I thought it was
11   primarily focused toward Balch.  And that could be
12   mistaken there, but I don't know whether it was
13   focused toward Ms. Whitlock.
14         MR. SPEAGLE:  Break in.  Was your
15   question Balch replacing Katherine Whitlock?
16         MR. McDOWELL:  No.
17         MR. SPEAGLE:  Never mind.  I was going
18   to object to form if that was the case.
19     Q. (BY MR. McDOWELL) What do you recall?  You
20   said there might have been some angst about Balch
21   withdrawing from the case.  What do you recall
22   about that, if anything?
23     A. The details of it?  I cannot remember what

Danny Ransom                                      32

1    prompted their resignation, but it didn't set
2    well.  I do remember that.
3      Q. Did not set well with whom?
4      A. With David, with Steve.
5      Q. Can you remember anything they said about it
6    or did about it or any complaints they made about
7    it?
8      A. There was some complaints because when you
9    mentioned it, that prompted my recollection.  But
10   actual verbiage, I can't remember what they said.
11     Q. Let me see on page -- on the third page of
12   Exhibit 33, and this has a Bates label at the
13   bottom of it of SIC 102.  You can see -- and this
14   is why I attached these because apparently Ms.
15   Whitlock sent a follow-up email the next day just
16   tacked on to the previous email with a postscript,
17   a PS at the top.  And certainly feel free to read
18   that first paragraph.  In it -- and I do want you
19   to read it, but there is a discussion of Balch and
20   Bingham and a man named David Sills withdrawing
21   because the interest of the insureds and AMIC
22   might diverge one day.  Do you remember any
23   discussions along those lines?

Danny Ransom                                      33

1    A. Some conflict between Sills and AMIC?

2    Q. The potential of what would have been Sills'

3  client and the Meadows and Holloway cases.  I

4  believe he may have been representing -- he was

5  representing one of the insureds, either the Town

6  of Woodland, Mr. Edmondson or both.  Balch and

7  Bingham likewise was representing one or both of

8  the insureds in the Meadows and Holloway claims,

9  and there was a concern that at least in theory,

10  the interest between the insureds and AMIC might

11  one day diverge.  Do you remember any discussions

12  about that prospect?

13    A. No.

14    Q. Okay.  And I take it then you wouldn't

15  remember whether there was anybody within AMIC who

16  disagreed with that position, anything like that?

17    A. With Sills' resignation or the issue of the

18  conflict?

19    Q. The issue of a potential conflict.  Do you

20  know whether there was anybody within AMIC who

21  disagreed with that?

22    A. No.

23    Q. Do you remember at all working on the

Danny Ransom                                      34

1  Murphy, Meadows and Holloway claims?

2    A. It was -- like I said, it was almost like

3  this is David's file.  And all of the details and

4  developments that came from that case, he handled.

5    Q. Okay.  Do you know whether Mr. Speagle was

6  kept in the loop on strategic issues related to

7  the Meadows, Holloway and Murphy claims from

8  January 2011 through the summer of 2011?

9    A. I don't know.

10    Q. Do you know whether Mr. Speagle ever

11  expressed any concerns about the defense that was

12  being provided to AMIC?

13        MR. SPEAGLE:  I think at this point I'm

14  going to object to are you asking him about any

15  concerns I may have given him to AMIC?

16        MR. McDOWELL:  Yeah, sure.

17        MR. SPEAGLE:  I would object on

18  attorney/client privilege on that.

19        MR. McDOWELL:  I don't think --

20        MR. SPEAGLE:  We can talk it out, but,

21  yeah, talk it out.

22        MR. McDOWELL:  This is before the suit

23  that you and I are here on was filed.  And just as

Danny Ransom                                      35

1  there wouldn't be any privilege between Kate

2  Whitlock and AMIC as it relates to the dispute you

3  and I are here on today, I don't think the

4  underlying litigation would be an appropriate

5  attorney/client privilege issue at this point as

6  to Scottsdale, which was providing coverage for

7  the bad faith component.

8        MR. SPEAGLE:  Okay.  I will withdraw my

9  objection.

10        MR. McDOWELL:  I know it can get

11  confusing in this case at times.

12        MR. SPEAGLE:  Well, yeah.

13    Q. (BY MR. McDOWELL) And so my question,

14  Mr. Ransom, is do you know whether Mr. Speagle

15  ever expressed concerns about the defense that was

16  being provided to AMIC from the time the Murphy

17  case was filed up until the time you left AMIC in

18  June of 2011?

19    A. The specifics of the Murphy case, I can't

20  recall that.

21    Q. Okay.  What about with respect to the

22  Meadows and Holloway cases?  Do you remember

23  whether Mr. Speagle expressed any concerns about

Danny Ransom                                      36

1  the defense that was being provided to AMIC in

2  connection with those claims?

3    A. I don't know.  I can't recall whether there

4  was concern, but there was discussion regarding

5  Mr. Holloway in the initial complaint against Town

6  of Woodland.  There was discussion about

7  engagement of initial counsel assigned to handle

8  the defense here, whether it would be from the

9  firm I mentioned in Atlanta or whether we would

10  engage counsel ourselves.  And NAMICO had

11  recommended Ms. Whitlock, I guess, and so AMIC

12  eventually acquiesced to accept her.  And I

13  believe Scott would have been involved in that,

14  you know, discussion.

15    Q. Okay.

16  (Plaintiff's Exhibit 34 was marked and is attached

17          to the original transcript.)

18    Q. (BY MR. McDOWELL) This has been marked as

19  Plaintiff's Exhibit 34.  It's a letter addressed

20  to you.  I know it's several pages long, but do

21  you recognize it?

22    A. Yeah, yes.  Yeah, okay.

23    Q. On the last page of the letter, which it's a

Danny Ransom                                                37

```
 1   letter from Ed Roesch to you as the primary
 2   addressee, and it appears that Kate Whitlock and
 3   Scott Speagle were copied with the letter.  To
 4   your knowledge did Mr. Speagle at any time express
 5   concern to anyone about the contents of this
 6   letter during the time you were still employed
 7   with AMIC?
 8       A. No concern was expressed to me.
 9       Q. Okay.  No concerns of any kind?
10       A. To me.
11       Q. To you?  And just to be on the safe side
12   here, I understand or at least I think I
13   understand from your testimony that Mr. Speagle
14   did not express any concerns to you.  To your
15   knowledge did Mr. Speagle express concerns to
16   anyone else at AMIC about the contents of this
17   letter from the time it was sent up until the time
18   you left the company in June of 2011?
19       A. I have no knowledge of that.
20       Q. Thank you.  Now if we can cycle back for a
21   moment to the Murphy complaint, which is that
22   Exhibit 19 that I handed you earlier, and I will
23   represent to you that whether we agree or disagree
```

Danny Ransom                                                38

```
 1   with the claims that are being made in that
 2   complaint, it arises from the fact that AMIC had
 3   not yet paid its policy limits in connection with
 4   the verdicts that had been entered in the Meadows
 5   and Holloway cases.  Do you remember whether you
 6   reviewed the Meadows and Holloway files after the
 7   Murphy complaint arrived on your desk?
 8           MR. SPEAGLE:  Form.
 9       A. When this complaint arrived, I'm sure what I
10   did was just -- because any suit like this is just
11   dictate or sign the complaint.  And as far as
12   files are concerned, not necessarily look at any
13   file or whatnot, but just requested whatever
14   needed to be sent to counsel, send it.
15       Q. Okay.
16       A. But I didn't review any file.
17       Q. Okay.  So if I'm understanding, you would
18   have made sure that either NAMICO or Ms. Whitlock
19   or both had copies of whatever materials they
20   needed?
21       A. NAMICO.
22       Q. NAMICO.  You would have made sure that
23   NAMICO had copies of whatever it needed for the
```

Danny Ransom                                                39

```
 1   file?
 2       A. If this was on my desk, yes.
 3       Q. Yes.  Okay.  And I take it from what you
 4   have been telling me though, you don't have a good
 5   recollection of the amounts of the judgments that
 6   had been entered and the claim for attorneys fees
 7   in Meadows and Holloway, those type issues?
 8       A. I knew that there was a big judgment, but
 9   that issue was still in flux when I was
10   terminated.
11       Q. What do you mean it was still in flux?
12       A. Well, as to how it was going to go about
13   being satisfied.
14       Q. Let me just ask you to be on the safe side
15   here.  With the Meadows and Holloway claims, do
16   you remember that the verdicts that were entered
17   in those claims, the claims that arise from
18   Exhibits 4 and 6, totalled just under four million
19   dollars?
20       A. Yes.  Seems like it was around a five
21   million dollar judgment.
22       Q. Right.  And you remember there was an
23   attorney's fee claim in the Meadows and Holloway
```

Danny Ransom                                                40

```
 1   cases that was nearly 1.6 million?  Does that ring
 2   a bell?
 3       A. No.
 4       Q. Were you aware or did you become aware that
 5   the plaintiffs could claim judgment interest of
 6   seven percent per year in the Meadows and Holloway
 7   cases over in Georgia?
 8       A. No.
 9       Q. Did you, Danny Ransom, have any opinion or
10   assessment of AMIC's ability to get the Meadows
11   and Holloway cases overturned?
12       A. Repeat that.
13       Q. Right.  After the verdicts were entered in
14   November of 2010, the verdicts that were in the
15   ballpark of 3.9 million dollars, AMIC and its
16   insureds undertook efforts to appeal those
17   verdicts.  Were you aware of that, that there was
18   an appeal process going on?
19       A. I vaguely recall that.  They were
20   challenging that verdict, yes, appeal.  Yes, I do
21   recall that.
22       Q. Did you ever form any sort of opinion or
23   assessment of AMIC's ability either on behalf of
```

---

**Danny Ransom**                                                41

1  itself or its insureds to get the Meadows and
2  Holloway verdicts overturned?
3      A. Yes.
4      Q. Okay.  What was your assessment of that?
5      A. Personally, I thought it was going to be
6  difficult because, let's face it, you are in
7  foreign territory.  You are in Georgia, and they
8  are what they are.   We were laboring, as I said
9  earlier, under the belief that our policy, AMIC's
10 policy, was all the coverage there was.  But, I
11 mean, that was a -- so in my mind, I mean, you are
12 in Georgia.  So I always thought that was going to
13 be a problem.
14     Q. Okay.  Did you ever relate this assessment
15 of yours to anyone?
16     A. I talked to David about that.
17     Q. When did you talk to Mr. Sikes about that?
18     A. Specifically when?  I can't recall, but I'm
19 pretty sure it was in casual conversation shortly
20 -- I mean, throughout this pending claim.  And
21 after that judgment came in, just in no specific
22 point in time.  It was just in the course of a
23 day, I know that was discussed.

---

**Danny Ransom**                                                42

1      Q. What did Mr. Sikes say in response when you
2  expressed these concerns to him?
3      A. Well, all throughout the case, he had an
4  opinion about how the case was tried.  I recall
5  that.  The issue with the jurist, you know, and --
6  but with respect to being able to win on appeal, I
7  can't recall what he may have said.  But I know
8  what I expressed.
9      Q. Okay.  You mentioned that Mr. Sikes had an
10 opinion about how the case was tried.  What are
11 you referring to there?
12     A. The judge.  I do remember him saying the
13 judge was for want of a better word not equitable.
14     Q. After November of 2010 and after these
15 verdicts were entered, it was clear that AMIC's
16 insureds, the Town of Woodland and the driver of
17 the Woodland vehicle, were facing exposure for
18 liability in excess of AMIC's policy.  Correct?
19     A. Yes.
20     Q. Do you know whether anyone at AMIC discussed
21 who would be responsible for any excess liability?
22     A. You mean excess of --
23     Q. The excess of policy limits, and I will

---

**Danny Ransom**                                                43

1  represent to you the Town of Woodland had policy
2  limits of two million dollars.  Now there was some
3  discussion about Alabama's municipal damages caps.
4      A. Right.
5      Q. Which are 100,000 per person up to an
6  aggregate limit of 300,000 per occurrence, and
7  there were two people at issue in this case for a
8  total of $200,000.  So there was certainly some
9  discussion about that in this file, but the policy
10 limits, regardless of whether you regard the
11 policy limits as being $200,000 or the policy
12 limits as two million, there was a verdict of 3.9
13 million.  Do you know whether there was any
14 discussion at AMIC over who would be responsible
15 for the damages in excess of that two million
16 dollar policy?
17     A. I don't recall a discussion in that regard
18 because the two million dollars, even with me,
19 never came into thought on that particular claim.
20     Q. And why?
21     A. And the reason why was really didn't have a
22 federal case.
23     Q. What do you mean by that?

---

**Danny Ransom**                                                44

1      A. We would from time to time get policies
2  on claims.  Attorneys would request policies,
3  which we had to give them.  And they would look at
4  the limits of the policy, primarily liability, two
5  million dollars.  They would see that.  They would
6  say why are you offering me, trying to settle the
7  claim for X number of dollars, and you have got --
8  it's primarily auto cases.  You have two million
9  dollars, but that's a different line of coverage.
10 State law, as you stated, says an auto claim's
11 liability is capped $100,000.  But they see two
12 million, and they say why are you writing two
13 million dollar limits?  Because there are no
14 limits in federal court.  But that didn't cross
15 our minds per se, although I say didn't cross our
16 mind.  It crossed my mind that that could be a
17 confusion even when the case went to -- over in
18 Georgia and they get the policy and see that limit
19 there.  And they may think that's applicable, but
20 that was -- I don't recall anybody discussing
21 that.
22     Q. Right.  So to your recollection, there
23 wasn't any discussion with AMIC over what would

Danny Ransom                                                        45

1   happen if the Georgia Court of Appeals refused to
2   overturn or reduce the verdict in the Meadows and
3   Holloway cases?
4       A. I never had that discussion.
5   (Plaintiff's Exhibit 35 was marked and is attached
6                to the original transcript.)
7       Q. (BY MR. McDOWELL)  Let me show you what I
8   have marked as Plaintiff's Exhibit 35.  Let me ask
9   as you are looking at that, this is a letter from
10  Ms. Whitlock dated April 19th, 2011.  On the front
11  page toward the bottom right, it has your name and
12  underneath it DannyR@AMICcentral.org.
13      A. Yes.
14      Q. Was that your email address at that time?
15      A. Yes.
16      Q. Okay.  All right.  Having looked at that, do
17  you recognize this letter?
18      A. No.
19      Q. There are several addressees, among them
20  there is yourself and David Sikes and Scott
21  Speagle.  The letter indicates that draft briefs
22  are enclosed.  Do you remember looking at draft
23  versions of appellate briefs in this case?

Danny Ransom                                                        46

1       A. No, I do not.
2       Q. Did you ever discuss the briefing referenced
3   in this letter with David Sikes?
4       A. No.
5       Q. I take it you wouldn't know whether
6   Mr. Sikes ever read the briefs?
7       A. I have no knowledge of that, right.
8       Q. Did you ever discuss the briefing referenced
9   in this letter with Scott Speagle?
10      A. No.
11  (Plaintiff's Exhibit 36 was marked and is attached
12               to the original transcript.)
13      Q. (BY MR. McDOWELL) I'm going to go ahead and
14  show you this.  This, Mr. Ransom, I'm marking as
15  Plaintiff's Exhibit 36.  This is a letter from Ms.
16  Whitlock directed to Ed Roesch, which carbon
17  copies David Sikes and Scott Speagle.  Let me ask
18  you, first of all, do you remember ever seeing
19  this letter?  You were not an addressee on it.
20      A. I don't remember seeing this letter.
21      Q. Okay.  From what you can recall during this
22  time frame, this would have been April 25th of
23  2011.  If Mr. Sikes received something like this,

Danny Ransom                                                        47

1   would he have typically brought it to your
2   attention?
3       A. No.
4       Q. Before I mark this, Mr. Ransom, this I will
5   represent to you is a file stamped copy of a brief
6   filed on behalf of Alabama Municipal Insurance
7   Corporation in the Georgia Court of Appeals
8   arising from the Meadows, Holloway and Murphy
9   claims.  Do you remember ever seeing this
10  briefing?  And for the record, what you are
11  looking at just in case we don't mark it is a
12  document that begins at Bates label 3166 and ends
13  at 3188.
14      A. No.
15      Q. Were you aware that the brief that has the
16  Bates label 3166, were you aware that this had
17  been filed?
18      A. No.
19      Q. And to your recollection, did you ever have
20  any discussions with anyone about the contents of
21  the brief?
22      A. I didn't look at all the contents of that
23  brief, but --

Danny Ransom                                                        48

1       Q. I tell you what, just to be on the safe
2   side, I'm going to mark this since I have asked
3   you more than I anticipated.  This is Plaintiff's
4   Exhibit 37.
5   (Plaintiff's Exhibit 37 was marked and is attached
6                to the original transcript.)
7       Q. (BY MR. McDOWELL) If you look, using the
8   briefing number in the bottom center, if you go to
9   page seven and eight, there is enumeration of
10  errors, which would be like what we in Alabama
11  will have issues.  And I think I'm just directing
12  you there to shorthand this a little bit because I
13  think that might give you an idea of the contents
14  of the briefs since that kind of outlines the
15  issues.
16      A. Well, even from page two, when I saw Ms.
17  Holloway and it mentioned her co-conservators and
18  guardians -- I believe she passed.
19      Q. That's correct.
20      A. That came back to me while this -- during
21  the pendency of this case.  And that was
22  discussed, but that's all I remember discussing
23  anything about that, that she passed.

**Danny Ransom** 49

1    Q. Okay. Let me ask you this just in case
2  there may have been some discussions about it.
3  The brief addresses issues of lack of standing,
4  lack of jurisdiction, due process concerns and
5  sovereign immunity issues, damages caps. Do you
6  remember any discussions with NAMIC about those
7  legal issues?
8            MR. SPEAGLE: Form.
9    A. No.
10   Q. (BY MR. McDOWELL) Were you aware that
11 Mr. Speagle was on the certificate of service for
12 this brief?
13   A. No.
14   Q. A related point, in case I don't mark this,
15 this is Bates labeled SIC 3189, and it goes to
16 Bates page 3211. This has a file stamp of April
17 21st, 2011. It's a brief third party and interest
18 amicus security brief of Alabama Municipal
19 Insurance Corporation. Do you remember whether
20 you ever saw this brief?
21   A. I have not.
22   Q. And just as we were discussing with that
23 other brief, you don't recall discussing any of

Freedom Court Reporting, Inc        877-373-3660

**Danny Ransom** 50

1  the issues or arguments that were raised in there?
2    A. No. No, sir.
3    Q. Okay. A somewhat related point, this is
4  Bates labeled SIC 3213. It goes to page 3227.
5  It's captioned as a reply brief of Appellate,
6  Alabama Municipal Insurance Corporation. Did you
7  ever review the reply brief that was filed?
8    A. No, sir.
9    Q. And you had no discussions about the issues
10 that were raised in there?
11   A. No.
12   Q. All right. Let me just make sure. I feel
13 confident I know what the answer is going to be,
14 but let me ask just to be sure. Those first
15 couple of briefs I showed you, 37 and the other
16 one that we didn't mark, those were filed on April
17 21st, 2011. This last brief, the one that has the
18 Bates page 3213, was filed June 3rd of 2011. So
19 there is a period of several weeks between the two
20 filings. During that five or six week period, do
21 you remember any discussions at AMIC or with
22 outside counsel about the arguments that were
23 being made in connection with the appeal, whether

Freedom Court Reporting, Inc        877-373-3660

**Danny Ransom** 51

1  there was anything that needed to be done better
2  or differently in the reply brief, anything like
3  that?
4    A. No discussions with me.
5    Q. All right. Were you aware of any
6  discussions even if you weren't a party to them?
7    A. No.
8    Q. Okay. Do you remember getting any sort of
9  notification in late April of 2011 or early May of
10 2011 that the Meadows, Murphy and Holloway cases
11 had been set for oral argument?
12   A. No. I don't recall that.
13         MR. McDOWELL: I tell you what, this
14 might be -- we are making good headway because
15 some of these briefs you are not familiar with.
16 Why don't we take a quick break, and then we'll
17 move into the latter part of this.
18         (Recess taken.)
19   Q. (BY MR. McDOWELL) Mr. Ransom, before I turn
20 away from the Meadows and Holloway claims, I know
21 you had indicated to me a little while ago that
22 you had some discussion with Mr. Sikes about some
23 concerns over whether the verdicts in Georgia, how

Freedom Court Reporting, Inc        877-373-3660

**Danny Ransom** 52

1  they might be treated on appeal. Did you ever
2  form an opinion on the value of these claims while
3  you were with AMIC?
4    A. Not of the value. I knew they were very
5  serious, but not an opinion on the value, no.
6    Q. Did you ever discuss the settlement value of
7  the Meadows and Holloway and Murphy cases with
8  anyone?
9    A. No.
10   Q. Were you aware that these cases settled in
11 the summer of 2011?
12   A. Yes.
13   Q. How did you become aware of that?
14   A. Through Mr. Speagle.
15   Q. When did you learn of that?
16   A. When I was noticed that I would be deposed.
17   Q. Okay. Do you know the specifics of the
18 settlement, the amount or anything like that?
19   A. I think it was 1.8 million, I think. I'm
20 not sure.
21   Q. Were you surprised at the settlement?
22   A. No.
23   Q. Why was the amount of the settlement not

Freedom Court Reporting, Inc        877-373-3660

Danny Ransom                                                 53

1   surprising to you?

2       A. Because I was -- just like my opinion when I

3   spoke to David, I was -- I questioned the validity

4   of the policy limits in Georgia.

5       Q. And why did you have questions about the

6   policy limits over in Georgia?

7       A. Because just that.  I mean, you are in a

8   foreign jurisdiction.  You have a policy.  You

9   come under the arm of their law.

10      Q. I want to turn now, if we can, to this McCoy

11  file.  And I want to ask you some questions about

12  it simply because it has come up in the context of

13  the Scottsdale versus AMIC case.

14  (Plaintiff's Exhibit 38 was marked and is attached

15              to the original transcript.)

16      Q. (BY MR. McDOWELL) This is kind of a thick

17  exhibit, which I'm marking as Plaintiff's Exhibit

18  38.  It's a thick exhibit because this is a 46-

19  page fax that you or somebody acting on your

20  behalf sent.  All right.  You are nodding your

21  head.  Do you recognize Plaintiff's Exhibit 38?

22      A. Yes.

23      Q. It looks like looking at your fax cover page

Danny Ransom                                                 54

1   that Jennifer Long had been involved with the

2   claim before it went to suit.

3       A. Yes, sir.

4       Q. What was her position with AMIC at that

5   time?

6       A. She was the claims adjuster.

7       Q. Did you have any involvement with the McCoy

8   claim before it went to suit?

9       A. Before suit was filed?  Yes.

10      Q. What do you recall about that?

11      A. That the matter had come up about the

12  limits, the UM coverage or even being applicable

13  to the -- I think it was the officer.  And I think

14  NAMIC had gotten involved in this too.

15      Q. Right.  It appears you are sending a fax to

16  the claims department at Scottsdale Insurance

17  Company, which, of course, worked closely with

18  NAMICO?

19      A. Right.

20      Q. NAMICO and Scottsdale would have become

21  involved once this suit was filed in May of 2009?

22      A. Yes.

23      Q. In the complaint, if we go by the Bates

Danny Ransom                                                 55

1   labels in the bottom right to page SIC 3574, there

2   is an allegation in paragraph 11 or according to

3   the complaint Officer McCoy was a Pleasant Grove

4   police officer.  He was injured in a car accident

5   while on the job.  He sought uninsured motorist

6   benefits which AMIC denied based on a policy

7   exclusion, which excluded coverage where the

8   insured, Pleasant Grove, may have been liable for

9   worker's compensation benefits.  And that

10  allegation is laid out there on that page.  Do you

11  remember this allegation?  Do you remember the

12  facts that gave rise to it?

13      A. Other than him being an officer and a

14  recipient of worker's comp benefits, that's

15  probably the sum total of my recollection of that.

16  I think the question was his ability to cover UM

17  and comp too.

18      Q. Right.  Do you remember what AMIC's position

19  was on that issue back in the 2009 time frame?

20      A. That he couldn't.

21      Q. That he could not?

22      A. Right.

23      Q. Do you remember any discussion about whether

Danny Ransom                                                 56

1   that exclusion was valid or not and specifically

2   whether the Alabama Supreme Court had issued

3   opinions holding that an insurance carrier could

4   not assert that particular exclusion?

5       A. Yes.

6       Q. You do remember that?

7       A. Yes.

8       Q. When did you first learn of the Alabama

9   Supreme Court opinions that invalidated that

10  exclusion?

11      A. It was -- that came up in the case.

12  Probably cited in here, I can't remember the case,

13  but it was before this suit was filed that we or I

14  and Jennifer because it was discussed learned

15  of case law that said --

16              (Discussion off the record.)

17      Q. (BY MR. McDOWELL) Okay.  I'm sorry.  We got

18  interrupted by my phone, for which I apologize.  I

19  want to point out for the record, that was the

20  land line, not my personal phone.

21      A. I can't remember the case, but there is a

22  case that says you can't write coverage that is

23  more restrictive than the statute.

**Danny Ransom** 57

1  Q. Right.
2  A. And from all indications, our policy was
3  more restrictive than the statute.
4  Q. Before Officer McCoy filed his suit against
5  AMIC, do you remember any discussions internally
6  at AMIC about whether his claim should be denied
7  on the basis of that exclusion, specifically that
8  worker's compensation exclusion?
9  A. Specifically the comp exclusion?
10  Q. I might be able to help you out here.  If
11  you look on page 3598, there is an exclusion No.
12  3, worker's compensation.
13  A. Yes.
14  Q. Do you remember, was this the exclusion upon
15  which Officer McCoy's claim had been denied?
16  A. No.  I don't think it was comp.  Huh-uh
17  (no).
18  Q. What do you remember?  What was the basis
19  for the denial of this claim?
20  A. I'm trying to recall.  I believe it had to
21  do with an endorsement or an exclusion added to
22  the policy where employees were excluded under the
23  policy because their remedy was comp.  And they

**Danny Ransom** 58

1  couldn't collect under the UM because of double
2  dipping or something to that effect.
3  Q. Let me get you to look down on Bates page
4  3588.  And do you know whether his claim was
5  denied on the basis of the exclusion, any of the
6  exclusions that are listed there?
7  A. I expect this was cited too.
8  Q. Bear with me, Mr. Ransom.  I think I may
9  have a letter.
10  (Plaintiff's Exhibit 39 was marked and is attached
11        to the original transcript.)
12  Q. (BY MR. McDOWELL) Let me show you -- we are
13  all going to have to look on here for a moment.  I
14  have marked this as Plaintiff's Exhibit 39, and I
15  will get you, if you could, just take a second to
16  look at that.  If you don't mind, let Mr. Speagle
17  look on with you.  And that is a document that is
18  Bates labeled SIC 3684.
19  A. Okay.
20  Q. Looking at this letter, this appears to be a
21  letter from Jennifer Long to a lawyer representing
22  Officer McCoy.  And she is alerting him to an
23  exclusion that reads from her letter "We will not

**Danny Ransom** 59

1  pay for any element of loss if a person is
2  entitled to receive payment for the same element
3  of loss under any worker's compensation disability
4  benefits or similar law."  Seeing that letter from
5  Ms. Long, does that refresh your recollection
6  whether AMIC denied Officer McCoy's claim on the
7  basis of that worker's compensation exclusion?
8  A. That specific letter?
9  Q. Yes, sir.
10  A. Honestly I don't recall it, but I don't
11  recall work comp being the basis for the denial.
12  But that's that.  This was there.
13  Q. What do you recall being the basis for the
14  denial?
15  A. The exclusion added to the auto policy
16  excluding employees under the UM coverage because
17  they did get comp, you know, from being able to
18  collect UM and comp also.
19  Q. Do you know which exclusion from the policy
20  which is -- I will caution you, the pages are a
21  little bit jumbled, I think, in that fax.  But
22  that's the exhibit that the plaintiff attached.
23  A. It's no longer in force now.  I think they

**Danny Ransom** 60

1  have taken it out of the policy, but it should be
2  in this one because it was in effect at the time.
3  Q. Let me ask you --
4  A. But I don't see it in here.
5  Q. With Ms. Long's letter of April of 2008, was
6  that basis for denial later rescinded by AMIC?
7  A. I recall it being rescinded, but yeah.
8  Based on, that's it, that Sockwell case.
9  Q. Okay.  The letter --
10  A. This refreshes my memory as to why it was
11  rescinded.
12  Q. And you are looking on page 3610.  And 3610
13  is part of an exhibit to the complaint, which is a
14  letter from the plaintiff's attorney to Jennifer
15  Long pointing out the case of National Insurance
16  Association versus Betty Sockwell.  Now it appears
17  in this letter, which is part of Plaintiff's
18  Exhibit 38, that Officer McCoy's attorney is
19  taking the position with Ms. Long on March 26 of
20  2009 that his UM claim has been denied by AMIC on
21  the basis of an exclusion that applies to bodily
22  injury to employees and on a limit of insurance
23  provision that indicates the policy will not pay

Danny Ransom                                                                61

1  for any element of loss if a person is entitled to
2  receive payment for the same element of loss under
3  any worker's compensation disability benefits or
4  similar law.  Do you recall Officer McCoy's claim
5  being denied on the basis of either these
6  exclusions or the limit of insurance condition
7  that plaintiff's counsel cites in that letter on
8  Bates page 3610?
9      A. And this is kind of muddled, but he is
10  primarily referring to UM in the body, my
11  recollection takes me, and not necessarily the
12  comp but under the auto policy itself.  But she
13  references that, and there's nothing wrong with
14  that.  That's fine.  But I think the foundation
15  for the denial came out of the UM policy -- I
16  mean, the auto policy, UM coverage, more so than
17  the comp.  That's my recollection.
18      Q. Okay.
19      A. And it was Sockwell that played a part in
20  changing or as you say rescinding the denial.
21      Q. Do you know, was AMIC, you or Ms. Long or
22  anybody else in the claims department to your
23  knowledge, was anybody at AMIC aware of the

Danny Ransom                                                                62

1  Sockwell decision before Officer McCoy's claim was
2  denied?
3      A. No.
4      Q. These letters that you and I were looking at
5  that are attached to Officer McCoy's complaint,
6  some of these ones you were just reading, did Ms.
7  Long ever bring to your attention Officer McCoy's
8  attorney's letters to her before this suit was
9  filed?
10      A. There was some correspondence, yes, that we
11  discussed for Mr. Dean, I think.  Yes.
12      Q. Right.  That's right, Mr. Dean was the
13  lawyer.  Did you ever discuss those letters with
14  Mr. Wells, Steve Wells at AMIC?
15      A. Specific letters?  No.  About the case?
16  Yes, because they were discussed in claims
17  committee meetings, this case or these cases.
18      Q. Let me get you to look within Exhibit 38,
19  Bates page SIC 3591.  It's an endorsement that
20  deals with limits.  Do you recall, was this
21  endorsement a part of the Pleasant Grove insurance
22  policy?
23      A. Just looking at the endorsement, okay.  I

Danny Ransom                                                                63

1  would say yes because Pleasant Grove's name is on
2  there.
3      Q. Okay.  Is this an endorsement?  Do you
4  recall ever seeing this endorsement before?
5      A. Yes.
6      Q. On AMIC policies?  So this is an endorsement
7  form that AMIC would have used at this time?
8      A. Yes.
9      Q. Okay.  The endorsement, when you look at
10  paragraph one, subparagraphs A and B, it sets out
11  that the policy limit is the sum of the limits for
12  each covered auto up to a maximum of three autos.
13      A. Yes.
14      Q. And that is set out in that endorsement,
15  correct?
16      A. Yes.
17      Q. That provision that the limit is the sum of
18  the limits applicable to each covered auto subject
19  to a maximum of three covered autos, that
20  provision doesn't require the insured to stack or
21  look up code sections or anything like that, does
22  it?  That's just set out there in the policy
23  that's what the limit is?

Danny Ransom                                                                64

1      A. Yes.
2      Q. This complaint, the Officer McCoy complaint,
3  is or was pending in the Bessemer division of
4  Jefferson County?
5      A. Yes.
6      Q. Generally speaking in 2009, what was the
7  reputation of the Bessemer division for defending
8  insurance companies in lawsuits?
9      A. Me, personally, from my perspective with
10  AMIC, not bad.
11      Q. Not bad?  Officer McCoy was suing AMIC for
12  bad faith in this case, correct?
13      A. I'm sure there was an allegation in there.
14  Yes, I recall that for bad faith.
15      Q. Count two, which is found on 3576 and spills
16  over on 3577, and when you look in count two over
17  on page 3577, Officer McCoy is making a claim for
18  mental anguish in there, correct, in subparagraph
19  E of paragraph 22?
20      A. Yes.
21      Q. Do you know or did you ever work with a
22  lawyer here in Birmingham named Kyle Turner?
23      A. Kyle, yes.

Danny Ransom                                                    65

1    Q. Did you know that he placed AMIC's exposure
2  on this claim in the vicinity of $180,000?
3    A. I don't recall a limit that Kyle placed on
4  it.  I don't recall that.
5    Q. Do you recall any discussions about the fact
6  that there were other claims, other AMIC claims,
7  that had been denied on the same invalid basis as
8  Officer McCoy's claim had been denied?
9    A. Yes.
10   Q. Do you recall Mr. Turner suggesting that it
11 might make sense to pay a little bit of a premium
12 on the McCoy case to avoid having to respond to
13 discovery that might unearth these other claims?
14   MR. SPEAGLE:  Form.
15   A. I don't recall them saying that to me.
16   Q. Okay.  Do you recall the McCoy case settling
17 for $165,000?
18   A. I recall it settling.  I didn't recall it
19 being that much, but I do recall it settling.  I
20 can't recall -- I can't even recall it was six
21 figures, but I do recall it settling.
22   Q. Do you remember discussing the settlement
23 with Mr. Roesch at NAMICO?

Danny Ransom                                                    66

1    A. I remember discussing this case and all the
2  cases that fall under this particular subject with
3  Ed Roesch.
4    Q. What do you recall about those discussions
5  with Mr. Roesch, settling this case and the other
6  similar cases?
7    A. Without specific detailed recollection,
8  generically, get those cases settled as fast as
9  possible.
10   Q. That was you saying that or him saying that?
11   A. Him.  That was Ed Roesch saying that.
12   Q. Do you know why he wanted to get those other
13 cases settled as soon as possible?
14   A. Because of Sockwell.
15   Q. Right.  To avoid additional bad faith
16 claims?
17   A. Well, he didn't say that.  But I guess that
18 can be inferred.
19   Q. Were you agreeable with that idea of getting
20 these other cases settled?
21   A. No.
22   Q. Were you -- I know you don't recall
23 apparently the specific amount of the settlement

Danny Ransom                                                    67

1  of the McCoy case as we sit here today.  Do you
2  remember being agreeable with the settlement of
3  the McCoy case?
4    A. Yes.
5    Q. Once the McCoy case had been settled, do you
6  remember whether there was any backlash within
7  AMIC about the fact that it had settled?
8    A. I know Steve wasn't happy that they settled.
9    Q. You are referring to Steve Wells?
10   A. Yes.
11   Q. What did Mr. Wells have to say about it?
12   A. Well, you recall the stacking provision, and
13 he didn't think that applied.
14   Q. Did he tell you why?
15   A. Well, because of the endorsement.  And I
16 think he felt like the endorsement was valid
17 because it had been -- the application for it had
18 gone through the Department of Insurance.  He felt
19 that made it valid but -- so he wasn't happy at
20 any of them really, I mean, stacking them
21 coverage.
22   Q. You referenced the other cases that were
23 settled on the basis of Sockwell and the fact that

Danny Ransom                                                    68

1  apparently there were other files that had been
2  denied on the same basis that Officer McCoy's
3  claim had initially been denied.  Were you aware
4  that outside counsel, specifically Kyle Turner
5  and/or other lawyers at his firm, had given the
6  opinion that those cases should be settled, if
7  possible?
8    A. Yes.
9    Q. And in your role of handling claims for
10 AMIC, you regularly work with outside counsel,
11 correct?
12   A. Yes.
13   Q. And if your outside counsel gave advice on
14 liability and exposure on a given claim, was it
15 your practice to heed that advice?
16   A. Yes.
17   Q. And that's a reasonable thing for an
18 insurance company to do, isn't it?
19   A. Yes.
20   MR. McDOWELL:  I believe that's all the
21 questions I have for you at this time.
22   MR. SPEAGLE:  Nothing from my end.
23   (Deposition concluded at 2:52 p.m.)

## Page 69

```
 1            C E R T I F I C A T E

 2

 3    STATE OF ALABAMA )

 4    JEFFERSON COUNTY )

 5

 6         I hereby certify that the above and foregoing

 7    proceeding was taken down by me by stenographic

 8    means, and that the questions and answers therein

 9    were produced in transcript form by computer aid

10    under my supervision, and that the foregoing

11    represents, to the best of my ability, a true and

12    correct transcript of the proceedings occurring on

13    said date at said time.

14         I further certify that I am neither of counsel

15    nor of kin to the parties to the action; nor am I

16    in anywise interested in the result of said case.

17

18         _____

19                    /s/Anne E. Miller

20                    ACCR #486

21                    Expires 9/30/13

22

23
```

## Page 70

**WORD INDEX**

< $ >
$100,000  44:11
$165,000  65:17
$160,000  65:2
$200,000  43:8, 11

< . >
. 29:8  57:17

< 1 >
1.6  40:1
1:25  52:10
1:00  5:7
100  21:12
100,000  43:5
101  3:10
102  32:13
105  3:10
11  10:5  55:2
12  10:3, 5
128  8:14
13  69:21
13.  6:19
14  1:21  5:6
135  52:4
5:5
19  17:14  19:20
23:12  24:14, 21
19.  17:8
1973  9:19
1973.  11:10
1974  11:9
19th  45:10

< 2 >
2:11-CV-668-MEF
  1:7
2:32  68:23
20  10:4
2000  8:18, 18
2009  54:21
2009  54:21
55:19  60:20  64:6
61:8
40:14  42:14
2011  12:21
17:19  20:11

24:23  25:21, 21
30:7  34:8, 8
35:18  37:10
45:10  46:23
49:17  50:17, 18
51:9, 10  52:11
2011.  17:14
30:15
2013  1:21  5:6
21st  49:17  50:17
22  64:19
24th  17:14  30:15
25th  46:22
26  4:6  60:19
26  4:7

< 3 >
3  57:12
3.9  22:21  40:15
43:12
30  69:21
300  21:12
300,000  43:6
3160  47:12, 16
3188.  47:13
3189  49:15
32  4:6  26:10
32.  26:9, 13
3211  49:16
3213  50:4, 18
3227.  50:4
33  4:7  28:22
29:2, 22  32:12
34  4:9  38:16, 19
35  4:9  45:5, 8
35007.  8:15
35201  3:6
3574  55:1
3575  60:20
3577  64:16, 17
3588  50:4
3591  62:10
3598  57:11
36  4:8, 10  46:11,
  18
3610  60:12, 12
3663  58:18
3684.  58:18

37  4:11  48:5
50:15
37.  48:4
38  4:12  53:14,
18.21  60:16
38.  52:18
39  4:13  58:10, 14
3rd  50:18

< 4 >
4  19:7, 20  39:18
420  3:5
45  4:9
46  4:10
46-  53:16
49  4:11
486  69:20

< 5 >
5  4:3  19:10
53  4:12
58  4:13

< 6 >
6  19:9, 21  39:18

< 7 >
73  11:9

< 9 >
9  69:21

< A >
8  7:17  11:3
16:13  18:22
24:6  27:1, 5
30:1  32:17
38:23  37:20
40:2  41:22  43:7,
21  44:16  47:11
53:7  55:13
58:21  58:20
59:20  60:13
64:21
ability  40:10, 23
55:16  69:11
able  26:15  42:6
57:10  59:17
about  5:6  17:17
22:11  23:4  26:4

31:22  32:6
34:12  35:23
38:6  39:12  53:11
about.  6:9
above  5:7
above  30:12
Adams  26:10
acceptable  31:1
accident  20:17
21:3  55:4
accompanying
41:4
ACCR  69:20
accustomed
16:17
acquiesced
26:20  38:12
acquiescing
24:14
acting  5:2  53:19
action  69:15
activity  15:10
actual  32:10
actually  10:4
addition  13:16
additional  68:15
address  8:13
43:14
addressed  29:13,
15  30:3  38:19
addressee  37:2
43:10
addressees  45:19
addresses  49:3
adjuster  8:4
21:22  22:2
adjuster.  54:6
adjusters  14:14
23:16
administrator
9:11
adult  11:13, 15,
18
advantages  30:5
advice  68:13, 15
after  41:21
against  21:21
24:8  57:4

## Page 71

aggregate  21:13
43:6
ago  51:21
agree  37:23
agreeable  66:19
67:2
AGREED  1:18
2:2, 8
ahead  19:11
46:13
aid  69:9
ALABAMA  1:2, 8
3:6, 11  52:2, 6
8:15  11:16  47:6
48:10  49:18
50:6  56:2, 8  69:3
Alabama.  2:1
Alabama's  43:3
Alabaster,  8:14
alerting  58:22
all  19:16  58:13
allegation  55:2,
10, 11  64:13
also.  59:18
amended  19:12
AMIC  6:6, 20
9:22  10:2, 3, 4, 5,
9  12:15  13:19
14:7, 12, 19
15:22  16:5, 7, 9,
15  17:1, 19
20:10  23:13
24:3, 8  25:23, 23
27:17  28:4, 5, 14,
18  29:19  30:4, 6
19  31:1, 6, 7
32:21  33:1, 10,
15, 20  34:12, 15
35:2, 16, 17  36:1,
11  37:7, 16  38:2
40:15  42:20
43:14  44:23
50:21  52:3
53:13  54:4  55:6
57:5, 6  59:6
60:6, 20  61:21,
23  62:14  63:6, 7
64:10, 11  65:6
67:17

AMIC,  16:12
AMIC.  13:8
AMIC's  18:3
20:4  21:5  24:21
40:10, 23  41:9
42:15, 18  55:16
65:1
amicus  49:18
amount  52:16, 23
66:23
amounts  39:5
an  16:20  21:2
39:22  40:18
42:3, 9  43:5
58:22  68:17
and  1:21  7:19
10:9  12:4  13:12
17:15  19:11, 21
21:14  22:19
25:7  26:14
27:16  29:6, 21
30:5, 7, 18  31:17
32:19  33:6, 9
34:3  35:3  37:2
38:5  40:11  41:1,
8:15  16:9  17:8
32:19  33:6, 9
answer  8:7
16:23  27:8  31:3
50:13
answering  8:3
answers  50:1,
22
arises  38:2
arising  47:8
arm  53:9
arrangement
30:6, 23
arrived  33:7, 9
6:19  5:19
13:23  22:15
24:20  30:17
34:23  35:5
38:18  38:11

anything  16:9
48:23
anyway  17:1
anywise  69:16
apologize  58:18
apparently  32:14
appeal  29:20
30:4, 19  40:16,
18, 20  42:6
50:23  52:1
Appeals  45:1
47:7
APPEARANCES
3:1
Appearing  3:2, 8
appears  25:8
57:2  54:15
58:20  60:16
appellate  45:23
Appellate,  50:5
applicable  44:19
54:12  53:16
application  67:17
applied.  67:13
applies  60:21
appropriate  35:4
approximately
8:16  13:3  22:21
April  45:10
46:22  49:16
anguish  64:18
Anne  1:21  5:6
41:8, 11  42:10
45:22  47:10
58:12
argument  51:11
arguments  50:1,
22
arises  38:2
arising  47:8
arm  53:9
arrangement
30:6, 23
arrived  33:7, 9
6:19  5:19
13:23  22:15
24:20  30:17
34:23  35:5
38:18  38:11

45:9  46:14  65:7
66:8
ask  45:8  46:17
asked  14:12  48:2
asking  34:14
assert  56:4
assessment
40:10, 23  44:14,
14
assign  2:12
assigned  13:23
14:14  38:7
assigning  13:12
Association
60:16
assume  31:8
at  2:12  10:23
44:3  47:13  57:6
62:4  63:9  67:19
et,  25:20
Atlanta  21:22
Atlanta,  28:3, 16
attached  26:10
28:22  32:14
36:16  45:5
46:11  48:5
53:14  58:10  62:5
attached.  58:22
attended  9:18
attention  47:2
62:7
attorney  34:18
35:5  60:14, 18
attorneys  39:6
44:2
attorney's  39:23
62:8
August  11:10
auto  16:17  21:3
44:8, 10  59:15
61:12, 16  63:12,
18
autos  63:19
autos.  63:12
avoid  65:12
68:15
aware  17:20
30:20  40:4, 4, 17

## Page 72

51:5  52:10, 13
61:23  68:3
away  51:20

< B >
back  10:23
17:18  20:9
37:20  48:20
55:19
background  9:17
backlash  67:6
bad  23:10, 14
24:5, 14  27:14
35:7  64:11, 12,
39:13  50:23
33:8
Baker  1:22  3:4
54:3
Belch  31:6, 10,
11, 15, 20  32:19
33:8
ballpark  40:15
Barbara  16:7
23:4  27:14  29:20
based  15:5, 56:6
60:8
based.  15:4
basis  57:7, 18
58:5  59:7, 11, 13
60:6, 21  61:5
65:7  67:23  68:6
Bates  32:12
47:12, 16  49:15,
18  50:4, 18
54:23  58:5, 18
61:6  62:19
be  2:9  13:4, 22
31:11  41:5, 13
60:1
be.  50:13
Bear  68:9
BEARMAN  3:4
5:4
Bearman,  1:22
became  25:2
because  14:3
35:18  42:18
51:14  58:16

67:17
become  54:20
been  2:6  6:14,
22  19:2  20:3
21:22  23:20
47:17  68:1
before  7:4
beginning  5:6
begins  47:12
behalf  40:23
47:6  53:20
being  5:12  8:8
34:17  35:16
39:13  50:23
believe  16:17
believe  16:17
35:12  36:18
38:13  48:19
57:20  68:20
bell  40:2
belle  29:9
benefits  55:6, 9,
14  59:4  61:3
benmark.  1:23
3:4  5:5
Bessemer  64:3, 7
best  7:20  69:11
better  26:16
42:13  51:1
46:15  50:16
between  22:21
big  39:8
billateral  13:11
billing  15:8
bills  15:7, 11, 14
Bingham  31:6
be  2:9  13:4, 22
31:1  41:5, 13
60:1
Birmingham  2:1
3:6  9:1  64:22
Birmingham,  5:3
bit  6:19  48:12
BLACK  3:9
25:17
Bobby  25:17
bodily  60:21
bother  30:13

bottom  32:13
45:11  48:6  55:1
boy.  11:4
BRADWELL  3:9
break  7:23
31:14  51:16
brief  10:19  47:5,
15, 21, 23  49:3,
12, 17, 18, 20, 23
50:5, 7, 17  51:2
briefing  46:2, 8
47:10  48:8
Briefly  10:14, 23
13:9
briefs  6:22
45:21, 23  46:6
48:14  50:15
briefs  6:22
bring  14:16  62:7
brought  16:13
47:1
BS  9:19
business  9:3, 10
10:20
bus.  61:10  10:3
12:1, 3  13:15, 15
17:21  19:1
22:11  26:18
32:9  39:8  42:6
44:19  50:14
56:13  59:12, 21
but,  34:20
by  2:3  6:2  9:21
10:15
bylined  13:22

< C >
CADWELL  3:4
Caldwell  1:23
5:5
3:6  9:1  64:22
can  18:10, 20
can't  35:19  42:7
capped  44:11
caps  49:5
captioned  50:5
car  55:4

carbon  48:16
card  9:3
carrier  18:3  56:3
carriers  11:7
case  6:4, 8, 20
15:20  16:7, 13,
15, 16, 17  18:3,
16  18:14  19:20,
23  23:11  27:14
31:21  34:4
35:11, 17, 19
42:3, 4, 10  43:7
44:17  45:23
47:11  48:21
47:14, 18  56:15,
21, 22  60:15
62:15, 17  64:12
65:2, 18  66:1, 5
67:1, 3, 5
case,  56:12
cases  61:9  7:8,
10  16:10  20:1
21:20  22:20
23:7  26:22  33:3
35:22  38:3  40:1,
7, 11  44:6  45:3
51:10  52:7, 10
60:2, 6, 8, 12, 20
67:22  68:6
cases.  62:17
casual  41:19
cause  5:8
caution  59:20
center  48:9
certain  29:21
30:6
certainly  32:17
43:8
certificate  49:11
certify  5:2  69:6,
14
challenging  40:20
changed  12:18
13:15
changing  61:20
children  11:13