**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) | Case No.: 2:11-CV-00668-MEF |
| v. | ) ) ) | |
| ALABAMA MUNICIPAL INSURANCE CORPORATION, | ) ) ) | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF SCOTTSDALE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff and Counter-Defendant Scottsdale Insurance Company ("Scottsdale") moves the Court to enter a final summary judgment in its favor declaring that Defendant and Counter-Plaintiff Alabama Municipal Insurance Corporation ("AMIC") is obligated to reimburse Scottsdale $900,000, plus interest, attorney's fees and expenses, and dismissing AMIC's counterclaims for breach of contract and bad faith. There is no genuine issue as to any material fact, and Scottsdale is entitled to judgment as a matter of law. For the reasons set forth herein, Scottsdale's motion for summary judgment should be granted.

## I. INTRODUCTION

A.   **AMIC IS OBLIGATED TO REIMBURSE SCOTTSDALE $900,000.00, PLUS FEES AND EXPENSES.**

Scottsdale's contract with AMIC gives it the right to be reimbursed for payments made on a claim for which it is determined the Scottsdale Policy provided no coverage. That is precisely the circumstance presented in this case.

1

AMIC's insureds, the Town of Woodland and Billie Vernon Edmondson, were defendants in a pair of lawsuits filed in Georgia.  The claims arose from a single car accident which caused grievous bodily injury, including rendering an elderly woman quadriplegic.  Following a jury trial, AMIC's insureds had two judgments entered against them totaling nearly $4 million.  Pursuant to Georgia law, the Plaintiffs' attorney made a claim for attorneys' fees of approximately $1.6 million.  When AMIC did not pay its $2 million policy limits toward the judgments, the Underlying Plaintiffs sued it for, among other things, bad faith.  Scottsdale provided a defense to AMIC in the Bad Faith Lawsuit.

When the Underlying Plaintiffs offered to settle all claims against both AMIC and its insureds for AMIC's policy limits, Scottsdale insisted AMIC settle the claims.  Scottsdale informed AMIC that if it opted not to settle the claim, Scottsdale would withdraw its defense.  The Scottsdale Policy contained a provision allowing it to withdraw its defense if AMIC continued to contest a claim for which Scottsdale had recommended settlement.  This same provision gave AMIC the option of continuing to contest the claims, and, if AMIC prevailed or achieved an outcome more favorable than the proposed settlement, AMIC had the right to demand reimbursement of its claim expenses.

AMIC, however, balked at settling the claims.  It suggested instead that it and Scottsdale split the settlement.  Scottsdale agreed to advance $900,000 to facilitate the settlement of the claims while making clear its position that the settlement involved contractual liability excluded under the Scottsdale Policy and that Scottsdale reserved the right to be reimbursed.  Scottsdale put AMIC on notice that it would initiate declaratory judgment proceedings to recover its payment.  AMIC accepted and benefited from the payment with these conditions.

2

Scottsdale is due to be reimbursed because its policy excluded the settlement of the underlying claim.  The Scottsdale Policy expressly excluded from coverage AMIC's contractual liabilities.  AMIC's liability under its contract for an unquestionably covered automobile accident fits squarely within this exclusion.

The purpose of the Scottsdale policy was to insure AMIC for professional liability, not to replace AMIC's policy with its insureds.  AMIC had a contractual duty to its insureds to pay its policy limits after they were hit for a judgment far exceeding those limits.  The settlement with the Underlying Plaintiffs was for those policy limits.  The settlement was properly AMIC's responsibility and no one else's.

Scottsdale is therefore entitled to be reimbursed $900,000 from AMIC, plus attorney's fees, costs, and interest.

**B.**    **AMIC'S CLAIMS FOR BREACH OF CONTRACT AND BAD FAITH ARE DUE TO BE DISMISSED.**

AMIC's counterclaims for breach of contract and bad faith have no merit whatsoever. Scottsdale did not breach its contract with AMIC.  Scottsdale simply invoked a written provision in its policy which gave it the right to withdraw if AMIC refused to settle a claim as recommended by Scottsdale.  It was within its rights to do so, per the terms of the Policy. Moreover, Scottsdale's position was sound from the standpoint of the risks to AMIC and its insureds.  AMIC's insureds were facing liability nearly three times their policy limits.  AMIC's strategy was simply to fight the Underlying Plaintiffs as long as it could on the hope that eventually the judgments **entered against them in Georgia** might somehow be subject to **Alabama's** municipal damages caps.

AMIC's strategy ignored the very porous nature of Alabama's governmental damages caps.  It ignored the fact that AMIC had already posted a collateralized garnishment bond of $2

3

million to put a stop to judgment collection efforts by the Underlying Plaintiffs.  It ignored the fact that outside counsel both in the underlying van accident litigation and in the Bad Faith Lawsuit were extremely doubtful AMIC's grand strategy would pan out.

AMIC's strategy was quixotic.  It had little hope of success and ran the risk of leaving its insureds liable for an excess verdict.  Accepting the settlement proposal of $2 million was the only sensible course of action.

AMIC apparently came to this same conclusion.  Once it became apparent to AMIC that it, not Scottsdale, would have to bear the risk if AMIC's strategy failed, it chose to settle.

AMIC chose to settle.  It agreed to split the settlement with Scottsdale with the express understanding that Scottsdale and AMIC would later litigate their respective rights to reimbursement.  Not only did AMIC agree to the settlement, it was AMIC which first came up with the idea of splitting the settlement.  The fact that AMIC agreed to the resolution of the Underlying Litigation is fatal to its bad faith claims.

There was no breach of contract.  AMIC suffered no injury.  AMIC voluntarily settled an excess claim for within its policy limits.

## II. NARRATIVE SUMMARY OF UNDISPUTED FACTS

### A.    THE SCOTTSDALE POLICY.

1.      Scottsdale issued an insurance policy to AMIC (Policy No. COS-002674-10) for the policy period beginning December 6, 2010 and ending on December 6, 2011 ("the Scottsdale Policy").  A copy of the Scottsdale Policy is attached hereto as **Exhibit A.**

2.      The Scottsdale Policy was delivered to AMIC at AMIC's address in Montgomery, Alabama.  (Scottsdale's Complaint at ¶ 6; AMIC's Answer at ¶ 6).

4

3.      The Scottsdale Policy provided coverage for "all **LOSS** resulting from a **CLAIM** … alleging an act, error or omission in the performance of **PROFESSIONAL SERVICES** …." (Scottsdale Policy, § I.A, Exhibit A, at page 1 of 23).

4.      The Scottsdale Policy defined "**CLAIM**" to mean, among other things, "a civil proceeding in a court of law seeking monetary damages." (Scottsdale Policy at § II.D.1, Exhibit A, at page 5 of 23).

5.      The Scottsdale Policy contained the following exclusions:

**III.  EXCLUSIONS**

**This policy does not apply to:**

> \*      \*      \*      \*      \*

**B.** an allegation in a **CLAIM** arising from, based upon, attributable to or related in any way (directly or indirectly) to **(1) BODILY INJURY, (2) PROPERTY DAMAGE, (3) ADVERTISING INJURY** or **(4) PERSONAL INJURY**, except as provided under Section **I. Insuring Agreements**, Paragraph **D.2**.

> \*      \*      \*      \*      \*

**I**. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation, whether real or alleged, assumed by or imposed upon an **INSURED** arising out of:

1. any policy or contract of insurance, reinsurance, insurance pool, suretyship, annuity or endowment; or

2. any written contract, unless the **INSURED** would have been liable in the absence of such contract;

(Scottsdale Policy, Exhibit A, §§ III, B. and I., at pages 11 and 12 of 23) (emphasis in original).

6.      The Scottsdale Policy contains the following condition:

**P.  Reimbursement of Insurer**

5

In the event of any payment by the Insurer as **CLAIM EXPENSE** or **LOSS** with regard to a **CLAIM** as to which it is determined by judgment or settlement or decision of an arbitrator that the policy provided no coverage for such **CLAIM**, all **INSUREDS** shall be liable to reimburse the Insurer for **LOSS** or **CLAIM EXPENSE** payments.  In the event the Insurer files suit or any other legal action to obtain this reimbursement, all **INSUREDS** shall be liable to the payment of the reimbursement as well as the Insurer's legal fees and costs, including attorney fees incurred by the Insurer seeking the reimbursement of such **LOSS** or **CLAIM EXPENSES.**

(Scottsdale Policy, Exhibit A, § IV, P., at page 22 of 23) (emphasis in original).

      7.     The Scottsdale Policy contains the following provision:

**C. Investigation, Defense and Settlement**

The Insurer shall have the right and duty to defend any **CLAIM** first made against an **INSURED** and reported in writing by an **INSURED** to the Insurer during the Policy Period, or applicable Extended Reporting Period, alleging a Wrongful Act or acts, error or omissions in the performance of **PROFESSIONAL SERVICES** on or after the **PRIOR ACTS DATE**, and seeking Loss payable under the terms of this policy, even if such allegations are groundless, false or fraudulent.  The Insurer shall have the right to choose counsel to defend any **INSURED**.  The Insurer may make any investigation it deems necessary and reasonable, and may, with the written consent of the **INSURED**, make any settlement of any **CLAIM** it deems expedient.

If an **INSURED** shall refuse to consent to any settlement or compromise recommended by the Insurer and acceptable to the claimant and shall elect to further contest the **CLAIM**, then the Insurer's liability shall not exceed the amount for which the Insurer would have been liable for **LOSS** and **CLAIM EXPENSE** at the time the **CLAIM** could have been settled or compromised.  Should the **INSURED** refuse consent for such recommended settlement, the Insurer may withdraw from the defense of the **CLAIM**.

If an **INSURED** shall refuse such consent and continue to contest the **CLAIM** and either prevail in litigation or pay **LOSS** in an amount less than the **LOSS** amount which the Insurer recommended, the Insurer shall, subject to the deductible and any applicable policy provision, reimburse the **INSURED** for **LOSS** and/or **CLAIM EXPENSES** incurred by the **INSURED** subsequent to the proposed settlement, even if the **CLAIM EXPENSE** to be reimbursed to **INSURED** exceeds the **CLAIM EXPENSE** at the time of the proposed settlement, but in no event shall the Insurer be obligated to reimburse the **INSURED** for more than the total amount of **CLAIM EXPENSE** and **LOSS** at the time of the proposed settlement recommended by the Insurer.

B DWM 1106250 v1
2920847-000001  03/29/2013

(Scottsdale Policy, Exhibit A, § I. C at pages 1-2 of 23) (emphasis in original).

**B.    THE UNDERLYING LITIGATION.**

8.      On or about November 24, 2009, Jeanette Holloway and Connie Meadows were passengers in a van driven by Billie Vernon Edmondson.   (Scottsdale's Complaint at ¶ 8; AMIC's Answer at ¶ 8).[1]

9.      The van was a covered auto under the AMIC Policy, and Mr. Edmondson was driving it with the permission of the Town of Woodland.  (Deposition of David Sikes, attached hereto as **Exhibit D**, at 33:20 - 34:5).

10.     The van was involved in a single-vehicle accident in Troup County, Georgia. Both Jeanette Holloway and Connie Meadows sustained injuries in this accident.  (Scottsdale's Complaint at ¶ 10; AMIC's Answer at ¶ 10).[2]

11.     Ms. Holloway was rendered a quadriplegic as a result of the accident.   Ms. Meadows suffered a broken leg.  (Sikes depo, Exhibit D, at 36:10-21).

12.     At the time of the accident, Mr. Edmondson was not performing a mission, errand, or duty for the Town of Woodland.  (Sikes depo., Exhibit D, at 123:20 - 124:18; Plaintiff's Exhibit 21 to the Deposition of David Sikes).  Mr. Edmondson was, however, using a covered auto with permission of the Town of Woodland.  (Sikes depo., Exhibit D, at 33:20 - 34:5).

13.     Jeanette Holloway and Connie Meadows brought suit against the Town of Woodland and Mr. Edmondson in Troup County, Georgia.  When Ms. Holloway later died, her claims were advanced by her Estate.  These suits were styled and numbered as follows: *Connie*

---

[1] AMIC chose to neither admit nor deny this factual allegation in Scottsdale's Complaint; it is therefore due to be deemed admitted.  *See* FED R. CIV. P. 8(b)(6); *see also Publicker v. Shallcross*, 106 F.2d 949 (3rd Cir. 1939) (by styling averments of petition "as immaterial and not requiring an answer," respondent admitted allegations).

[2] AMIC chose to neither admit nor deny this factual allegation in Scottsdale's Complaint; it is therefore due to be deemed admitted.  *See* FED. CIV. P. 8(b)(6).

*Meadows v. Town of Woodland, Alabama and Shirley Doris Edmondson as Executrix of the Estate of Billie Vernon Edmondson, Deceased, and Alabama Municipal Insurance Corporation,* In the Superior Court of Troup County, Georgia, CV-2010-423 ("the *Meadows* Lawsuit") and *Barbara Jean Murphy, individually, as surviving child of Jeanette Holloway and Barbara Jean Murphy and Jimmy T. Murphy, as Co-Personal Representatives of the Estate of Jeanette Holloway, Deceased v. Town of Woodland, Alabama and Shirley Doris Edmondson as Executrix of the Estate of Billie Vernon Edmondson, Deceased,* In the Superior Court of Troup County, Georgia, CV-2010-424 ("the *Holloway* Lawsuit").  (Scottsdale's Complaint at ¶ 11; AMIC's Answer at ¶ 11;[3] Affidavit of Ed Roesch, attached hereto as **Exhibit I**, at ¶ 6 ).

14.     AMIC insured the Town of Woodland pursuant to its Policy No. 0093056247103 ("the AMIC Policy").   The limit of liability under the AMIC Policy was $2,000,000.00 per occurrence.  The AMIC Policy insured the Town of Woodland for, among other things, "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' … caused by an 'accident' and resulting from the … use of a covered auto."  (AMIC Policy, Business Auto Coverage Form at page 2).   A copy of the AMIC Policy is attached hereto as **Exhibit B**.

15.     The AMIC Policy defined the term "insured" to include anyone using a covered auto with permission.  (AMIC Policy, Exhibit B, Business Auto Coverage Form at page 2; Sikes depo., Exhibit D, at 33:20 - 34:5).

16.     AMIC insured Billie Vernon Edmondson under the AMIC Policy for purposes of the *Meadows* and *Holloway* Lawsuits.  (Sikes depo., Exhibit D, at 33:17 - 34:5).

---

[3] AMIC chose to neither admit nor deny this factual allegation in Scottsdale's Complaint; it is therefore due to be deemed admitted.  *See* Fed. R. Civ. P. 8(b)(6).

17.     AMIC, as the insurer of the Town of Woodland, defended the Town of Woodland and Mr. Edmondson in the *Meadows* and *Holloway* Lawsuits.  (Scottsdale's Complaint at ¶ 13; AMIC's Answer at ¶ 13).

18.     On May 20, 2010, the Underlying Plaintiffs filed amended complaints in the *Meadows* and *Holloway* Lawsuits seeking a declaratory judgment as to the limits of the AMIC policy that would apply in those cases.  AMIC consented to have this issue decided by the Superior Court of Troup County, Georgia.  (Complaint styled and numbered *Barbara Jean Murphy, an individual; Barbara Jean Murphy and Jimmie T. Murphy, Personal Representatives of the Estate of Jeanette Holloway, Deceased; and Connie Meadows, Plaintiffs v. Alabama Municipal Insurance Corporation, a corporation, Defendant*, In the Superior Court of Troup County, Georgia, CV-2011-0061, at ¶ 17, and Exhibit B to that Complaint, attached as **Exhibit G-1** to the Affidavit of Timothy F. Sullivan which is attached hereto as **Exhibit G**).

19.     The defense counsel retained by AMIC to defend its insureds determined that liability for the van accident was "impossible to credibly contest," and AMIC agreed with this assessment.  (Sikes depo., Exhibit D, at 38:13 - 39:4).

20.     On November 4, 2010 following a jury trial, the Superior Court of Troup County, Georgia entered a final judgment in favor of Plaintiff Connie Meadows and against Defendants Edmondson and the Town of Woodland for $340,000.00.   (Scottsdale's Complaint at ¶ 14; AMIC's Answer at ¶ 14).[4]

21.     On November 4, 2010, following a jury trial, the Superior Court of Troup County, Georgia entered a final judgment in favor of the Estate of Jeanette Holloway and against

---

[4] AMIC chose to neither admit nor deny this factual allegation in Scottsdale's Complaint; it is therefore due to be deemed admitted.  *See* FED. R. CIV. P. 8(b)(6).

B DWM 1106250 v1
2920847-000001  03/29/2013

Defendants Edmondson and the Town of Woodland for $3,650,000.00.  (Scottsdale's Complaint at ¶ 15; AMIC's Answer at ¶ 15).[5]

22.     On or about November 12, 2010, the Superior Court of Troup County, Georgia, ordered, as to both the *Holloway* and the *Meadows* Lawsuits, "That policy #0093056247103 issued by AMIC was in full force and effect on November 24, 2009, and the limits of liability as set forth on the declaration pages of that policy are applicable as opposed to any foreign statutory limitation."  A copy of the November 12, 2010 Order is attached to Scottsdale's Complaint as **Exhibit C**.

23.     On or about December 3, 2010, AMIC, The Town of Woodland, and The Edmondson Estate filed Notices of Appeal with the Court of Appeals of the State of Georgia, appealing the judgments totaling nearly $4,000,000.00 which had been entered against them. (Scottsdale's Complaint at ¶ 17; AMIC's Answer at ¶ 17).

24.     On December 21, 2010, the Superior Court of Troup County, Georgia entered an order requiring a supersedeas bond in the *Holloway* Lawsuit at $4,744,685.49.  The same day, the Superior Court of Troup County, Georgia set the amount of the supersedeas bond in the *Meadows* Lawsuit at $441,954.51.   The combined total of these two bonds equaled $5,186,640.00.  (Scottsdale's Complaint at ¶ 18; AMIC's Answer at ¶ 18).[6]

25.     On or about January 18, 2011, Connie Meadows, Barbara Jean Murphy, and Jimmy T. Murphy initiated garnishment proceedings in the Superior Court of Troup County, Georgia against AMIC in a case styled and numbered *Connie Meadows, Barbara Jean Murphy, and Jimmy T. Murphy as Personal Representative for Dorothy Jeannette Holloway, Plaintiffs v.*

---

[5] AMIC chose to neither admit nor deny this factual allegation in Scottsdale's Complaint; it is therefore due to be deemed admitted.  *See* FED. R. CIV. P. 8(b)(6).

[6] AMIC chose to neither admit nor deny this factual allegation in Scottsdale's Complaint; it is therefore due to be deemed admitted.  *See* FED. R. CIV. P. 8(b)(6).

*Town of Woodland, Alabama, and Billie Vernon Edmondson, Alabama Municipal Insurance Corporation, Defendants, Regions Bank, Garnishee*, CV-2011-0035.  (Scottsdale's Complaint at ¶ 20; AMIC's Answer at ¶ 20).

26.    To avoid having its accounts with Regions Bank garnished, AMIC filed a collateralized garnishment bond in the amount of $2,000,000.00 with the Superior Court of Troup County, Georgia.  (Deposition of Stephen Wells, attached hereto as **Exhibit J**, at 32:5 - 22; 35:20 - 36:5; Plaintiff's Exhibit 29 to Wells depo.).

27.    On or about January 24, 2011, Connie Meadows, Barbara Jean Murphy, and Jimmy T. Murphy filed a lawsuit against AMIC in Troup County, Georgia styled and numbered *Barbara Jean Murphy, an individual; Barbara Jean Murphy and Jimmie T. Murphy, Personal Representatives of the Estate of Jeanette Holloway, Deceased; and Connie Meadows, Plaintiffs v. Alabama Municipal Insurance Corporation, a corporation, Defendant*, In the Superior Court of Troup County, Georgia, CV-2011-0061, alleging that AMIC was liable to them for, among other things, $1,990,000.00, the amount by which the collective verdicts in the Holloway and Meadows lawsuits exceeded the AMIC policy's limits, plus costs and attorney's fees ("the Bad Faith Lawsuit").  (A copy of the Bad Faith Lawsuit with exhibits is attached hereto as **Exhibit G-1** to the Affidavit of Timothy F. Sullivan which is attached hereto as **Exhibit G**).

## C.    SCOTTSDALE DEFENDS AMIC IN THE BAD FAITH LAWSUIT UNDER A RESERVATION OF RIGHTS.

28.    AMIC tendered the defense of the Bad Faith Lawsuit to Scottsdale.  (Scottsdale's Complaint at ¶ 22; AMIC's Answer at ¶ 22; Sullivan Affidavit, Exhibit G, at ¶ 7).

29.    NAMIC Insurance Company ("NAMICO") was the administrator for Scottsdale in connection with the Bad Faith Lawsuit.  (Sullivan Affidavit, Exhibit G, at ¶ 3).

B DWM 1106250 v1
2920847-000001  03/29/2013

30.     Scottsdale provided a defense to AMIC in the Bad Faith Lawsuit under a reservation of rights.  (Sullivan Affidavit,  Exhibit G, at ¶ 8).

31.     Scottsdale sent an initial reservation of rights letter to AMIC on February 2, 2011, when it first opened its file in connection with the Bad Faith Lawsuit.  (Deposition of Danny Ransom, attached hereto as **Exhibit M**, 26:12 - 28:11, Plaintiff's Exhibit 32 to Ransom's deposition).

32.     Scottsdale sent a separate reservation of rights letter to AMIC on April 8, 2011. (Ransom depo., Exhibit M, at 36:18-22, Plaintiff's Exhibit 34 to Ransom deposition).  This letter was addressed to Danny Ransom at AMIC, with a copy going to Scott Speagle.  (Exhibit M, Plaintiff's Exhibit 34 to Ransom deposition).

33.     At no time did Mr. Speagle express any concerns to Mr. Ransom about the contents of the reservation of rights letter.  (Ransom depo., Exhibit M, at 36:23 - 37:19).

34.     With AMIC's consent, Scottsdale retained Georgia attorney Kathryn Whitlock to represent AMIC in both the appeal of the *Meadows* and *Holloway* Lawsuits as well as the *Murphy* lawsuit.  Scott Speagle entered an appearance on behalf of AMIC in these cases as well. (Roesch Affidavit, Exhibit I, at ¶ 7).

35.     With input from Ms. Whitlock and with the input and consent of AMIC's counsel, Scott Speagle, AMIC and Scottsdale requested that the attorneys who had represented the Town of Woodland, Billie Vernon Edmondson and AMIC in the trial proceedings in the *Meadows* and *Holloway* Lawsuits to withdraw from their representation of these parties.  (Roesch Affidavit, Exhibit I, at ¶ 8).

**D.**   **A REVIEW OF AMIC'S FILE FROM THE UNDERLYING LITIGATION AS WELL AS THE ASSESSMENT OF OUTSIDE COUNSEL REVEALS THAT THE EXPOSURE TO AMIC'S INSUREDS IN THE *MEADOWS* AND *HOLLOWAY* SUITS GREATLY EXCEEDS AMIC'S POLICY LIMITS OF TWO MILLION.**

36.     On or about February 8, 2011, Scottsdale received AMIC's claim file associated with the *Meadows* and *Holloway* Lawsuits.  (Roesch Affidavit, Exhibit I, at ¶ 9).

37.     AMIC's claim file consisted of hundreds of pages of material, including legal research, briefing, Orders entered by the trial court, and numerous evaluations of the *Meadows* and *Holloway* claims.  (Roesch Affidavit, Exhibit I, at ¶ 10).

38.     From Scottsdale's review of AMIC's claim file, it learned that AMIC and its insureds conceded that AMIC's insureds were liable for the van accident giving rise to the *Meadows* and *Holloway* Lawsuits.  (Roesch Affidavit, Exhibit I, at ¶ 11).

39.     From Scottsdale's review of AMIC's claim file, it learned that the centerpiece of AMIC's defense and the defense of its insureds in the *Meadows* and *Holloway* Lawsuits was that Alabama's damages caps, found in §§ 11-47-190 and 11-93-2 of the Alabama Code, capped the liability of the Town of Woodland and Billie Vernon Edmondson at $100,000 per claimant, for a total exposure of $200,000.  (Roesch Affidavit, Exhibit I, at ¶ 12).

40.     From Scottsdale's review of AMIC's claim file, it learned that the trial court in Troup County, Georgia rejected the arguments of AMIC and its insureds that their liability was capped at $200,000.  (Roesch Affidavit, Exhibit I, at ¶ 13).

41.     From Scottsdale's review of AMIC's claim file, it found that at the outset of the *Meadows* and *Holloway* Lawsuits defense counsel expressed doubt as to whether Georgia courts would apply the Alabama damages caps.  (Roesch Affidavit, Exhibit I, at ¶ 14).

42.     From Scottsdale's review of AMIC's claim file, it learned that on September 16, 2010, the defense counsel in the *Meadows* and *Holloway* Lawsuits expressed doubts that

13

Alabama law would displace Georgia substantive law even in a judgment domestication proceeding in Alabama.  (Roesch Affidavit, Exhibit I, at ¶ 15).

43.    From Scottsdale's review of AMIC's claim file, it learned that the *Meadows* and *Holloway* Lawsuits were tried to a jury in Troup County, Georgia, and the jury returned verdicts totaling $3,990,000.00.  (Roesch Affidavit, Exhibit I, at ¶ 16).

44.    From Scottsdale's review of AMIC's claim file, it found several references both before and after the trial to the *Suttles v. Roy* case in which the Alabama Supreme Court determined that a municipal employee sued in his individual capacity could be liable for damages beyond Alabama's damages cap.  (Roesch Affidavit, Exhibit I, at ¶ 17).

45.    In the course of her evaluation of the *Meadows*, *Holloway* and *Murphy* Lawsuits, Ms. Whitlock expressed doubts as to whether the Alabama damages caps would ever apply to a judgment entered against AMIC's insureds in Georgia.  (Roesch Affidavit, Exhibit I, at ¶ 18).

46.    As the defense of the appeal progressed, on April 19, 2011, Ms. Whitlock sent a draft of the initial appeal briefs she prepared on behalf of AMIC to Scottsdale via e-mail.  The e-mail distribution list included Danny Ransom at AMIC, David Sikes at AMIC, and Scott Speagle, AMIC's retained counsel.  (Roesch Affidavit, Exhibit I, at ¶ 19).

47.    Scottsdale received copies of the initial briefs Ms. Whitlock filed on behalf of AMIC in the *Meadows*, *Holloway* and *Murphy* Lawsuits on April 21, 2011.  Scott Speagle, AMIC's retained counsel, was on the distribution list for the initial briefs.  (Roesch Affidavit, Exhibit I, at ¶ 20).

48.    On or about May 20, 2011, Scottsdale received a copy of the Plaintiffs' appeal brief in the *Meadows* and *Holloway* Lawsuits.  In it, the Underlying Plaintiffs argued that under the *Suttles v. Roy* decision of the Alabama Supreme Court Alabama's damages caps did not

14

apply to an individual defendant such as Billie Vernon Edmondson.  They also argued that the municipal damages caps did not apply because Mr. Edmondson was liable to the Plaintiffs for wantonness.  (Roesch Affidavit, Exhibit I, at ¶ 21).

49.     Scottsdale received a copy of the reply brief Ms. Whitlock filed on behalf of AMIC in the *Murphy* Lawsuit on June 3, 2011.  Scott Speagle, AMIC's retained counsel, was on the distribution list for this brief.   To Scottsdale's knowledge, during the six week period between April 21, 2011 and June 3, 2011, no one from AMIC, including AMIC's retained counsel, Scott Speagle, expressed any concerns about the prosecution of the appeal.  (Roesch Affidavit, Exhibit I, at ¶ 22).

50.     Georgia attorney Tom Harper represented the Town of Woodland and Billie Vernon Edmondson in the appeal of the *Meadows* and *Holloway* Lawsuits.  (Sikes depo., Exhibit D, at 70:12 - 71:13).

51.     In the appeal of the *Meadows* and *Holloway* Lawsuits, among the arguments Mr. Harper advanced on behalf of the Town of Woodland and Mr. Edmondson was that the verdicts against AMIC's insureds should be capped at AMIC's policy limits of $2 million.  (Sikes depo., Exhibit D, at 77:14 - 80:5; Plaintiff's Exhibits 17 and 18 to Sikes depo.).

52.     On July 5, 2011, Ms. Whitlock sent a letter to Scottsdale on which David Sikes of AMIC and Scott Speagle were copied.  In this letter, Ms. Whitlock noted that AMIC's retained counsel in the *Meadows* and *Holloway* Lawsuits had opined that the trial court in Troup County, Georgia would not be likely to apply the Alabama damages cap, and had expressed doubts as to whether the Alabama damages caps would apply even if the judgment had to be domesticated in Alabama.  Furthermore, Ms. Whitlock noted that the exposure to AMIC's insureds was as high as $5,977,020.00.  ((Roesch Affidavit, Exhibit I, at ¶ 23; Exhibit I-1 to Roesch Affidavit).

15

E.     **THE UNDERLYING PLAINTIFFS RENEW THEIR PREVIOUS DEMAND OF $2,000,000.00**.

53.     Prior to July 5, 2011, Scottsdale and AMIC planned a meeting for July 8, 2011 to discuss the defense of the Underlying Litigation, their respective evaluations of the Underlying Litigation, and the oral argument in the appeal of the *Meadows* and *Holloway* Lawsuits scheduled for July 14.  (Deposition of Timothy Sullivan, attached hereto as **Exhibit K**, at 36:4 - 36:18; Deposition of Edward Roesch, attached hereto as **Exhibit L**, at 144:9-11).

54.     On July 5, 2011, the Underlying Plaintiffs offered to settle all of their various claims pending against the Town of Woodland and AMIC (sometimes referred to herein collectively as the "Underlying Litigation") for $2,000,000.00, plus accrued interest.  (Sullivan Affidavit, Exhibit G, at ¶ 10; Exhibit G-2 to Sullivan Affidavit).

55.     In the July 5, 2011 demand letter, Underlying Plaintiffs' counsel "renewed" the Underlying Plaintiffs' previous offer of settlement which was attached to the Bad Faith Lawsuit as Exhibit C.  (Sullivan Affidavit, Exhibit G, at ¶ 10,  Exhibit G-1 to Sullivan Affidavit).  The previous offer referenced in counsel's letter was dated August 25, 2010, and was formally made in connection with the Meadows and Holloway Lawsuits.  (Exhibit C to Bad Faith Lawsuit, attached as Exhibit G-1 to Sullivan Affidavit).[7]

56.     At the time of the settlement demand described in the preceding paragraphs, the Court of Appeals of the State of Georgia had scheduled oral argument in appeals involving the several cases against the Town of Woodland and AMIC for July 14, 2011.  Counsel for the Underlying Plaintiffs demanded that the case be settled before the appellate hearing or the $2,000,000.00 demand would be withdrawn.  (Sullivan Affidavit, Exhibit G, at ¶ 11).

---

[7] Furthermore, according to David Sikes of AMIC, counsel for the Underlying Plaintiffs' demand throughout the pendency of the Underlying Litigation, was consistently $2 million.  (Sikes depo., Exhibit D, at 39:14 - 40:3).

16

57.   The demand letter with its imminent deadline changed the nature of the July 8 meeting.  (Sullivan depo., Exhibit K, at 36:4 - 36:18).

58.   At the time of the settlement demand described in the preceding paragraphs, the Town of Woodland had judgments pending against it totaling $3,990,000.00, plus accruing interest.  Every attempt which had been made by AMIC and/or the Town of Woodland to apply Alabama's governmental entity damages cap under principles of comity or otherwise to the Georgia proceedings had proven unsuccessful.  Furthermore, at the time of the demand for $2,000,000.00 plus interest, AMIC was faced with the prospect of defending against the separate Bad Faith Lawsuit in connection with its handling of the *Meadows* and *Holloway* lawsuits. (Sullivan Affidavit, Exhibit G, at ¶ 12).

**F.   AMIC, SCOTTSDALE, AND DEFENSE COUNSEL MEET IN MONTGOMERY ON JULY 8, 2011.**

59.   On July 8, 2011, both corporate and outside counsel representing AMIC as well as David Sikes, Senior Claims Adjuster for AMIC, acknowledged that case law from both Alabama and Georgia was unfavorable to arguments seeking to apply statutory damages caps or governmental immunity to reduce the verdicts against the Town of Woodland and/or its driver. (Sullivan Affidavit, Exhibit G, at ¶ 13).

60.   Based on its review of the file, counsel evaluations, and the meeting on July 8, 2011, Scottsdale formed the opinion that it was in the best interests of AMIC and its insureds to accept the Underlying Plaintiffs' offer if the Plaintiffs refused to go any lower.  (Roesch Affidavit, Exhibit I, at ¶ 25).

61.   It did not appear to Scottsdale that the Bad Faith Lawsuit had any real merit.  It appeared unlikely that the Underlying Plaintiffs had standing to bring such a claim against AMIC.  Scottsdale was concerned, however, that if AMIC failed to settle the claims against its

17

insureds within its policy limits, with the risk that an excess verdict would be allowed to stand, it would open itself up to a meritorious bad faith claim from one or both of its insureds. (Roesch Affidavit, Exhibit I, at ¶ 26).

62.    In light of the foregoing, Scottsdale, through NAMICO, recommended on July 8, 2011, that AMIC settle the Underlying Litigation for $2,000,000.00, the policy limits under the AMIC policy. (Sullivan Affidavit, Exhibit G, at ¶ 14).

63.    When it recommended AMIC settle for its policy limits, NAMICO reminded AMIC of the "Investigation, Defense and Settlement" clause found at § I. C in the Scottsdale policy. (Sullivan Affidavit, Exhibit G, at ¶ 15).

64.    AMIC refused to pay $2,000,000.00 to settle the Underlying Litigation. (Sullivan Affidavit, Exhibit G, at ¶ 16).

65.    Scottsdale advised AMIC that AMIC's liability to the Underlying Plaintiffs was excluded from coverage under the Scottsdale Policy. (Sullivan Affidavit, Exhibit G, at ¶ 17).

66.    AMIC suggested that Scottsdale and AMIC seek to settle the Underlying Plaintiffs' claims for $1.8 million, splitting the settlement authority between them, with AMIC paying $1 million, and Scottsdale paying $800,000.00. (Wells depo., Exhibit J, at 56:5 - 57:1).

67.    Scottsdale agreed to split the settlement as AMIC proposed, but with the understanding that the parties would afterwards litigate the question of whether either party was entitled to reimbursement, which was acceptable to AMIC. (Wells depo., Exhibit J, at 56:21 - 57:1).

68.    Seeking to avoid the risk, uncertainty, and expense associated with litigation, Scottsdale offered to contribute toward the settlement of the Underlying Litigation with the express understanding that (1) the Scottsdale Policy excluded the proposed settlement and

18

Scottsdale disagreed with any contention that it was obliged to fund the settlement; (2) the Scottsdale Policy gave Scottsdale the right to seek reimbursement; and (3) Scottsdale would file a declaratory judgment action to recoup any monies advanced to facilitate the settlement. (Sullivan Affidavit, Exhibit G, at ¶ 18).

**H.    THE UNDERLYING LITIGATION SETTLES FOR $2 MILLION, WITH AMIC PAYING THE FIRST $200,000 AND SCOTTSDALE AND AMIC SPLITTING THE REMAINING $1.8 MILLION, WITH THE AGREEMENT THAT THEY WOULD AFTERWARDS LITIGATE THE ISSUE OF REIMBURSEMENT FOR THEIR RESPECTIVE CONTRIBUTIONS OF $900,000.00.**

69.    AMIC, AMIC's insureds, and Scottsdale ultimately reached a settlement agreement with the Underlying Plaintiffs in the amount of $2,000,000.00.    Copies of the Settlement Releases executed in connection with the Underlying Litigation are attached hereto as **Exhibit F.**

70.    Scottsdale and AMIC agreed between themselves to fund a settlement with the Underlying Plaintiffs in the amount of $2,000,000.00 under the following terms:  AMIC would fund the first $200,000.00 of the settlement, and the remaining $1,800,000.00 would be split evenly between Scottsdale and AMIC, with Scottsdale reserving the right to recoup its payment of $900,000.00 from AMIC.  (Sullivan Affidavit, Exhibit G, at ¶ 19).

71.    AMIC's counsel, Scott Speagle, sent an e-mail on July 12, 2011, acknowledging AMIC's understanding that Scottsdale intended to litigate its reimbursement right with respect to its payment of $900,000.00.  (Affidavit of Ed Roesch, attached hereto as **Exhibit H** at ¶ 5; Exhibit H-1 to Roesch Affidavit).

72.    Acting on behalf of Scottsdale, NAMICO sent a detailed letter to AMIC's counsel, Scott Speagle, on July 13, 2011, which outlined the terms of Scottsdale's payment:

•    The Claim has settled for $2 million.  Payment to be made on or about August 2, 2011.

19

- AMIC will pay the first $200,000 of the settlement, and AMIC and Scottsdale agree that this amount is the unquestioned obligation of AMIC, and not subject to further review or request for reimbursement.

- AMIC and Scottsdale will share equally in the payment of the balance of $1.8 million, $900,000 each.

- Scottsdale and AMIC each reserve any and all rights under the Scottsdale policy issued to AMIC.

- Scottsdale and AMIC each retain all rights to claim reimbursement from the other for all or any part of their $900,000 payment.

- Scottsdale will file suit in federal court in Alabama for the purposes of having the Court determine the obligations of Scottsdale and AMIC as to the appropriate share of the $1.8 million balance of the settlement.  Any reimbursement of either party for amounts paid will be determined in the federal court action.

Furthermore, in this same letter, Scottsdale advised AMIC, "[I]t is Scottsdale's position that the $2 million plus interest demanded by plaintiffs constitutes policy benefits under the AMIC policy, and therefore pursuant to Exclusion (I) are not covered by the Scottsdale policy." (**Exhibit G-3** to Sullivan Affidavit - Letter from Timothy F. Sullivan to Scott Speagle, dated July 13, 2011).

73.     AMIC formally agreed with Scottsdale on July 21, 2011, to settle the claims with AMIC contributing $1.1 million toward the settlement.  (Wells depo., Exhibit J, at 40:20 - 41:21; Plaintiff's Exhibit 30 to Wells depo.).

74.     Scottsdale provided $900,000.00 toward the settlement of the underlying litigation while expressly reserving its right to be reimbursed for these funds.  (Scottsdale's Complaint at ¶ 36; AMIC's Answer at ¶ 36).

75.     On July 27, 2011, AMIC consented to the settlement of the Underlying Litigation in writing.  A copy of AMIC's Consent to Settle is attached hereto as **Exhibit E**.

20

76.     On August 3, 2011, the Plaintiffs in the Holloway and Meadows Lawsuits executed settlements of their claims against AMIC and its insureds totaling $2,000,000.00 in exchange for complete releases.  **(Exhibit F)**.

77.     According to public statements made by AMIC, the accuracy of which President Steve Wells attested to, as of December 31, 2011 (the calendar year in which the Underlying Litigation was settled), AMIC had a net worth of $22,813,139.00.  (Exhibit 28 to Wells depo.; Wells depo., Exhibit J, at 19:21 - 21:5).

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  In order to prevail, the moving party has the burden of proving the absence of a genuine issue of material fact as to some essential element of the opposing party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## IV. ARGUMENT

This declaratory judgment action involves the construction of an insuring agreement delivered to an insured in Alabama, and, therefore, the substantive law of Alabama applies.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Pan Am. Fire & Cas. Co. v. Edwards Aircraft, Inc.*, 377 F. Supp. 205, 208 (N.D. Ala. 1974) (applying substantive law of Alabama to insurance coverage dispute); *Cherokee Ins. Co. v. Sanches*, 975 So. 2d 287, 293 (Ala. 2007) (law of state where an insurance policy is issued applies when interpreting that policy).

21

**A.    AMIC AGREED BOTH TO SPLIT THE COST OF SETTLING THE UNDERLYING LAWSUITS AND TO LITIGATE THE ISSUE OF WHETHER SCOTTSDALE WAS ENTITLED TO REIMBURSEMENT.**

At the outset of this case, AMIC filed a Motion for Judgment On The Pleadings (Doc. # 8), to which Scottsdale responded with a Cross Motion for Summary Judgment (Doc. # 14). AMIC premised its Motion on the argument that Scottsdale's demand for reimbursement was barred by Alabama's common law "voluntary payment doctrine." (*See* Doc. # 8).  In denying AMIC's Motion, this Court noted that Alabama recognizes an exception to the "voluntary payment doctrine," and furthermore concluded "that the exception, not the general rule, governs this case." (Doc. # 27, at 10).

The exception this Court referenced was from the case of *Smith v. Baldwin,* 187 So. 192 (Ala. 1939), in which the Alabama Supreme Court noted,

> [W]hen there is a controversy between persons and money is paid in protest of its correctness and with the assurance of a suit for the recovery of all or a part of it, and that situation is assented to, the amount is thereby left open to be adjudicated and it is not a voluntary payment.

*Id.* at 194.  This Court noted that, at the time of its Memorandum Opinion, "there [was] a dispute as to the existence of an agreement."  (Doc. # 27, at 10).   The parties have now had the opportunity to conduct discovery, and AMIC has admitted it agreed to litigation of Scottsdale's claim for reimbursement. Consider the following testimony from AMIC's President Stephen Wells:

> A.    … We ultimately get to, you know, you think you can get this done for 1.8.  Here's what we'll do.  We owe $200,000.  That's all we contractually owe.  We'll put up the first 200, and we'll split up to the 1.8.  And they go, we can't commit to that.  We've got to think about it over the weekend.
>
> So that's sort of the prevailing factors.  And I may have missed some issues, but that was sort of the prevailing issues that came -- or stick in my memory.

Q.     Okay.

A.     So Monday or Tuesday of the following week, we have a discussion, me, David [Sikes], Scott [Speagle], certainly Ed Roesch.  I don't remember Tim Sullivan being on the line, but certainly Ed Roesch.  And they go, okay, we'll do that, but we want to litigate afterwards on who owes what.  And I think Scott's response was, okay, well, go for it.

(Wells depo., Exhibit J, at 56:5 - 57:1).[8]

Apparently, the only basis upon which AMIC has disputed the existence of the agreement is that, at one time, there was a dispute as to precisely how the settlement was to be split.  This detail, however, is irrelevant at this point.  The parties ultimately agreed to split the settlement under the following terms: AMIC paid $1,100,000 and Scottsdale paid $900,000, with each reserving the right to litigate the reimbursement issue.  (Wells depo. at 40:20 - 41:21; Plaintiff's Exhibit 30 to Wells depo.; Sullivan Affidavit, Exhibit G, at ¶¶ 19-20).

**B.     AMIC'S LIABILITY TO THE UNDERLYING PLAINTIFFS WAS EXCLUDED UNDER THE SCOTTSDALE POLICY.**

Approximately three and a half months after securing judgments against AMIC's insureds totaling $3,990,000.00 for a covered motor vehicle accident, the Underlying Plaintiffs sued AMIC directly, alleging AMIC had no "debatable reason to refuse to settle the [Holloway and Meadows] claims within [its] $2,000,000.00 policy limits."  (Bad Faith Complaint, Exhibit G-1 at ¶ 30).  They claimed standing to sue based upon the following provision in the AMIC policy:

3.     **Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

a.     There has been full compliance with all the terms of the Coverage Form; and

---

[8] Scott Speagle was AMIC's counsel at the time.

> b. Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the final amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

(Bad Faith Complaint, Exhibit G-1, at ¶ 33; AMIC Policy, Exhibit B, at page 7, Section IV, Business Auto Conditions, A.3).

The following exclusion in the Scottsdale Policy excludes the claims against AMIC in the Underlying Litigation:

### III. EXCLUSIONS

**This policy does not apply to:**

**I.** any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation, whether real or alleged, assumed by or imposed upon an **INSURED** arising out of:

**1.** any policy or contract of insurance, reinsurance, insurance pool, suretyship, annuity or endowment; or

**2.** any written contract, unless the **INSURED** would have been liable in the absence of such contract;

(Scottsdale Policy, Exhibit A, Exclusion *I*, at page 12 of 23) (emphasis in original). The Underlying Litigation fits squarely within this provision. The Underlying Plaintiffs' "loss" at the hands of AMIC resulted from AMIC's refusal to pay a covered claim for damages its insureds were legally obligated to pay.

Exclusion *I* underscores the fact that the Scottsdale Policy was a *liability* policy, not a blanket indemnity agreement. The Scottsdale Policy provided coverage for "all **LOSS** resulting from a **CLAIM** … alleging an act, error or omission in the performance of **PROFESSIONAL SERVICES** … ." (Scottsdale Policy, Exhibit A, § I.A, at page 1 of 23).   AMIC's obligation to pay covered losses involving its insureds stems from its contract with its insured, the Town of Woodland -- a risk it underwrote and for which it charged premiums. The Scottsdale Policy, by

24

contrast, insured AMIC against the unforeseeable risk of errors and omissions occurring in the adjusting of claims resulting in extra contractual damages -- damages which were not at issue in the policy-limits settlement with the Underlying Plaintiffs. Exclusion *I* does nothing more than make clear the common sense proposition that AMIC's contractual obligations to AMIC's insureds remain with AMIC.

The Underlying Plaintiffs sued AMIC after it failed to pay its policy limits toward the judgments against the Town of Woodland and Billie Vernon Edmondson which greatly exceeded AMIC's limits. AMIC's settlement with the Underlying Plaintiffs, funded in part with $900,000 advanced under a reservation of rights by Scottsdale, equaled AMIC's $2,000,000.00 policy limit under its insuring agreement with the Town of Woodland. Because the Town of Woodland and Billie Vernon Edmondson were "legally obligated" to pay $3,990,000 to the Underlying Plaintiffs, AMIC's settlement with them fell entirely within its coverage obligations to its insureds.

AMIC is attempting to pass its contractual liability to the Town of Woodland onto its Errors & Omissions carrier. AMIC, however, cannot avoid the policy provisions precluding coverage for contractual obligations by simply pointing out that its refusal to satisfy the verdicts in the Underlying Litigation triggered a bad faith lawsuit. Allowing AMIC to avoid liability on this basis would simply reward dilatory and even illicit conduct. **Moreover, the fact that the Underlying Plaintiffs sued AMIC for bad faith does not alter the fact that the obligation AMIC failed to fulfill -- whether its failure was tortious or not -- was a contractual obligation.**

As the Court of Appeals for the First Circuit held in a conceptually similar case, "It makes no sense to permit a dereliction in duty to transform an uninsured liability into an insured

25

event." *Pacific Ins. Co. v. Eaton Vance Mgmt.,* 369 F.3d 584, 593 (1st Cir. 2004).   In *Eaton Vance,* the First Circuit held that even though Eaton Vance violated its statutory fiduciary duty under ERISA by failing to fund contractually-mandated pension obligations, that circumstance did not impose liability on its Errors and Omissions carrier to fund the benefit payments.   *Id.*   As the Court noted, "The insured's 'wrongful act did not result in their obligation to pay; its contract imposed on it the obligation to pay.'" (quoting *American Cas. Co. of Reading, Pa. v. Hotel & Rest. Employees and Bartenders Int'l Welfare Fund,* 942 P.2d 172, 176-77 (Nev. 1997)); *see also American Cas. Co., supra,* at 176, in which the Nevada Supreme Court noted that it is impermissible to "allow an insured to turn all of its legal liabilities into insured events by the intentional act of refusing to pay them."

As the court in *Executive Risk Indemnity, Inc. v. CIGNA Corporation*, 976 A.2d 1170 (Pa. Super. Ct. 2009) noted, allowing an Errors & Omissions insured to circumvent exclusions for its own contractual liability would be absurd.   *Id.* at 1173.   In *Executive Risk,* the Superior Court of Pennsylvania examined a "contract liability" exclusion in the context of a Professional Liability Policy which, as in this case, covered an insurance company.   CIGNA, the insured, was involved in an underlying suit alleging both breach of contract and RICO violations for the systematic underpayment of claims.   *Id.* at 1171.   CIGNA settled both the contract and RICO claims for $140,000,000 without an apportionment of how much of the consideration was for the breach of contract claim.   *Id.*   CIGNA's insurer, Executive Risk, obtained a declaratory judgment in its favor that it had no coverage obligation for either the contract or the RICO claims.   *Id.*

26

On appeal, the Superior Court of Pennsylvania analyzed the application of exclusionary language similar to Scottsdale's Exclusion *I*.[9]   *See id.* at 1173.  The Court in *Executive Risk* observed,

> Both exclusions 4 and 7 prevent coverage from attaching where the loss claimed is for an amount due under the contract.  This is entirely sensible.  A policy that applies to a breach of contract, in a situation such as present here, would invite the policy holder to abdicate its responsibilities under contract with a subscriber knowing that its insurer would pick up the bill.  **That would be an absurd interpretation of this, or virtually any, professional liability policy**.

*Id.* at 1173 (emphasis added).

The Superior Court disagreed with the trial court, however, on the question of whether the RICO claims were covered.  *Id.*  It concluded that the policy was meant to cover RICO claims.  *Id.* at 1174.  Noting that RICO claims provide for "treble the underlying damages," the Superior Court reversed and remanded the case so that the trial court could "determine the allocation between the covered RICO claims and excluded breach of contract claims."  *Id.* at 1174-75.

The Settlement in this case did not involve any "extra contractual" damages.  Unlike the *Executive Risk* case, there is no need for apportionment as there is nothing here to apportion. The entire settlement of the Underlying Litigation fell within AMIC's policy limits.  Indeed, the Underlying Plaintiffs' demand of July 5, 2011, was expressly a mere "renewal" of their $2

---

[9] The exclusions in *Executive Risk* read as follows:

4.      for liability of the Assured under contract or agreement, except liability of the Assured under contract or agreement, except liability which would have attached to the Assured even in the absence of such contract or agreement;

7.      for benefits, coverage, or amounts due or allegedly due, including any amount representing interest thereon, from the Assured as:

(a) an insurer or reinsurer, under any policy or contract or treaty of insurance, reinsurance, suretyship or endowment.

*Executive Risk*, 976 A.2d at 1173.

million demand filed before the trial of the Holloway and Meadows Lawsuits, a trial which involved a van accident covered by AMIC's policy with the Town of Woodland.  (Sullivan Affidavit, Exhibit G, at ¶ 10; Exhibit G-2 to Sullivan Affidavit; Exhibit C to Bad Faith Lawsuit, attached as Exhibit G-1 to Sullivan Affidavit; Sikes depo., Exhibit D, at 33:17 - 34:5).

The court's reasoning in *Executive Risk* was sound and should be followed here.  As it noted, "the insurance policy at issue was not designed to allow CIGNA to simply shift the burden of paying a breach of contract claim to Executive Risk."  *Executive Risk*, 976 A.2d at 1175 n.7.  Here, likewise, Scottsdale's policy with AMIC was not designed to supplant AMIC's policy with the Town of Woodland.  As the court in *Executive Risk* reasoned, to hold otherwise "would invite the policy holder to abdicate its responsibilities under contract with a subscriber knowing that its insurer would pick up the bill."  *Id.* at 1173.

In *Waste Corporation of America, Inc. v. Genesis Insurance Company*, 384 F. Supp. 2d 1349 (S.D. Fla. 2005), the United States District Court for the Southern District of Florida concluded that breach of contract damages were not within the coverage of a D&O policy, reasoning that to conclude otherwise would improperly shift the contract risks of the insured (i.e., AMIC in this case) to the insurer (here, Scottsdale):

> Allowing an insured to control whether it will be covered for its act of breaching a contract places the insured in the unique posture of voluntarily choosing to do some act for which he knows an insurance company will compensate him even if he chooses wrongly.  Who wouldn't buy insurance if he could decide whether to perform or decline to perform some act which would give him coverage for that action?  Such a premise eliminates all risk to a potential insured.  He could enter into a contract safe in the assumption that if he later decides to engage in an act which might be considered a breach, the insurance company will step forward to cover the consequences of his act if he was wrong; and if he was right, he still walks away with no consequence to himself.  **Such a practice is inimical to the entire concept of insurance.**

B DWM 1106250 v1
2920847-000001  03/29/2013

382 F. Supp. 2d at 1354-55 (emphasis added). [10]

The payment under the settlement with the Underlying Plaintiffs flowed from AMIC's contractual obligations to its insureds. The settlement amount was not a penny more than AMIC's policy limits, and satisfied a renewed demand the underlying Plaintiffs' counsel made before the underlying case went to trial. (Sullivan Affidavit, Exhibit G, at ¶ 10; Exhibit G-1 to Sullivan Affidavit). The Scottsdale Policy expressly excludes this very type of liability. If the Court were to invalidate or simply ignore this exclusion, as AMIC desires, AMIC could breach its policy obligations to its insureds at will, shifting to Scottsdale the burden of satisfying contract claims arising under policies underwritten by AMIC. Other courts around the country have recognized the morally hazardous nature of such a position. *See, e.g., Pacific Ins. Co. v. Eaton Vance Mgmt.,* 369 F.3d 584, 593 (1st Cir. 2004) ("It makes no sense to permit a dereliction in duty to transform an uninsured liability into an insured event."); *Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.,* 987 F.2d 415, 420 (7th Cir. 1993) (if breach of contract claims were covered by liability policies, "[w]e dare not imagine the creative legal theories treading just short of malpractice and frivolity that could seek to transform contract obligations into insured events."); *Waste Corp. of Am. v. Genesis Ins. Co.,* 382 F. Supp. 2d 1349, 1355 (S.D. Fla. 2005) ("There would be nothing to stop an insured from trying his hand and betting all his chips on a breach if he could be assured that the consequences of such an act had no impact on him."); *Executive Risk Indem., Inc. v. CIGNA Corp.,* 976 A.2d 1170, 1173 (Pa. Super. Ct. 2009) (applying a professional liability policy to cover an insured's responsibilities under its contracts with its customers "would be an absurd interpretation of … [a] professional

---

[10] The Court in *Waste Corporation* noted there was a question as to whether Texas law or Florida law applied, but it was unnecessary to address the issue because "the result would be the same under the law of either state … ." *Id.* at 1353.

29

liability policy."); *American Cas. Co. of Reading, Pa. v. Hotel & Rest. Employees and Bartenders Int'l Welfare Fund,* 942 P.2d 172, 176 (Nev. 1997) (an insured cannot turn "its legal liabilities into insured events by the intentional act of refusing to pay them.").

AMIC's liability to the Underlying Plaintiffs resulted from its contract obligations to its insureds, the Town of Woodland and Billie Vernon Edmondson.   The Scottsdale Policy specifically excluded an obligation to pay benefits owed under AMIC's contract with the Town of Woodland.   Accordingly, Scottsdale's Policy with AMIC provided no coverage for the settlement of the Underlying Litigation.

C.     **BECAUSE AMIC'S LIABILITY WAS EXCLUDED, SCOTTSDALE IS ENTITLED TO BE REIMBURSED.**

The Scottsdale Policy contains the following condition:

**P.  Reimbursement of Insurer**

In the event of any payment by the Insurer as **CLAIM EXPENSE** or **LOSS** with regard to a **CLAIM** as to which it is determined by judgment or settlement or decision of an arbitrator that the policy provided no coverage for such **CLAIM**, all **INSUREDS** shall be liable to reimburse the Insurer for **LOSS** or **CLAIM EXPENSE** payments.  In the event the Insurer files suit or any other legal action to obtain this reimbursement, all **INSUREDS** shall be liable to the payment of the reimbursement as well as the Insurer's legal fees and costs, including attorney fees incurred by the Insurer seeking the reimbursement of such **LOSS** or **CLAIM EXPENSES.**

(Scottsdale Policy, Exhibit A, § IV, P., at page 22 of 23) (emphasis in original).

Thus, as a condition of the Scottsdale Policy, Scottsdale has the right to be reimbursed for its provision of settlement proceeds if there is a determination that the Scottsdale Policy did not cover the settlement of the Underlying Litigation.   As Scottsdale has demonstrated, the settlement with the Underlying Plaintiffs was for $2 million, the exact amount of AMIC's policy insuring the Town of Woodland and Billie Vernon Edmondson.   AMIC's insureds had been found liable in an automobile accident covered by the AMIC policy in an amount well in excess

30

of AMIC's policy limits.  Scottsdale had no obligation to pay for AMIC's contractual risks and obligations.  The settlement was excluded per the terms of the Scottsdale Policy, and AMIC is therefore obligated to reimburse Scottsdale for the $900,000 payment it made to facilitate the settlement.

Furthermore, Scottsdale is entitled to pre- and, if applicable, post-judgment interest, and to be reimbursed for its attorneys' fees, costs, and expenses, in the event of a judgment in its favor.

**D.    AMIC'S COUNTERCLAIMS ARE DUE TO BE DISMISSED.**

**1.    Scottsdale Did Not Breach Its Contract With AMIC.**

AMIC's breach of contract claim is based on the following allegation:  "Scottsdale breached the [Scottsdale Policy] by forcing AMIC to pay $900,000.00 toward the settlement of [the *Barbara Jean Murphy, et al. v. Alabama Municipal Ins. Corp.,* CV-2011-0061]."  (AMIC's Counterclaim, Doc. #6 at ¶ 32).  This contention is without merit.

Scottsdale did not "force" AMIC to do anything.  AMIC chose to settle the Underlying Litigation.  All Scottsdale did was invoke the "Consent to Settle" provision, also known as the "Hammer Clause."  This provision reads:

**C. Investigation, Defense and Settlement**

The Insurer shall have the right and duty to defend any **CLAIM** first made against an **INSURED** and reported in writing by an **INSURED** to the Insurer during the Policy Period, or applicable Extended Reporting Period, alleging a Wrongful Act or acts, error or omissions in the performance of **PROFESSIONAL SERVICES** on or after the **PRIOR ACTS DATE**, and seeking Loss payable under the terms of this policy, even if such allegations are groundless, false or fraudulent.  The Insurer shall have the right to choose counsel to defend any **INSURED**.  The Insurer may make any investigation it deems necessary and reasonable, and may, with the written consent of the **INSURED**, make any settlement of any **CLAIM** it deems expedient.

B DWM 1106250 v1
2920847-000001  03/29/2013

If an **INSURED** shall refuse to consent to any settlement or compromise recommended by the Insurer and acceptable to the claimant and shall elect to further contest the **CLAIM**, then the Insurer's liability shall not exceed the amount for which the Insurer would have been liable for **LOSS** and **CLAIM EXPENSE** at the time the **CLAIM** could have been settled or compromised. Should the **INSURED** refuse consent for such recommended settlement, the Insurer may withdraw from the defense of the **CLAIM**.

If an **INSURED** shall refuse such consent and continue to contest the **CLAIM** and either prevail in litigation or pay **LOSS** in an amount less than the **LOSS** amount which the Insurer recommended, the Insurer shall, subject to the deductible and any applicable policy provision, reimburse the **INSURED** for **LOSS** and/or **CLAIM EXPENSES** incurred by the **INSURED** subsequent to the proposed settlement, even if the **CLAIM EXPENSE** to be reimbursed to **INSURED** exceeds the **CLAIM EXPENSE** at the time of the proposed settlement, but in no event shall the Insurer be obligated to reimburse the **INSURED** for more than the total amount of **CLAIM EXPENSE** and **LOSS** at the time of the proposed settlement recommended by the Insurer.

(Scottsdale Policy, Exhibit A, § I. C) (emphasis in original).

As set forth above in the quoted contract provision, Scottsdale had the right to settle a claim, **but only with the written consent of AMIC**. AMIC consented to the settlement with the Underlying Plaintiffs in writing more than once. (Exhibit E; Wells depo., Exhibit J, at 40:20 - 41:21; Plaintiff's Exhibit 30 to Wells depo.).

Based on AMIC's deposition testimony, Scottsdale anticipates that AMIC will attempt to argue that Scottsdale "forced" it to settle by invoking the Hammer Clause approximately six days before the *Meadows* and *Holloway* cases were set for oral argument before the Georgia Court of Appeals. **Under the Hammer Clause, however, AMIC had the option of continuing to litigate the Underlying Lawsuits.** The Scottsdale Policy gave AMIC the option of continuing to contest the claims made against it; had it prevailed or obtained a result more favorable than the settlement which Scottsdale recommended, AMIC could have pursued Scottsdale for the expenses it incurred, including attorneys' fees. (Scottsdale Policy, Exhibit A, § I. C, at pages 1-2 of 23). AMIC's arguments before the Georgia Court of Appeals had been well-briefed, and its

32

counsel, Scott Speagle, had been involved at every step of the way.  Had AMIC been willing to

accept the risk of failure, it could have continued to contest the claims.  Evidently, it did not have

confidence in its ability to obtain a better result than the Underlying Plaintiffs' policy-limits

settlement proposal.

> **a.**     **The Scottsdale Policy contained detailed provisions on how**
> **disagreements over whether to settle claims are to be handled, which were even-**
> **handed and mutually enforceable.**

Regardless of the various explanations AMIC may now conjure to explain away the fact

that it consented to the Settlement, it has failed to demonstrate that Scottsdale breached its

contract.

The premise behind the Hammer Clause is simple:  if the insured (AMIC) is presented

with an opportunity to settle a claim and the insurer (Scottsdale) recommends that the claim be

settled, the insured may refuse to accept the insurer's recommendation, but it does so at its peril.

AMIC had the option of refusing to settle the claim.  Had it done so, and later achieved a better

result, it could have made a claim against Scottsdale for the legal fees and expenses it incurred as

it continued to contest the claim.  (Scottsdale Policy, Exhibit A, § I. C at pages 1-2 of 23).

AMIC consented to a settlement agreement under which it paid $1.1 million up front to

resolve the Underlying Litigation.  (Exhibit E; Wells depo., Exhibit J, at 40:20 - 41:21;

Plaintiff's Exhibit 30 to Wells depo.).  It was AMIC, not Scottsdale, that introduced the idea of

the "split" proposal.  (Wells depo., Exhibit J, at 56:5 - 57:1).  Even under AMIC's initial

proposal, it was prepared to contribute $1 million up front toward the settlement.  (Wells depo.,

Exhibit J, at 56:5 - 57:1).  According to public statements made by AMIC, the accuracy of which

President Steve Wells attested to, as of December 31, 2011 (the calendar year in which the

33

Underlying Litigation was settled), AMIC had a net worth of $22,813,139.00.   (Exhibit 28 to Wells depo.; Wells depo., Exhibit J, at 19-21).   Thus, AMIC had the financial capability of continuing to fund a vigorous defense of the claims against it and later pursuing Scottsdale for reimbursement.

> **b.**   **AMIC's explanation for its decision to settle.**

To hear the testimony of AMIC's President, Steve Wells, at the time of the decision to settle the claims, AMIC's position in the Underlying Litigation was strong.   If one is to believe Mr. Wells, it makes AMIC's decision to settle the Underlying Litigation bewildering.   According to Mr. Wells, at the time the settlement split between Scottsdale and AMIC was proposed, AMIC was **certain** its exposure in the *Meadows* and *Holloway* cases was capped at $200,000:

> Q.     When, on July 8th, AMIC put forth a proposal under which it might have been paying up to a million dollars -- $200,000 plus $800,000 -- toward an overall settlement of 1.8 million, did AMIC believe at that point it had some exposure beyond the $200,000 of the damages cap?
>
> A.     No.
>
> Q.     Did AMIC believe at that point that the damages caps were a sure thing as it relates to the Meadows and Holloway claims?
>
> A.     As sure as you can have in this legal system.

(Wells depo., Exhibit J, at 99:6 - 99:18).

If AMIC was certain, holding as sure a bet "as you can have in this legal system," that its exposure was capped at $200,000, why settle the claims?   Why not continue the fight, knowing that once the litigation was successfully concluded, it could demand reimbursement from Scottsdale for its litigation expenses?

The only **logical** explanation for AMIC's behavior, i.e., settling the Underlying Litigation for $2 million and agreeing to litigate the issue of whether Scottsdale was entitled to be

B DWM 1106250 v1
2920847-000001  03/29/2013

reimbursed for its contribution toward that amount, is that AMIC believed its exposure in the Underlying Litigation greatly exceeded $200,000. Within this proceeding, AMIC has conjured up a few illogical explanations for its behavior. As Scottsdale has demonstrated, AMIC's explanations for its behavior have no bearing on the narrow question of whether Scottsdale breached its contract. However, because Scottsdale anticipates AMIC will attempt to justify its decision to settle as having been forced, Scottsdale will address AMIC's allegations.

AMIC's certainty that its liability to the Underlying Plaintiffs was capped at $200,000 is belied by its decision to settle the Underlying Litigation for a sum many times that amount. In fact, it was AMIC, not Scottsdale, that first proposed settling the Underlying Litigation for $1.8 million, with AMIC providing $1 million of that amount.

The feeble excuse AMIC offered in its depositions for consenting to the settlement was that the oral argument of the appeals in the Underlying Litigation was imminent, and it did not have confidence in its counsel, Kathryn Whitlock:

> Q.    Any reason if Scottsdale had chosen to pull the defense AMIC couldn't just take over the obligation of paying [Ms. Whitlock's] fees until this was sorted out?
>
> A.    Well, you're a lawyer. If you were there and your supposed defense lawyer who is protecting you does nothing and shakes her head every time the people that's paying her bills says something, I don't believe you'd have used her. So it's an option, but it's an extremely bad option. Again, we're six days away from the appeal. I believe it was six days, plus or minus. Bad option. Again, they timed it beautifully to protect their interest and to stick it to us.

(Wells depo., Exhibit J, at 81:5-19). AMIC's supposed crisis of confidence in its defense counsel overlooks two crucial points: (1) the briefs which were to be argued at oral argument had been completed months earlier with AMIC's input and approval; Ms. Whitlock had made every argument important to AMIC, and there is not one shred of evidence that AMIC disapproved of her work on the appeal; and (2) AMIC was also represented in the appeal by

35

attorney Scott Speagle, who is representing AMIC in this proceeding.  (Roesch Affidavit, Exhibit I, at ¶¶ 19-20, 22).  Furthermore, AMIC supposedly was of the opinion that the proceedings in Georgia did not matter, since any judgment entered against AMIC's insureds would, according to AMIC, have to be collected in Alabama and would therefore be capped at $200,000.

Every argument in the Underlying Litigation important to AMIC had been briefed.  There is no reason AMIC could not have continued to contest the claims against it and its insureds beyond July 14, 2011.  It simply made a business decision not to.

      c.    **AMIC can prove neither nonperformance on the part of Scottsdale nor damages resulting from any supposed breach of contract.**

Under Alabama law, in order to prevail on its breach of contract claim, AMIC must prove (1) the existence of a valid contract, (2) its performance under the contract, (3) Scottsdale's nonperformance under the contract, and (4) resulting damages.  *See State Farm Fire and Cas. Co. v. Williams*, 926 So. 2d 1008, 1012 (Ala. 2005).  AMIC cannot prove elements (3) and (4) of this claim.  Scottsdale had no duty to pay any amount of money on behalf of AMIC.

Scottsdale provided AMIC with a defense not only in the *Murphy* bad faith suit, but also in the appeal of the *Meadows* and *Holloway* claims.  Scottsdale simply refused to pay indemnity benefits (other than its conditional contribution for which it now seeks reimbursement) because the claim was excluded as a contractual liability.  (Scottsdale Policy, Exhibit A, Exclusion *I*, at page 12 of 23).  As Scottsdale demonstrated in the preceding section of this brief, its application of this exclusion was correct.

Furthermore, even if AMIC could prove that Scottsdale failed to perform under its contract, which it cannot, AMIC cannot prove the requisite element of damages to support a breach of contract claim.  *See State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 317 (Ala.

1999) (identifying damages as an element of a breach of contract claim).  AMIC was required under its contract with the Town of Woodland to pay its policy limits, at a minimum, to satisfy the excess verdict entered against its insureds on a covered claim.   AMIC cannot explain how the payment of damages AMIC was obligated to pay on behalf of the Town of Woodland and Billie Vernon Edmondson could ever qualify as "damages" in a breach of contract claim against Scottsdale.

AMIC's position on the breach of contract claim is nothing less than this:  even though AMIC's insureds had a verdict entered against them on a covered claim exceeding AMIC's $2,000,000.00 policy limit, AMIC should not have to pay more than $200,000 because it delayed satisfaction of the judgment until it got sued for bad faith.  As Scottsdale has already demonstrated, this position is not tenable.  Indeed, other courts have described this same argument as "mak[ing] no sense," *see Pacific Insurance Company v. Eaton Vance Management*, 369 F.3d 584, 593 (1st Cir. 2004) and "absurd," *see Executive Risk Indemnity, Inc. v. CIGNA Corporation*, 976 A.2d 1170, 1173 (Pa. Super. Ct. 2009).

As Scottsdale as already demonstrated, AMIC's liability to the Underlying Plaintiffs arose entirely from their claims against AMIC's insureds for injuries sustained in a covered automobile accident.  Their demand was for AMIC's policy limits of $2,000,000.00.  The Scottsdale Policy excluded from coverage AMIC's contractual obligations to its insureds.  Therefore, Scottsdale had not obligation to pay the Underlying Plaintiffs' indemnity demand.

    2.    **Scottsdale Is Not Liable To AMIC For "Normal" Bad Faith.**

        a.    **Elements of Bad Faith Under Alabama Law.**

Under Alabama law, the plaintiff in a bad faith refusal-to-pay case has the burden of proving the following:

(a) an insurance contract between the parties and a breach thereof by the
defendant;

(b) an intentional refusal to pay the insured's claim;

(c) the absence of any reasonably legitimate or arguable reason for that refusal
(the absence of a debatable reason);

(d) the insurer's actual knowledge of the absence of any legitimate or arguable
reason;

(e) if the intentional failure to determine the existence of a lawful basis is relied
upon, the plaintiff must prove the insurer's intentional failure to determine
whether there is a legitimate or arguable reason to refuse to pay the claim.

In short, plaintiff must go beyond a mere showing of nonpayment and prove a *bad
faith* nonpayment, a nonpayment without any reasonable ground for dispute.  Or,
stated differently, the plaintiff must show that the insurance company had no legal
or factual defense to the insurance claim.

*State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 304 (Ala. 1999) (internal quotations
omitted) (italics emphasis in original).  "Bad faith, then, is not simply bad judgment or
negligence.  It imports a dishonest purpose and means a breach of a known duty, i.e., good faith
and fair dealing, through some motive of self-interest or ill will."  *Id.* at 303-04 (internal
quotations omitted).  Moreover, in order for an insured to recover for bad faith, "an insurer must
have acted with an intent to injure."  *Coleman v. Gulf Life Ins. Co.*, 514 So. 2d 944, 946 (Ala.
1987) (quoting *Blue Cross & Blue Shield v. Granger*, 461 So. 2d 1320, 1327 (Ala. 1984)).

AMIC's bad faith claim fails in this case because, as demonstrated above, there has been
no breach of contract on the part of Scottsdale.  The bad faith claims are due to be dismissed on
this basis alone.  Even apart from the threshold requisite showing of a breach of contract,
however, the bad faith claims in this case are fatally flawed.  AMIC cannot show the absence of
a debatable reason for Scottsdale having handled the claim the way it did.  **On the contrary,
Scottsdale's handling of the claim was not only reasonable, AMIC voluntarily agreed to it.**

38

Bad faith claims are meant to be difficult to prove under Alabama law. *See Shelter Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1154 (Ala. 2001) (bad faith reserved for "extreme cases"). AMIC cannot demonstrate an intent to injure on the part of Scottsdale. Scottsdale did nothing more nor less than recommend that AMIC settle within its policy limits a claim for which AMIC's insureds, and possibly AMIC itself, faced excess exposure -- exposure of nearly $6,000,000.00, before taking into account any bad faith allegations. Scottsdale is entitled to a summary judgment on AMIC's bad faith claim.

  **b.**  **Scottsdale Had A Reasonable Basis For Its Manner of Handling AMIC's Claim.**

AMIC has the burden of proving that Scottsdale refused to pay legitimate claims without any reasonably legitimate or arguable reason for that refusal. *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 304 (Ala. 1999). It cannot meet that burden. As demonstrated above, Scottsdale had no obligation under its contract to pay anything on behalf of AMIC as the claims against AMIC were excluded under the Scottsdale Policy.

"When a claim is fairly debatable, the insurer is entitled to debate it … ." *Slade*, 747 So. 2d at 303 (internal quotations omitted) (emphasis supplied). AMIC, then, must prove that Scottsdale "had no legal or factual defense to the insurance claim." *National Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1361 (Ala. 1982) (internal quotations omitted). Because (1) AMIC's liability to the Underlying Plaintiffs arose from a claim covered by its policy with the Town of Woodland, (2) the settlement was a global settlement within AMIC's policy limits, and (3) the Scottsdale Policy was never intended to supplant AMIC's policy with the Town of Woodland, Scottsdale was within its rights to refuse to pay the claim against AMIC. Thus, AMIC's bad faith claim fails as a matter of law.

39

Furthermore, there is no evidence that Scottsdale has acted with an intent to injure. Scottsdale and AMIC agreed to the settlement funding proposal that effected the settlement with the Underlying Plaintiffs.  In order for an insured to recover for bad faith, "an insurer must have acted with an intent to injure."  *Coleman v. Gulf Life Ins. Co.*, 514 So. 2d 944, 946 (Ala. 1987) (quoting *Blue Cross & Blue Shield v. Granger*, 461 So. 2d 1320, 1327 (Ala. 1984)).  Here, the undisputed evidence is that while Scottsdale may not have performed as AMIC desired, **it performed as AMIC agreed.**

There is no evidence that Scottsdale handled AMIC's claim with any malice or ill will. Should the insured's evidence fail "to eliminate any arguable reason … any fairly debatable reason on a matter of fact or a matter of law, [the insured] cannot recover under the tort of 'bad faith' … ."  *National Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 185 (Ala. 1982).

An insured's burden of proof in a bad faith case "is a heavy burden."  *National Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).  AMIC has not met that burden in this case.  Scottsdale is entitled to a summary judgment in its favor as to the AMIC's "normal" bad faith claim.

### 3.   Scottsdale Is Not Liable To AMIC For "Abnormal" Bad Faith.

In *State Farm Fire & Casualty Company v. Slade*, 747 So.2d 293 (Ala. 1999), the Alabama Supreme Court thoroughly analyzed the tort of bad faith and concluded that a threshold requirement of any bad faith claim is that the insured must be entitled to benefits under the policy.  *See id.* at 317.  The plaintiffs in Slade attempted to argue that the tort of bad faith provides a cause of action independent of the insurance contract.  *Id.*  The Alabama Supreme Court rejected this argument, observing that although the Alabama Supreme Court has recognized abnormal cases of bad faith, "that recognition did not eliminate the requirement that

the plaintiff prove an entitlement to benefits under the insurance policy." *Id*. at 318 (emphasis

supplied).  Writing for the Court, Justice Lyons noted that by rejecting the Slades' argument that

bad faith liability was independent of contractual liability,

> [W]e make it clear that in order to recover under a theory of an abnormal case of
> bad-faith failure to investigate an insurance claim, the insured must show (1) that
> the insurer failed to properly investigate the claim or to subject the results of the
> investigation to a cognitive evaluation and review **and** (2) that the insurer
> breached the contract for insurance coverage with the insured when it refused to
> pay the insured's claim.

*Slade*, 747 So. 2d at 318 (emphasis supplied).  AMIC can prove neither of these two elements.

As Scottsdale has already demonstrated, there was no breach.  Thus, AMIC's bad faith

claim fails as a matter of law.

Moreover, abnormal bad faith cases require "proof the insurer had recklessly or

intentionally failed to properly investigate a claim or to subject the results of its investigation to a

cognitive evaluation."  *Jones v. Alfa Mut. Ins. Co*., 1 So. 3d 23, 32 (Ala. 2008) (internal

quotations omitted) (emphasis added).  A careful reading of the *Jones* decision makes it clear

that "abnormal" bad faith cases, like normal bad faith cases, require more than proof of a

mistake:  "'Bad faith … is not simply bad judgment or negligence.  It imports a dishonest

purpose and means breach of a known duty, i.e., good faith and fair dealing, through some

motive of self-interest or ill will.'"  *Jones*, 1 So. 3d at 32 (quoting *State Farm Fire & Cas. Co. v.

Slade*, 747 So. 2d 293, 303-04 (Ala. 1999)).

In this case, Scottsdale, through its administrator, reviewed hundreds of pages of

material, including legal research, pleadings, briefings, and evaluations from and of the

Underlying Litigation.  (Roesch Affidavit, Exhibit I, at ¶ 10).  NAMICO, acting on behalf of

Scottsdale, evaluated the various claims pending between and among the Underlying Plaintiffs,

AMIC and AMIC's insureds before making decisions as to the handling of settlement negotiations and authority.  (Sullivan Affidavit, Exhibit G, at ¶ 9).

The claims file provided by AMIC revealed two crucial points:  there was significant doubt as to whether AMIC would ever be able to reduce the verdicts against its insureds in the *Meadows* and *Holloway* Lawsuits to anything below $2 million, and AMIC's insureds were facing exposure well beyond their policy limits.  (Roesch Affidavit, Exhibit I, at ¶¶ 14-18, 23). These two points compel a third conclusion:  **AMIC had been wrong in its evaluation of the** ***Meadows*** **and** ***Holloway*** **cases at every step along the way.**

Scottsdale's recommendation that AMIC settle the roughly $6 million liability facing its insureds was reasonable, to say the least.  AMIC's once-held ideas that it would be able to reduce the verdicts against its insureds to $200,000 bordered on delusional.  AMIC obviously did not have much confidence in its position because it opted to settle the claims when it could have easily continued to fight them and made a claim for reimbursement from Scottsdale if it had been vindicated.

Scottsdale properly evaluated the claim presented to it and concluded that the best course of action for AMIC was for it to settle the claims.  AMIC's claim for abnormal bad faith is due to be dismissed.

B DWM 1106250 v1
2920847-000001  03/29/2013

# V.  CONCLUSION

WHEREFORE, based on the foregoing, the Plaintiff, SCOTTSDALE INSURANCE COMPANY, respectfully requests the Court to enter an Order granting its Motion for Summary Judgment.  Scottsdale requests the Court to enter an Order dismissing AMIC's Counterclaims, and awarding Scottsdale the relief requested in its Complaint, including reimbursement of $900,000, plus interest, costs, and attorney's fees and to such other relief to which it may be entitled.

Respectfully submitted this 29th day of March, 2013.


s/ David W. McDowell
DAVID W. McDOWELL (ASB-7713-L69D)
STEPHEN K. PUDNER (ASB-4702-E57P)
Attorneys for Scottsdale Insurance Company

OF COUNSEL:

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Wells Fargo Tower, Suite 1600
420 Twentieth Street North
Birmingham, Alabama 35203
Telephone:     (205) 328-0480
Facsimile:     (205) 322-8007
dmcdowell@bakerdonelson.com

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of March, 2013, the foregoing has been served upon the following counsel of record by U.S. Mail or by electronic mail via the Court's electronic filing system which will send notification of such filing to the following:

Scott M. Speagle, Esq.
Webster, Henry, Lyons, White, Bradwell, & Black P.C.
105 Tallapoosa Street, Suite 101
Montgomery, Alabama 36104

s/ David W. McDowell
Of Counsel

44