## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
## NORTHERN DIVISION

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, a corporation, | ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:11-CV-668-MEF |
| | ) | |
| ALABAMA MUNICIPAL INSURANCE CORPORATION, a corporation; | ) ) | |
| | ) | |
| **Defendant.** | ) | |

## AMIC'S OPPOSITION TO SCOTTSDALE'S
## MOTION FOR SUMMARY JUDGMENT

Comes now Alabama Municipal Insurance Corporation (AMIC) and, pursuant to *Federal Rules of Civil Procedure* 56 opposes Scottsdale's Motion for Summary Judgment (Doc. 39-40).  In support of said Opposition, AMIC submits this brief and evidentiary submission:

- AMIC adopts and incorporates its Narrative Statement of Undisputed Facts and Exhibits from its Motion for Summary Judgment (Doc. 31-32);

- AMIC incorporates the following exhibits, which have previously been filed with this Court: Doc. 39-11 – Deposition of Tim Sullivan; Doc. 39-4 Deposition of David Sikes; Doc. 37, Ex. 9 – Claims Diary of Scottsdale for the Holloway and Meadows suit; Doc. 34 – Deposition of Ed Roesch; Doc. 36, Ex. 6 – Deposition of Danny Ransom; Doc 39-10 – Deposition of Steve Wells.

- AMIC introduces the following exhibits:

- Ex. 1 – Kate Whitlock's bills;

- Ex. 2 – Scottsdale's responses to AMIC's interrogatories

- Ex. 3 – Litigation Plan dated June 26, 2011;

- Ex. 4 – Letter from Whitlock dated July 5, 2011;

- Ex. 5 – Email from Sullivan to Scottsdale dated July 12, 2011;

- Ex. 6– AMIC's answers to Scottsdale's second interrogatories;

- Ex. 7– Large loss report to Scottsdale;

- Ex. 8 –AMIC's answers to Scottsdale's first interrogatories;

- Ex. 9 – Order and claims in Randolph County, Alabama.

## I.   SCOTTSDALE'S MOTION FOR SUMMARY JUDGMENT.

This suit is incredibly simple: Is there any basis in law or fact that allowed Scottsdale to invoke Exclusion "I", deny any obligation to pay the $2 million dollar settlement, and demand AMIC reimburse it for money it voluntarily paid? Scottsdale's Motion for Summary Judgment answers this question with a resounding "no." Scottsdale's brief is a jury speech rather than argument that, as a matter of law, Exclusion "I" ought to be enforced.

Scottsdale argued that AMIC's position was untenable and "delusion." Yet it failed to address how this Court, as a matter of law, can enforce Exclusion "I". Scottsdale argued that AMIC consented to settlement and was not forced into it.

Yet, it failed to address how consenting to settlement (even if true) made Exclusion "I" applicable.  Scottsdale argued that AMIC had an attorney.  Yet again, it failed to explain how an attorney made Exclusion "I" enforceable.

Instead, what Scottsdale has shown this Court (see Doc. 40 at 23-30, which absolutely proves Scottsdale's policy was illusory) is that none of AMIC's causes of action can be dismissed.  Rather, AMIC is due summary judgment in its favor on its breach of contract claim and Scottsdale's declaratory judgment claim and summary judgment is due to be denied to Scottsdale on all grounds.

## II.   NARRATIVE SUMMARY OF DISPUTED AND UNDISPUTED FACTS.

As is shown below, AMIC disputes and presents substantial, material evidence to the contrary to the following paragraphs in Scottsdale's Motion for Summary Judgment: 12, 22, 23, 30, 31, 32, 33, 34, 35, 39, 40, 41, 42, 44, 45, 51, 52, 53, 55, 57, 58, 59, 60, 61, 62, 63, 64, 65, 72, 73, 75.  Adopting its Narrative Statement in its Motion for Summary Judgment, AMIC presents the following undisputed facts:

### A.   The Holloway and Meadows Claim is Scottsdale's Claim.

Scottsdale policy provision IV. B-3 requires AMIC to cooperate with Scottsdale's defense. (Doc. 11-1). AMIC's President Steve Wells testified that once NAMICO received the Holloway and Meadows claim it was their claim and they "instructed" AMIC. (Doc. 39-10 at 45 1.16-46 1.3). NAMICO's point of

contact with AMIC, Danny Ransom, explained that while AMIC wanted to choose its own counsel, it had to acquiesce to NAMICO's hiring of Kate Whitlock (Doc. 36, Ex. 6 at 28 l. 14-16, 18-20; 36 l.10-12). As testified by Mr. Ransom, NAMICO controlled the firing of Balch & Bingham, AMIC's selected counsel for its insureds (*Id*. at 31 l.19-32.110; Sikes deposition, Doc. 39-4 at 70 l.17-21).

NAMICO admits as much when its litigation examiner, Ed Roesch, testified that he wanted and pursued AMIC's change of trial counsel. (Doc. 34 at 118 l.22-119 l.1; 135 l.8-12). Although NAMICO has taken the position that AMIC consented to Ms. Whitlock, Mr. Roesch admitted that he only sought consent as a "courtesy" because it was a "large enough case". (*Id*. at 56 l.16-23). Both Mr. Roesch's claims notes (Doc. 37, ex 9) and Ms. Whitlock's bills show that Ms. Whitlock was hired and began work on the file prior to any contact with Mr. Ransom. (Legal bills of Whitlock attached as Exhibit One.)

Once NAMICO had the case, it immediately took over all aspects of the Holloway and Meadows claim in Georgia. Mr. Roesch gave permission to its assigned counsel to contact Scott Speagle. (Doc. 37, Ex. 9, dated 2/22/11 SIC628). NAMICO directed Ms. Whitlock to defend AMIC in the appeal. (Roesch deposition, Doc. 34 at 123 l.15-19). As litigation examiner, Mr. Roesch reviewed the appeal activities. (*Id*. at 129 l.10-16). President of NAMICO, Tim Sullivan, critiqued and edited Ms. Whitlock's appeal briefs that were being submitted to the

Georgia Court of Appeals on AMIC's behalf. (Claims notes Doc. 37, Ex. 9 on 4/20/11, SIC640). Mr. Roesch and Ms. Whitlock discussed and approved how Ms. Whitlock and AMIC's insureds' counsel were going to divide their time on oral arguments. (*Id*. on 6/17/11, SIC648). Ms. Whitlock's time spent on appeal activities were charged against the Scottsdale policy and eroded AMIC's deductible. (Ex. 1).

### B.     Scottsdale Performs No Investigation.

David Sikes, litigation adjuster for AMIC on the Holloway and Meadows tort claim, and Ed Roesch, litigation adjuster for NAMICO on the bad faith claim, performed many of the same tasks and have the same goals in adjusting a claim. (Roesch deposition, Doc. 34 at 11 l.5-9; 13 l.6-9; Sikes deposition, Doc. 39-4 at 17 l.1-21 l.18). Mr. Roesch admitted that he wanted to get the "best outcome you can" for a policyholder. (Roesch deposition at 11 l.16-19; p.36).

Mr. Sikes testified that AMIC is non-profit company, owned by the municipalities of the State of Alabama and that AMIC was and is trusted to protect the public coffers. (Sikes deposition at 54 l.20-22; 62 l.1-14). At the very beginning of the Holloway and Meadows tort claim, Mr. Sikes testified that he met with AMIC's insureds to discuss the claims and events. (*Id*. at 63 l.15-64 l.2).

Mr. Roesch testified that Danny Ransom was his point of contact at AMIC. (Roesch deposition at 25 l.18-19; 33 l.10-11). Mr. Roesch candidly admitted,

however, that between January 27, 2011 (NAMICO's receipt of the bad faith claim) and July 8th, 2011 (when NAMICO informally asserted the "hammer clause"), he never spoke to David Sikes about the handling of the claim. (*Id*. at 45 l.5-8). Mr. Roesch attempted to excuse this failure by testifying that Mr. Sikes could not provide him with any useful information, that he may be a witness, and that he (Roesch) was communicating with Danny Ransom. (*Id*. at 45 l.15-21; 46 l.6-10). Indeed, Mr. Roesch testified that he had a number of "substantive" conversations with Danny Ransom. (*Id*. at 43 l.16-20). Mr. Roesch testified any conversations he had with Mr. Ransom would be found in his claims notes. (*Id*. 44 l.7-18).

In fact, when AMIC requested from Scottsdale interrogatory answers on conversations with AMIC, Scottsdale opted to produce the claims notes instead. (Scottsdale's answers to AMIC's interrogatories attached as Exhibit 2). The claims notes completely contradict Mr. Roesch's testimony regarding his supposed "substantive" conversation with Mr. Ransom: from the start of the claim to July 8, 2011, Mr. Roesch left Mr. Ransom a voicemail regarding choice of counsel on January 31, 2011; spoke with him about the same topic on February 3, 2011; and sent Mr. Ransom an email regarding the Reservation of Rights and any updates to which Mr. Ransom acknowledged receipt. (Claims Notes, Doc. 37, Ex. 9 at SIC 619, 620, 637). Other than the notation regarding the Reservation of Rights sent on

April 8, 2011, there are no communications between NAMICO and AMIC about coverage, policy language, or facts of either lawsuit until July 8, 2011. (Doc. 37, Ex. 9). Indeed, Mr. Ransom testified that all he did was make sure NAMICO, not Ms. Whitlock, had all file materials it requested. (Ransom deposition, Doc. 36, Ex. 6 at 38 l.17-21; 50 l.21-51 l.4). Mr. Ransom did not even know of NAMICO's plan for appeal. (*Id*. at 30 l.17-31 l.4).

It is undisputed that Mr. Sullivan never spoke to Steven Wells, AMIC's president, about the handling of a claim that NAMICO understood had significant value, until July 8, 2011. (Sullivan deposition, Doc. 39-11 at 44 l.22-45 l.2).  The first time anyone with NAMICO even spoke with David Sikes was on July 8, 2011. (Sikes deposition, Doc. 39-4 at 88 l.20-21). Mr. Roesch admitted that at no point between the issuance of that Reservation of Rights and the imposition of "hammer clause" did NAMICO ever update AMIC on coverage. (Roesch deposition, Doc. 34 at 144 l.12-17).

Mr. Roesch testified that while the suit venue was a variable to consider, he did not investigate Judge Lee (the Troup County, GA trial judge in the underlying and bad faith actions), even though NAMICO was informed about him and, nine months after settlement, he had to retire amid corruption charges. (Roesch deposition Doc. 34 at 51 l.7-55 l.10; Wells depo, Doc. 39-10, at 66 l.10-67 l.17).

Mr. Roesch testified that as an adjuster, he would typically ask defense

counsel about and review all applicable law. (Roesch deposition, Doc. 34 at 12 l.3-8). Mr. Roesch testified that if a legal issue were "gray" he would review cases and may hire independent counsel to review. (*Id*. at 71 l.4-22). But in this case, he did none of those things (*Id*.).

NAMICO never contacted the Town of Woodland, its counsel John Tinney, Billie Vernon Edmonson, or plaintiff's counsel. (Ex. 2; Roesch deposition, Doc. 34 at 74 l.16-20; 76 l.22-77 l.19; 78 l.5-8). NAMICO never looked at Alabama law regarding punitive damages against a municipality or Georgia law on malicious litigation, all issues that were brought to NAMICO's attention (Roesch deposition, Doc. 34 at 86 l.6-11; 87 l.16-88 l.10).

Finally, although Mr. Roesch testified that Alabama's "tort caps" were "gospel" to AMIC, he never sought an opinion from AMIC's general counsel, nor did he ever seek an independent opinion from an Alabama attorney, on the "tort caps." (Roesch deposition, Doc. 34 at 90 l.21-91 l.10; 93 l.2-4; 151 l.23-152 l.4).

### C.    AMIC is Delusional?

Despite its understanding of the incredible significance of the tort caps and its complete failure to even research the issue, NAMICO claimed that it had "big questions" on whether Alabama's "tort caps" would apply. (Roesch deposition, Doc. 34 at 96 l.20-97 l.1). In its Narrative Summary, NAMICO purports to rely upon Ms. Whitlock's "Litigation Plan" (attached as Exhibit Three) and Ms.

Whitlock's July 5, 2011 letter (attached as Exhibit Four) as its legal basis for its actions. However, the most basic examination shows that these documents contain no Alabama law regarding the caps at all (Exhibit 3 & 4), and Mr. Roesch never realized it. (Roesch deposition, Doc. 34 at 99 l.1-15). Likewise, after the July 8, 2011, meeting, Mr. Roesch received a memorandum on the subject from Scott Speagle, but he did not even remember receiving it and testified he did not ask anyone else to review. (*Id*. at 99 l.20-100 l.15).

While Mr. Sullivan commended this memo "for its thoroughness" he dismissed it as "not reflecting an awareness of the reality of the situation." (Sullivan email dated 7/12/11 attached as Exhibit Five.) The reality, of course, was completely opposite: it was AMIC who understood the tort caps significantly better than NAMICO, as admitted by Mr. Sullivan:

> Q:   Okay. Did you happen to review or do you recall as we sit here today that in AMIC's responses or answers to the second set of interrogatories that they paid a total of four claims above the tort caps?
> A:   I don't recall that.
> Q:   Wouldn't that have been something you would have wanted to know at the July 8th meeting, that they had paid four claims over thousands upon thousands of claims over its lifetime about the tort cap?
> A:   I would have expected in the course of the discussion, if that were the case, that Alabama Municipal would have related that information to us.
> Q:   Well, you're the insurer, correct?
> A:   We are indeed the insurer.
> Q:   And you have the duty to defend?
> A:   Correct.
> Q:   And you have the duty to investigate?
> A:   Correct.

> Q:     Who has more experience with the tort caps, NAMICO or AMIC?
> A:     Alabama Municipal.
> Q:     Who has more experience with the operation of the tort caps under Alabama law; AMIC or NAMICO?
> A:     Alabama Municipal.

(Sullivan deposition, Doc. 39-11 at 39 l.19-40 l.23). Mr. Sullivan admitted, as he must, he knew nothing about AMIC and its experience with the "tort caps" (*Id*. at 38 l.17-21). Further although NAMICO relied on Ms. Whitlock's litigation plan and July 5, 2011, letter, Mr. Sullivan admitted he did not even know whether Kate Whitlock, NAMICO's retained counsel, was licensed in Alabama. (*Id*. at 41).

Likewise, Mr. Roesch never bothered to ask AMIC for a listing of cases – tried or settled – where AMIC paid over the "tort cap" or had a claim outside of Alabama. (Roesch depo, Doc. 34 at 154 l.4-16). As Mr. Sikes testified, AMIC had previously settled an auto case with similar injuries to the claimant for the cap amount in Mississippi. (Sikes deposition, Doc. 39-4 at 54 l.1-12). During his deposition Mr. Sikes testified that NAMICO's counsel asked more about the claim than Mr. Roesch ever did. (*Id*. at 138 l.18 -139 l.21). Indeed, during discovery, NAMIC asked and AMIC provided the exhausting list of all five (5) cases it ever settled above the cap, along with the unrelated reasons why. (AMIC's responses to NAMICO's Discovery attached as Exhibit Six).

### D.     Shock! July 8, 2011, Meeting.

Mr. Roesch admitted that within a week of receiving the claim, NAMICO

was aware that a bad outcome was a possibility in the bad faith action. (Roesch deposition, Doc 34 at 79 l.17-21). By March 21, 2011, less than two months from receipt of claim, Mr. Sullivan knew that the claim could result in a large loss. (Claims notes, Doc. 37, Ex. 9 at SIC 636). On that day, Mr. Sullivan instructed Mr. Roesch to send a "large loss report" or "LLR" to Scottsdale. (*Id*.) An LLR is only sent to Scottsdale in a case has potential for a loss above $200,000.00 dollars; if the potential is below the amount then no LLR is sent. (Roesch deposition, Doc. 34 at 26 l.12-18). Mr. Roesch sent the LLR (attached as Exhibit Seven) on April 8, 2011, which noted AMIC's liability to be "questionable". (*Id*.) Mr. Roesch admitted that the term "questionable" meant AMIC "could" have liability. (Roesch deposition at 107 l.18-23). This LLR also indicated that coverage was "being provided under a ROR" even though NAMICO never assigned a separate adjuster review coverage. (*Id*. at 106 l.13 -107 l.1; Ex. 7).

By June 28, 2011, NAMICO realized that AMIC's appeal with the Georgia Court of Appeals was the "critical juncture in the case" even though the appellate issues did not invoke the bad faith claim. (Claims notes, Doc. 37, Ex. 6 at SIC 659; Sikes deposition, Doc. 39-4 at 79 l.22-80 l.5). The following day, NAMICO more than doubled its reserves to $250,000.00. (Claims notes, Doc. 37, Ex. 9 at SIC659). In their depositions, both Mr. Roesch and Mr. Sullivan testified that their purpose in visiting AMIC on July 8, 2011 – only six (6) days before the "critical juncture"

in the case – was to discuss the oral arguments and appeal. (Roesch deposition, Doc. 34 at 160 l.4-9; Sullivan deposition, Doc. 39-11 at 35 l.18-36 l.22).

In opposition to that deposition testimony provided a year and a half after the meeting, however, are the salient facts that no one at the meeting for AMIC was a licensed Georgia lawyer; that the Georgia lawyers who filed all the briefs – Whitlock and Harper – were located in Atlanta, not at AMIC; and that the most telling, is Roesch's own claims notes from July 6, 2011, two days prior to the meeting: "TFS and I are of the opinion that this [the renewed $2 million dollar demand by Plaintiffs] may be our "best case" which may make the upcoming meeting with the insureds difficult." (Claims notes, Doc. 37, Ex. 9 at SIC602).

As testified by David Sikes and Steve Wells during their depositions and in their answers to interrogatories, Tim Sullivan only wanted to deliver the "hammer clause" because NAMICO had "twice the exposure" of AMIC in the bad faith litigation; AMIC was subject to punitive damages in Georgia; and AMIC only had a $2 million dollar policy, while NAMICO had a $5 million dollar policy. (AMIC's answers to Scottsdale's first discovery attached as Exhibit 8; Sikes deposition, Doc. 39-4 at 93 l.17-94 l.1-3; Wells deposition, Doc. 39-10 at 48 l.18-49 l.23; 59 l.4-22; 61 l.10-11). Mr. Sullivan admitted that he told AMIC "there would be multi-million dollar exposure to NAMICO." (Sullivan deposition, Doc. 39-11 at 47 l.15-16). Mr. Sullivan also admitted telling AMIC it had twice the

exposure and was subject to punitive damages in Georgia. (*Id*. at 52 l.15-53 l.21). Incredibly, Mr. Sullivan attempted to testify that he was "immediately corrected" by either Ed Roesch or Kate Whitlock. Mr. Roesch, not surprisingly, never testified to correcting Mr. Sullivan or hearing Ms. Whitlock do so. (Roesch depo, Doc. 34 at 166 l.11-169 l.8).

Because, and only because, of the risk to NAMICO's financial well-being Mr. Sullivan stated to AMIC that he was going to pull defense and indemnity from the appeal and bad faith case. (Wells deposition at 68 l.1-69 l.5; 96 l.20-23). After a deal was struck to offer the Plaintiffs $1.8 million dollars, NAMICO dismissed AMIC from the negotiations and settled the case for $2 million dollars. (Sikes deposition, Doc. 39-4 at 112 l.10-113 l.2). AMIC was then forced to consent to the settlement when NAMICO directed AMIC's insureds to execute a "consent to settle" (required under Georgia law); had AMIC, at that point, refused, it would have been subjected to bad faith suit from its insureds. (*Id*. at 125 l.2-15).

NAMICO attempts to excuse its conduct by asserting that everything had gone against AMIC to that point and that AMIC's insureds were over its policy limits. But Mr. Roesch was forced to admit that at the time NAMICO forced the settlement, there had been no final judgment that AMIC owed $2 million dollars. (Roesch depo. at 186 l.21-187 l.3). And both Mr. Sullivan and Mr. Roesch knew that there were three actions that had not yet occurred – appeal, Declaratory

Judgment action, and Probate Court action – that would ultimately determine AMIC's liability. (*Id*. at 191 l.11-22; Sullivan deposition at 46 l.14-17; Exhibit 9).

## III.   STANDARD OF REVIEW.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Once the party seeking summary judgment successfully bears its initial burden of proof under Rule 56(c), the burden of production shifts to the nonmoving party. *Id.* at 331. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   That party must demonstrate that there is a "genuine issue for trial." *Id.* at 587. An action is void of a material issue for trial if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

## IV.   ARGUMENT.

Scottsdale's sole argument in its Motion for Summary Judgment is that AMIC is "delusion." *See* Doc. 40 at 37.  What Scottsdale means by that, of course, is that AMIC's stance on how the "tort caps" would be applied to the Holloway and Meadows excess judgments was so untenable that Scottsdale cannot be contractually liable for any of the $2 million dollar settlement when AMIC delayed payment until it was sued for bad faith.  (Doc. 40 at 23-37).  Scottsdale trots out cases from other jurisdictions that purport to say such a result is "absurd" and "morally hazardous."  Instead, what Scottsdale did is prove (1) the illusory nature of their contract, (2) that it acted in bad faith, and (3) that it breached the enhanced duty of good faith it owed to AMIC.

### A.   Scottsdale Cannot Prove by Policy, Law, or Fact that Exclusion "I" Applies.

As is now undisputed, if for any reason in fact or law Exclusion "I" does not apply, Scottsdale loses and AMIC wins.  Despite significant effort in arguing that AMIC consented to settlement, had an attorney, and that the policy provided a procedure for a dispute, none of these areas bear on whether the exclusion can be enforced – and Scottsdale did not, and cannot, provide any authority that they should.

But, as stated above, Scottsdale argues that Exclusion "I" applies because the law will not allow AMIC to pawn off on its insurer what it is required to pay.

And, because there was a $2 million dollar demand and a $3.9 million dollar judgment, AMIC was required to pay as its contract obligation the entire settlement. Scottsdale's argument fails as a matter of policy, law, and fact.

### 1.)    Policy does not exclude bad faith allegations.

There is no exclusion in Scottsdale's policy for allegations of bad faith failure to settle a claim; there is no exclusion in Scottsdale's policy against allegations that one of its insureds' has "delay[ed] payment" and subsequently is sued for bad faith; and, as Mr. Sullivan admitted, there is no exclusion in Scottsdale's policy for settlements that happen to equal an amount to the insured's liability limits. (Sullivan Depo., Ex. 39-11 at 30 l. 17-23).

Instead, as Mr. Roesch has admitted, the Scottsdale policy provides for coverage against bad faith:

> Q.    Why did AMIC send NAMIC that claim?
> A.    Because they were sued for bad faith.
> Q.    Okay.  And does the insurance policy that NAMIC has with AMIC protect against or provide coverage for bad faith?
> A.    Correct.

(Roesch Depo, Ex. 34, at 34 l. 17 – 35 l.7).  Scottsdale cannot then take the position, as it does in its brief, that this claim is not covered because AMIC did not pay (or "delayed payment") for a claim it was responsible.  The very nature of the bad faith claim requires such an allegation.  But, Scottsdale taken that position in its brief, which makes its policy illusory.

### 2.)     As a matter of law, Scottsdale policy is illusory.

If Scottsdale's policy operates as it states in its brief (Doc. 40 at 23-30) then the policy is illusory.  There could never be situation where an insured-insurance company (like AMIC) is sued for bad faith, where that bad faith allegation does not require proof that the insured-insurer failed to pay a sum it was contractually obligated to pay.   When an insurance policy "includes limitations or exclusions [that] completely contradict the insuring provisions, coverage is deemed illusory and the insurer must cover the insured." *Finger v. State Farm Fire & Cas. Ins. Co.*, 459 F. App'x 828, 831 (11th Cir. 2012) (citing *Shrader v. Emp'rs Mut. Cas. Co.,* 907 So. 2d 1026, 1033 (Ala. 2005)). "Alabama law does not countenance such illusory coverage." *Shrader*, 907 So. 2d at 1033. Alabama recognizes the illusory coverage doctrine as a "corollary to the ambiguity doctrine," and has made it clear that "the language or interpretation of an ambiguous provision by an insurance company may be so tortured as to result in 'illusory' coverage." *Titan Indem. Co. v. Newton,* 39 F.Supp.2d 1336, 1344 (M.D. Ala. 1999) (citing *Industrial Chemical & Fiberglass Corp. v. Hartford Accident & Indem. Co.*, 475 So. 2d 472, 478-79 (Ala. 1985)).

A policy is illusory if it "provides coverage on the front side and then excludes it on the backside." *Finger v. State Farm Fire & Cas. Co.*, 829 F. Supp. 2d 1154, 1160 (S.D. Ala. 2011), *rev'd sub nom. on other grounds Finger v. State*

*Farm Fire & Cas. Ins. Co.*, 459 F. App'x 828 (11th Cir. 2012). "Certainly it is true that Alabama courts do not allow insurers to extend coverage with one hand, then eradicate it with the other." *Nautilus Ins. Co. v. Mobile Area Mardi Gras Ass'n, Inc.*, 2010 WL 4269184 *7 (S.D. Ala. Oct. 27, 2010).

Scottsdale's ICPL policy provides coverage for AMIC against bad faith claims made against it. (Roesch depo at 35). The policy, however, contains the following exclusion:

> **I**. any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation, whether real or alleged, assumed by or imposed upon an **INSURED** arising out of:
>
>> **1**. any policy or contract of insurance, reinsurance, insurance pool, suretyship, annuity or endowment; or
>>
>> **2.** any written contract, unless the **INSURED** would have been liable in the absence of such contract;

(Doc. 11-1 at § III, I.) Scottsdale attempts to use this exclusion to absolve itself of its duty to provide coverage to AMIC for the bad faith claims against AMIC. This exclusion, however, completely contradicts the insuring provisions of the ICPL policy, making coverage illusory under the policy in direct conflict with Alabama law.

The insuring provision of the Scottsdale policy exists to protect AMIC from, among other things, bad faith claims brought as a result of AMIC's claims handling and adjusting. (Doc. 11-1 at I.A. and II.X; Deposition of Edward Roesch

at p. 35.) According to Scottsdale, however, exclusion "I" specifically excludes coverage for the bad faith claims, because the underlying plaintiffs' "loss" at the hands of AMIC resulted from AMIC's refusal to pay damages for a covered claim. Thus, according to Scottsdale, the bad faith claim was a "claim arising from, based upon, attributable to, or…related" to AMIC's written contract with its insureds, which, according to Scottsdale, places the claim within exclusion "I."

What Scottsdale fails to acknowledge, however, is that *AMIC **only** conducts business with its insureds through written policies of insurance or contracts!* The most fundamental aspect to any bad faith claim, whether in Georgia or in Alabama, is whether the insurer breached its contract with the insured. *See e.g.* O.C.G.A. § 33-4-6; *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 32 (Ala. 2008). Thus, any bad faith claim brought against AMIC necessarily constitutes a "claim arising from, based upon, attributable to, or…related" to AMIC's written contracts with its insureds. By specifically providing coverage under the policy to AMIC for bad faith claims, then crafting an exclusion to take away the very coverage the policy is intended to provide, Scottsdale has "provide[d] coverage on the front side and then exclude[d] it on the backside." *Finger*, *supra*. Because an insurer cannot "extend coverage with one hand, then eradicate it with the other, *Nautilus*, *supra*, Scottsdale cannot rely on exclusion "I" to defeat the very coverage the ICPL policy was intended to provide AMIC for bad faith claims. Thus, because exclusion "I"

completely contradicts the insuring provisions of the policy, coverage is illusory and as a matter of law AMIC cannot rely on exclusion "I" and must provide coverage to AMIC for the bad faith claims. *Finger*, 459 F. App'x at 831 (citing *Shrader,* 907 So. 2d at 1033.

Scottsdale, of course will (or should) argue that its policy will protect against bad faith allegations but only against damages above what the insured was contractually liable for.  Such an argument does not save Scottsdale because this lawsuit settled; there was no final judgment.  Scottsdale does not have the power to declare, under its policy, that a covered claim is excluded because it settled the claim rather than allowed a final judgment to be entered.  As Mr. Roesch admitted, the bad faith case settled for $2 million.  That claim was covered.  While Scottsdale can envision a scenario where that claim could be excluded, such power would always, in the bad faith context, result in a non-covered claim prior to a final judgment.  Hence, Scottsdale's position that this claim is excluded renders its policy illusory.  Alabama law "does not countenance such illusory coverage," AMIC is due summary judgment in its favor on its breach of contract claim and in its favor on Scottsdale's declaratory judgment claim.

### 3.)  As a matter of fact, AMIC has never been ordered to pay $2 million dollars to its insureds.

Finally, Scottsdale "puts the cart before the horse."  All of the cases cited and its arguments assume a fact not present here: that AMIC was under a duty to

pay, on behalf of any party, $2 million dollars and, simply, "delayed payment" until it got sued for bad faith.   AMIC's insureds had a $3.9 million dollar judgments against them, which were being appealed.  As Mr. Roesch admitted and as is undisputed that there had been no final, unappealable, judgment in any case. (Roesch Depo., at 186 l.21-187 l.3). And both Mr. Sullivan and Mr. Roesch knew that there were 3 actions that had not yet occurred – appeal, Declaratory Judgment action, and Probate Court action – that would determine AMIC's liability. (*Id.* at 191 l.11-22; Sullivan deposition at 46 l.14-17; Exhibit 9).    Only through Scottsdale's continuing desire to protect its own interests did it say then (and continues in its motion arguments) that AMIC "delayed payment," thus exposing it to bad faith.

Scottsdale also argued that AMIC's position that it would not have ever been obligated for $2 million is "delusional" and untenable.  But Scottsdale stating such, does not, as a matter of law, make it so.  Simply Scottsdale cannot argue to this Court: we think AMIC was wrong on the "tort cap" and, thus, as a matter of law, the settlement was AMIC's contract obligation.  In order for the Court render such a decision, it would have to make a factual determination that AMIC's position was untenable on the caps – assuming that question is even before this court.  So as a matter of fact, who was in a better position to determine whether AMIC's position on the tort caps was viable or "delusional":

> Q:     Okay. Did you happen to review or do you recall as we sit here today that in AMIC's responses or answers to the second set of interrogatories that they paid a total of four claims above the tort caps?
>
> A:     I don't recall that.
>
> Q:     Wouldn't that have been something you would have wanted to know at the July 8th meeting, that they had paid four claims over thousands upon thousands of claims over its lifetime about the tort cap?
>
> A:     I would have expected in the course of the discussion, if that were the case, that Alabama Municipal would have related that information to us.
>
> Q:     Well, you're the insurer, correct?
>
> A:     We are indeed the insurer.
>
> Q:     And you have the duty to defend?
>
> A:     Correct.
>
> Q:     And you have the duty to investigate?
>
> A:     Correct.
>
> **Q:     Who has more experience with the tort caps, NAMICO or AMIC?**
>
> **A:     Alabama Municipal.**
>
> **Q:     Who has more experience with the operation of the tort caps under Alabama law; AMIC or NAMICO?**
>
> **A:     Alabama Municipal.**

(Sullivan deposition, Doc. 39-11 at 39 l.19-40 l.23). Mr. Sullivan admitted, as he must, he knew nothing about AMIC and its experience with the "tort caps" (*Id.* at 38 l.17-21).   Likewise, Mr. Roesch never bothered to ask AMIC for a listing of cases – tried or settled – where AMIC paid over the "tort cap" or had out of jurisdiction. (Roesch depo, Doc. 34 at 154 l.4-16). As Mr. Sikes testified, AMIC had previously settled an auto case with similar injuries to the claimant for the cap amount in Mississippi. (Sikes deposition, Doc. 39-4 at 54 l.1-12). Over the three thousand claims and 700 lawsuits that AMIC averages each year, AMIC has settled all five (5) cases above the cap and the reasons are totally unrelated to the viability

of the cap. (AMIC's responses to NAMICO's Discovery attached as Exhibit Six).

NAMICO, however, only has a litigation plan from a Georgia attorney and a letter from a Georgia attorney, neither of which discuss Alabama law or where and against whom the Alabama plaintiffs were going to collect against Alabama defendants. NAMICO, nor anyone acting on its behalf, has any basis on which to call AMIC's stance on the tort cap "delusional." NAMICO provides **zero** citations of law or affidavits of fact that would allow it to conclude that AMIC's stance on the tort caps was "delusional."

NAMICO's inability to do so is, of course, the death knell to its entire argument. Because AMIC had a basis in law that the caps applied, experience in fact that the caps applied, and actions in place in Alabama to render the caps applicable, then NAMICO cannot declare that AMIC was liable for all $2 million of the settlement because it was a contract obligation.

### B.    Scottsdale is Liable for Bad Faith.

AMIC sued Scottsdale for both "normal" and "abnormal" bad faith. The law on these torts is well-settled:

> This Court has defined 'normal' and 'abnormal' bad faith
> in the following manner: 'In the "normal" bad-faith case,
> the plaintiff must show the absence of any reasonably
> legitimate or arguable reason for denial of a claim. [*State
> Farm Fire & Cas. Co. v.Slade,* 747 So.2d [293] at 306 [
> (Ala.1999) ]. However, ' "[t]he rule in 'abnormal' cases
> dispensed with the predicate of a preverdict JML
> [judgment as a matter of law] for the plaintiff on the

> contract claim if the insurer had recklessly or
> intentionally failed to properly investigate a claim or to
> subject the results of its investigation to a cognitive
> evaluation." ' *White v. State Farm Fire & Cas. Co.,* 953
> So.2d 340, 348 (Ala.2006).

*Watson v. Life Ins. Co. of Alabama*, 74 So. 3d 470, 475-76 (Ala. Civ. App. 2011).

### 1.)   Scottsdale is liable for "normal" bad faith.

In order to recover on a 'normal' bad-faith claim, the plaintiff must prove:

"(1) the existence of an insurance contract; (2) an intentional refusal to pay the

claim; and (3) the absence of any lawful basis for refusal and the insurer's

knowledge of that fact or the insurer's intentional failure to determine whether

there is any lawful basis for its refusal.' *Acceptance Ins. Co. v. Brown,* 832 So.2d

1, 16 (Ala. 2001).   To begin, there is no question that there is a contract of

insurance between Scottsdale and AMIC.  But, "the underlying contract claim must

be so strong that the plaintiff would be entitled to a preverdict judgment as a matter

of law." *Shelter Mut. Ins. Co. v. Barton,* 822 So.2d 1149, 1155 (Ala. 2001).  As has

now been adequately briefed, AMIC is entitled to summary judgment on its

contract claim because exclusion "I" cannot be enforced by Scottsdale.

Lastly, it is virtually undisputed that NAMIC did not have any "reasonable"

or "legitimate" basis for refusing to pay.  NAMICO's stated reasons on July 8,

2011, were that it had multi-millions in financial exposure, which was twice that of

AMIC and that AMIC was subject to punitive damages in Georgia.  If NAMICO's

exclusion were applicable, there was never a need to be concerned about its financial well-being nor invoke the "hammer clause."  It did so, however, precisely because AMIC was sued for bad faith to which its exclusion did not apply.

### 2.)   Scottsdale is liable for "abnormal" bad faith.

In the "abnormal" case, bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim.  *State Farm Fire & Cas. Co. v.Slade,* 747 So.2d 293, 306-07 (Ala.1999).  "Bad faith ... is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of a known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.' " *Slade,* 747 So.2d at 303–04 (quoting *Gulf Atlantic Life Ins. Co. v. Barnes,* 405 So.2d 916, 924 (Ala.1981)).

These elements fit NAMICO perfectly.  As shown below, NAMICO did not investigate the claim at all! It spoke to no one with AMIC about any substantive issue until it came to Montgomery to deliver the "hammer clause."  And this was delivered, again, almost undisputedly, for NAMICO's own self-interest. NAMICO specifically told AMIC that the only reason it was invoking the "hammer clause" was because of its financial exposure.  Assuming the truth of the

matter, such a fact absolutely "imports a dishonest purpose" because of "self-interest."   Also, as briefed, NAMICO's manufactured exclusion "I" in order to deny the claim.

### C.   Scottsdale Breached the Enhanced Duty of Good Faith it Owed to AMIC.

Even if Scottsdale had defended AMIC under a properly issued reservation of rights (which it did not), Scottsdale would still be estopped to deny coverage, as it did not meet the enhanced duty of good faith in conducting the defense of AMIC under a reservation of rights.

An insurer that defends its insured under a reservation of rights "has an enhanced obligation of good faith toward its insured in conducting such a defense." *L & S Roofing Supply Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 521 So. 2d 1298, 1303 (Ala. 1987). The enhanced duty of good faith is read into the reservation of rights whenever an insurer defends its insured under a reservation of rights. *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 839 So. 2d 614, 616 (Ala. 2002).

An insurer fulfills its enhanced duty of good faith by meeting four specific criteria, outlined by the court in *L & S Roofing Supply*:

> First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries. Second, it must retain competent defense counsel for the insured. Both retained defense counsel and the insurer must understand that only the

> insured is the client. Third, the company has the
> responsibility for fully informing the insured not only of
> the reservation-of-rights defense itself, but of all
> developments relevant to his policy coverage and the
> progress of this lawsuit. Information regarding progress
> of the lawsuit includes disclosure of all settlement offers
> made by the company. Finally, an insurance company
> must refrain from engaging in any action which would
> demonstrate a greater concern for the insurer's monetary
> interest than for the insured's financial risk.

*L & S Roofing*, 521 So. 2d at 1303 (quoting *Tank v. State Farm Fire & Casualty Co.*, 715 P.2d 1133 (Wash. 1986)). *See also State Farm & Cas. Co. v. Myrick*, 611 F.Supp.2d 1287, 1295 (M.D. Ala. 2009) ("The insurer satisfies its enhanced duty by meeting specific criteria: (1) conducting a thorough investigation; (2) retaining competent defense counsel, who, along with the insurer, must understand that only the insured is the client; (3) informing the insured of the defense and all developments relevant to his policy coverage and the progress of the lawsuit; and (4) refrain[ing] from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk") (internal citations omitted). Because of the potential conflicts inherent in a reservation of rights situation, "the enhanced duty of good faith put[s] in place a procedure by which the insured can be confident that his interests will not be compromised nor in any way subordinated to those of the insurer as a result of the defense he is required to accept under the contract of insurance." *Twin City*, 839 So. 2d at 616 (quoting *L & S Roofing,* 521 So.2d at 1304). In adopting the

approach taken by the *Tank* court, the *L & S Roofing* Court noted that "[g]ood conscience and fair dealing require that the company pursue a course that is not advantageous to itself while disadvantageous to its policyholder." *L & S Roofing*, 521 So. 2d at 1304 (quoting *Van Dyke v. White*, 349 P.2d 430 (Wash. 1960)).

Finally, an insurer that does not fulfill its enhanced duty of good faith cannot deny coverage pursuant to a reservation of rights. *Shelby Steel Fabricators, Inc. v. United States Fidelity & Guaranty Ins. Co.*, 569 So. 2d 309 (Ala. 1990); *Aetna Casualty & Surety Co. v. Mitchell Brothers, Inc.*, 814 So. 2d 191 (Ala. 2001). An insurer's failure to meet *any one* of the four *L & S Roofing* criteria is a breach of the enhanced duty of good faith, and the insurer cannot deny coverage under the reservation of rights. *See*, *e.g.*, *Shelby Steel*, 569 So. 2d at 312.

Here, Scottsdale breached its enhanced duty of good faith (if indeed it had such a duty under a properly issued reservation of rights, which AMIC contends it did not, as there was no reservation of rights in place), by not conducting a thorough investigation, by not keeping AMIC informed of all developments relevant to coverage and the progress of the lawsuit, and by engaging in conduct that demonstrated a greater concern for Scottsdale's monetary interest than for AMIC's financial risk. While a failure to meet any one of the *L & S Roofing* criteria would be a breach of the enhanced duty of good faith such that Scottsdale could not deny coverage to AMIC, here Scottsdale has breached, at a minimum,

three of the four *L & S Roofing* criteria.

### i.   Scottsdale did not conduct a thorough investigation.

An insurer defending an insured under a reservation of rights has a duty to conduct a thorough investigation regarding the potential liability of its insured and the plaintiff's potential damages. *L & S Roofing*, 521 So. 2d at 1303 (quoting *Tank*, *supra*). Here, Scottsdale not only failed to investigate AMIC's potential liability, but it further failed to investigate or even acknowledge the likely cap on the plaintiff's recoverable damages.

Ed Roesch, NAMICO's litigation examiner, admitted in his deposition that he never spoke to David Sikes at AMIC about the handling of the underlying claim that led to the bad faith suit against AMIC for which Scottsdale provided a defense to AMIC. Mr. Roesch excused his failure to communicate with Mr. Sikes by stating that Mr. Sikes could not provide him with any useful information, and that Mr. Sikes might be a witness in the case. Mr. Roesch further excused his failure to communicate with Mr. Sikes about the claim by stating that he instead communicated with Danny Ransom at AMIC regarding the claim and that he (Mr. Roesch) had a number of "substantive" conversations with Mr. Ransom regarding this claim. The claims notes produced by Scottsdale, however, completely contradict Mr. Roesch's testimony and reveal that during the entire pendency of the claim, Mr. Roesch communicated with Mr. Ransom on only three occasions:

on January 31, 2011, Mr. Roesch left Mr. Ransom a voicemail regarding choice of counsel; on February 3, 2011, Mr. Roesch spoke with Mr. Ransom regarding choice of counsel; and on April 8, 2011, Mr. Roesch sent Mr. Ransom and email regarding the Reservation of Rights. Thus, contrary to Mr. Roesch's contention that he had substantive communications with Mr. Ransom about the claim, thereby excusing his complete lack of communication with Mr. Sikes to investigate the claim, Scottsdale's claims notes confirm that Mr. Roesch had minimal contact with Mr. Ransom during the pendency of this litigation; and indeed, only one of the communications between Mr. Roesch and Mr. Ransom referenced anything other than choice of counsel. Further, until July 8, 2011, Tim Sullivan at NAMICO had never spoken to Steven Wells, AMIC's president, about the handling of the claim.

   Mr. Roesch also admits that while venue is a variable to consider, he never investigated Judge Lee, the judge in Troup County, Georgia, presiding over the underlying and bad faith lawsuits, even though AMIC had informed NAMICO about concerns it had with Judge Lee—concerns that had significant merit and bearing on the case and should have been investigated by NAMICO, as Judge Lee retired amid corruption charges only nine months after the settlement in this case.

   But perhaps NAMICO's most outrageous failure to investigate that resulted in a breach of its enhanced duty of good faith was NAMICO's complete oblivion (at best) or at worst, outright refusal, to research or review Alabama law regarding

punitive damages against a municipality, Georgia law on malicious litigation, and the Alabama tort caps. Mr. Roesch testified that as an adjuster, he would want to ask defense counsel about and review all applicable law, and that if any legal issue were a "gray" area, he would want to review case law and might even hire independent counsel to review the legal issue. Here, however, Mr. Roesch did none of these things: neither he nor anyone at NAMICO ever contacted any of AMIC's insureds or their counsel or plaintiff's counsel regarding applicable law; and neither he nor anyone at NAMICO ever researched or reviewed Alabama law regarding punitive damages against a municipality, Georgia law on malicious litigation, or law regarding the Alabama tort caps, all of which were issues brought to NAMICO's attention. Mr. Roesch testified that the Alabama tort caps were "gospel" according to AMIC, yet he ever sought an opinion from AMIC's general counsel or any other Alabama attorney regarding the tort caps.

Incredibly, even with its complete failure to research the Alabama tort caps issue, NAMICO claims that it had serious questions regarding whether the Alabama tort caps would apply, and it bases its position on a Litigation Plan and a July 5, 2011, correspondence prepared by Ms. Whitlock. Neither the Litigation Plan nor the correspondence, however, contain a discussion of Alabama case law regarding the tort caps—a fact that Mr. Roesch apparently never even noticed in his scant investigation of the claim.

NAMICO's failure or refusal to thoroughly investigate AMIC's potential liability and the issues surrounding the plaintiff's potential damages and the applicability of the Alabama torts cap is a clear failure to fulfill the first criteria expressed in *L & S Roofing*, and NAMICO's failure to meet this criteria results, as a matter of law, in a breach of its enhanced duty of good faith. Because NAMICO breached its enhanced duty of good faith, it cannot now deny coverage pursuant to its Reservation of Rights, if indeed such a Reservation of Rights ever existed.

### ii. Scottsdale did not keep AMIC informed of all developments relevant to coverage and the progress of the lawsuit.

An insurer defending its insured under a Reservation of Rights must keep its insured fully informed of all developments relevant to policy coverage and the progress of the lawsuit. *L & S Roofing*, 521 So. 2d at 1303 (quoting *Tank*, *supra*). Here, Scottsdale repeatedly failed to communicate with AMIC regarding coverage issues and suit development, and instead kept AMIC in the dark about the direction the case was headed and the position Scottsdale was developing regarding coverage.

As detailed above, Mr. Roesch never communicated with Mr. Sikes about the handling of the claim, instead claiming that his "substantive" communications were with Mr. Ransom. Mr. Roesch's "substantive" communications with Mr. Ransom turned out to be only three communications, only one of which referenced anything other than choice of counsel. Further, until July 8, 2011, Tim Sullivan at

NAMICO had never spoken to Steven Wells, AMIC's president, about the handling of the claim, and no one at NAMICO had spoken with Mr. Sikes about the handling of the claim or Scottsdale's position regarding coverage.

Perhaps more importantly, however, is Mr. Roesch's admission that between the time of the issuance of the Reservation of Rights and the imposition of the "Hammer Clause" on July 8, 2011, *no one at NAMICO had ever updated AMIC on coverage*. This fact alone demonstrations a significant breach of the enhanced duty of good faith, as one of the criteria that an insurer *must* fulfill in order to satisfy its enhanced duty of good faith is to inform the insured of the defense and "all developments relevant to his policy coverage and the progress of the lawsuit." *Myrick*, 611 F.Supp.2d at 1295.

NAMICO's failure to keep AMIC informed of all developments relevant to coverage and the progress of the lawsuit is a clear failure to fulfill the third criteria expressed in *L & S Roofing*, and NAMICO's failure to meet this criteria results, as a matter of law, in a breach of its enhanced duty of good faith. Because NAMICO breached its enhanced duty of good faith, it cannot now deny coverage pursuant to its Reservation of Rights, if indeed such a Reservation of Rights ever existed.

> **iii.    Scottsdale engaged in conduct that demonstrated a greater concern for Scottsdale's monetary interest than for AMIC's financial risk.**

An insurer defending an insured under a reservation of rights "must refrain

from engaging in *any action* which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk." *L & S Roofing*, 521 So. 2d at 1303 (quoting *Tank*, *supra*) (emphasis added). Here, Scottsdale not only engaged in conduct that demonstrated a great concern for Scottsdale's monetary interest than for AMIC's financial risk, but, somewhat shockingly, it told AMIC outright that it had chosen its plan of action (invoking the "Hammer Clause" to force AMIC to settle) because it had "twice the exposure" of AMIC. Such an admission is, of itself, evidence of Scottsdale's failure to meet its enhanced duty of good faith.

According to NAMICO, by June 28, 2011, it realized that AMIC's appeal in Georgia was the "critical juncture in the case," even though the appellate issues did not involve the bad faith claim against AMIC. By June 29, 2011, NAMICO more than doubled its reserves to $250,000.00. Both Mr. Roesch and Mr. Sullivan testified that the purpose of the July 8, 2011, meeting with AMIC six days before the "critical juncture" in the case was to discuss the pending arguments and appeal. What they are careful to not mention, however, is that no one appearing for AMIC at the July 8, 2011, meeting was licensed to practice law in Georgia; that the Georgia lawyers who filed the appellate briefs, and not AMIC, were located in Georgia; and that rather than meeting with AMIC to discuss the upcoming oral arguments, Mr. Roesch's own claims notes from only two days before the meeting

indicate that he and Mr. Sullivan were "of the opinion that this [the renewed $2 million dollar demand by the underlying plaintiffs] may be our best case *which may make the upcoming meeting with the insureds difficult.*" (Emphasis added.) Thus, contrary to NAMICO's contention that the July 8, 2011, meeting was for the shared purpose of discussing the upcoming oral arguments in the underlying litigation, NAMICO was instead already in the process of setting up a scheme to put itself in the best monetary position possible while leaving AMIC open to financial risk.

But more importantly, Mr. Sullivan told AMIC during the July 8, 2011, meeting that Scottsdale was invoking the "Hammer Clause" because it had twice the exposure as AMIC, and because it was subject to punitive damages in Georgia. Mr. Sullivan also admitted that he told AMIC "there would be multi-million dollar exposure to NAMICO." Thus, NAMICO's sole reason for Mr. Sullivan's threat at the July 8, 2011, meeting to pull defense and indemnity from the appeal and bad faith case was a concern for NAMICO's financial well-being. Such a bold, unabashed admission that NAMICO's primary concern by the time of the July 8, 2011, meeting was its own monetary interest regardless of AMIC's financial risk is, standing alone, more than sufficient evidence of Scottsdale's breach of the enhanced duty of good faith.

Rather than being confident that its interests "[would] not be compromised

nor in any way subordinated to those of [NAMICO] as a result of the defense [it was] required to accept under the contract of insurance," *Twin City*, *supra*, AMIC instead was informed by NAMICO, quite bluntly, that its interests were in fact being subordinated to NAMICO's concern for its own financial risk. Because "[g]ood conscience and fair dealing require that the company pursue a course that is not advantageous to itself while disadvantageous to its policyholder," *L & S Roofing*, *supra*, NAMICO has clearly breached the enhanced duty of good faith and cannot now deny coverage pursuant to a Reservation of Rights. *Shelby Steel Fabricators*, *supra*.

## V.    CONCLUSION.

AMIC requests this Court deny Scottsdale's Motion for Summary Judgment and grant summary judgment in its favor on its breach of contract counterclaim against Scottsdale and in its favor on Scottsdale's declaratory judgment count against AMIC.

/s/ Scott M. Speagle
SCOTT M. SPEAGLE (0705-T-78-S)
Attorney for AMIC

OF COUNSEL:

WEBSTER, HENRY, LYONS, WHITE,
  BRADWELL & BLACK, P.C.
Post Office Box 239
Montgomery, Alabama 36101
Telephone:  (334) 264-9472
Facsimile:  (334) 264-9599
Email:       scott@websterhenry.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing same to this office address via United States first class mail, postage prepaid or by electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing on this the 16th day of April 2013:

David W. McDowell, Esq.
Stephen K. Pudner, Esq.
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, P.C.
420 Twentieth Street North
Birmingham, Alabama 35203


                                        **/s/ Scott M. Speagle_____**
                                        OF COUNSEL