**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

SCOTTSDALE INSURANCE          )
COMPANY,                      )
                             )
        Plaintiff,            )
                             )
v.                            )          CASE NO. 2:11-cv-668-MEF
                             )             (WO – Do Not Publish)
ALABAMA MUNICIPAL            )
INSURANCE CORPORATION,       )
                             )
        Defendant.            )

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case arises out of a dispute between Scottsdale Insurance Company ("Scottsdale") and Alabama Municipal Insurance Corporation ("AMIC") over sums paid by both companies in settlement of a lawsuit against AMIC's insureds. Each party seeks reimbursement for its respective $900,000 contribution to the $2 million dollar settlement. Scottsdale initiated this action seeking a declaratory judgment that it was not required to indemnify AMIC for liability to AMIC's insureds and that it was entitled to reimbursement of $900,000 (Doc. #1). AMIC counterclaimed for breach of contract and bad faith, likewise seeking reimbursement for $900,000 (Doc. #6). The parties have filed cross-motions for summary judgment. AMIC seeks summary judgment on its breach of contract claim and Scottsdale's declaratory judgment claim (Docs. ##31-32). Scottsdale seeks summary judgment on its declaratory judgment claim and against AMIC's breach of contract and bad

faith claims (Docs. ##39, 40).  Having considered the arguments of counsel, the evidentiary submissions, and the record as a whole, the Court finds that Scottsdale's Motion is due to be GRANTED AS TO ALL CLAIMS and AMIC's Motion is due to be DENIED.

## II. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over the parties' claims under 28 U.S.C. § 1332.  The parties do not dispute that venue is proper under 28 U.S.C. § 1391(b), and the Court finds adequate allegations supporting both.

## III. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine dispute of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party

to go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations omitted).  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A plaintiff must present evidence demonstrating that it can establish the basic elements of its claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## IV. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion. The submissions of the parties establish the following material facts:

### A. The Scottsdale Policy

AMIC is a non-profit mutual insurance company that issues insurance policies to

3

Alabama governmental entities.  Scottsdale issued a professional liability insurance policy to AMIC that was in effect at all times relevant to this litigation.  The Scottsdale policy was the result of an agreement between Scottsdale and the National Association of Mutual Insurance Companies ("NAMICO").  NAMICO partnered with Scottsdale so that NAMICO could issue professional liability insurance in states where it was not licensed to issue policies.  (Doc. #32, Ex. 5, 10, 20–23.)  The Scottsdale policy was written by NAMICO and issued on Scottsdale paper since only Scottsdale was licensed to issue policies in Alabama. (Doc. #32, 22.)

The Scottsdale policy provided professional liability insurance for risk of loss associated with AMIC's handling of claims for its insureds.  Specifically, the policy covers "all **LOSS** resulting from a **CLAIM** alleging an act, error or omission in the performance of **PROFESSIONAL SERVICES** . . . ."  (Doc. #39-1, Ex. A, 19.)  "Loss" is defined in part as "a monetary judgment, award or settlement arising from a covered **CLAIM**."  (Doc. #39-1, Ex. A, 26.)  "Claim" is defined in part as "a civil proceeding in a court of law seeking monetary damages."  (Doc. #39-1, Ex. A, 23.)  Among the "Professional Services" covered by the policy are "claim handling and adjusting."  (Doc. #39-1, Ex. A, 28.)  The Scottsdale policy also contains a coverage exclusion for:

> I.  any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation, whether real or alleged, assumed by or imposed upon an **INSURED** arising out of:
>
> 1.  any policy or contract of insurance, reinsurance, insurance pool, suretyship, annuity or endowment; or

4

2. any written contract, unless the **INSURED** would have been
liable in the absence of such contract;

(Doc. #39-1, Ex. A, 30) (hereafter "Policy Exclusion 'I'").  The principal issue in this case
is whether Policy Exclusion "I" applies to the amount Scottsdale paid to settle a civil suit
against AMIC's insureds.  If the exclusion applies, then, under the policy, Scottsdale is
entitled to reimbursement for the $900,000 it contributed towards the settlement of the suit.
(Doc. #39-1, Ex. A, 40.)

The other relevant portion of the Scottsdale policy is the so-called "hammer clause,"
under which Scottsdale reserves the authority to withdraw defense of a claim in the event one
of its insureds refuses to accept a settlement that Scottsdale recommends.  The hammer
clause acknowledges Scottsdale's duty to defend insureds for properly reported claims
arising from errors or omissions in the performance of professional services.  (Doc. #39-1,
Ex. A, 19-20.)  But the hammer clause also allows Scottsdale to withdraw its defense of an
insured if the insured refuses to accept a settlement offer that Scottsdale recommends.  If the
insured rejects a settlement offer recommended by Scottsdale and prevails in the litigation
or is liable for a smaller amount than the settlement amount, Scottsdale must reimburse the
insured for the loss and claim expenses incurred so long as this reimbursement does not
exceed the total amount of the claim expense and loss at the time of the proposed settlement.
(Doc. #39-1, Ex. A, 20.)

**B.     The Underlying Litigation Against AMIC's Insureds and AMIC**

AMIC issued an insurance policy to the Town of Woodland, Alabama, that covered,
among other things, bodily injury or property damage caused by an accident resulting from

5

the use of a covered auto.  (Doc. #39-2, Ex. B.)  The policy had a $2 million dollar limit per occurrence.  On November 24, 2009, Billie Vernon Edmondson ("Edmondson") was the driver of a van covered by the Town of Woodland's policy.  The van was involved in a single-vehicle accident in Troup County, Georgia, resulting in injuries to passengers Jeanette Holloway and Connie Meadows ("the underlying plaintiffs") and the eventual death of Holloway.  The underlying plaintiffs sued Edmondson and the Town of Woodland in Troup County, Georgia, and AMIC defended its insureds in these suits.  The suits resulted in final judgments against Edmondson and the Town of Woodland for $4 million.  Following these judgments, the Superior Court of Troup County, Georgia, issued an order declaring the limits of the Town of Woodland's liability were the $2 million policy limit in AMIC's policy rather than a $100,000 per occurrence limit under Alabama's law that limits municipal liability.  (Doc. #39-7, Ex. G-1, 59-62.)

AMIC maintained throughout the underlying litigation, and still maintains, that it would not have been liable for more than $200,000 for its insureds under Alabama's law that limits recovery of damages against governmental entities to $100,000 per occurrence.  *See* Ala. Code §§ 11-93-2, 11-47-190 (1975).  Accordingly, AMIC, Edmondson, and the Town of Woodland brought suit in Randolph County, Alabama, seeking a declaratory judgment that the Alabama limit on recovery of damages against governmental entities would apply to recovery for the judgments entered against them in Troup County, Georgia.  They also filed a notice of appeal from the underlying litigation in Georgia, challenging, among other grounds for appeal, the Superior Court's declaratory judgment that AMIC's $2 million policy

limit was the limit of its liability to the underlying plaintiffs.  (Doc. #39-7, Ex. G-1, 71-72.)

Oral argument on the appeal was scheduled for July 14, 2011, before the Georgia Court of

Appeals.

On January 24, 2011, the underlying plaintiffs filed a lawsuit in Troup County,

Georgia, against AMIC for bad faith failure to settle within policy limits.  (Doc. #39-7, Ex.

G-1, 11-21.)  The underlying plaintiffs claimed standing to sue under AMIC's insurance

agreement with the Town of Woodland.  They sought the $1,990,000 for which the Town of

Woodland and Edmondson's estate were liable due to AMIC's rejection of an earlier offer

to settle within the policy limits.  The underlying plaintiffs had offered to settle the case for

$2 million dollars ($1,750,000 for Holloway and $250,000 for Meadows), which was what

the Superior Court had determined was the limit of AMIC's policy with the Town of

Woodland.  (Doc. #39-7, Ex. G-1, 47-52.)  After AMIC rejected the settlement offer, the

underlying plaintiffs obtained a jury verdict in their favor and a final judgment against

AMIC's insureds for $4 million.  The underlying plaintiffs thus sought the excess $2 million

of the $4 million verdict from AMIC in the bad faith lawsuit due to AMIC's earlier rejection

of the settlement offer.

**C.      Scottsdale's Defense of AMIC in the Bad Faith Lawsuit**

AMIC tendered defense of the bad faith lawsuit to its professional liability insurer,

Scottsdale.  NAMICO was the administrator for Scottsdale in connection with the bad faith

lawsuit.  (Doc. #39-7, 2.)  The case was assigned to the Claims Manager for NAMICO, Ed

Roesch ("Roesch").  (Doc. #39-9, 2.)  Roesch received notice of the bad faith lawsuit against

AMIC on January 27, 2011.  (Doc. #39-9, 3.)  On February 2, 2011, Roesch sent a letter to

Danny Ransom ("Ransom"), the litigation manager for AMIC who was NAMICO's main

contact with AMIC for the bad faith lawsuit.  (Doc. #39-13, 12; Doc. #36, 23.)  Roesch's

letter acknowledged receipt of the claim for the bad faith lawsuit and contained the following

paragraph, which was standard language included in all letters acknowledging receipt of a

claim:

> Neither this letter nor any other action of Scottsdale or
> NAMICO is intended, nor should be construed, as a waiver or
> estoppel of any term or condition of the insurance policy under
> which this Claim is made, or any Reservation of Rights or
> Disclaimer of Coverage which may be or has been tendered by
> Scottsdale in connection with this matter.  Scottsdale fully
> reserves all rights under the policy, including but not limited to
> the right to deny or withdraw a defense and/or indemnity.

(Doc. #39-13, 12; Doc. #34, 29–30.)  Roesch received the claim file on the bad faith lawsuit

from AMIC on February 8, 2011.  (Doc. #39-9, 3.)  The claim file consisted of hundreds of

pages of materials, including legal research and numerous court documents relating to the

underlying litigation.  (Doc. #39-9, 4.)  After reviewing the claim file, Roesch sent another

letter to Ransom on April 8, 2011, with the heading "Reservation of Rights By Scottsdale

Insurance Company."  (Doc. #39-13, 13.)  The letter listed policy exclusions from the

Scottsdale policy that might negate Scottsdale's duty to indemnify AMIC.  Policy Exclusion

"I" for contract liability was among the quoted policy exclusions.  (Doc. #39-13, 14-18.)

    NAMICO proceeded with the defense of AMIC in the appeal of the underlying

litigation and the bad faith lawsuit after it received the January 27 notice of the bad faith

lawsuit.  It retained Georgia attorney Kate Whitlock to represent AMIC in both the appeal

of the underlying litigation and the bad faith lawsuit. (Doc. #39-9, 3.) AMIC acquiesced to NAMICO's choice of defense counsel and to the withdrawal of the attorneys who had tried the case in the underlying litigation. (Doc. #36, 26; Doc. #37, 13-14.) Scott Speagle ("Speagle"), general counsel for AMIC, was also in direct contact with NAMICO's chosen defense counsel. (Doc. #37, 19-20.) Kate Whitlock sent drafts and copies of briefs for the appeal of the underlying litigation to an e-mail distribution list that included Ransom, Speagle, and David Sikes of AMIC. (Doc. #39-9, 5.) The appellate briefs advanced the argument that the Alabama limitation on municipal liability should apply, or, alternatively, Georgia law should apply to cap liability at the $2 million limit of AMIC's policy. (Doc. #37, 15, 38.) Speagle also received copies of briefs filed by Whitlock in the defense of the bad faith lawsuit. (Doc. #39-9, 5.) During the period from April 21, 2011, and June 3, 2011, no one from AMIC expressed any concerns about the legal strategy or arguments contained in the briefs sent to it in the e-mail distribution list. (Doc. #39-9, 6.)

As a result of Roesch's review of the claim file, Roesch and NAMICO concluded there were serious doubts about whether Alabama's law limiting AMIC's liability to $200,000 would apply. (Doc. #39-9, 4-5.) Defense counsel had expressed doubts about the applicability of the Alabama collection caps and stated that AMIC could be liable for as much as $5,977,020. (Doc. #37, 51-52.) On July 5, 2011, the plaintiffs in the underlying litigation made an offer of settlement for $2 million. (Doc. #39-7, Ex. G-2, 105.) The offer was set to expire on July 14, 2011, the date set for oral argument before the Georgia Court of Appeals. (Doc. #39-7, Ex. G-2, 105.) A meeting had already been scheduled between

Scottsdale/NAMICO and AMIC for July 8, 2011, to discuss the appeal and bad faith litigation, but the settlement offer became the new focus of the meeting.  (Doc. #36, 10.) Roesch's notes state that he and Tim Sullivan ("Sullivan"), Vice President of Claims for NAMICO, were of the opinion that accepting the $2 million settlement may be the "best case" which "may make the upcoming meeting with the Insured difficult."  (Doc. #37, 53; Doc. #39-7, 2.)

## D.    The July 8, 2011 Meeting

On July 8, 2011, Roesch and Sullivan met with Speagle, David Sikes (the litigation manager who had replaced Ransom), and Steve Wells ("Wells"), President of AMIC, at AMIC's offices in Montgomery, Alabama.  (Doc. #35, 15; Doc. #37, 53.)  Kate Whitlock was also present at the meeting.  (Doc. #35; Doc. #37, 53.)  At the meeting, AMIC reiterated its position that the Alabama collection caps for municipalities would apply to limit its liability to $200,000, and that AMIC wanted to reject the settlement and to continue with the appeal, defense of the bad faith lawsuit, and declaratory judgment action in Alabama.  (Doc. #35, 15; Doc. #34, 24-25.)  NAMICO stated its position that the Alabama collection caps were unlikely to apply and that it wanted AMIC to accept the $2 million settlement to end all pending litigation.  (Doc. #39-7, 5-6.)

It was at this point that Sullivan invoked the "hammer clause" from the Scottsdale policy.  (Doc. #39-7, 6; Doc. #35, 15.)  Sullivan stated that if AMIC refused to accept the $2 million settlement, then NAMICO would withdraw its defense and AMIC would be responsible for its own defense in the pending suits under the terms of the Scottsdale policy.

10

(Doc. #39-7, 6; Doc. #35, 15.)  NAMICO also stated it was not obligated to indemnify AMIC for the $2 million dollar settlement since this was within the limits of the policy between AMIC and the Town of Woodland.  (Doc. #39-7, 6.)  After a lunch break, AMIC proposed the following: AMIC would pay $200,000 towards the settlement (which it indisputably owed under its own theory that Alabama collection limits for municipalities applied) and split the remaining $1.8 million with Scottsdale.  (Doc. #39-9, 5.)  Scottsdale/NAMICO refused to commit to this proposal at the meeting.   (Doc. #35, 15.)   The following week, Scottsdale/NAMICO and AMIC agreed that AMIC would pay $200,000 towards the settlement, the parties would split the remaining $1.8 million between them, and that Scottsdale would reserve its right to recover $900,000.  (Doc. #39-7, 7-8; Doc. #39-7, Ex. G-3; Doc. #39-8, Ex. H; Doc. #35, 15-16.) The settlement was paid as agreed, and Scottsdale initiated the present action to seek a declaratory judgment that it was not obligated to pay its share of the settlement under Policy Exclusion "I."  (Doc. #1.)  AMIC counterclaimed for breach of contract and bad faith.  (Doc. #6.)

## V. DISCUSSION

AMIC has moved for summary judgment on its breach of contract claim (Doc. #31), and Scottsdale has moved for summary judgment on its declaratory judgment claim and AMIC's breach of contract and bad faith claims (Doc. #39).  This case turns on whether Policy Exclusion "I" applies to the $2 million that was paid to settle the underlying litigation.  However, as a threshold matter, the Court must first address whether Scottsdale timely reserved its right to deny coverage after it undertook the defense of AMIC.

11

A.      **Scottsdale's Reservation of Rights**

AMIC argues that Roesch's February 2, 2011 letter containing a general reservation

of rights was too general to reserve Scottsdale's right to deny coverage and that the April 8,

2011 letter specifically mentioning Policy Exclusion "I" was untimely.  (Doc. #32.)  A

liability insurer that assumes the defense of the insured must issue a timely reservation of

rights to the insured if the insurer wishes to later deny coverage.  *See Shelby Steel*

*Fabricators, Inc. v. U.S. Fid. & Guar. Ins. Co.*, 569 So. 2d 309, 310–12 (Ala. 1990).[1]

AMIC first argues that a reservation of rights must inform the insured of the specific

policy exclusion the insurer intends to apply in order to be effective.  (Doc. #32.)  Since the

February 2, 2011 letter contains only a general reservation of rights, AMIC argues this was

inadequate.  AMIC does not cite a single Alabama case to support its claim that a reservation

of rights must inform the insured "of the specific policy defense that may ultimately be

asserted by the insurer."  (Doc. #32, 12.)  On the contrary, Alabama case law establishes that

a general reservation of rights is sufficient to allow an insurer to later deny coverage under

a specific policy exclusion.  *See Shelby Steel*, 569 So. 2d at 310–12; *Ala. Farm Bureau Mut.*

*Cas. Ins. Co. v. Adams*, 267 So. 2d 151, 158 (Ala. 1972) ("We have held that a nonwaiver

agreement is not essential for the preservation of policy defenses and that all that is necessary

to preserve the right to such defenses is for the insurer to notify the insured that it proceeds

with the defense upon the understanding that it was not thereby waiving its said rights.")

(citation omitted).  Indeed, in *Shelby Steel*, an unsigned form nonwaiver agreement coupled

_____

[1] The substantive law of Alabama applies to this case.

12

with the insured's receipt of a letter from the insurer to its law firm stating that the insurer was handling the case pursuant to a nonwaiver agreement was held to provide sufficient notice that the insurer reserved its right to deny coverage.  569 So. 2d 310–12.  Neither the form nonwaiver agreement nor the letter from the insurer to the defense attorney mentioned specific policy exclusions.  569 So. 2d at 310.  Based on this, the Court concludes that Roesch's February 2, 2011 letter was sufficient to reserve Scottsdale's right to deny coverage of AMIC's claim arising from the underlying litigation.[2]

## B.    The Voluntary Payment Doctrine

As another threshold matter, AMIC invites the Court to reconsider its earlier ruling that Alabama's common law voluntary payment doctrine does not bar Scottsdale from seeking reimbursement.  (Doc. #27.)  AMIC goes so far as to say the Court's earlier ruling "runs afoul of the *Erie* doctrine" and construes the Court's *interpretation* of Alabama law as a *failure to apply* Alabama law.  (Doc. #32, 24.)  Since AMIC provides no new evidence that would change the Court's earlier ruling on the applicability of Alabama's voluntary payment doctrine, the Court declines AMIC's invitation to reconsider its earlier ruling.

## C.    Policy Exclusion "I"

All legal claims in this case turn on whether Policy Exclusion "I" is enforceable and whether it applied to the $2 million paid to settle the underlying litigation and bad faith

---

[2] Since the Court has found that Roesch's February 2, 2011 letter adequately reserved Scottsdale's right to deny coverage, there is no need for the Court to consider AMIC's argument that the April 8, 2011 letter was untimely.  In any event, it is clear that the February 2, 2011 letter was timely since Roesch mailed it six days after he received notice of the bad faith claim from AMIC on January 27, 2011.  Therefore, Scottsdale adequately reserved its right to deny coverage after it undertook the defense of AMIC.

lawsuit against AMIC's insureds.  AMIC's breach of contract claim asserts that Scottsdale breached its contractual duty to indemnify AMIC for bad faith lawsuits and that AMIC was forced to settle the underlying litigation and bad faith suit when Scottsdale threatened to withdraw its defense pursuant to the "hammer clause."  (Doc. #6, ¶¶ 30-32.)  Scottsdale's declaratory judgment claim seeks a declaration from the Court that AMIC's settlement with the plaintiffs in the underlying litigation was excluded by the Scottsdale policy.  (Doc. #1, ¶ 47.)

An insurer has the burden of proof in asserting that a claim is excluded under its policy of insurance. *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 696 (Ala. 2001).  When ambiguity exists in the language of an exclusion, the exclusion will be construed so as to limit the exclusion to the narrowest application reasonable under the wording. *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.*, 595 So. 2d 1375, 1377 (Ala. 1992) (citation omitted).  However, in the absence of statutory provisions to the contrary, insurers have the right to limit their liability by writing policies with narrow coverage. *Id.*  If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties. *Id.*

Policy Exclusion "I" relieves Scottsdale of the duty to indemnify AMIC for "any **CLAIM** arising from, based upon, attributable to, or related in any way (directly or indirectly) to any contract obligation" assumed by AMIC "arising out of . . . any . . . contract of insurance . . . or . . . any written contract, unless the **INSURED** would have been liable

in the absence of such contract."   (Doc. #39-1, Ex. A, 19.)  Policy Exclusion "I" seems on its face to apply to the $2 million settlement.  AMIC was liable for the personal injury caused by its insured, the Town of Woodland, and the settlement offer was for the $2 million limit of AMIC's policy with the Town of Woodland.  The underlying plaintiffs' settlement demand was thus for AMIC's underlying contractual obligation to the Town of Woodland.  But AMIC gives two arguments for why Policy Exclusion "I" does not apply. (Doc. #32.)  First, AMIC claims the exclusion does not apply as a matter of law because it makes Scottsdale's insurance contract illusory.  Second, AMIC claims the exclusion does not apply as a matter of fact because the $2 million settlement was paid partly to settle the suit for bad faith, and the Scottsdale policy clearly covered suits against AMIC for bad faith.  The Court finds both of these arguments unpersuasive and instead holds that Policy Exclusion "I" applies to exclude Scottsdale from liability for any portion of the $2 million settlement.

To begin, AMIC argues that Policy Exclusion "I" makes the coverage provided by the Scottsdale policy illusory.  (Doc. #32.)  When limitations or exclusions completely contradict the insuring provisions, insurance coverage becomes illusory.  *See Shrader v. Emp'rs. Mut. Cas. Co.*, 907 So. 2d 1026, 1033 (Ala. 2005) (internal quotations and citation omitted).  Alabama law does not countenance such illusory coverage.  *Id.*  Since AMIC is a non-profit mutual insurance company that provides insurance policies to governmental entities, it conducts all its business through insurance contracts.  AMIC thus argues that, if the Scottsdale policy relieves Scottsdale of the duty to indemnify AMIC for liability incurred under AMIC's insurance contracts, then the professional liability policy as a whole is

effectively nullified.

However, Scottsdale does not seek to apply Policy Exclusion "I" in the broad manner in which AMIC construes it. The Scottsdale policy protects AMIC from **"LOSS** resulting from a **CLAIM** alleging an act, error or omission in the performance of **PROFESSIONAL SERVICES** . . . ." (Doc. #39-1, Ex. A, 19.) The policy indemnifies AMIC for errors and omissions arising from AMIC's claims handling. Policy Exclusion "I" simply distinguishes between liability incurred by AMIC for breach of contract with its insureds, and liability incurred for negligent acts and omissions committed by AMIC in handling claims arising from its insurance contracts. The Scottsdale policy indemnifies AMIC only for negligent acts and omissions in AMIC's handling of claims, not for AMIC's liability to its insureds for breaching its insurance contracts. In other words, the policy does not require Scottsdale to take the place of AMIC with respect to AMIC's insurance contracts.

A number of cases in other jurisdictions have upheld similar "contract liability" exclusions. *See, e.g., Spirtas Co. v. Fed. Ins. Co.*, 521 F.3d 833 (8th Cir. 2008); *Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt.*, 369 F.3d 584 (1st Cir. 2004); *May Dep't Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597 (7th Cir. 2002); *Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415 (7th Cir. 1993); *Farm Bur. Life Ins. Co. v. Holmes Murphy & Assocs., Inc.*, 831 N.W.2d 129 (Iowa 2013). The insurance contract in the *Spirtas* case contained an exclusion almost identical in wording to Policy Exclusion "I."[3] The contract

---

[3] The contract in *Spirtas* precluded coverage for claims "based upon, arising from, or in consequence of any actual or alleged liability . . . under any written or oral contract or agreement, provided that this Exclusion[] shall not apply to the extent that an Insured Organization would have

insured Spirtas for director and officer liability (D & O policy) but excluded any coverage for liability incurred by Spirtas under contract.  Spirtas was sued by a subcontractor for breach of contract, and the Eighth Circuit found the insurer had no duty to indemnify Spirtas under the exclusion for contract liability.  521 F.3d at 835–36.  Even though some of the claims against Spirtas were tort claims, rather than contract claims, the Court held that they all arose from Spirtas's underlying contractual obligations and were thus excluded by the policy.  *Id.*

The *Farm Bureau* case is also highly persuasive because it involves an insured who is also an insurer, as in the present case.  Farm Bureau issued life insurance policies and had an Insurance Company Professional Liability (ICPL) policy, just as AMIC had with Scottsdale.  831 N.W.2d at 132.  The ICPL policy insured Farm Bureau against losses arising out of wrongful acts committed in the course of performing insurance services.  *Id*.  The policy contained an underwriting exclusion relieving the insurer from any liability incurred by Farm Bureau arising from its underlying life insurance contracts.  *Id.* at 133 n. 5.  Farm Bureau was found liable for failing to report that applicants for life insurance were HIV-positive after they underwent a medical exam as part of the application process.  *Id.* at 131–32.  The Supreme Court of Iowa applied the underwriting exclusion to relieve the insurer from its duty to indemnify since the duty to disclose the applicants' HIV-positive status arose from Farm Bureau's underlying life insurance business.  *Id.* at 135–37.  The Court also held that the underwriting exclusion did not render the ICPL illusory because the

---

been liable in the absence of the contract or agreement."  521 F.3d at 835.

insurer could specify groups of claims to which the ICPL would apply. *Id*. at 138.

The *Spirtas* and *Farm Bureau* cases support the enforceability of Policy Exclusion "I." In both cases the insurance contracts distinguish between indemnification for errors and omissions by the insured in the performance of professional services, and indemnification for the insured's contractual liability resulting from the insured's provision of professional services. The insurer indemnifies the insured only for errors and omissions in the performance of professional services. Far from being illusory, these contract liability exclusions are essential to prevent the insurer from assuming the insured's contractual obligations. If an ICPL insurer were responsible for the insured's performance of the underlying contract, then the insured would have an incentive to refuse performance and to seek indemnification upon the commencement of a lawsuit. This policy consideration is repeatedly invoked in cases upholding exclusions for contractual liability. Indeed, Judge Posner, in a case involving insurance for errors and omissions in administering a pension plan subject to ERISA, stated:

> It would be passing strange for an insurance company to insure a pension plan (and its sponsor) against an underpayment of benefits . . . because of the acute moral hazard problem that such coverage would create . . . Such insurance would give the plan and its sponsor an incentive to adopt aggressive (just short of willful) interpretations of ERISA designed to minimize the benefits due, safe in the belief that if, as would be likely, the interpretations were rejected by the courts, the insurance company would pick up the tab. Heads I win, tails you lose.

*May Dept. Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 601 (7th Cir. 2002); s*ee also Am. Cas. Co. of Reading, Pa. v. Hotel & Rest. Emps. & Bartenders Int'l Union Welfare Fund*, 942

P.2d 172, 176 (Nev. 1997) (stating that to require an insurer to be responsible for the insured's underlying contractual obligations "would allow an insured to turn all of its legal liabilities into insured events by the intentional act of refusing to pay them."). Thus, both precedent and policy establish that Policy Exclusion "I" is enforceable. AMIC does not cite to a single case to support its claim that the contract liability exclusion makes Scottsdale's coverage illusory. As the cases discussed above establish, the coverage is not illusory because Scottsdale must still indemnify AMIC for losses incurred by errors and omissions of AMIC in the performance of its insurance business.

AMIC further argues that, even if Policy Exclusion "I" is enforceable, it does not apply to this case because AMIC was sued for bad faith, which is a tort, rather than for breach of contract. The particular cause of action, however, is not dispositive of whether the loss was based on contractual liability. The relevant inquiry is whether AMIC's loss arose out of its contractual obligations to its insured, the Town of Woodland. *See Spirtas*, 521 F.3d at 835 ("[T]he term 'arising from' is construed broadly such that an exclusion precluding insurance coverage for claims arising from a contract not only applies to claims sounding directly in contract but also to claims sounding in tort as long as they flowed from or had their origins in the breach of the contract.") (internal quotations and citation omitted). The bad faith lawsuit was brought against AMIC because AMIC's refusal to settle within the $2 million policy limit resulted in a $4 million judgment against its insureds. AMIC does not dispute that its insureds were liable for the injuries to the underlying plaintiffs. (Doc. #39-7, 23.) The underlying plaintiffs obtained a declaratory judgment that the limits of the Town

of Woodland's and AMIC's liability were the $2 million policy limit in AMIC's policy. (Doc. #39-7, Ex. G-1, 59-62.)  When the underlying plaintiffs offered to settle the bad faith lawsuit, they stated "we renew our offer of settlement for $2,000,000" because they only ever sought the amount AMIC owed to its insured under the policy.  (Doc. #39-7, 105.)  AMIC's refusal to settle for the policy amount, and the resulting bad faith lawsuit, does not convert its contractual liability to its insureds into an error or omission under the Scottsdale policy. *See Am. Cas. Co. of Reading, Pa.*, 942 P.2d at 176–77 ("The refusal to pay an obligation simply is not the cause of the obligation, and the [insured's] wrongful act in this case did not result in their obligation to pay; their contract imposed on them the obligation to pay.").

For the reasons stated, the Court finds Policy Exclusion "I" to be unambiguous and to apply to the $2 million paid to settle the litigation with the underlying plaintiffs.  AMIC had a contractual duty to pay the $2 million policy amount to satisfy any judgments against its insureds.  Scottsdale was under no duty to indemnify AMIC for amounts paid under insurance contracts issued by AMIC and for which AMIC collected premiums.  Since the case settled within the limits of AMIC's policy, Scottsdale was not liable to AMIC for any portion of the settlement amount.  Therefore, the Court finds that summary judgment is due to be GRANTED to Scottsdale on its declaratory judgment claim (Doc. #1) and DENIED to AMIC on its breach of contract counterclaim as alleged in Count 1 of AMIC's answer (Doc. #6).  AMIC's cross-motion for summary judgment (Doc. #31) on Scottsdale's declaratory judgment claim is likewise due to be DENIED.

**D.     AMIC's "Normal" Bad Faith Claim**

AMIC asserts a "normal" bad faith counterclaim based on Scottsdale's alleged breach of contract in refusing to pay the $900,000 AMIC paid towards the settlement with the underlying plaintiffs, Scottsdale's lack of an arguable reason for refusal to pay, and its enforcement of the "hammer clause." (Doc. #6, 33–39.) Scottsdale has moved for summary judgment on that claim. (Doc. #39.) To recover on such a claim, a plaintiff must prove: (1) an insurance contract between the parties and a breach thereof by the defendant; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal; (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason; (5) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim. *State Farm & Cas. Co. v. Slade*, 747 So. 2d 293, 304 (Ala. 1999). The Court has already found that Policy Exclusion "I" was unambiguous and relieved Scottsdale of its obligation to indemnify AMIC for the $2 million settlement, which was within the limits of AMIC's policy with the Town of Woodland. The undisputed evidence thus shows that AMIC cannot establish the first, third, fourth, and fifth elements of a "normal" bad faith claim. Scottsdale did not breach its contract with AMIC, and Scottsdale had knowledge of a legitimate reason for refusing to pay, namely, Policy Exclusion "I." Therefore, summary judgment is due to be GRANTED to Scottsdale on AMIC's counterclaim for "normal" bad faith as alleged in Count 2 of AMIC's answer (Doc. #6).

E.      AMIC's "Abnormal" Bad Faith Claim

AMIC asserts an "abnormal" bad faith claim against Scottsdale on the grounds that Scottsdale did not investigate AMIC's claim and improperly relied on Policy Exclusion "I" to deny coverage.  (Doc. #6, 41–45.)  Scottsdale has moved for summary judgment against AMIC on this claim.  (Doc. #39.)  "Abnormal" bad faith requires the plaintiff to establish that the insurer: (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.  *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 306–07 (Ala. 1999).  With respect to the first two elements of this bad faith claim, AMIC exclaims "NAMICO did not investigate the claim at all!"  (Doc. #47.)  It would be helpful to the Court if this sentence ended with a citation to the record rather than an exclamation point.  AMIC's failure to cite to the record here is understandable since the record itself establishes a completely opposite conclusion.  AMIC submitted the claim notes of Ed Roesch, Claims Manager for NAMICO, as an evidentiary submission accompanying its own motion for summary judgment.  (Doc. #37.)  Roesch's claim notes created during his investigation into AMIC's claim consist of approximately 44 pages, single-spaced, and cover the period from January 27, 2011, when the notice of AMIC's claim was received, to July 12, 2011, when Scottsdale and NAMICO agreed to pay the $2 million settlement and to litigate over their respective $900,000 contributions.  (Doc. #37, 10–54.)  The notes document numerous updates in the underlying

22

litigation and demonstrate that defense counsel analyzed various legal strategies, including AMIC's preferred method of attempting to apply Alabama's law that limits tort recoveries against governmental entities to $100,000 per occurrence.  (Doc. #39-9, Ex. I, ¶¶ 11–18.)  Clearly, NAMICO investigated AMIC's claim and conducted an evaluation and review of the claim.  Thus, the undisputed evidence shows AMIC cannot establish the first two elements of its "abnormal" bad faith claim.  Therefore, summary judgment is due to be GRANTED to Scottsdale on AMIC's counterclaim for "abnormal" bad faith as alleged in Count 3 of AMIC's answer (Doc. 6).

**F.    AMIC's Enhanced Duty of Good Faith Claim**

Finally, AMIC counterclaimed against Scottsdale for violation of its enhanced duty of good faith towards AMIC based on Scottsdale allegedly forcing AMIC to accept the underlying plaintiff's settlement offer.  (Doc. #6, ¶ 46.)  Scottsdale has moved for summary judgment against AMIC on this claim.  (Doc. #39.)  An insurer conducting a defense of its insured under a reservation of rights has an enhanced obligation of good faith toward its insured in conducting such a defense.  *L & S Roofing Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 521 So. 2d 1298, 1303 (Ala. 1987).  An insurer meets its enhanced duty of good faith by: (1) conducting a thorough investigation; (2) retaining competent defense counsel for the insured; (3) informing the insured of the insurer's reservation of rights and all developments relevant to policy coverage and the progress of the lawsuit; and (4) refraining from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.  *Id.* at 1303.  With respect to the first

element, Scottsdale/NAMICO conducted a thorough investigation of AMIC's claim, as discussed above.  AMIC does not dispute in its brief that Scottsdale retained competent defense counsel.  (Doc. #47.)  Scottsdale informed AMIC of its reservation of rights in the February 2 and April 8, 2011 letters.  Scottsdale informed AMIC of the progress of the lawsuit through contact between its hired defense lawyer, Kate Whitlock, and AMIC's general counsel, Scott Speagle, and also circulated drafts of litigation documents to AMIC.  (Doc. #39-9, 5–6.)  Scottsdale informed AMIC of new developments in policy coverage when they arose.  The July 5, 2011 offer of settlement was a new development affecting policy coverage, and Scottsdale expressed its view that it was not obligated to pay the $2 million falling within AMIC's polic limits at the July 8, 2011 meeting.  (Doc. #39-7, 6.)  The undisputed evidence thus far shows none of the elements of a claim for breach of enhanced duty can be met.  However, AMIC's claim that Scottsdale's invocation of the "hammer clause" demonstrated a greater concern for Scottsdale's monetary interest than AMIC's merits some discussion.

Roesch and Tim Sullivan, Vice President of Claims for NAMICO, went to the July 8, 2011 meeting after the underlying plaintiffs' settlement offer with the intention of persuading AMIC to accept the offer.  (Doc. #37, 53; Doc. #39-7, 2.)  Scottsdale/NAMICO's position was based on its belief that a refusal of the $2 million settlement offer would leave AMIC vulnerable to a bad faith lawsuit from the Town of Woodland for the excess of the $4 million verdict.  (Doc. #39-9, 6–7; Doc. #39-7, 5–6.)  Scottsdale also believed that Alabama law would not apply to limit AMIC's liability to $200,000.  (Doc. #39-7, 5; Doc. #39-9, 6.)

24

For these reasons, Scottsdale argued at the July 8, 2011 meeting that AMIC should accept the $2 million settlement offer.  (Doc. #39-7, 6.)  AMIC stated it did not want to accept the settlement offer because it still believed Alabama law would apply to limit its insureds' liability to only $200,000.  (Doc. #35, 18.)  It was at this point that Sullivan invoked the "hammer clause."  That is, Scottsdale threatened to withdraw its defense of AMIC if AMIC refused to accept the settlement that Scottsdale recommended.   (Doc. #39-7, 6; Doc. #35, 15.)  AMIC contends that Scottsdale's threat to withdraw its defense was motivated by Scottsdale's concern for its own financial well-being, rather than AMIC's, which AMIC claims violated Scottsdale's enhanced duty of good faith.  (Doc. #47, 34.)  But Scottsdale's representatives had a reasonable and sincere belief that AMIC was liable for $2 million dollars and that accepting the settlement offer was in AMIC's own interest since refusing it would expose AMIC to over $4 million in liability.  Although AMIC believes it was liable only for $200,000, the undisputed evidence shows that Scottsdale reasonably believed otherwise.

The enhanced duty of good faith did not preclude Scottsdale from invoking the "hammer clause" to allow it to withdraw from its defense of AMIC.  The enhanced duty of good faith did not require Scottsdale to gamble on AMIC's legal theory that Alabama law would apply when Scottsdale's lawyers had concluded otherwise.  If AMIC believed it would be liable for only $200,000, then it was free to pay for Kate Whitlock to continue the appeal of the underlying litigation and the defense of the bad faith litigation.  If AMIC had prevailed on its legal theory, then under the terms of the "hammer clause," Scottsdale would have had

25

to reimburse AMIC for the costs of its defense.  Thus, contrary to AMIC's assertions, it was not "forced" to accept the settlement due to Scottsdale's threat to withdraw defense.  (Doc. #6, ¶ 46.)  Moreover, Scottsdale's lawyers had already filed briefs with the Georgia Court of Appeals  that argued Alabama's damage caps for municipal liability should apply, and AMIC's lawyer had received copies of these briefs.  (Doc. #39-9, 5; Doc. #37; 15, 38.)  AMIC was free to simply take up funding of the defense litigation already in place.  Instead, AMIC proposed splitting the costs of the $2 million settlement and litigating each party's respective $900,000 contribution afterwards.  (Doc. #39-9, 5.)  Thus, Scottsdale was not acting out of a greater concern for its own financial interest than AMIC's when it refused to continue the defense of AMIC after AMIC refused to accept what Scottsdale reasonably believed to be a settlement that was in AMIC's best interest.  As a result, the undisputed facts establish that Scottsdale did not violate its enhanced duty of good faith towards AMIC and summary judgment is due to be GRANTED in Scottsdale's favor on AMIC's enhanced duty of good faith counterclaim as alleged in Count 4 of its answer.  (Doc. #6).

## VI. CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1.    Scottsdale's motion for summary judgment (Doc. #39) is GRANTED as to its declaratory judgment claim (Doc. #1) and Counts 1 through 4 of AMIC's counterclaim (Doc. #6).  AMIC's counterclaims (Doc. #6) are DISMISSED WITH PREJUDICE;

2.    AMIC's motion for summary judgment (Doc. #31) is DENIED;

3.      The final pretrial conference set for September 19, 2013 and the trial set for October 21, 2013 are CANCELLED;

It is further ORDERED that a hearing is set for September 19, 2013 at 9:00 A.M. in United States Courthouse, One Church Street, Courtroom 2A, Montgomery, Alabama.  The purpose of the hearing will be to determine pre- and post-judgment interest, costs, legal fees, and any other relief to which Scottsdale is entitled (Doc. #1).

Done this the 16th day of September, 2013.

_____/s/ Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE